UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

UNITED STATES OF AMERICA,      )
                                )
  PLAINTIFF,                    )      CASE NO. 2:14-CR-127
                                )
       vs.                     )      APRIL 12, 2016
                                )
ROBERT B. LEDBETTER, ET AL.,    )      9:00 A.M.
                                )
  DEFENDANTS.                   )      VOLUME 6
_____)


**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
BEFORE THE HONORABLE ALGENON L. MARBLEY
UNITED STATES DISTRICT JUDGE, and a jury
COLUMBUS, OHIO


APPEARANCES:

FOR THE PLAINTIFF:

BENJAMIN C. GLASSMAN
United States Attorney
By:  DAVID M. DEVILLERS
     KEVIN W. KELLEY
     BRIAN J. MARTINEZ
Assistant United States Attorneys
303 Marconi Boulevard
Columbus, Ohio  43215


FOR THE DEFENDANT ROBERT B. LEDBETTER:

JEFFREY A. BERNDT, ESQ.
575 South High Street
Columbus, Ohio  43215

AARON G. DURDEN, ESQ.
10 West Monument Avenue
Dayton, Ohio  45402
                  - - -


Proceedings recorded by mechanical stenography,
transcript produced by computer.

```
APPEARANCES CONTINUED:



FOR THE DEFENDANT CHRISTOPHER A. HARRIS:

Carpenter, Lipps & Leland, LLP
By:  KORT W. GATTERDAM, ESQ.
280 North High Street
Columbus, Ohio  43215

KEVIN P. DURKIN, ESQ.
367 East Broad Street
Columbus, Ohio  43215


FOR THE DEFENDANT RASHAD A. LISTON:

ISABELLA DIXON, ESQ.
98 Hamilton Park
Columbus, Ohio  43203

Kegler, Brown, Hill & Ritter
By:  S. MICHAEL MILLER, ESQ.
65 East State Street
Columbus, Ohio  43215


FOR THE DEFENDANT DEOUNTE USSURY:

Office of the Ohio Public Defender
By:  GREGORY W. MEYERS, ESQ.
     KIRK A. MCVAY, ESQ.
250 East Broad Street
Columbus, Ohio  43215



FOR THE DEFENDANT CLIFFORD L. ROBINSON:

Scott & Nolder Law Firm
By:  STEVEN S. NOLDER, ESQ.
35 East Livingston Avenue
Columbus, Ohio  43215


                        -  -  -
```

TRIAL ONE – VOL 6 –  165

TUESDAY MORNING SESSION

APRIL 12, 2016

– – –

 (Thereupon, the following proceeding was held in open court with all counsel and defendants present.)

 (Jury in at 9:02.)

 THE COURT:  Good morning, ladies and gentlemen.  And I hope everyone had a pleasant evening and a nice ride in this morning.  It seems that spring is finally here and we're in for a gorgeous day that you might be able to experience at lunchtime.  We're going to begin with the government's case in chief this morning.  I understand that your witness is here, Mr. Devillers?

 MR. DEVILLERS:  Yes, Your Honor.

 THE COURT:  Are you ready to proceed?

 MR. DEVILLERS:  I am, Your Honor.

 THE COURT:  Please proceed.

 MR. DEVILLERS:  Your Honor, the United States calls Allen Wright.

 THE COURT:  Mr. Wright, please come forward and be sworn.

 (Witness sworn.)

 THE COURT:  Mr. Devillers, please proceed.

1                              – – –

2                         ALLEN WRIGHT

3     Called as a witness on behalf of the Plaintiff,

4     being first duly sworn, testified as follows:

5                     DIRECT EXAMINATION

6     BY MR. DEVILLERS:

7     Q    Mr. Wright, please state your full name and spell your

8     last name.

9     A    Allen Wright, W-R-I-G-H-T.

10          MR. DEVILLERS:  Your Honor, may I approach the witness

11    to put the --

12          THE COURT:  Yes.  Is that A-L-L-A-N, Mr. Wright?

13          THE WITNESS:  E-N.

14    BY MR. DEVILLERS:

15    Q    Mr. Wright, are you a murderer?

16    A    Yes.

17    Q    Are you in a gang?

18    A    No.

19    Q    Were you in a gang?

20    A    Yes.

21    Q    What was the gang called?

22    A    Crips.

23    Q    Where are you from?

24    A    The Short North.

25    Q    How old are you, Mr. Wright?

1    A    Thirty.

2    Q    You say the Short North.  Where?  Where do you mean?

3    A    Short North.  It's a neighborhood.

4    Q    What's that?

5    A    A neighborhood.

6    Q    Is it a neighborhood in Columbus, Ohio?

7    A    Yes.

8    Q    Are there particular streets or intersections that you

9    would associate with the Short North?

10    A    Yes.

11    Q    What would that be?

12    A    Fourth and Eighth.

13         THE COURT:  Fourth and what?

14         THE WITNESS:  Eighth.

15    BY MR. DEVILLERS:

16    Q    Did you grow up there?

17    A    Yes.

18    Q    Are you currently incarcerated?

19    A    Yes.

20    Q    Were you indicted recently?

21    A    Yes.

22    Q    About how long ago were you indicted?

23    A    Two years ago.

24    Q    And did you have co-defendants in the indictment?

25    A    Yes.

TRIAL ONE - VOL 6 -  168

1    Q    Are the men in this courtroom today, were they in that

2    indictment with you?

3    A    Yes.

4    Q    Have you been in prison before?

5    A    Yes.

6    Q    About how many times have you been in prison?

7    A    Once.

8    Q    When was that?

9    A    From '06 to '14.

10   Q    2006 to 2014?

11   A    Yes.

12   Q    When in 2006 did you go to prison?

13   A    Probably December, October; one of them.

14   Q    When were you locked up?

15   A    March.

16   Q    So --

17            THE COURT:  March of --

18            THE WITNESS:  '06.

19   BY MR. DEVILLERS:

20   Q    Locked up in March of '06; is that right?

21   A    Yes.

22   Q    Were you in jail in March of '06?

23   A    Yes.

24   Q    And then eventually in prison by December of '06?

25   A    Something like that.

1    Q    When did you get out of prison?

2    A    January 27th, 2014.

3    Q    How long were you out of prison before you got arrested

4    on this case?

5    A    About five months.

6    Q    Before you went to prison, what did you do for a living?

7    A    Sell drugs, rob people.

8    Q    What's a Crip?

9    A    It's a gang.

10   Q    Do you have any tattoos?

11   A    All over.

12   Q    Do you have any tattoos that deal with the gang?

13   A    Yes.

14   Q    Can you describe some of them?

15   A    Crip on my fingers, Short North.

16   Q    The letters Crip on your fingers?

17   A    Right.

18   Q    You said something else?

19   A    Short North.

20   Q    Short North?

21   A    Uh-huh.

22   Q    Did you ever hear of the term cuzz?

23   A    Yeah.  I got that tatted, too.

24   Q    What's cuzz mean?

25   A    Just say cuzz like saying what's up or something.

TRIAL ONE - VOL 6 - 170

1    Q    Is that in any way indicative of being a Crip at all?

2    A    Right.

3    Q    Is that yes?

4    A    Yes.

5    Q    Do you know what a Blood is?

6    A    Yes.

7    Q    What's a Blood?

8    A    The opposite of a Crip.

9    Q    Would a Blood use the term cuzz when he's referring to a

10  friend?

11    A    No.

12    Q    All right.  You have Short North tattooed you on as

13  well?

14    A    Right.

15    Q    Where?

16    A    My hands, my chest, a few places.

17    Q    Do you have tombstones tattooed on you anywhere?

18    A    Yes.

19    Q    Where on your body?

20    A    My right arm.

21    Q    And what are in those tombstones?

22        THE COURT:  Could you identify for the record where he

23  indicated, Mr. Devillers?

24         MR. DEVILLERS:  Yes, Your Honor.

25

1   BY MR. DEVILLERS:

2   Q    I believe you said your arm?

3   A    Right arm.

4   Q    Right forearm?

5   A    Right.

6   Q    And in those tombstones, is there anything written?

7   A    Names of friends I lost.

8   Q    Can you name some of those friends for us?

9   A    Kev, Bone, Blacc, Ant Man.

10  Q    We're going to go slower.  You said -- what was the

11  first one?

12  A    Kev.

13  Q    Who is Kev?

14  A    He died like 16 years ago.

15  Q    Do you know his real name?

16  A    Kevin Russell.

17  Q    Kevin Russell.  How did he die?

18  A    He got shot.

19  Q    Was he from the Short?

20  A    Yes.

21  Q    Is he a Crip?

22  A    Couldn't tell you.

23  Q    Okay.

24       THE COURT:  What was your answer?  Oh, "Couldn't tell

25  you."

1    BY MR. DEVILLERS:

2    Q    Who else is on your arm?

3    A    Ant Man.

4    Q    Ant Man, was he from the Short?

5    A    No.

6    Q    Did he associate with people from the Short?

7    A    Yes.

8    Q    Did he commit crimes with people from the Short?

9    A    Yes.

10   Q    Who else do you have?

11   A    Blacc.

12   Q    Who is Blacc?

13   A    Lando Reynolds.

14   Q    Is Mr. Reynolds from the Short?

15   A    Yes.

16   Q    Who else do you have there?  Wait.  Let me go backwards.

17   Ant Man, what was his real name?

18   A    Anthony Martin.

19   Q    What happened to him?

20   A    Got killed.

21   Q    Shot and killed?

22   A    Yes.

23   Q    Mr. Reynolds, how was he -- did he die?

24   A    Yes.

25   Q    How did he die?

1    A    Shot and killed.

2    Q    And he goes by Blacc?

3    A    Yes.

4    Q    How do you spell Blacc?

5    A    B-L-A-C-C.

6    Q    Why not B-L-A-C-K?

7    A    That's not how to spell it.

8    Q    Why don't you spell it that way?

9    A    I rather prefer to use two Cs than C-K.

10   Q    Why don't you use C-K?

11   A    That's what Bloods use.

12   Q    That's what who uses?

13   A    Bloods.

14   Q    Bloods use C-K.  Why would a Blood use a term C-K?

15   What's that mean to you?

16   A    It means disrespectful.

17   Q    Why is it disrespectful?

18   A    Because it means Crip killer.

19   Q    It means Crip killer.  Okay.

20        Anyone else on your forearm in the tombstones?

21   A    Bone.

22   Q    Okay.  Stop there.  Who is Bone?

23   A    Tyrun.

24   Q    Tyrun Hill?

25   A    Tyrun Hill.

TRIAL ONE – VOL 6 – 174

1     Q    How did Bone die?

2     A    Got shot and killed.

3     Q    Do you remember when that was?

4     A    '05.

5     Q    Anyone else?

6     A    Choice.

7     Q    Choice.  And who is Choice?

8     A    He got shot and killed.

9     Q    Do you remember his real name?

10    A    Huh-uh.

11    Q    What?

12    A    No.

13    Q    Do you remember when he was shot and killed?

14    A    I think it was '03.

15    Q    Are all of these people from the Short or associated

16 with the Short?

17    A    Yes.

18    Q    Did I get them all?  Is there anybody else, Mr. Wright?

19    A    I can't hear you.

20    Q    Is there anyone else on your forearm?

21    A    There's like 20-some.  Do you want me to name all of

22 them?

23    Q    No, I don't.

24        THE COURT:  I'm sitting right here, and I can't hear

25 the answers.

1    THE WITNESS:  I have over 20-something tattoos with

2  names in them, tombstones.

3  BY MR. DEVILLERS:

4    Q    Do you have any tattoos that identifies with Cut Throat?

5    A    Yes.

6    Q    What tattoo do you have on you that identifies with Cut

7  Throat?

8    A    Cut Throat and CT.

9    Q    CT?

10    A    Right.

11    Q    Where is that tattooed on you?

12    A    My hand.

13    Q    How about Homo or homicide?

14    A    Yes.

15    Q    Where is that tattooed on you?

16    A    My chest.

17    Q    I'd like to show you some photographs and see if you can

18  identify what those photographs are of.  First, I'd like to

19  show you 1-2-056.

20    Do you see something in front of you, Mr. Wright?

21    A    Yes.

22    Q    What is it that you see?

23    A    A few of the homies' names.

24    Q    Is it a photograph?

25    A    Right.

1   Q    And do you recognize that photograph?

2   A    Correct.

3   Q    Do you recognize the place?

4   A    Right.

5   Q    Where is the place?

6   A    In the Short.

7   Q    Do you know where in the Short?

8   A    In between Seventh and Eighth.

9   Q    In between Seventh and Eighth?

10  A    Correct.

11  Q    Do you recognize some of these names?

12  A    Right.

13       MR. DEVILLERS:  Your Honor, I'd like to publish this

14  photograph to the jury.

15       THE COURT:  Could you give me a time period that this

16  photograph -- not necessarily when it was taken, but what time

17  period this photo represents.

18  BY MR. DEVILLERS:

19  Q    Basically, the time from say -- the time that you --

20  before you went to prison, was it unusual to see graffiti in

21  the Short?

22  A    You'll see it.

23  Q    I'm sorry?

24  A    You will see it.

25  Q    Did you see it?

TRIAL ONE – VOL 6 –   177

1    A    Yes.

2    Q    Is this what you're looking at now typical graffiti that

3  you'd see in the Short?

4    A    Correct.

5    Q    Does this graffiti to you mean something?

6    A    I don't understand what you're saying.

7         THE COURT:  Mr. Wright, let me ask you this.  Do you

8  recognize this photograph?

9         THE WITNESS:  Yes.

10         THE COURT:  And do you recognize this particular wall

11  and the graffiti on it?

12         THE WITNESS:  Yes.

13         THE COURT:  Around what time period did this wall

14  appear with this graffiti?  About what year -- first of all,

15  give me the year.

16         THE WITNESS:  Probably '05, but I couldn't say exact

17  month.

18         THE COURT:  Is it a fair and accurate representation

19  of what that wall looked like in the particular year that you

20  saw it?  What year was that, did you say?

21         THE WITNESS:  2005.

22         THE COURT:  2005?

23         THE WITNESS:  Yes, sir.

24         THE COURT:  Go ahead.

25         MR. DEVILLERS:  May I publish this to the jury, Your

TRIAL ONE – VOL 6 –  178

1   Honor?

2           THE COURT:  Any objection?

3           MR. BERNDT:  No, Your Honor.

4           MR. GATTERDAM:  No, Your Honor.

5           MS. DIXON:  No, Your Honor.

6           MR. MEYERS:  No, Your Honor.

7           MR. NOLDER:  No, sir.

8           THE COURT:  It will be received and you may publish

9   it, Mr. Devillers.

10          MR. DEVILLERS:  Okay.

11    BY MR. DEVILLERS:

12    Q    Mr. Wright, tell us what we're looking at.

13    A    A wall with some homies' names on it that got passed --

14   that passed away.

15    Q    Help me out.  What's a homie?

16    A    A friend, someone from our neighborhood.

17    Q    From the left part of that wall, at the top left part of

18   that wall, do you see a name?

19    A    Yes.

20    Q    What's that name?

21    A    T-Pat.

22    Q    Who is T-Pat?

23          THE COURT:  Before you ask that, can you see?

24          JUROR:  I can see when I'm not supposed to see.

25          THE COURT:  I'm going to ask that you -- now you can

TRIAL ONE – VOL 6 –   179

1   see.

2            JUROR:  I turned away.

3            THE COURT:  I wanted you to be able to see it with

4   Juror No. 8.  Can you see his?

5            JUROR:  Yes.

6            THE COURT:  Please continue, Mr. Devillers.  I

7   apologize.  I wanted to make sure she could see it.

8   BY MR. DEVILLERS:

9   Q     Who is T-Pat?

10  A     A homie from the hood.

11  Q     Do you know his real name?

12  A     Tabarie.

13  Q     Do you remember his last name?

14  A     Patterson.

15  Q     Is that Patterson?

16  A     Yes.

17  Q     Do you remember about when he died?

18  A     2003.

19  Q     And do you know who killed him?

20  A     No.

21  Q     Were there individuals within the Crips in the Short

22  North who blamed a particular group for killing him?

23  A     Correct.

24  Q     What was that group?

25  A     D-Block.

1    Q    D-Block.  Is that what you said?

2    A    Yes.

3    Q    What is D-Block?

4    A    A neighborhood.

5    Q    And is there -- let me ask you this.  When I say the

6  word set when it comes to gangs, what's that mean to you?

7    A    Something you rep.

8    Q    Something you rep?

9    A    Yes.

10   Q    What's rep mean?

11   A    Claim.

12   Q    Is D-Block a set of a particular gang?

13   A    Yes.

14   Q    What gang?

15   A    Bloods, mixed.

16   Q    What was the last thing?

17   A    Mixed.

18   Q    Mixed Bloods?

19   A    Bloods and Crips mixed.

20   Q    Do Bloods and Crips tend to get along?

21   A    Yes, you can.

22   Q    Is it necessarily that Bloods and Crips are rivals?

23   A    Yes.

24   Q    It is necessary?

25   A    Uh-huh.

TRIAL ONE – VOL 6 –   181

1   Q    But does it sometimes happen where they're not rivals?

2   A    Right.

3   Q    Do you know people that are from Blood neighborhoods?

4   A    Correct.

5   Q    Did you associate with some people from Blood

6   neighborhoods?

7   A    Correct.

8   Q    Let's go down a bit.  I believe there's an RIP.  What's

9   that stand for?

10   A    Rest in peace.

11   Q    And I believe there is a Frank next to it, the name

12   Frank?

13   A    Correct.

14   Q    Do you know who that is?

15   A    Yes.

16   Q    Who is that?

17   A    He was a little younger.  He passed away.

18   Q    Do you know if he was killed or he died of natural

19   causes?

20   A    Shot and killed.

21   Q    It looks like there's underneath Frank there is another

22   name.  What's that?

23   A    Blacc.

24   Q    And again, Blacc is spelled B-L-A-C-C?

25   A    Correct.

TRIAL ONE – VOL 6 –  182

1    Q    The B on that wall that appears to be crossed out -- is

2  that accurate?

3    A    Correct.

4    Q    Why would it be crossed out?

5    A    Because we don't use it.

6    Q    Let's kind of move a little bit towards the center of

7  the picture.  There seems to be some sort of shield or

8  something with some words in it.  Do you see that?

9    A    Correct.

10    Q    What's that?

11    A    N-Hood.

12    Q    What's N-Hood?

13    A    Another word for the Short North.

14    Q    Is that another name for the Short North?

15    A    Correct.

16    Q    There also seems to be some sort of number to the right

17  of that.  What's that?

18    A    Rollin 20.

19    Q    Rollin 20s?

20    A    Uh-huh.

21    Q    What's Rollin 20s?

22    A    A Crip gang.

23    Q    Is that the Crip gang here in Columbus?

24    A    Correct.

25      MS. DIXON:  I can't hear.

TRIAL ONE – VOL 6 – 183

1          MR. DEVILLERS:  Can you try to speak up a little bit,

2    Mr. Wright?

3          THE WITNESS:  My throat is messed up.

4          THE COURT:  Ms. Dixon, if you or any other counsel or

5    any of the defendants can't hear, just motion and I'll either

6    have the question repeated or the question and answer repeated

7    so that you can hear.

8          Please continue, Mr. Devillers.

9    BY MR. DEVILLERS:

10   Q    I'd now like to show you another exhibit, Exhibit

11   1-2-057.  Do you see that exhibit?

12   A    Yeah.

13   Q    And what is that?

14   A    The same wall.

15   Q    The same wall.  Does that appear to be an accurate

16   depiction of the wall that you've testified about in the last

17   exhibit?

18   A    Correct.

19   Q    And does that appear to come from about the same time

20   period from the photograph in the last exhibit?

21   A    I couldn't tell you that.

22   Q    Is this the wall that you -- is this the same wall from

23   the last exhibit?

24   A    Correct.

25   Q    That the graffiti you see in this wall, is this typical

1   of what you've seen in the Short North?

2    A    Correct.

3           MR. DEVILLERS:  Your Honor, may I publish this to the

4   jury?

5           THE COURT:  Any objection, Mr. Berndt?

6           MR. BERNDT:  Yes, Your Honor, foundation.

7           THE COURT:  All right.  Perfect your foundation,

8   Mr. Devillers.

9    BY MR. DEVILLERS:

10   Q    Have you seen -- you said you've seen this wall before;

11   is that right?

12   A    Correct.

13   Q    Have you seen this graffiti before?

14   A    Correct.

15   Q    This very graffiti you see in this photograph?

16   A    Right.

17   Q    Does that appear to be the same graffiti on this

18   photograph that you saw when you saw it live as a human looking

19   at it?

20   A    Correct.

21   Q    Does it appear to be accurate as to what you remember

22   seeing?

23   A    Right.

24   Q    Does it appear to be from the same time period as the

25   last exhibit?

                                                    TRIAL ONE – VOL 6 –   185

1      A      Yeah, looking at the screen, but I don't know when it

2    got done.

3      Q      But you recall seeing this?

4      A      Right.

5             MR. DEVILLERS:  Your Honor, I'd like to enter it into

6    evidence.

7             THE COURT:  All right.  I'm going to admit it.  But I

8    will, for the record, ask if there are any objections.

9             MR. BERNDT:  No, Your Honor.  Thank you.

10            MR. GATTERDAM:  Repeat the same objection.

11            THE COURT:  All right.  Ms. Dixon?

12            MS. DIXON:  No, Your Honor.  But I would note for the

13   record that the date is in the bottom –– I think my bottom left

14   corner.

15            THE COURT:  All right.  Your objection is duly noted.

16            MR. MEYERS:  No, Your Honor.

17            MR. NOLDER:  None, Your Honor.

18            THE COURT:  It will be admitted and it –– you may

19   publish it, Mr. Devillers.

20            MR. DEVILLERS:  Your Honor, I don't think I actually

21   offered 1-2-056 into evidence.  I ask it to be published, but I

22   ask that it be admitted into evidence as well.

23            THE COURT:  I admitted it.

24     BY MR. DEVILLERS:

25     Q     Mr. Wright, starting again from the left hand, there

TRIAL ONE - VOL 6 -   186

1   appears to be some sort of painting of a hand.  Do you see

2   that?

3    A    Correct.

4    Q    What's that?

5    A    I don't know.

6    Q    You don't know what that is?

7         Within the Crips in the Short North, are there

8   particular hand signs that are used?

9    A    Correct.

10    Q    Give us an example of some.

11    A    Four fingers, a C.

12    Q    Wait.  Can you show us?  What do you mean four fingers?

13    A    Like four.

14    Q    Why four fingers?

15         MR. BERNDT:  Your Honor, I can't see what he's

16   gesturing from here.

17         THE COURT:  Can you lift your hand any higher?  I know

18   you're cuffed.

19         MR. BERNDT:  Thank you.

20         THE COURT:  All right.

21    BY MR. DEVILLERS:

22    Q    For the record, you lifted up four fingers?

23    A    Correct.

24    Q    What else?

25    A    A "C" for Crip.

TRIAL ONE – VOL 6 –  187

1    Q    Can you show us that the best you can?

2         MR. DEVILLERS:  For the record, he's sticking his

3    thumb and index finger and making in the form of a C.

4         THE COURT:  The record will so reflect.

5    BY MR. DEVILLERS:

6    Q    What other ones?

7    A    N-Hood.

8    Q    What's N-Hood?

9    A    Like this.

10   Q    For the record, it appears that -- please hold it up for

11   me.  Keep doing it.  Are you trying to make an N sort of with

12   your hand?

13   A    Correct.

14   Q    Keep doing it so I can describe it.  All right.  So it

15   looks like you have your thumb and your index and middle finger

16   up and holding down, in the downward area?

17   A    However you want to hold it, you know.

18   Q    All right.  Before -- I don't recall if I asked this.

19   You're throwing up fours.  Is that accurate?

20   A    Correct.

21   Q    What's the significance of that?

22   A    It's just four like Fourth.  It's where you'll be, on

23   Fourth.

24   Q    Fourth what?

25   A    Fourth Street.

TRIAL ONE – VOL 6 – 188

1  Q    Okay.  Any other hand signs that you typically would

2  use, you'd see?

3  A    Not to my recognition.

4  Q    Not that you remember?

5  A    Right.

6  Q    It looks like at the bottom of this wall there's a

7  number of things that are crossed out.  Do you know what that

8  is?

9  A    Couldn't tell you.

10  Q    There's also apparently two numbers in the middle of it.

11  Do you see those two numbers?

12  A    Correct.

13  Q    What are those two numbers?

14  A    Fourth and Eighth.

15  Q    What's that represent?

16  A    The Short North.

17  Q    It looks like to the very right there's some dice of

18  some sort.  Do you know what that's about?

19  A    I couldn't tell you.

20  Q    And I think you told us but tell us again, where is this

21  wall located?

22  A    In between Seventh -- Fourth and Seventh and Fourth and

23  Eighth.

24  Q    Would you spend time at this wall?

25  A    Have I?

1   Q    Yes.

2   A    A few times, probably.

3   Q    What would you be doing at this wall?  Why would you be

4   at this wall?

5   A    It ain't being at the wall, just probably was in that

6   place at the time, ain't nothing particular.

7   Q    Just hanging out?

8   A    Probably.

9   Q    You ever jump over that wall?

10  A    A few times.

11  Q    Why would you jump over the wall?

12  A    Probably didn't want to walk around, or running from the

13  police, or something.

14  Q    What?

15  A    Probably didn't want to walk around, or running from the

16  police, depends on the case.

17  Q    Do you remember ever running from the police and jumping

18  over that wall?

19  A    Probably a few times.

20  Q    Why would you run from the police?

21  A    Probably had a warrant or something.

22  Q    Typically, when –– in '05, '06, when you're walking

23  around the Short, what are you carrying with you?  What do you

24  have on you?

25  A    Be more specific.

TRIAL ONE – VOL 6 –  190

1    Q    What's in your pockets?

2    A    Probably money, gun or something, drugs.  I don't know.

3    Q    You don't know?  I don't want to put words in your

4    mouth.  You said money.  You would have money on you?

5    A    Correct.

6    Q    Where would you get the money from?

7    A    Numerous different places.

8    Q    Start off with one.  Give me one.

9    A    Might sell drugs or something.

10   Q    Give me another one.  Where would you get money from?

11   A    A female or something.

12   Q    All right.  What other ones -- how else would you get

13   money?

14   A    Rob people, whatever.

15   Q    During this time period, did you have any job where you

16   got a paycheck?

17   A    No.

18   Q    Did you have any legal job?

19   A    No.

20   Q    What else is in your pocket?  You got money in your

21   pockets.  What else?

22   A    Probably a phone or something.

23   Q    Phone?

24   A    Gun or something.

25   Q    Let's start off with the phone.  Where would you get a

1    phone?

2    A    From the store.

3    Q    How would you pay for it?

4    A    With money.

5    Q    What kind of money?

6    A    Money that you have in your pocket, money you got.

7    Q    Travelers Cheques, credit cards?

8    A    Cash.

9    Q    Back in this time period, '05, '06, that area, what kind

10   of phone would you have?

11   A    Probably Nextel.

12   Q    Are there two ways to communicate on a Nextel?

13   A    Correct.

14   Q    What are the two ways?

15   A    A two-way and the regular phone.

16   Q    You use it like the modern day phones we have?

17   A    A walkie-talkie.

18   Q    Use it like a walkie-talkie or a dial?

19   A    Correct.

20   Q    We got money, phones.  What else?

21   A    Probably have a gun or me or something.

22   Q    A gun or something.  You carry a gun a lot?

23   A    Correct.

24   Q    What kind of gun did you carry?

25   A    A variety, different guns.

1   Q    Where would you get your guns?

2   A    All over.  It depends.

3   Q    Is it tough to get a gun in the Short?

4   A    Is it tough to get one?

5   Q    Yeah.

6   A    No.

7   Q    Give me an example of where you would get your guns.

8   A    Anywhere, like anywhere.

9   Q    At a gun store?

10  A    Depends on the occasion.

11  Q    On occasion?  I couldn't hear you.

12  A    On occasions.

13  Q    So a gun store might be one place.  What other place

14  would you get a gun?

15  A    Probably somebody I know or something.

16  Q    How would you get it from them?  Would you pay for it?

17  A    Might ask them to use it, might buy it or something.  It

18  depends on what the case may be.

19  Q    Okay.  So we got money, guns, and phone.  What else

20  might be in your pockets?

21  A    Probably some weed or something.

22  Q    Weed or something?  Okay.  Weed meaning marijuana?

23  A    Correct.

24  Q    What's the "or something"?

25  A    Drugs or something.  It depends.  I couldn't tell you

TRIAL ONE – VOL 6 –   193

1   what I might have on me at that time.

2       Q    At that time, did you sell weed?

3       A    Did I do what?

4       Q    Sell marijuana?

5       A    Smoke.

6       Q    Smoked it.  Did you ever sell it?

7       A    At a point in time of my life.

8       Q    How about 2005, 2006?

9       A    I don't recall.

10      Q    You ever sell any other kind of drugs?

11      A    Yes.

12      Q    In '05, '06, what kind of drugs were you selling?

13      A    Crack.

14      Q    Where would you get your crack?

15      A    Around, people, different people.

16      Q    Tell me about some of those different people.

17      A    It depends on where you -- who got it or something.  It

18  depends on where you --

19      Q    Who's got it?

20      A    Shit, I don't know.

21      Q    When you're in the Short North, did you buy crack in the

22  Short North?

23      A    No.

24      Q    Where did you get the crack?

25      A    Probably on a lick or something.

```
                                        TRIAL ONE - VOL 6 -  194
```

1    Q    On a lick?  What's a lick?

2    A    When you rob somebody.

3    Q    What's the difference between -- is there a difference

4    between cocaine and crack cocaine?

5    A    Correct.

6    Q    What's the difference?

7    A    One powder and one rock.

8    Q    Is one more powerful than the other?

9    A    Correct.

10   Q    Which one is more powerful?

11   A    Crack.

12   Q    Does crack come from powder cocaine?

13   A    Correct.

14   Q    Do you know how it's made?

15   A    Cook it.

16   Q    How do you cook it?

17   A    Different ways.

18   Q    Give me an example.

19   A    You can use a stove, microwave.  It depends on who's

20   doing it.

21   Q    Is there a recipe to it?

22   A    Correct.

23   Q    Have you ever cooked crack cocaine?

24   A    No.

25   Q    Are there people that kind of specialize in that?

TRIAL ONE – VOL 6 –   195

1    A    I didn't hear you.

2    Q    Are there people that specialize in that, that know how

3  to do it?

4    A    People know how to do it.

5    Q    I want to show you what's been marked as 1-2-026.  Do

6  you see recognize this?

7    A    I don't remember seeing that.

8    Q    All right.  Let's move on to 1-2-027.  Do you recognize

9  that?

10   A    I can't recall.

11   Q    Say again.

12   A    Can't recall.

13   Q    All right.  Let's go to 1-2-031.  Do you recognize that?

14   A    Yes.

15   Q    What's that?

16   A    It's a building.

17   Q    Do you know where that building is?

18   A    On the corner of Fourth and Eighth it look like.

19   Q    Is there something written on that building?

20   A    Correct.

21   Q    What's written on that building?

22   A    Cut Throat.

23   Q    Have you seen that written on that building?

24   A    Correct.

25   Q    About what time period?

TRIAL ONE – VOL 6 – 196

1    A    Probably '05 or something.

2    Q    Does that accurately reflect -- that photograph,

3    1-2-031, accurately reflect what you saw?

4    A    Say it again.

5    Q    Does this photograph accurately --

6    A    Correct.

7    Q    -- reflect what you've seen?

8    A    Right.

9         MR. DEVILLERS:  Your Honor, may I publish this to the

10   jury?

11        THE COURT:  Any objection?

12        MR. BERNDT:  No objection.

13        MR. GATTERDAM:  No objection.

14        MS. DIXON:  No objection, Your Honor.

15        MR. MEYERS:  No, Your Honor.

16        MR. NOLDER:  None, Your Honor.

17        THE COURT:  Exhibit 1-2-031 may be admitted and you

18   may publish it, Mr. Devillers.

19   BY MR. DEVILLERS:

20   Q    What is Cut Throat?

21   A    Cut Throat is -- it's a group of people.

22   Q    And what do these group of people do?

23   A    A lot of things.

24   Q    Can you go over those things with us?

25   A    Rob, shoot, sell drugs, kill, whatever.

TRIAL ONE – VOL 6 –  197

1    Q    Okay.  Are those -- these people -- are all of these

2   people in Cut Throat from the Short North?

3    A    No.

4    Q    Do they all associate with people from the Short North?

5    A    Correct.

6    Q    Name some of those people for us.

7    A    From Cut Throat?

8    Q    Yes.

9    A    Me, Jigg.

10   Q    You said Jiggs, right?

11   A    Correct.

12   Q    Do you know his real name?

13   A    Lance Green.

14   Q    I'm going to show you what's been marked as Government's

15  Exhibit 155-2.  Do you see that photograph?

16   A    Correct.

17   Q    Who's in that photograph?

18   A    Jigg.

19        MR. DEVILLERS:  Your Honor, I'd ask to publish this to

20  the jury.

21        THE COURT:  Any objection?

22        MR. BERNDT:  No objection.

23        MR. GATTERDAM:  No objection.

24        MS. DIXON:  No objection, Your Honor.

25        MR. MEYERS:  No, Your Honor.

TRIAL ONE – VOL 6 –  198

1          MR. NOLDER:  None, Your Honor.

2          THE COURT:  Exhibit 155-2 will be admitted,

3   Mr. Devillers, and you may publish it.

4     BY MR. DEVILLERS:

5     Q    Who is this?

6     A    Jigg.

7     Q    And you said he's part of Cut Throat; is that right?

8     A    Correct.

9     Q    Is he originally from the Short North?

10    A    No.

11    Q    Where is he from?

12    A    Mount Vernon.

13    Q    And is there a particular set of a gang that's from

14   Mount Vernon?

15    A    I don't know.

16    Q    But Mr. Green is not from the Short North?

17    A    No.

18    Q    Did he associate with the Short North?

19    A    Correct.

20    Q    Did he commit crimes with Crips from the Short North?

21    A    Correct.

22    Q    Who named Cut Throat?  Where did it come from?  Do you

23   know?

24    A    I don't know where it came from.

25    Q    About when did you become associated with Cut Throat?

```
1    A    Probably around 2003, 4.  '03, '04.

2    Q    Who else is in Cut Throat?

3    A    Fee.

4    Q    Fee.  Do you know Fee's real name?

5    A    Richard Willis.

6         THE COURT:  What was the last name?  Richard Willis?

7         THE WITNESS:  Yes.

8         THE COURT:  Okay.

9    BY MR. DEVILLERS:

10   Q    What happened to Mr. Willis?

11   A    Got shot and killed.

12   Q    Do you know who shot and killed him?

13   A    Yes.

14   Q    Who?

15   A    Day-Day.

16   Q    Did Mr. Willis have a nickname?  I'm sorry.

17   A    Fee.

18   Q    Did he have another nickname?

19   A    Le Le.

20   Q    So Richard Willis is known as Fee and Le Le?

21   A    Correct.

22   Q    And Day-Day killed Le Le?

23   A    Correct.

24   Q    Do you know where Day-Day is from?

25   A    Poindexter.
```

TRIAL ONE – VOL 6 –   200

1    Q    Is there a particular gang from Poindexter?

2    A    I couldn't tell you that.  I don't know.

3    Q    Who else is in Cut Throat?

4    A    Freddie.

5    Q    Okay.  Freddie.  Do you know Freddie's real name or full

6    name?

7    A    Freddie Johnson.

8    Q    Did he have a street name or nickname?

9    A    Freeze Pop.

10   Q    I'm going to show you what's been marked as Government

11   Exhibit 155-12.  Is that Freddie Johnson?

12   A    Correct.

13   Q    What's your nickname?

14   A    Al-Nuts.

15   Q    Why Al-Nuts?

16   A    I don't know.

17   Q    Is there a story behind why you're called Al-Nuts?

18   A    Yes, a little bit.  But it was when I was a little

19   younger, but it just stuck with me.

20   Q    How old were you when you got this name?

21   A    Probably around eight or nine or something.

22   Q    Tell the ladies and gentlemen of the jury why you were

23   called Al-Nuts.

24   A    Well, my first name Allen, broke it down short for Al.

25   I used to do crazy things when I was younger.

1    Q    Okay.  Like what?

2    A    All type of stuff: fight, run around the neighborhood,

3    just doing wild stuff.

4    Q    Was there a particular day because you did something

5    that you became known as Al-Nuts?

6    A    Yeah.  We used to -- there used to be a Debbie truck.

7    We used to jump on the back of it and throw boxes out.  I ended

8    up falling off of it.  Some people thought I was a little nuts

9    for it.

10    Q    Little Debbie's?

11    A    Yeah, like at the corner store.

12    Q    Like the Danishes in the boxes?

13    A    Yeah, like Oatmeal Pies and stuff like that.

14    Q    Who else was in Cut Throat?

15    A    Yak.

16    Q    Do you know Yak's real name?

17    A    Kinyatta Glass.

18        THE COURT:  You're going to have to repeat that name

19    for me.

20    BY MR. DEVILLERS:

21    Q    Can you say that name again?

22    A    Kinyatta Glass.

23    Q    Kinyatta Glass?

24    A    Correct.

25    Q    Lance Green and Freddie Johnson, the people you already

TRIAL ONE – VOL 6 –   202

1   identified, were they in this indictment along with you and the

2   defendants here today?

3    A    Correct.

4    Q    Can you name some other individuals?

5    A    Little Leak.

6    Q    What's Little Leak's name?

7    A    I don't know his first name.

8    Q    Do you know his last name?

9         Name some other people.

10   A    Tysin.

11   Q    Tysin what?

12   A    Gordon.

13   Q    Does Tysin Gordon have a street name?

14   A    Sleep.

15   Q    Did you say Sleep?

16   A    Yeah, Sleep.

17   Q    Do you know why they call him Sleep?

18   A    I couldn't tell you why he picked that name.

19   Q    I'm going to show you what's been marked as Government

20   Exhibit 155-4.  Who is that?

21   A    Sleep.

22   Q    Can you name some other people that were Cut Throat?

23   A    Tommy.

24   Q    Tommy who?

25   A    Coates.

TRIAL ONE - VOL 6 -  203

1    Q    Tommy Coates.  Did he have a street name?

2    A    Eag.

3    Q    I'm going to show you what's marked 155-9.  Who is that?

4    A    Eag.

5    Q    Tommy Coates?

6    A    Correct.

7    Q    Was Mr. Coates and Mr. Gordon, were they indicted along

8 with you?

9    A    Correct.

10   Q    Can you name anyone else in Cut Throat?

11   A    Do you want me to give you the whole list?

12   Q    You tell me.  Let me ask you this.  Were there people

13 that were in Cut Throat and people associated with Cut Throat?

14   A    Correct.

15   Q    There's a bit of a difference between the two?

16   A    Right.

17   Q    The people you've mentioned so far, would you say that

18 they're in Cut Throat?

19   A    Correct.

20   Q    I'm going to show you what's been marked as Government's

21 Exhibit 1-2-036.  What is this?

22   A    Corner store.

23   Q    Corner store.  What's it called?

24   A    D&J's.

25   Q    Have you been to that corner store before?

```
 1    A    Correct.

 2    Q    You spent a lot of time at that corner store?

 3    A    Right.

 4    Q    And where is it located?

 5    A    The corner of Fourth and Eighth.

 6    Q    If you had to pick one place in the Short North where

 7  it's iconic of the Short North, what you think of as a place,

 8  what would you pick?

 9    A    Fourth and Eighth.

10    Q    The intersection Fourth and Eighth?

11    A    Correct.

12    Q    And is D&J Carryout on Fourth and Eighth?

13    A    Correct.

14    Q    Do you know if the D&J Carryout still exists?

15    A    It doesn't exist.

16    Q    Was it torn down?

17         MR. GATTERDAM:  Objection.

18         THE COURT:  Sustained.

19  BY MR. DEVILLERS:

20    Q    Why doesn't it exist anymore?

21         MR. GATTERDAM:  Objection.  Same objection.

22         MR. DEVILLERS:  Maybe I didn't hear your answer.

23         THE COURT:  I have to rule on the objection.  I

24  sustained your first objection, Mr. Gatterdam.  I'm going to

25  sustain the second one because the second one presumes facts
```

TRIAL ONE – VOL 6 – 205

1    that are not yet in evidence.  So go back and establish how he

2    knows the current status of the D&J Carryout.

3      BY MR. DEVILLERS:

4      Q    Let me -- perhaps I didn't --

5            MR. DEVILLERS:  May I reask the question?

6            THE COURT:  Yes, you may.

7      BY MR. DEVILLERS:

8      Q    Do you know if the D&J Carryout still exists?

9      A    It's not open no more.

10     Q    How do you know it's not open no more?

11     A    They closed down right before I got arrested.

12     Q    Before you got arrested when?

13     A    2014.

14           THE COURT:  Do you know, Mr. Wright, whether the

15     building itself, whether the store itself still exists though

16     not open?

17           THE WITNESS:  The building might be there, but the

18     store is not open.

19           THE COURT:  Okay.

20     BY MR. DEVILLERS:

21     Q    I want you to look at the -- this photograph.  Does this

22     photograph truly and accurately represent the D&J Carryout as

23     you knew it, as you saw it?

24     A    Right.

25     Q    Does this look like how it looked in 2005, 2006 area?

TRIAL ONE – VOL 6 –  206

1   A    Yes.

2         MR. DEVILLERS:  Your Honor, may I publish it to the

3   jury?

4         THE COURT:  Any objection?

5         MR. BERNDT:  No objection.

6         MR. GATTERDAM:  No objection.

7         MS. DIXON:  No objection, Your Honor.

8         MR. MEYERS:  No, Your Honor.

9         MR. NOLDER:  None, Your Honor.

10        THE COURT:  Exhibit 1-2-036 may be admitted and you

11  may publish it.

12  BY MR. DEVILLERS:

13  Q    Mr. Wright, it appears to the left of this photograph,

14  the left bottom, there is some graffiti.  Do you see that?

15  A    I couldn't tell you what it is.

16  Q    I'm going to show you what's been marked as 1-2-037.  Do

17  you know what we're looking at here?

18  A    It's the N-Hood.

19  Q    Beyond that, are we looking at a wall?

20  A    You say what?

21  Q    What is this we're looking at?  Are we looking at a

22  wall?

23  A    Yeah, the wall of the store.

24  Q    The wall of what store?

25  A    D&J's.

TRIAL ONE – VOL 6 – 207

1  Q    And again, does this look like a true and accurate

2  depiction of how the D&J looked when you saw it in 2005, 2006?

3  A    Correct.

4  Q    There's some graffiti on it?

5  A    Right.

6  Q    What is this graffiti?

7  A    RIP, names, N-Hood.

8  Q    N-Hood.  Is there a --

9       MR. DEVILLERS:  Your Honor, may I publish this to the

10  jury?  I don't think I asked to do that yet.

11       THE COURT:  Yes.  Any objection, Mr. Berndt?

12       MR. BERNDT:  No, Your Honor.

13       MR. GATTERDAM:  No, Your Honor.

14       THE COURT:  Ms. Dixon?

15       MS. DIXON:  No, Your Honor.

16       THE COURT:  Mr. Meyers?

17       MR. MEYERS:  No, Your Honor.

18       THE COURT:  Mr. Nolder?

19       MR. NOLDER:  None, Your Honor.

20       THE COURT:  It may be admitted.  That's Exhibit

21  1-2-037.  It will be received into evidence and you may publish

22  it.

23       MR. DEVILLERS:  Thank you, Your Honor.

24  BY MR. DEVILLERS:

25  Q    You said N-Hood; is that right?

TRIAL ONE – VOL 6 –  208

1    A    Correct.

2    Q    Is that written to the right of the photograph?

3    A    Correct.

4    Q    To the left of the photograph appears to be some sort of

5  hand, a drawing of a hand of some sort; is that correct?

6    A    Right.

7    Q    What is that?

8    A    The N-Hood sign.

9    Q    What you were demonstrating earlier today?

10   A    Correct.

11   Q    Just above that and to the right a little bit there

12 appears to be some writing.  What is that?

13   A    RIP names.

14   Q    Is that common to see that in the Short?

15   A    Correct.

16   Q    Are those some of the names that you've already

17 mentioned?

18   A    Correct.

19   Q    I'm now going to show you what's been marked as 1-2-034.

20 Do you recognize that?

21   A    I don't think I remember that.

22   Q    You don't recall that?

23   A    No.

24   Q    I'm going to show you what's been marked as 1-2-039.  We

25 just were looking at 1-2-037.  Is this the same wall as that

TRIAL ONE – VOL 6 –   209

1    exhibit?

2      A    Correct.

3      Q    Is this just a little bit higher?

4      A    Right.

5      Q    Is that a true and accurate depiction of the wall at D&J

6    Carryout as you saw it in 2005 and 2006?

7      A    Correct.

8           MR. DEVILLERS:  May I publish this to the jury, Your

9    Honor?

10          THE COURT:  Any objection?

11          MR. BERNDT:  No, Your Honor.

12          MR. GATTERDAM:  No objection.

13          MS. DIXON:  No objection, Your Honor.

14          MR. MEYERS:  No objection.

15          MR. NOLDER:  None, Your Honor.

16          THE COURT:  1-2-039 will be received and you may

17   publish it, Mr. Devillers.

18          MR. DEVILLERS:  Thank you, Your Honor.

19     BY MR. DEVILLERS:

20     Q    What's this?

21     A    I didn't hear you.

22     Q    What's this say?

23     A    SNP.

24     Q    SNP?  Is that what you said?

25     A    Right.

1    Q    What's that stand for?

2    A    Short North.

3    Q    Short North what?

4    A    Posse.

5    Q    What do you think of that term, Short North Posse?

6    A    I don't like it, but...

7    Q    Do some of your colleagues, do they not like it as well?

8    A    I can't answer for them.

9    Q    Have you heard some of your colleagues use that term?

10   A    Not too often.

11   Q    Where were you back in the 1990s?  Did you live in the

12   Short North?

13   A    Correct.

14   Q    Did something happen to a group of individuals that —— a

15   group of Crips in the Short North back in the 1990s?

16   A    Correct.

17   Q    And what happened?

18   A    There was a big roundup.

19   Q    By who?

20   A    The feds.

21   Q    And did a lot of those people go to prison?

22   A    Correct.

23   Q    Did you know some of those people?

24   A    Correct.

25   Q    Do you still know some of those people?

TRIAL ONE – VOL 6 –  211

1    A    Correct.

2    Q    Are they older than you?

3    A    Right.

4    Q    About how much older than you?

5    A    Probably ten years plus.

6    Q    Did they call themselves anything in particular?

7    A    Short North Posse.

8    Q    Your generation of Crips in the Short North, you

9  personally, do you not like the term Short North Posse?

10   A    No.

11   Q    Why?

12   A    I just don't.  It ain't -- I don't see it as a posse.

13  It's just a neighborhood.  It's just the Short North.

14   Q    Do you have associates that are Crips in the Short North

15  that you commit crimes with?

16   A    Repeat it.

17   Q    Do you have associates that are Crips in the Short North

18  that you commit crimes with?

19   A    Correct.

20   Q    Have we talked about some of them already?

21   A    Correct.

22   Q    You mentioned at one point -- strike that.

23        Okay.  It's spring of 2005.  You wake up.  In a typical

24  day, what time do you wake up?

25   A    It depends on what's going on; probably 10, 11.

1    Q    What do you do in the spring of 2005?

2    A    There is a lot of things going on.  I can't recall too

3    much of them.  You got to be more specific.

4    Q    On a typical day, you didn't have a routine at all?

5    A    I just go with the flow.

6    Q    Is there a particular place or area you'd go to?

7    A    Yeah, the Short.

8    Q    In the spring of 2005, did you sleep in the Short North?

9    A    If I didn't feel like going home or something.  It

10   depends.

11   Q    What area of town was home where you slept in 2005?

12   A    Woodrow.

13   Q    Where is that?

14   A    Woodrow.

15   Q    Woodrow?

16   A    Correct.

17   Q    Where is that?

18   A    South.

19   Q    So you'd wake up and then you'd go to the Short?

20   A    Correct.

21   Q    When you got to the Short, what would you do?

22   A    Just hang out, chill.

23   Q    Who would you hang out and chill with?

24   A    Whoever out there that day.  It depends.

25   Q    Do you know a person by the name of Chris Harris?

1   A   Correct.

2   Q   What's his street name?

3   A   O-Dog.

4   Q   Would you hang out with him?

5   A   Every day.

6   Q   Every day.  Did you say every day?

7   A   Right.

8   Q   Do you know a person by the name of Elijah Ledbetter?

9   A   Correct.

10  Q   Did you hang out with him?

11  A   Almost every day.

12  Q   Did he have a street name?

13  A   White Boy Tone.

14  Q   How about a person by the name of Rashad Liston?

15  A   Right.

16  Q   Did you hang out with him?

17  A   Correct.

18  Q   Did he have a name?

19  A   Bucc.

20  Q   Bucc.  How about a person by the name of Robert Wilson?

21  A   Correct.

22  Q   Would you hang out with him?

23  A   Right.

24  Q   What's his -- does he have a street name?

25  A   RJ.

TRIAL ONE – VOL 6 –   214

1    Q    Some of the other people you mentioned earlier, Tommy

2  Coates, Lance Green, people like that, would you hang out with

3  them?

4    A    Right.

5    Q    The three people that you –– Deounte Ussury, does he

6  have a street name?  Do you know Deounte Ussury?

7    A    Right.

8    Q    Does he have a street name?

9    A    Correct.

10   Q    What is his street name?

11   A    Frog.

12   Q    Would you hang out with him?

13   A    Sometimes.

14   Q    As much as O-Dog?

15   A    No.

16   Q    The people that you just mentioned – Chris Harris,

17  Robert Wilson, Rashad Liston and Mr. Ussury – were they part of

18  Cut Throat?

19   A    Not to my knowledge.

20   Q    Did they associate with –– and Elijah Ledbetter.  Was

21  Elijah Ledbetter part of Cut Throat?

22   A    Not to my knowledge.

23   Q    Did they associate with people in Cut Throat?

24   A    Correct.

25   Q    Chris Harris, was he a Crip?

TRIAL ONE – VOL 6 – 215

1    A    Correct.

2    Q    Rashad Liston, was he a Crip?

3    A    Right.

4    Q    Robert Wilson, was he a Crip?

5    A    Right.

6    Q    Elijah Ledbetter, was he a Crip?

7    A    Correct.

8    Q    Do you know a person that goes by the name of Forty, or

9    Troy Patterson?

10   A    Correct.

11   Q    Did you hang out with him as well?

12   A    He was a little younger.

13   Q    Was he a Crip?

14   A    Right.

15   Q    How about Mr. Ussury, D Frog?  Was he a Crip?

16   A    To my knowledge.

17   Q    Was he from the Short, though, originally?

18   A    No.

19   Q    Where was he from?

20   A    Mount Vernon area.

21   Q    Okay.  So you're hanging out with some of your

22   associates.  What do you do when you hang out?

23   A    It depends on what's going on that day.  It could be a

24   lot of things.

25   Q    You said earlier that you'd sell drugs.  Is that true?

1    A    Correct.

2    Q    And would you do that on a daily basis?

3    A    If I had it.

4    Q    Where would you get it?

5    A    It depends on what day that was.  I probably would have

6    robbed somebody and took it from them.

7    Q    Rob somebody and take it from them?

8    A    Correct.

9    Q    How would you know who to rob and take it from?

10   A    People talk.  You hear things.

11   Q    Would you ever buy -- let's say crack.  Would you ever

12   buy crack from people and then sell it?

13   A    No.

14   Q    You get it all from robbing?

15   A    Correct.

16   Q    How often do you think in 2005, 2006, you'd commit a

17   robbery?

18   A    Probably every other day.

19   Q    Every other day?

20        Where would you commit these robberies?

21   A    All over.

22   Q    Would you commit any of them in the Short?

23   A    No.

24   Q    All over what?

25   A    Columbus.

TRIAL ONE - VOL 6 - 217

1    Q    How would you get to these places to commit these

2    robberies?

3    A    A car.

4    Q    A car?

5    A    Correct.

6    Q    Any particular car?

7    A    Not for real.

8    Q    Would you ever commit any of these robberies with

9    Mr. Harris?

10   A    Correct.

11   Q    With Mr. Wilson?

12   A    No.

13   Q    How about Mr. Liston?

14   A    No.

15   Q    In 2005, 2006, the robberies you would commit, how about

16   Mr. Ledbetter, Elijah Ledbetter?

17   A    Right.

18   Q    Was there kind of a particular group of people that you

19   tended -- besides Cut Throat, outside of Cut Throat, is there a

20   particular group of people you tended to do robberies with?

21   A    No.

22   Q    No?

23   A    No.

24   Q    How many robberies do you think you've committed?

25   A    How many I committed?

TRIAL ONE – VOL 6 –  218

1    Q      Yeah.

2    A      I couldn't tell you.

3    Q      More than 50?

4    A      Probably so.

5    Q      How many do you think you've committed with Mr. Harris?

6            MR. GATTERDAM:  Your Honor, objection.  May we

7    approach?

8            THE COURT:  Yes.

9                              –  –  –

10    Thereupon, the following proceeding was held at side bar

11    out of hearing of open court:

12            THE COURT:  Go ahead, Mr. Gatterdam.

13            MR. GATTERDAM:  Your Honor, it's basically preserving

14    the record.  I believe he's going to testify about these

15    robberies that he's not charged with in this indictment.  I

16    understand the Court's made a ruling on this, but I need to

17    preserve the issue that we have no notice of this.  This is not

18    part of this indictment.  So I object for the record.

19            THE COURT:  Go ahead, Mr. Devillers.

20            MR. DEVILLERS:  Your Honor, he was given notice of

21    this.  He was given notice of this back in –– about a month

22    after the indictment when we filed the notice of exactly what

23    we intended to do.  He was also given notice in the indictment

24    of the overt acts that are alleged in the indictment, as well

25    as given notice to specific acts within our notice of intent to

TRIAL ONE – VOL 6 –   219

1    use predicate offenses.

2          THE COURT:  Your objection is duly noted but

3    overruled.

4          MS. DIXON:  Is there any way to move that microphone

5    closer to him?

6          MR. DEVILLERS:  I will --

7          THE COURT:  I'll get the marshal over there to move it

8    closer.  But you're right, Mr. Berndt, when he leans -- the one

9    time he leaned toward --

10       (Back in open court.)

11         THE COURT:  Mr. Wright, do you remember when you

12   leaned in and answered a question just a moment ago?  That's

13   when we could hear you.  I know you can't lean in for every

14   question, but to the extent possible, the closer you can get to

15   the mic, that's perfect.

16         Please continue, Mr. Devillers.

17         You may answer the question, Mr. Wright.  Do you need it

18   read back to you?

19          THE WITNESS:  Correct.

20          THE COURT:  Mrs. Evans, would you read the question

21   back, please.

22       (Thereupon, the last question was read by the court

23   reporter.)

24          THE WITNESS:  Probably the majority of all of them.

25

TRIAL ONE – VOL 6 –   220

1    BY MR. DEVILLERS:

2    Q     How about with Mr. Ledbetter, that being Elijah

3    Ledbetter?

4    A     Probably the same.

5          MR. DEVILLERS:  May I have a moment, Your Honor?

6          THE COURT:  Yes.

7    BY MR. DEVILLERS:

8    Q     We mentioned Mr. Wilson, the person you know as RJ.  I'm

9    going to show you a photograph of 155-6.  Can you tell me who

10   that is?

11   A     RJ.

12   Q     And now I want to show you a photograph of 154-1-85.

13   Please hold for a second.

14         MR. DEVILLERS:  Your Honor, I'd like to enter this

15   into evidence and publish this to the jury.

16         MR. BERNDT:  No objection, Your Honor.

17         MR. GATTERDAM:  No objection.

18         MS. DIXON:  No objection, Your Honor.

19         MR. MEYERS:  No objection.

20         MR. NOLDER:  None, Your Honor.

21         THE COURT:  155-6 may be admitted and you may publish

22   it, Mr. Devillers.

23   BY MR. DEVILLERS:

24   Q     Thank you.

25         Again, this is RJ?

1    A    Correct.

2    Q    154-1-85.  Do you recognize this photograph?

3    A    Right.

4    Q    Who is that?

5    A    White Boy Tone.

6    Q    And his real name is?

7    A    Elijah.

8    Q    And now I want to show you a photograph -- show you an

9    exhibit of 155-17.  Do you recognize that photograph?

10   A    Forty.

11   Q    What is his real name?

12   A    Troy Patterson.

13   Q    I believe you testified he was a bit younger than you.

14   Do you know how much younger than you he is?

15   A    A couple years.

16   Q    You ever heard the term knockout game?

17   A    Say it again.

18   Q    You ever heard the term knockout game?

19   A    I heard it before.

20   Q    What is it?

21   A    You walk around seeing who can knock somebody out or

22   something.

23   Q    Have you seen that done?

24   A    Have I seen it done?

25   Q    Yeah.

1    A    No.

2    Q    You've never seen anybody do that?

3    A    Say it again.

4    Q    Have you ever seen anyone play the knockout game?

5    A    You're correct.

6    Q    Have you ever played the knockout game?

7    A    A few times.

8    Q    So why?  Why would you do that?

9    A    We was young.  You do a lot of things when you're young.

10   Q    Have you ever seen Mr. Patterson do that, 40?

11   A    Correct.

12   Q    Have you ever seen Mr. Elijah Ledbetter do that?

13   A    Correct.

14   Q    How about Mr. Harris?

15   A    Correct.

16   Q    Mr. Liston?

17   A    Can't recall.

18   Q    You don't recall ever seeing him do it?

19   A    Right.

20   Q    How about RJ?

21   A    Probably.

22   Q    How about Tommy Coates?

23   A    Correct.

24   Q    So after the person was knocked out, what would happen?

25   A    Go about your business.

1    Q    Did you ever take anything from someone that's knocked

2    out?

3    A    I can't recall.

4    Q    Have you ever seen anybody take anything from someone

5    that's knocked out?

6    A    Can't recall.

7    Q    Do you remember the first robbery you ever committed?

8    A    I don't remember.

9    Q    When did you start committing robberies?

10   A    Probably my late teenage years.

11   Q    Do you remember the first robbery you ever committed

12   with O-Dog?

13   A    I don't remember that one.

14   Q    Do you know a person -- I think you indicated before

15   you'd drive somewhere to do robberies; is that right?

16   A    Say that again.

17   Q    You indicated you'd drive places to do robberies?

18   A    Correct.

19   Q    You ever rob a place off of Parkwood and Dunoon?

20   A    Parkwood and Dunoon, correct.

21   Q    Tell us about it.

22   A    When they had a lick.

23   Q    Who went?

24   A    Me and Dog.

25   Q    Do you remember how you got there?

1    A    It was a car.

2    Q    By Dog, who do you mean by Dog?

3    A    O-Dog.

4    Q    By O-Dog, what do you mean?

5    A    Say it again.

6    Q    By O-Dog, who do you mean?

7    A    Chris.

8    Q    Chris?

9    A    Harris.

10   Q    So do you remember what car you went in?

11   A    No.

12   Q    Did you ever steal any cars?

13   A    Numerous of times.

14   Q    What is that?

15   A    Numerous of times.

16   Q    How do you steal a car?

17   A    Peel it.  I don't know.  You break the thing and use a

18   flat head.

19   Q    Use a flat head what?

20   A    Screwdriver.

21   Q    You said you peel it.  You peel what?

22   A    The column.

23   Q    You know how to do that?

24   A    Do I know how?

25   Q    Yeah.

1    A    Correct.

2    Q    You good at it?

3    A    No.

4    Q    But you've done it?

5    A    Right.

6    Q    Where is Dunoon and -- Parkwood and Dunoon?

7    A    Up north.

8    Q    About how far up north?

9    A    Off of Joyce, around up there.

10   Q    Is that south of the outer belt, 270?

11   A    I don't know if it's south, north, east or west.

12   Q    Of the outer belt, you mean?

13   A    Or the freeway.  I don't know the freeway over there.

14   Q    Why did you hit that house?

15   A    I was turned on to it.

16   Q    Who turned you on to it?

17   A    A female.

18   Q    Who was the female?

19   A    Melinda.

20   Q    Arlinda?

21   A    Melinda.

22   Q    Melinda?

23   A    West.

24   Q    Why did you decide to hit that house?  What did Melinda

25   tell you?

1    A    Some weed in there.

2    Q    Was there weed in there?

3    A    Correct.

4    Q    How did you get in there?

5    A    Through the window.

6    Q    Who went in?

7    A    Me, Dog and Trav.

8    Q    And Trav?

9    A    Correct.

10   Q    Who is Trav?

11   A    Trigger Trav from the hood.

12   Q    Do you know Trigger Trav's real name?

13   A    Travis McGinnis.

14   Q    Is Travis McGinnis a Crip?

15   A    Correct.

16   Q    Now, I want to show you a photograph, exhibit rather,

17   154-1-4.  Can you tell me who that is?

18   A    Trav.

19   Q    The Travis McGinnis you mentioned earlier?

20   A    Correct.

21        MR. DEVILLERS:  Your Honor, I'd like to publish this

22   to the jury.

23        THE COURT:  Any objection?

24        MR. BERNDT:  No objection.

25        MR. GATTERDAM:  No objection.

TRIAL ONE - VOL 6 -  227

1          MS. DIXON:  No objection, Your Honor.

2          MR. MEYERS:  No, Your Honor.

3          MR. NOLDER:  None, Your Honor.

4          THE COURT:  154-1-4 will be admitted, Mr. Devillers,

5    and you may publish it.

6          MR. DEVILLERS:  Thank you, Your Honor.

7    BY MR. DEVILLERS:

8    Q    Mr. McGinnis, was he part of Cut Throat?

9    A    No.

10   Q    Did he associate with Cut Throat?

11   A    Correct.

12   Q    Okay.  You get into the house.  What happens next?  Who

13   goes in?

14   A    I went in, then they came in, grabbed the weed and left.

15   Q    Do you remember where you found the weed?

16   A    Huh?

17   Q    Do you remember where you found the weed?

18   A    In the tub.

19   Q    In the tub?

20   A    Correct.

21   Q    About how much weed did you get?

22   A    It was like ten pounds.

23   Q    By weed, do you mean marijuana?

24   A    Correct.

25   Q    How much does a pound of weed go for, if you were going

TRIAL ONE – VOL 6 –   228

1   to sell it in the Short?

2   A    Probably 13, 1,400.  It depends what year it was.

3   Q    Is there some sort of marijuana that's worth more per

4   pound than others?

5   A    Correct.

6   Q    Do you know if that's like a more expensive form of

7   marijuana?  Is there a name for that?

8   A    Now or then?

9   Q    What?

10  A    Now or then?  When are we talking about?

11  Q    Then.

12  A    Correct.

13  Q    What was it called?

14  A    Dro.

15  Q    Is Dro short for another name?

16  A    Hydro, I guess.

17  Q    What?

18  A    Hydro, I guess.

19  Q    You know it as Dro?

20  A    Right.

21  Q    How much would a pound of Dro go for?

22  A    I can't remember the price then.

23  Q    So you, Mr. McGinnis, Mr. Harris, have this ten pounds

24  of weed.  Where do you go now?

25  A    Split it up.

TRIAL ONE - VOL 6 - 229

1    Q   Is there a particular place you'd go to split it up?

2    A   No.

3    Q   Did you split it up?

4    A   Correct.

5    Q   How did you split it up?

6    A   Evenly.

7    Q   Ms. West, did she get anything for this?

8    A   Can't remember.

9    Q   Typically, if someone turns you on to a spot to hit a

10  lick, would they get something for it?

11    A   Correct.

12    Q   Do you know a person that went by the name of DeWitt?

13    A   Correct.

14    Q   Who is Mr. DeWitt?

15    A   A person we was having problems.

16    Q   Who is "we"?

17    A   Me.

18    Q   You were having problems with Mr. DeWitt?

19    A   Correct.

20    Q   What were you having problems over?

21    A   Street stuff.

22    Q   What is street stuff?

23    A   Robbery, all that, shoot-outs.

24    Q   Where is Mr. DeWitt from?

25    A   Up north, Cleveland Avenue area.

TRIAL ONE - VOL 6 -  230

1   Q    Explain this to the jury.  Were you robbing each other?

2   A    No.  He tried to rob me but he didn't succeed, so I end

3   up robbing him.

4   Q    How did he try to rob you?

5   A    From taking some rims I had.

6   Q    What are rims?

7   A    Car tires.

8   Q    Are rims -- at least back in 2005, '06, were there

9   expensive rims out there?

10  A    Correct.

11  Q    How much would a rim go for?

12  A    It depends on what was the inch.

13  Q    What is the most expensive rim you owned?

14  A    Twenty-fours.

15  Q    How much was that?  How much did it go for?

16  A    Out the store and the street value is different.

17  Q    What's the street value?

18  A    Probably a couple thousand.

19  Q    Per rim?

20  A    For all -- the whole set.

21  Q    For all four?

22  A    Correct.

23  Q    Okay.  So did you ever rob Mr. DeWitt?

24  A    Correct.

25  Q    Did you go with anybody?

TRIAL ONE - VOL 6 - 231

1   A   Right.

2   Q   Who did you go with?

3   A   Me, Dog, Waddell and Loaf.

4   Q   What was the last name?

5   A   Loaf.

6   Q   Who is Loaf?

7   A   Carlos Gardner.

8   Q   And Mr. Gardner, was he part of Cut Throat?

9   A   Correct.

10  Q   You said Waddell?

11  A   Right.

12  Q   Shawn Waddell, you said?

13  A   Correct.

14  Q   Does he have a nickname?

15  A   Little Shawn, Baby Shawn.

16  Q   Little Shawn or Baby Shawn?

17  A   Right.

18  Q   I'm going to show you what's been marked as Government's

19  Exhibit 153-177.  Do you recognize that photograph?

20  A   Little Shawn.

21  Q   Shawn Waddell?

22  A   Correct.

23  Q   Do you know if he had a different last name as well?

24  A   Couldn't tell you.

25  Q   Okay.  So I believe you said -- and who else?  You got

TRIAL ONE - VOL 6 - 232

1   Mr. Waddell, Mr. Gardner and you.  Anyone else go with you?

2   A    O-Dog.

3   Q    So the four of you go to Mr. DeWitt's house?

4   A    Correct.

5   Q    Do you remember how you got there?

6   A    We was in the car.  I don't remember what car, but we

7   was in the car.

8   Q    Do you remember what you brought with you?

9   A    Say what?

10  Q    Did you bring anything with you?

11  A    We had guns.

12  Q    Did all of you have guns?

13  A    Can't recall.

14  Q    Did you have a gun?

15  A    Correct.

16  Q    How did you get into this house?

17  A    I think through the window.

18  Q    Through the window?

19  A    Correct.

20  Q    Was anyone in the house?

21  A    Right.

22  Q    Who was in the house?

23  A    A girl and a couple -- two babies and a girl.

24  Q    Did you know this girl?

25  A    Not at all.

TRIAL ONE - VOL 6 -  233

1    Q    At this time, were you wearing any masks or gloves or

2    anything?

3              MR. GATTERDAM:  Objection, leading.

4              THE COURT:  Rephrase your question, Mr. Devillers.

5    BY MR. DEVILLERS:

6    Q    Were you wearing anything?

7    A    I had a scarf on my face and gloves on my hands.

8    Q    How about the other three individuals?  Were they

9    wearing anything?

10   A    The same.

11   Q    Once you got in the house and you found the children and

12   the lady, what happened?

13   A    We start searching the house.

14   Q    Were you looking for anything in particular?

15   A    Whatever was in there of value.

16   Q    Did you find --

17   A    Drugs or something.

18   Q    Did you find anything of value?

19   A    Correct.

20   Q    What did you find?

21   A    Money, weed, guns.

22   Q    Do you remember how much money?

23   A    Can't recall.

24   Q    Do you remember how much weed?

25   A    A couple pounds.

1    Q    Do you remember how many guns?

2    A    Probably one or two.

3    Q    Do you remember what kind of guns?

4    A    An AK.

5    Q    What's an AK?

6    A    It's an assault rifle.

7    Q    A long gun?

8    A    Correct.

9    Q    Was there another name you use for an AK, sort of street

10   name?

11   A    K.

12   Q    Who went looking for these items?  Were all of you

13   looking for the items at the same time?

14   A    Correct.

15   Q    And where was the lady?

16   A    Repeat it.

17   Q    Where was the lady that was in the house?

18   A    One of the bedrooms.

19   Q    What happened to that lady?

20   A    She ended up getting raped.

21   Q    By who?

22   A    Waddell.

23   Q    How do you know that?

24   A    Because he said it.

25   Q    When did he tell you?

TRIAL ONE – VOL 6 –   235

1    A    When we was leaving.

2    Q    What do you think of that?

3    A    I ain't like it.

4    Q    Did you ever get caught?

5    A    No.

6    Q    Mr. Waddell ever get caught?

7    A    No.

8    Q    Mr. Harris?

9    A    No.

10   Q    Mr. Gardner?

11   A    No.

12   Q    Do you know a person by the name of Kevin Bonner?

13   A    Correct.

14   Q    Who is Kevin Bonner?

15   A    KB.

16   Q    Is that his street name?

17   A    Right.

18   Q    What's he do for a living?

19   A    Sell drugs.

20   Q    Sell what?

21   A    Drugs.

22   Q    As far as a level of a drug dealer, could you

23   characterize kind of what level of a drug dealer he was?

24   A    He wasn't small-time.

25   Q    He wasn't small-time?

| | | |
|---|---|---|
| 1 | A | Right. |
| 2 | Q | Is he the kind of guy you'd want to tick off? |
| 3 | A | Say what? |
| 4 | Q | Does he have friends and associates? |
| 5 | A | I don't know what -- say it again. |
| 6 | Q | Does he have friends? |
| 7 | A | Right. |
| 8 | Q | Does he have friends that he sells drugs with? |
| 9 | A | Probably.  I don't know.  Probably. |
| 10 | Q | Did you ever rob Mr. Bonner? |
| 11 | A | Correct. |
| 12 | Q | Who would you go with? |
| 13 | A | Me, Dog and Fee. |
| 14 | Q | Fee.  What's Fee's name? |
| 15 | A | Richard Willis. |
| 16 | Q | And this is the same Fee that goes by Le Le? |
| 17 | A | Correct. |
| 18 | Q | Is he part of Cut Throat? |
| 19 | A | Correct. |
| 20 | Q | Do you know where Mr. Bonner lives? |
| 21 | A | Out south at the time. |
| 22 | Q | Did you bring anything with you? |
| 23 | A | Yes, a gun. |
| 24 | Q | Did you have a gun? |
| 25 | A | Right. |

TRIAL ONE – VOL 6 –   237

1    Q    Do you remember if the others had guns or not?

2    A    Can't recall.

3    Q    Were you wearing anything?

4    A    I don't remember that.

5    Q    Did you get inside the house?

6    A    Correct.

7    Q    How did you get inside the house?

8    A    Kicked the door down.

9    Q    Was anyone in the house?

10    A    No.

11    Q    Did you get anything out of the house?

12    A    Correct.

13    Q    What did you get?

14    A    Money, drugs.

15    Q    Do you remember how much money?

16    A    A couple thousand.

17    Q    Do you remember what kind of drugs?

18    A    Crack.

19    Q    Did you get anything else out of that house, if you can

20    recall?

21    A    Some rims.

22    Q    Rims.  Car rims?

23    A    Correct.

24    Q    Anything else?

25    A    Huh-uh.

TRIAL ONE – VOL 6 –   238

1    Q    This time period, these three robberies that you just

2    told us about that you committed with Mr. Harris and others,

3    what time period are we talking about?

4    A    2005.

5    Q    Did Mr. Bonner ever find out that you robbed him?

6    A    Right.

7    Q    He did?

8    A    Correct.

9    Q    Any repercussions from that?

10   A    I didn't hear you.

11   Q    Any repercussions from that?  Anything happen?

12   A    No.

13   Q    How do you know that he knew you robbed him?

14   A    Mentioned it.

15   Q    Who mentioned it?

16   A    He mentioned it to me.

17   Q    Was that awkward?

18   A    He just said he heard I did it, but ain't nothing come

19   about.

20   Q    What did you say when he said he heard you did it?

21   A    I just laughed.

22   Q    You ever rob a place off of Refugee Road?

23   A    Probably.

24   Q    Probably?

25   A    Correct.

TRIAL ONE – VOL 6 –   239

1    Q    Do you have any recollection of robbing a place off

2    of -- a particular place off of Refugee Road?

3    A    Right.

4    Q    You do?

5    A    Right.

6    Q    Do you remember who you went with?

7    A    Me, Dog, and White Boy Tone.

8    Q    Do you remember how you got there?

9    A    A hottie.

10   Q    A hottie?

11   A    Right.

12   Q    What's a hottie?

13   A    Stolen car.

14   Q    What happened -- how did you know to hit this particular

15   place, hit this lick?

16   A    Probably was following him or something.  I can't

17   recall.

18   Q    Can't recall.  Was he a drug dealer?

19   A    Right.

20   Q    Do you remember his name?

21   A    Not at all.

22   Q    What happened?  You're in your hottie.  You're driving

23   up to Refugee Road area.  What happens?

24   A    Got there, kicked the door in, went in.  Somebody was in

25   there.  Tone started shooting and we left.

TRIAL ONE – VOL 6 –   240

1    Q    Did you get anything?

2    A    Can't remember.

3    Q    Do you know if Tone actually shot anybody?

4    A    No.

5    Q    He shoot at somebody?

6    A    Correct.

7    Q    How long were you in there for?

8    A    A couple minutes.

9    Q    Do you know if that person had a gun?

10   A    Can't remember.

11   Q    Do you know why Tone started shooting?

12   A    I can't answer that.

13   Q    Did you ever ask him why he shot?

14   A    No.

15   Q    Was it unusual for somebody to go in the house and start

16   shooting?

17   A    Right.

18   Q    Is that yes?

19   A    Correct.

20   Q    Have you ever shot anybody?

21   A    A few times.

22   Q    How many times, do you think?

23   A    Can't remember.

24   Q    Okay.  So we've talked a little bit -- gone over what

25   you do when you get up in the daytime.  So you're done with

TRIAL ONE - VOL 6 -   241

1   your busy day, to some extent.  What do you do?  What do you do

2   for fun?  What do you do at night?

3      A    Like chill with my kids or with a female or something.

4   It depends.

5      Q    Do you ever go out to any clubs or anything like that?

6      A    Sometimes.

7      Q    Is there particular clubs or places that Cut Throat or

8   Short guys would go to?

9      A    Whatever is going on in the city at the time.

10     Q    In 2005, 2006, were there any particular spots?

11     A    Probably the Cabana, the 8 Ball or something.

12     Q    The Cabana.  Where is the Cabana?

13     A    161.

14     Q    Where is the 8 Ball?

15     A    In the Short.

16     Q    Do you remember where in the Short?

17     A    Summit and Eleventh.

18     Q    Summit and Eleventh?

19     A    Correct.

20     Q    Any of these locations, did you ever run into any other

21   gangs or any other people?

22     A    Right.

23     Q    Does that ever cause any problems?

24     A    Correct.

25     Q    Are there -- is there a large police presence at a lot

TRIAL ONE – VOL 6 –   242

1   of these venues?

2   A    It depends.

3   Q    Do you know a person named Avery Johnson?

4   A    Correct.

5   Q    Where is Avery Johnson from?

6   A    The Short.

7   Q    Were you friends with Mr. Johnson?

8   A    No.

9   Q    Did you ever rob Mr. Johnson?

10  A    Correct.

11  Q    Why did you rob Mr. Johnson if he is from the Short?

12  A    We ended up getting into it.

13  Q    About what?

14  A    A few things; can't remember.

15  Q    Who did you rob him with?

16  A    I didn't hear you.

17  Q    Did you rob him with anybody, or did you rob him by

18  yourself?

19  A    I robbed him by myself.

20  Q    Where was it?

21  A    In the Short.

22  Q    At his house?  On the street?  What?

23  A    A trap.

24  Q    A trap.  What's a trap?

25  A    It could be a dope spot, a hangout spot, a chill spot,

TRIAL ONE - VOL 6 -   243

1   whatever.

2        Q    What's a dope spot?

3        A    Where you sell drugs.

4        Q    Are you talking about like a building of some sort?

5        A    It depends.  It can be a house, apartment, whatever.

6        Q    Did you have a trap house or a spot?

7        A    Correct.

8        Q    Where was it?

9        A    Fifth and Eighth.

10       Q    Did other people from the Short North have spots, trap

11  houses and spots?

12       A    Correct.

13       Q    Do you recall a time when Mr. Harris was arrested in a

14  trap house or a spot?

15       A    I don't remember.

16       Q    Tommy Coates, you mentioned him earlier.  Did he have a

17  trap house or a spot?

18       A    Right.

19       Q    Did he share it with other people?

20       A    I think him and Trav had one.

21       Q    Trav McGinnis?

22       A    Right.

23       Q    Do you remember where that was?

24       A    Fifth and Seventh.

25       Q    Fifth and Seventh in the Short?

TRIAL ONE – VOL 6 – 244

1    A    Correct.

2    Q    Do you remember that house ever getting hit by CPD,

3  INTAC?

4    A    I was in jail at the time.

5    Q    Did you ever talk to anybody about it?

6    A    Might have heard about it.

7    Q    Do you remember if you ever talked to Chris about it?

8    A    Can't remember.  Can't recall.

9    Q    D-Block.  You testified earlier some problems with some

10  Short North guys and D-Block.  Is that accurate?

11   A    Correct.

12   Q    That started from some killings?

13   A    Right.

14   Q    And in 2005 did that -- those problems continue?

15   A    Correct.

16   Q    Tell us about it.  What happened?

17   A    It was just -- it was just an ongoing thing, problems.

18   Q    Do you know a guy by the name of Ricky Darthard?

19   A    Correct.

20   Q    Was he a D-Block guy, D-Block associate?

21   A    Right.

22   Q    Well, you ever shoot at him?

23   A    Right.

24   Q    You ever try to kill him?

25   A    Correct.

1    Q    Tell us about it.  What happened?  Who were you with?

2    A    Me, Jigg and Tysin.

3    Q    What was this over?

4    A    Me shooting him?

5    Q    Yeah.

6    A    An ongoing feud.

7    Q    The night you shot at him, where were you?

8    A    On Seventeenth and Woodland.

9    Q    And what?

10   A    Woodland.

11   Q    Were you in a car?

12   A    Right.

13   Q    And again, who was in the car with you?

14   A    Me, Jigg and Tysin.

15   Q    Jigg and Tysin.  Are they Cut Throat?

16   A    Right.

17   Q    Were they looking to kill Mr. Darthard as well?

18   A    Correct.

19   Q    Did you have anything on you?

20   A    A gun.

21   Q    What kind of gun?

22   A    An AK.

23   Q    Whose car was it?

24   A    Jiggs.

25   Q    Do you remember what kind of car it was?

1    A    A truck.

2    Q    A truck?

3    A    Right.

4    Q    Like an SUV or pickup truck?

5    A    SUV.

6         THE COURT:  Just a second, Mr. Devillers.

7         Is this a good place to break?

8         MR. DEVILLERS:  It is, Your Honor.

9         THE COURT:  Do you want to finish this line of

10   questioning or can you break right now?

11        MR. DEVILLERS:  We can break now.

12        THE COURT:  Ladies and gentlemen, we're going to take

13   our morning recess.  It's a couple minutes past 10:30, but so

14   that we can continue to move along, let's reconvene at 10:45,

15   be in our seats.  We'll continue with the current testimony.

16      (Jury out at 10:36 a.m.)

17      Thereupon, the following proceeding was held in chambers

18   with all counsel present:

19        THE COURT:  Just one observation.

20        Shawna, would you go back to the question I had you

21   mark.

22        THE COURT REPORTER:  "Question:  Were they looking to

23   kill Mr. Darthard as well?"

24        THE COURT:  Now, this witness I've allowed some

25   leading because I thought it was appropriate because sometimes

TRIAL ONE - VOL 6 - 247

1  a lot of stuff he didn't recall, he needed to be kind of inched

2  along.  These are the kind of questions that I work assiduously

3  to keep off the record.  You can ask them what their intentions

4  were.  He's smart enough to figure that out.  So on critical

5  questions like this, I don't want you to lead, Mr. Devillers,

6  because it's not necessary.  Some of the other questions I

7  believe it was necessary, so I don't have a problem with it.

8  And I think that the direct has gone well just from a

9  structural vantage point thus far.  So I don't have any problem

10  with that.

11        I wanted to bring that to everybody's attention because

12  I've told you that I am a firm believer in the fact that when

13  you have your own witnesses -- even though they're not

14  technically your own witnesses, but those are the witnesses

15  you're calling in your case -- you've had a chance to prepare

16  them.  I don't want them led on critical questions such as

17  that.  The foundational stuff, it doesn't matter.  It's up to,

18  in large part, defense counsel.  If you want to object, that's

19  your prerogative; I'll rule accordingly.  But as the

20  gatekeeper, I'm going to make sure I keep the gates

21  appropriately so that no one will say that the rules were

22  applied less than evenhandedly.

23        That's all for you, Shawna.  You may leave.

24        (Recess taken from 10:38 a.m. to 10:45 a.m.)

25     (Thereupon, the following proceeding was held in open court

TRIAL ONE - VOL 6 -   248

1   with all defendants and counsel present.)

2      (Jury in at 10:50 a.m.)

3          THE COURT:  Mr. Devillers, please continue.

4          MR. DEVILLERS:  Thank you, Your Honor.

5   BY MR. DEVILLERS:

6   Q.   I'm going to backtrack a little bit.  I think I failed

7   to publish to the jury some photographs.  But I'd like you to

8   look at the photograph on your screen now, which is

9   Government's Exhibit 155-17.  Who is that person?

10  A.   40.

11  Q.   That's Troy Patterson?

12  A.   Correct.

13          MR. DEVILLERS:  May I publish this to the jury, Your

14  Honor?

15          THE COURT:  Yes, you may.

16          Any objections?

17          MR. GATTERDAM:  No objection.

18          THE COURT:  Ms. Dixon?

19          MS. DIXON:  No objection.

20          MR. BERNDT:  No, Your Honor.

21          MR. MEYERS:  No, Your Honor.

22          MR. NOLDER:  None, Your Honor.

23          THE COURT:  It will be received.

24          And you may publish.  I'm sorry.

25  BY MR. DEVILLERS:

TRIAL ONE – VOL 6 –   249

1    Q.    I'd also like to show you Government's Exhibit 154-1-85.

2          Who is this, Mr. Wright?

3    A.    White Boy Tone.

4    Q.    Is that Elijah Ledbetter?

5    A.    Correct.

6          MR. DEVILLERS:  Your Honor, I'd like to publish this

7    to the jury as well.

8          THE COURT:  Okay.  And that last -- did you say "Tom"

9    or "Tone"?

10         THE WITNESS:  Tone.

11         THE COURT:  T-o-n-e?

12         THE WITNESS:  Correct.

13         THE COURT:  Yeah.  Okay.

14         MR. BERNDT:  No Objection, Your Honor.

15         MR. GATTERDAM:  No objection.

16         MS. DIXON:  No objection, Your Honor.

17         MR. MEYERS:  No objection.

18         MR. NOLDER:  None, Your Honor.

19         THE COURT:  Okay.  154-1-85 will be received.  And you

20   may publish it.

21         MR. DEVILLERS:  Thank you, Your Honor.

22    BY MR. DEVILLERS:

23    Q.   Okay.  Mr. Wright, we were talking about an incident

24   involving you, Mr. Green, Mr. Gordon, in your -- in a vehicle

25   and a dispute between you and Ricky Darthard.  Do you recall

TRIAL ONE – VOL 6 –   250

1    talking about that?

2      A.    Correct.

3      Q.    Tell us what happened.

4      A.    We was riding around.  We seen the car.  I hung out the

5    window with the -- with the AK and started shooting at him.

6    Police got behind us.  High-speed chase.  I jumped out, got

7    away.  They got arrested.

8      Q.    Who got arrested?

9      A.    Tysin and Jigg.

10     Q.    And where did you go?

11     A.    I was hiding somewhere.

12     Q.    Eventually, where did you go?

13     A.    I didn't hear you.

14     Q.    What's that?

15     A.    I didn't hear you.

16     Q.    Eventually, where did you go?  After you were hiding,

17   where did you go?

18     A.    Got picked up.  Went to the room.

19     Q.    What room?

20     A.    A hotel room.

21     Q.    Do you remember where that hotel was?

22     A.    Cassady and Agler, I think.

23     Q.    What was the name?

24     A.    Cassady and Agler, I think.

25     Q.    Cassady and Agler?

TRIAL ONE – VOL 6 – 251

1    A.   Correct.

2    Q.   Who was -- Was anyone at the hotel room?

3    A.   When I got there, it was Tabby there.

4    Q.   Who is Tabby?

5    A.   Say what?

6    Q.   Who is Tabby?

7    A.   Tabby Broomfield.

8    Q.   I'll show you what's been marked as Government's Exhibit

9    153-35.  Who is that?

10   A.   Tabby.

11   Q.   Okay.  Do you know where Tabby is from originally?

12   A.   New York.

13   Q.   Does he associate with Short North?

14   A.   Correct.

15   Q.   Did he associate with Cut Throat?

16   A.   Correct.

17   Q.   What did he do for a living?

18   A.   Sell drugs.

19   Q.   Okay.  What did you do with the AK-47?

20   A.   Threw it out the window.

21   Q.   Do you know what happened to that AK-47?

22   A.   Couldn't tell you.

23   Q.   Was there another time that you saw Mr. Darthard off of

24   Lilley Avenue?

25   A.   Correct.

TRIAL ONE – VOL 6 – 252

1    Q.    What happened?

2    A.    I was on my way to commit a robbery, and I seen him.

3    Q.    Who were you on your way to commit a robbery with, if

4    anybody?

5    A.    Me, Ant Man, and Yak.

6    Q.    Ant Man, that's Anthony Martin?

7    A.    Correct.

8    Q.    And Yak --

9    A.    Correct.

10   Q.    -- is who?

11   A.    Kinyatta Glass.

12   Q.    Were they Cut Throat?

13   A.    Correct.

14   Q.    So you're on your way to do a robbery, and you see what?

15   A.    Rick D.

16   Q.    Rick D is who?

17   A.    Ricky Darthard.

18   Q.    Where do you see him?

19   A.    At the house on Lilley.

20   Q.    Where at the house on Lilley?

21   A.    What do you mean where?  He was at a house on Lilley.

22   Q.    Can you see the house?

23   A.    Right.

24   Q.    You said inside the house?

25   A.    No.  On the front porch.

TRIAL ONE - VOL 6 - 253

1    Q.   Okay.  That's what I'm asking you.

2         All right.  So he's where?

3    A.   On the front porch.

4    Q.   All right.  Was he with anybody?

5    A.   A couple other guys.

6    Q.   What do you do as a result of seeing him on Lilley?

7    A.   Call Jigg and let him know he's over there.

8    Q.   And Jigg is --

9    A.   -- Lance Green.

10   Q.   Why call Lance Green and tell him?

11   A.   Because he needed to know when you see him.  Then call

12   him.

13   Q.   Why?

14   A.   I guess they had a problem.

15   Q.   But what's the result?  Why did you want -- Why does

16   Lance Green want you to call him when you see him?

17        MR. GATTERDAM:  Objection.

18        THE COURT:  Sustained as to what Mr. Green knows or

19   wants without foundation.

20   BY MR. DEVILLERS:

21   Q.   Did Mr. Green ask you to do something with regards to

22   Mr. Darthard?

23   A.   If I seen him, to call him and let him know.

24   Q.   Did you do so?

25   A.   Correct.

TRIAL ONE – VOL 6 –   254

1   Q.   Why did -- Do you know why Mr. Green wanted you to call

2   him?

3   A.   Because he wanted Rick D dead.

4   Q.   And is this before, or after, the situation where you

5   shot at Mr. Darthard?

6   A.   I think it was before.

7   Q.   Okay.

8   A.   This incident was after that -- that was after.

9   Q.   Which one went first?

10   A.   When the gun got thrown out the window was first.

11   Q.   Okay.  And do you, in fact, call Mr. Green?

12   A.   Correct.

13   Q.   Do you see Mr. Green -- When's the next time you see Mr.

14   Green after you make that phone call?

15   A.   The next day.

16   Q.   Where?

17   A.   At a hotel room.

18   Q.   Did he tell you anything about what happened?

19   A.   Sanikqua got killed.

20   Q.   Sanikqua who?

21   A.   Hester.

22   Q.   How did he feel about that?  Did he tell you how he felt

23   about that?

24   A.   Did he tell me how he felt about it?

25   Q.   Yeah.

TRIAL ONE – VOL 6 –  255

1    A.    Nervous.  Scared.

2    Q.    Did he tell you whether he was trying to kill Sanikqua

3    Hester?

4    A.    No.  She wasn't a target.

5    Q.    Who was the target?

6    A.    Rick Darthard.

7    Q.    Did you enter a plea of guilty in this case, in your

8    indictment?

9    A.    Correct.

10   Q.    And did you plead to a number of counts?

11   A.    Correct.

12   Q.    Was one of those counts involving the murder of Sanikqua

13   Hester?

14   A.    Correct.

15   Q.    I believe you indicated that one of the people on your

16   arm was a person by the name of Bone; is that right?

17   A.    Bone.

18   Q.    Bone?

19   A.    Correct.

20   Q.    All right.  And who is that?

21   A.    Tyrun Hill.

22   Q.    What happened to Tyrun Hill?

23   A.    Got shot and killed.

24   Q.    Do you remember when that was?

25   A.    I think May of '05.

TRIAL ONE – VOL 6 –  256

1    Q.   Okay.  Do you remember where you were in May of '05?

2    A.   The workhouse.

3    Q.   What's the workhouse?

4    A.   Jackson Pike.

5    Q.   What's Jackson Pike?

6    A.   Like, the county jail.

7    Q.   You were locked up?

8    A.   Correct.

9    Q.   How did you find out what happened to him?

10   A.   I seen it on the news.  Then I made a few calls and

11   heard what happened, or whatever.

12   Q.   Who did you talk to?

13   A.   I can't remember that time.

14   Q.   Did you ever remember talking to anybody that told you

15   what happened?

16   A.   I can't recall.

17   Q.   Individuals within the Short North, or Cut Throat, did

18   they blame anybody for what happened?

19        MR. MEYERS:  Objection.  Foundation.

20        THE COURT:  Sustained.

21   Mr. Devillers, rephrase your question.  Lay a foundation

22   for how he would know and who the particular individuals were.

23   BY MR. DEVILLERS:

24   Q.   Do you recall talking to particular individuals about

25   what happened to Tyrun Hill?

TRIAL ONE – VOL 6 – 257

1    A.    They said there was a shoot-out at the gas station.

2          THE COURT:  No.  No.  No.

3          Sustained.  Your question was appropriate.

4          Your answer was not responsive, Mr. Wright.

5          So, Ms. Errett, would you read the question back?

6          Listen to the question carefully, Mr. Wright.

7      (Question read back by the court reporter.)

8          THE COURT:  He just wants to know if you recall

9    talking to individuals.  Yes or no?

10         THE WITNESS:  Yes.

11         THE COURT:  Okay.

12     BY MR. DEVILLERS:

13     Q.    Do you remember who those individuals were?

14     A.    Not by names.  Just a few people from my neighborhood.

15     Q.    Do you remember if those individuals were part of Cut

16   Throat?

17     A.    Correct.

18     Q.    What did they tell you?

19         MR. MEYERS:  Objection.  Same objection.

20         THE COURT:  I need to know -- Side-bar.

21                        - - -

22     (Thereupon, the following proceeding was held at side-bar.)

23         THE COURT:  Mr. Meyers, go ahead.

24         MR. MEYERS:  Your Honor, same basis.  He has, several

25   times now, said he doesn't remember the people.  And I don't

TRIAL ONE - VOL 6 -   258

1   think casting it as "Who are these individuals you don't

2   remember, were they Cut Throat" saves the objection from the

3   problem of no foundation.

4           THE COURT:  Go ahead, Mr. Devillers.

5           MR. DEVILLERS:  I think it does, Your Honor.  I think

6   I've established, so far, through evidence, that Cut Throat is

7   a conspiracy.  And the conspiracy gets guys to commit crimes

8   and do things together.  And I realize that I -- we can't -- he

9   doesn't recall exactly who, but he does say someone from Cut

10  Throat.  I would say that's in furtherance of a conspiracy.

11  It's a statement in furtherance of a conspiracy.

12          THE COURT:  Well, anything, Mr. Meyers?

13          MR. MEYERS:  Even if that is so, nonetheless, what you

14  don't have is, you don't have individuals.  He's cast the hook

15  into the same pond three or four times.  He doesn't remember.

16  And then --

17      I know you didn't mean to lead him.  I'm not accusing,

18  but when you asked --

19          THE COURT:  Leading was not a problem.

20          MR. MEYERS:  When you go, Are they part of Cut Throat,

21  he is sitting there going, Well, I guess.

22      You know, I don't think it's --

23          THE COURT:  The problem with the question is not that

24  it's not being offered -- it's not that it's not being offered

25  as a statement in furtherance of a conspiracy.  It's that we

1    don't know who said what.

2         Now, what saves, I think, the question is the fact that

3    I'm not certain that it's being offered for its truth of what

4    they said, but it's there to show what he did.  So it's not

5    being offered for the truth.

6         Even if we assume -- even if I accept your argument that

7    it's not necessarily in furtherance of a conspiracy, taking it

8    out of the realm of hearsay, let's assume that it would

9    otherwise be hearsay.  It may not be hearsay because it's not

10   being offered for its truth, but to show what --

11        MR. MEYERS:  Do we know --

12        THE COURT:  That's what I'm getting at.

13        -- to show what the effect was on this guy.

14        What do you expect his answer to be?

15        MR. DEVILLERS:  To that question?

16        THE COURT:  Yes.

17        MR. DEVILLERS:  That there was a battle between the

18   D-Block and Short North Posse, and he got killed as a result of

19   that battle.  That's what I expect him to say.

20        MR. MEYERS:  So it's the truth of the fact that there

21   was a gang battle, not what he did or didn't do, because he's

22   locked up, as he said, and remained locked up for years.

23        MR. DEVILLERS:  I think I can rephrase the question.

24        THE COURT:  All right.  Rephrase the question.

25        MR. DEVILLERS:  And he was in jail at the time.  He

TRIAL ONE – VOL 6 – 260

1    wasn't in prison.  He gets out -- he gets out afterwards.

2         MR. GATTERDAM:  Your Honor, could we just, to save

3    another side-bar -- you sort of alluded to it -- if he starts

4    eliciting what would otherwise be hearsay, is the Court making

5    a finding, because, otherwise, I think we have to object and

6    come forward and say, Is there sufficient evidence of a

7    conspiracy to start introducing statements of coconspirators?

8         THE COURT:  Well, as you know, it has to be proven by

9    a preponderance of the evidence.  And I think that, at this

10   point, there is a preponderance of the evidence that there is a

11   conspiracy.  So the answer to your question is "yes."

12        MR. GATTERDAM:  Note my exception at the time --

13        THE COURT:  Absolutely.

14        MR. GATTERDAM:  I don't want to come back here.

15        THE COURT:  Yes, okay.  And you can make a continuing

16   objection if you would like.

17        MR. GATTERDAM:  Okay.

18        MR. BERNDT:  I will join.

19        THE COURT:  Mr. Nolder, do you want to join in?

20        MR. NOLDER:  I'm not in the conspiracy, but I'll join,

21   just to be charitable.

22        MR. MEYERS:  I'll join.

23        MS. DIXON:  I'll join.

24        MR. MEYERS:  And another point of clarification to

25   avoid another trip, do I understand that you expect this would

TRIAL ONE – VOL 6 – 261

1   go to the truth of the matter asserted?  Is that fair?

2           MR. DEVILLERS:  It depends on what he says next.

3           THE COURT:  He's going to rephrase the question.

4           MR. MEYERS:  Okay.

5           THE COURT:  You can make an objection, but we won't

6   have to have another side-bar on this.

7       (The following proceedings were had in open court.)

8           THE COURT:  Please continue, Mr. Devillers.

9   BY MR. DEVILLERS:

10  Q.   Without at this point telling me who or what, did you

11  have conversations with individuals about what happened to

12  Mr. Hill?

13  A.   Correct.

14  Q.   As a result of those conversations that you had about

15  Mr. Hill, did you do anything, or did the people that you -- in

16  Cut Throat or Homicide do anything?

17  A.   Not at that time.

18  Q.   Later on, did they do something?

19  A.   Probably a few shootouts or somethin'.

20          COURT REPORTER:  Would you repeat that, please?

21          THE WITNESS:  A few shootouts.

22  BY MR. DEVILLERS:

23  Q.   Were you aware of the shootouts between Cut Throat, or

24  Short North, and D-Block?

25  A.   Correct.

TRIAL ONE – VOL 6 – 262

1    Q.    Were you involved in any of those?

2    A.    No.

3    Q.    To be clear, from May of 2005 on, were you involved in

4    any of those?

5    A.    No.

6    Q.    Before that, were you involved with shootouts with

7    D-Block?

8    A.    Correct.

9    Q.    Okay.  After Mr. Hill was killed -- Strike that.

10         Lance Green.  Did Lance Green ever pay you to do

11   anything?

12   A.    Right.

13   Q.    What did he pay you to do?

14   A.    Kill somebody.

15   Q.    And who did Lance Green pay you to kill?

16   A.    Mike T.

17   Q.    Who's Mike T.?

18   A.    Michael Teague.

19   Q.    Did you kill him?

20   A.    Correct.

21   Q.    Where did you kill him?

22   A.    On Garfield.

23   Q.    Is Garfield a street in Columbus?

24   A.    Right.

25   Q.    What area of Columbus?

TRIAL ONE – VOL 6 –   263

1    A.   Mount Vernon area.

2    Q.   What did Michael Teague do for a living?

3    A.   Sell drugs.

4    Q.   Did Mr. Green tell you why he wanted Mr. Teague killed?

5    A.   Right.

6    Q.   What did he tell you?

7    A.   Because he shot Fee.

8    Q.   Is Fee Le Le?

9    A.   Correct.

10   Q.   Richard Willis?

11   A.   Correct.

12   Q.   Now, when Michael Teague shot Le Le, did he die?

13   A.   No.

14   Q.   Later on, did Fee get killed by -- shot by somebody

15   else?

16   A.   Correct.

17   Q.   He died then?

18   A.   Right.

19   Q.   How much was Mr. Green going to pay you to kill Michael

20   Teague?

21   A.   Ten thousand.

22   Q.   Was it -- Did he simply ask you to do it, or did he ask

23   anybody to do it?

24   A.   Anybody.

25   Q.   And how did you become aware of this:  That he would pay

TRIAL ONE – VOL 6 –  264

1    $10,000?

2    A.   Talked about it.

3    Q.   You and Mr. Green?

4    A.   Correct.

5    Q.   Do you remember where you were; how it happened?

6    A.   The talk, or the killing?

7    Q.   The killing.

8    A.   We was on -- You just want me to tell you all that?

9    Q.   That's what we want you to tell us, yeah.

10   A.   It was in January, probably around 11:00, 11:00-11:30,

11   in the area of Garfield.  I waited outside the house.  He

12   pulled up, went inside.  Me and a couple other people waited on

13   him to come out.  When he came out, shot him.

14   Q.   Did anyone else shoot him besides you?

15   A.   No.

16   Q.   Who were you with when you went out there?

17   A.   Me, Ant Man, Fly and Darrell.

18   Q.   Who's -- Ant Man is who?

19   A.   Anthony Martin.

20   Q.   Who is Fly?

21   A.   Jeremiah Frazier.

22   Q.   Is he part of Cut Throat?

23   A.   No.

24   Q.   And the next person?

25   A.   Darrell.

TRIAL ONE – VOL 6 – 265

1     Q.   Darrell --

2     A.   -- Tols- -- Tol -- I can't say his last name.

3     Q.   Is Darrell -- Did Darrell eventually get killed as well?

4     A.   Correct.

5     Q.   Ant Man, was he killed?

6     A.   Say it again.

7     Q.   Was Ant Man eventually killed as well?

8     A.   Correct.

9     Q.   You indicated that you went to prison in 2006?

10    A.   Correct.

11    Q.   Why did you go to prison in 2006?

12    A.   Shot two people.

13    Q.   Tell us about that.

14    A.   Was leaving the club.

15    Q.   What club?

16    A.   The Cabana.  Got into it with some Bloods.  They shot at

17  me.  I followed them on the freeway, shot back at the car.  Two

18  people got shot.

19    Q.   Okay.  How many people were in the car you shot at?

20    A.   Four.

21    Q.   The Bloods that were shooting at you, where are they

22  from?

23    A.   Twenty-second and Livingston.

24    Q.   Is there a particular set name for people from 22nd and

25  Livingston?

1    A.   Not that I know of.

2    Q.   The Bloods aren't called anything from out there?

3    A.   I call them 22nd.  I don't know.

4    Q.   Do you know who those Bloods were, the names?

5    A.   That I was shooting at?

6    Q.   Yeah.

7    A.   Val (phonetic) and Little Rob.

8    Q.   First name?

9    A.   Val.

10   Q.   Do you know his last name?

11   A.   (Shakes head.)

12   Q.   Second person?

13   A.   Little Rob.

14   Q.   Little Rob?

15   A.   Right.

16   Q.   There were four people in the car all together?

17   A.   Two males and two females.

18   Q.   Who got hit?

19   A.   The females.

20   Q.   Did they live?

21   A.   Right.

22   Q.   Did you plead guilty to that?

23   A.   Correct.

24   Q.   And what did you get sentenced to?

25   A.   Eight years.

TRIAL ONE – VOL 6 –   267

1   Q.   When you were in jail, and then later on in prison, did

2   people visit you?

3   A.   Correct.

4   Q.   Did Mr. Harris visit you?

5   A.   Right.

6   Q.   Did other people from Short North or Cut Throat visit

7   with you?

8   A.   No.

9   Q.   Did Mr. Harris put money on your books?

10  A.   Right.

11  Q.   What's that mean, putting money on your books?

12  A.   Just looking out for me.

13  Q.   The ladies and gentlemen of the jury, they may not have

14  spent time in prison.  So I want you to tell them what it means

15  to put money on your books.  What's that mean?

16  A.   It means I might need to go to commissary.  They gave me

17  some money to go to commissary.

18  Q.   So if someone puts money on books, you can use that

19  money to go to commissary and get things?

20  A.   Correct.

21  Q.   Anybody else from Cut Throat or Short North put money on

22  your books while you were in jail or prison?

23  A.   Not that I recall.

24  Q.   Have you talked -- Did you talk on the phone with

25  anybody else from Cut Throat or Short North?

TRIAL ONE – VOL 6 –   268

1    A.   You mean throughout my sentence?

2    Q.   What's that?

3    A.   Throughout my prison, did.

4    Q.   Eventually, in 2008-2009, did Chris Harris meet with you

5    in prison?

6    A.   Correct.

7    Q.   And 40, Troy Patterson, did he do time with you?

8    A.   Right.

9    Q.   How about Mr. Liston?  Do you know if –– Did you ever do

10   time with Mr. Liston in 2009, on?

11   A.   We didn't do time, but I got to a spot.  He was leaving

12   when I got there.

13   Q.   R.J., Mr. Wilson, did you ever spend –– do time with

14   him?

15   A.   Correct.

16   Q.   Was there a point in time when you, Mr. Harris, Mr.

17   Liston, and Mr. Wilson were all in prison together?

18   A.   No.

19   Q.   Okay.  So there's different times?

20   A.   Correct.

21   Q.   Anthony Jones, Tony Jones, do you know who that is?

22   A.   Correct.

23   Q.   How do you know Mr. Jones?

24   A.   From around.  Other people.

25   Q.   Was he a part of Cut Throat?

TRIAL ONE - VOL 6 -   269

1    A.    No.

2    Q.    Did he associate with Cut Throat?

3    A.    Correct.

4    Q.    I want to show you what's been marked as Government's

5    Exhibit 154-1-31.  Who is that?

6    A.    Tony Jones.

7          MR. DEVILLERS:  May I publish this to the jury, Your

8    Honor?

9          THE COURT:  Any objection?

10         MR. GATTERDAM:  No objection.

11         MS. DIXON:  No objection, Your Honor.

12         MR. BERNDT:  No objection.

13         MR. NOLDER:  No objection.

14         MR. MEYERS:  No objection.

15         THE COURT:  Yes.  You may publish it.

16    BY MR. DEVILLERS:

17    Q.    Did you ever do any time with Mr. Jones?

18    A.    Correct.

19    Q.    And was Mr. Jones in prison with yourself, Mr. Harris,

20    and Mr. Liston?

21         MS. DIXON:  Objection, Your Honor.

22         THE COURT:  Sustained.

23         Rephrase, Mr. Devillers.

24    BY MR. DEVILLERS:

25    Q.    Was Mr. Jones and you in prison with anyone else you've

TRIAL ONE – VOL 6 – 270

1    talked about today?

2    A.    Correct.

3    Q.    Who is that?

4    A.    Me and Harris.

5    Q.    Freddie "Freeze Pop" Johnson, you identified him before.

6    Did you ever do any prison time with him?

7    A.    Correct.

8    Q.    So, after Mr. Harris is in prison with you, do you talk

9    to him about the events that took place from 2006 to 2008?

10    A.    Correct.

11    Q.    In 2006, before you went to prison, did you ever hear of

12    something called Homo, or Homicide for the Cash?

13    A.    No.

14    Q.    After you went to prison, did you become aware of this?

15    A.    Correct.

16    Q.    What is Homo, or Homicide for the Cash?

17          MR. MEYERS:  Objection.  Foundation.

18          MR. DEVILLERS:  I'll rephrase, Your Honor.

19          THE COURT:  No.  Overruled.  He testified about this

20    earlier.

21          MR. DEVILLERS:  Okay.

22          THE COURT:  You may answer.

23          THE WITNESS:  Same as Cut Throat.

24    BY MR. DEVILLERS:

25    Q.    Same people?

1    A.    No.

2    Q.    Different people?

3    A.    Correct.

4    Q.    And did Mr. Harris tell you about those people?

5    A.    Correct.

6    Q.    Did you talk to Mr. Liston about Homo, or Homicide

7  Squad?

8    A.    No.

9    Q.    How about Mr. Jones?

10   A.    Maybe a few times.

11   Q.    How about R.J.?

12   A.    Same thing.  A few times.

13   Q.    A few times?  How about Mr. Patterson, Troy Patterson,

14  40?

15   A.    We talked about it.

16   Q.    From those individuals -- Mr. Harris -- what did he tell

17  you?  Did he tell you who was in Homo, or Homicide Squad?

18   A.    Just him and Dog -- I mean Dog, 40, Bucc, and Jizzle.

19   Q.    Did he indicate anybody else he considered part of

20  Homicide Squad?

21   A.    Not for real.

22   Q.    What do you mean, not for real?

23   A.    He didn't consider anybody else Homo.

24   Q.    Did he ever indicate if they associated -- Homicide

25  Squad associated with other people?

TRIAL ONE - VOL 6 - 272

1    A.   Correct.

2    Q.   What's that?

3    A.   Right.

4    Q.   Can you name some of those people?

5    A.   B.  Frog.

6    Q.   B.  Who is B?

7    A.   Brandon Ledbetter.

8    Q.   Okay.  Who else?

9    A.   Frog.

10   Q.   Who is Frog?

11        MS. DIXON:  Your Honor, I'm going to object.

12        THE COURT:  Basis?  Legal basis?

13        MS. DIXON:  I believe it's, basically, hearsay.  I

14   understand he's saying Mr. Harris told him.  However, the

15   testimony he's --

16        THE COURT:  That's okay.  I understand the basis of

17   your objection.  It's overruled based on my ruling at side-bar.

18        You may answer.

19   BY MR. DEVILLERS:

20   Q.   Who is Frog?

21   A.   Deounte.

22   Q.   Deounte, do you know his last name?

23   A.   Ussury.

24   Q.   During your time with Mr. Harris, did you discuss -- did

25   he ever tell you about what happened in 2006, or when he went

1  to prison, from -- after that, in regards to the battle going

2  on with D-Block?

3   A.   Right.

4   Q.   He told you about that?

5   A.   Correct.

6   Q.   Do you know a person by the name of Jenkins, Antwan

7  Jenkins?

8   A.   Heard his name before.

9   Q.   Who did you hear it from?

10   A.   A few people around the way, around -- throughout the

11  city or whatever.

12   Q.   Do you know where Antwan Jenkins is from?

13   A.   D-Block.

14   Q.   Did you ever talk to Chris Harris about Antwan Jenkins?

15   A.   A shootout at Joyce.

16   Q.   Who told you about this?

17   A.   Dog.

18   Q.   What did he tell you happened?

19   A.   They met up at Joyce.  Shots was fired.

20   Q.   Do you know why they met up at Joyce?

21   A.   Couldn't tell you.

22   Q.   Alan Johnson, I believe you testified about him earlier.

23  Is that right?

24   A.   Correct.

25   Q.   Have you ever talked -- What eventually happened to

TRIAL ONE – VOL 6 –   274

1    Elijah Ledbetter?

2    A.    He ended up getting killed.

3    Q.    Did you ever talk to anybody about that?

4    A.    A few people.

5    Q.    Were you locked up when he was killed?

6    A.    Correct.

7    Q.    Did you talk to Chris Harris about that?

8    A.    Correct.

9    Q.    What did he tell you happened to Mr. Ledbetter?

10   A.    That A.V. killed him.

11   Q.    Did he tell you why A.V. killed him?

12   A.    Something about a dog or something.

13   Q.    Something about a dog?

14   A.    A.V. thought Tone broke in his house, or whatever.

15   Q.    You've broken -- Have you broken into A.V.'s house

16   before?

17   A.    No.

18   Q.    Have you robbed A.V. before?

19   A.    Correct.

20        THE COURT:  Can you clarify who A.V. is?

21        MR. DEVILLERS:  Yeah.

22   BY MR. DEVILLERS:

23   Q.    A.V.'s last name, what is that?

24   A.    Johnson.

25   Q.    And is his -- do you know his real name?

1    A.    Alan, I think.

2    Q.    Alan Johnson?

3    A.    Correct.

4    Q.    As a result of –– Did Mr. Harris tell you about what

5  happened after Mr. Elijah Ledbetter was killed?

6    A.    Correct.

7    Q.    What did he tell you happened?

8    A.    A.V. ended up being killed.

9    Q.    Did he tell you how A.V. ended up getting killed?

10   A.    He got shot and killed at China's house.

11   Q.    China who?

12   A.    Hester.

13   Q.    I want to show you what's been marked as Government's

14 Exhibit 153–116.  Who is this?

15   A.    China Hester.

16          MR. DEVILLERS:  Your Honor, may I publish this to the

17 jury?

18          THE COURT:  Any objection?

19          MR. GATTERDAM:  No objection.

20          MS. DIXON:  No objection, Your Honor.

21          MR. MEYERS:  No objection.

22          MR. BERNDT:  No objection.

23          MR. NOLDER:  No, Your Honor.

24          THE COURT:  153–116 can be published, will be received

25 into evidence.

TRIAL ONE – VOL 6 –   276

1          Mr. Devillers, you may publish it.

2      BY MR. DEVILLERS:

3      Q.   How do you know Ms. Hester?

4      A.   Along the way.  She used to be in my neighborhood.

5      Q.   Did she associate with Cut Throat guys?

6      A.   Right.

7      Q.   Did she associate with Short North guys?

8      A.   Right.

9      Q.   What else did Chris tell you?

10     A.   He, B and Black Marc went to go kill A.V.

11     Q.   And, again, who is B?

12     A.   Brandon Ledbetter.

13     Q.   Who is Black Marc?

14     A.   Marcus Peters.

15     Q.   Was Marcus Peters part of Cut Throat?

16     A.   No.

17     Q.   Did he associate with Cut Throat?

18     A.   Right.

19     Q.   What did Marcus Peters do for a living?

20     A.   Same thing I done.

21     Q.   I'm going to show you what's been marked as Government's

22     Exhibit 154-1-39.  Can you tell me who that is?

23     A.   Black Marc.

24     Q.   And his real name is --

25     A.   -- Marcus Peters.

TRIAL ONE – VOL 6 –   277

1    Q.    Did Mr. Harris tell you why he and Mr. Ledbetter and

2    Mr. Peters killed Elijah Ledbetter -- I mean killed Alan

3    Johnson?

4    A.    Because A.V. killed White Boy Tone.

5    Q.    Did he tell you specifics, how he did it, how they got

6    there, what happened?

7    A.    They drove there.  They got a call he was over at

8    China's house.

9    Q.    Who was over at China's house?

10   A.    A.V.

11   Q.    Yeah.

12   A.    They went there, shot him, killed him.

13   Q.    Did Mr. Harris indicate whether he'd got anything out of

14   that?

15   A.    No.

16   Q.    Was Mr. Harris close to Elijah Ledbetter?

17   A.    Right.

18   Q.    Were you close to Elijah Ledbetter?

19   A.    Right.

20   Q.    Mr. Harris, does he have tattoos?

21   A.    Correct.

22   Q.    On his arm, does he have tattoos of names?

23   A.    Right.

24   Q.    Do you remember who is on that, that list of names?

25   A.    Just a few people.  I can't recall who.

1   Q.   Are you on that list?

2   A.   Right.

3   Q.   Mr. Harris, does he have -- does he have some brothers?

4   A.   A few of 'em.

5   Q.   Can you name some of them?

6   A.   Mechie, Hurt, Lenny (phonetic).

7   Q.   Mechie, Hurt and Len?

8   A.   Lenny.

9   Q.   Do you know Mechie's real name?

10  A.   Demetrius.

11  Q.   Is it Demetrius Harris?

12  A.   Correct.

13  Q.   I'm going to show you what's marked as Government's

14  Exhibit 154-1-13.  Do you recognize that picture?

15  A.   Correct.  Mechie.

16  Q.   Who is that?

17  A.   Mechie.

18  Q.   Is that Chris Harris' brother?

19  A.   Correct.

20       MR. DEVILLERS:  Your Honor, I'd ask to publish this to

21  the jury and offer it into evidence.

22       THE COURT:  All right.

23       Any objection?

24       MR. GATTERDAM:  No objection.

25       MS. DIXON:  No objection, Your Honor.

TRIAL ONE – VOL 6 –  279

1          MR. BERNDT:  No, Your Honor.

2          MR. MEYERS:  No, Your Honor.

3          MR. NOLDER:  None, Your Honor.

4          THE COURT:  154-1-13 will be admitted.

5      You may publish it, Mr. Devillers.

6    BY MR. DEVILLERS:

7    Q.    Do you remember, before you got locked up, before you

8    went to prison, do you remember a time when Columbus police

9    were trying to arrest Mechie?

10   A.    Correct.

11   Q.    Do you remember where that was?

12   A.    The alley on 5th -- in between 5th and 6th.

13   Q.    Where were you at the time?

14   A.    Over at Tommy's spot.

15   Q.    The same spot you talked about earlier?

16   A.    Correct.

17   Q.    And what street is that on?

18   A.    5th and 7th.

19   Q.    Who were you there -- Were you there -- Were you there

20   with anybody?

21   A.    Me, Dog, Tommy and Trav (phonetic).

22          COURT REPORTER:  Excuse me?

23          THE WITNESS:  Me, Dog, Tommy and Trav.

24   BY MR. DEVILLERS:

25   Q.    Did you find out that he was being arrested?

1    A.   Yeah.  Somebody called and said that he was -- got

2  pulled over or something.

3    Q.   Okay.  As a result of that, what did you do?

4    A.   We walked outside.  And he was getting roughed up by the

5  police.

6    Q.   As a result of that, what did you do?

7    A.   Started shootin' at 'em.

8    Q.   Shooting at who?

9    A.   The police.

10   Q.   Who is "we"?

11   A.   Me and Dog.

12   Q.   How many times did you shoot, if you remember?

13   A.   I can't recall.

14   Q.   Do you remember how many times Chris shot?

15   A.   Can recall a couple times, probably.

16   Q.   Do you know if anyone got hit?

17   A.   No.

18   Q.   What did you do after the shooting?

19   A.   Went back in the house.

20   Q.   Do you know a person by the name of Parkay?

21   A.   Correct.

22   Q.   Who is Parkay?

23   A.   Older person from the hood.

24   Q.   From whose neighborhood?

25   A.   The Short North.

TRIAL ONE – VOL 6 –   281

1    Q.   How much older?

2    A.   Probably ten to twelve.  I ain't exact, for sure.

3    Q.   Did you ever talk to Chris Harris about anything he may

4    have done with regards to Parkay?

5    A.   For what he went to prison for.

6    Q.   What did he go to prison for?

7    A.   Breaking in his house.

8    Q.   Did he tell you who he was with when he broke into his

9    house?

10   A.   Him, 40, Paco, and Mark.

11   Q.   Okay.  Who is Paco?

12   A.   Andre Brown.

13   Q.   I want to show you what's been marked as Government

14   Exhibit 155-18.  Who is that?

15   A.   Paco.

16   Q.   Is he in your indictment as well, Paco?

17   A.   Correct.

18   Q.   And I think you said that another individual was with

19   them as well?

20   A.   40.

21   Q.   And another?

22   A.   Mark.

23   Q.   Mark who?

24   A.   I don't know his last name.

25   Q.   Did Mr. Harris tell you what happened during that

TRIAL ONE - VOL 6 -   282

1   robbery?

2      A.   A female ended up getting raped or whatever.  They got

3   away with some money.  Ended up getting caught.

4      Q.   Okay.  Do you know the circumstances surrounding that

5   rape?

6      A.   Just a gun was put in her.

7      Q.   By who?

8      A.   40.

9      Q.   They got -- You said they got away with some money?

10     A.   Correct.

11     Q.   But they got caught?

12     A.   Right.

13     Q.   Do you know how they got caught or what happened?

14     A.   I guess leaving the scene.  I guess they got pulled

15   over.  I couldn't tell you.

16     Q.   They what?

17     A.   Leaving the scene, got pulled over.

18     Q.   Did Mr. Harris get arrested out of that scene?

19     A.   Correct.

20     Q.   And how about 40?

21     A.   Right.

22     Q.   Is that -- from that incident -- Is that incident why

23   they were locked up with you?

24     A.   Correct.

25     Q.   You also indicated that Mr. Liston and R.J. got locked

TRIAL ONE – VOL 6 –  283

1   up; is that right?

2   A.   Right.

3   Q.   And I don't recall.  You were in prison with one of them

4   at one point.  Which one was that?

5   A.   R.J.

6   Q.   Okay.  Why was R.J. locked up?

7   A.   For murder.

8   Q.   Do you know who he murdered?

9   A.   I don't remember his name.

10   Q.   Do you remember where it took place?

11   A.   I think in the Short, 8th.

12   Q.   Did you ever talk to R.J. about that?

13   A.   No.

14   Q.   Did you ever talk to Mr. Liston about that?

15   A.   No.

16   Q.   Are you aware of anybody that witnessed that murder?

17   A.   Nutty, he witnessed it.

18   Q.   Did you ever talk to Mr. Harris about that?

19   A.   Right.

20   Q.   What did he tell you?

21   A.   Nutty told on Bucc and R.J.

22   Q.   Was Nutty from the Short?

23   A.   Correct.

24   Q.   Was Nutty a Crip?

25   A.   Right.

TRIAL ONE – VOL 6 –   284

1   Q.   What did you think of that when you heard that Nutty

2   told?

3   A.   Shit, I don't know.  At the time, he should -- he

4   should've got dealt with.

5   Q.   What do you mean he should've got dealt with?

6   A.   Like something should happen for it.

7   Q.   What do you mean something should happen for it?

8   A.   Shot or something.  Something.

9   Q.   If someone -- If a Crip, someone from the Short or Cut

10  Throat or Homicide, if they tell the police or testify, is

11  there an understanding as to what's supposed to happen to them?

12  A.   Correct.

13  Q.   And what's supposed to happen to them?

14  A.   They get fucked up.

15  Q.   Did something happen to Nutty?

16  A.   Correct.

17  Q.   What happened to him?

18  A.   Got killed.

19  Q.   Did you ever talk to the person that killed him?

20  A.   Correct.

21  Q.   Who was that person?

22  A.   R.J.

23  Q.   We talked about R.J. being Robert Wilson.  Was it that

24  R.J.?

25  A.   No.  Robert Liston, R.J.

TRIAL ONE – VOL 6 –   285

1    Q.   Who is Robert Liston?

2    A.   Bucc's brother.

3    Q.   Is there a way to differentiate, as far as nickname

4   goes, between the two R.J.s?

5    A.   Little R.J. and Big R.J.

6    Q.   Who is Little R.J.?

7    A.   Robert Wilson.

8    Q.   Who is Big R.J.?

9    A.   Robert Liston.

10   Q.   I'm going to show you what's been marked as Government's

11  Exhibit 153-173.  Can you tell me who that is?

12   A.   Big R.J.

13       MR. DEVILLERS:  Your Honor, may I publish this to the

14  jury?

15       THE COURT:  Any objection?

16       MR. GATTERDAM:  No objection.

17       MS. DIXON:  No objection, Your Honor.

18       MR. BERNDT:  No, Your Honor.

19       MR. MEYERS:  No, Your Honor.

20       MR. NOLDER:  None, Your Honor.

21       THE COURT:  153-173 will be received into evidence.

22  You may publish it.

23   BY MR. DEVILLERS:

24   Q.   Is this a relation to Mr. Liston?

25   A.   His brother.

TRIAL ONE – VOL 6 –   286

1    Q.   His brother.  Older or younger?  Do you know?

2    A.   Older.

3    Q.   When did Big R.J. tell you about what happened?

4    A.   When I came home in 2014.

5    Q.   Do you know when Mr. Austin, Nutty, do you know when he

6    was killed?

7    A.   I think it was 2013.

8    Q.   What did Big R.J. tell you about what happened?

9         MS. DIXON:  Objection.

10        THE COURT:  Overruled.

11   BY MR. DEVILLERS:

12   Q.   What did Big R.J. tell you about what happened?

13   A.   That he -- that him and Jody went and killed Nutty.

14   Q.   Who is Jody?

15   A.   Jody Loc.

16   Q.   Jody who?

17   A.   Loc.

18   Q.   Loc?  Do you know his real name?

19   A.   No.

20   Q.   Was Jody Loc associated with Homicide Squad or Short

21   North?

22   A.   Correct.

23   Q.   Big R.J., is he associated with Homicide Squad and Short

24   North?

25   A.   Yes.

TRIAL ONE – VOL 6 –  287

1   Q.   Do you know if anything happened to Jody?

2   A.   He ended up getting killed.

3   Q.   How long after?  Do you know?

4   A.   Probably a few years.  A couple years, I think.

5   Q.   Did –– How did that come up?  How did the conversation

6   with Big R.J. come up where he said he killed Nutty?

7   A.   Because he was trying to convince me he was Homo, and I

8   said he wasn't.

9   Q.   What do you mean, Homo?

10  A.   Homicide.

11  Q.   Does he have any Homo tattoos or anything like that?

12  A.   On his chest.

13  Q.   And he was trying to convince you that he was part of

14  it?

15  A.   Right.

16  Q.   And you challenged him on that?

17  A.   Right.

18  Q.   Is that when he told you about what he did?

19  A.   Correct.

20  Q.   When Mr. Austin, Nutty, was killed, where were you at

21  that time?

22  A.   In Ross.

23  Q.   You were still in prison?

24  A.   Correct.

25  Q.   Was Mr. Harris with you in prison?

TRIAL ONE – VOL 6 –   288

1   A.   Right.

2   Q.   How about 40?  Was he in with you?

3   A.   Correct.

4   Q.   At that time, was R.J., Little R.J., with you in prison?

5   A.   Right.

6   Q.   How did they feel about -- Did they ever tell you how

7   they felt about what happened to Nutty, to Austin?

8   A.   They didn't give a fuck what happened.  They didn't care

9   what happened to him.

10        MR. GATTERDAM:  Objection.  Multiple people.

11        THE COURT:  I'm going to sustain.  Rephrase your

12   question and see if you can narrow it to find out who said what

13   or if they all said the same thing.

14   BY MR. DEVILLERS:

15   Q.   Did Mr. Harris talk about Nutty?

16   A.   He didn't care to talk about him.  He didn't care about

17   him.

18   Q.   Mr. Austin, Nutty -- Strike that.  Did Mr. Harris have a

19   girlfriend?

20   A.   I suppose.  Everybody's got a girlfriend, I guess.

21        THE COURT:  Wait.  Before we go into that particular

22   area, I want you to clean this up about them not caring what

23   happened.  I want you to find out who said it.  Otherwise, I'm

24   going to have to -- I sustained the objection.  I'm going to

25   have to strike the testimony unless you establish the

TRIAL ONE - VOL 6 -  289

1   foundation for it.

2   BY MR. DEVILLERS:

3   Q.   Did R.J. talk to you about Mr. Austin being killed, --

4   A.   No.

5   Q.   -- Little R.J.?

6   A.   No.

7   Q.   Did 40, Troy Patterson, talk to you about it?

8   A.   Right.

9   Q.   What did he say?

10  A.   He said he's just glad he was dead now.

11  Q.   Mr. Harris, did he talk to you about it?

12  A.   Right.

13         MR. GATTERDAM:  Objection.  Asked and answered.

14         THE COURT:  Overruled.

15         THE WITNESS:  Right.

16  BY MR. DEVILLERS:

17  Q.   What did he say about it?

18  A.   Fuck him.

19  Q.   Nutty, Mr. Austin, did he have, like, a stepdaughter of

20  some sort?

21  A.   Correct.

22  Q.   Who is that?

23  A.   Dog's baby mom.

24  Q.   Dog's baby's mom.  Do you know her name?

25  A.   Lynne.

1    Q.    Lynne?   Okay.

2          And this is Chris Harris' baby's momma named Lynne?

3    A.    Correct.

4          MR. DEVILLERS:  At this time, I would like to play a

5    phone call.  We'd ask to play Government's Exhibit 150-1282.

6          THE COURT:  Just a second.  I have that stipulation

7    that I need to read.

8          MR. DEVILLERS:  Yes, Your Honor.

9       (Whereupon, there was a brief interruption.)

10         THE COURT:  Ladies and gentlemen, this is a limited

11   instruction to which all counsel agreed.  And it will guide

12   your consideration of these telephone calls.

13         Ladies and gentlemen of the jury, throughout this trial,

14   there will be telephone calls played and admitted into evidence

15   that involve the defendants while they were being detained in

16   either a jail or a prison.  The fact that the defendants were

17   being detained at the time the respective call was made shall

18   not be used by you to in any way infer guilt on any of the

19   charges pending in this case.  No inference should be made as

20   to whether the person stands accused or convicted of a crime.

21         MR. DEVILLERS:  Thank you, Your Honor.

22         We would like to play Government's Exhibit 150-128

23   (sic), and we're going to start at approximately one oh eight.

24         THE COURT:  All right.

25         MR. DEVILLERS:  1282.  I'm sorry.

TRIAL ONE – VOL 6 –   291

1      (Audiotape begun to be played in open court.)

2           THE COURT:  Could you start from the beginning?  Start

3      from the beginning.  I'm going to turn it up.  Oh, oh.  Sorry.

4           Discontinue it.  I'm going to have our tech person come

5      up.  I think that he might have turned it down when he was up

6      here earlier doing a sound test.

7           MR. DEVILLERS:  I can continue with another part of

8      direct, Your Honor.

9           THE COURT:  Okay.  Yes.  Ms. Clark is going to call

10     Mr. Wright.  You go ahead and continue with the direct.

11          Ladies and gentlemen, we'll come back to the tape once

12     we overcome our technical deficiencies.

13          Go ahead, Mr. Devillers.

14     BY MR. DEVILLERS:

15     Q.   Have you ever heard of the name Earl Williams, or E-Dub?

16     A.   Correct.

17     Q.   Who have you heard that from?

18     A.   Dog.

19     Q.   And what did Dog tell you about E-Dub?

20     A.   He thinks he was telling on him.

21     Q.   He thinks E-Dub was telling on him?

22     A.   Right.

23     Q.   For what?

24     A.   A crime they committed.

25     Q.   Who is "they"?

TRIAL ONE – VOL 6 –   292

1    A.   Dog and E-Dub, I guess.

2    Q.   Did he tell you any more specifics about that crime?

3    A.   It was a murder.

4    Q.   Did he tell you who got murdered?

5    A.   Williams, I think.

6    Q.   What's that?

7    A.   Williams.

8    Q.   Did he tell you anything more specific than that?

9    A.   A group of them went in the house to rob him.  He got

10   killed.

11   Q.   Did he say who was in the group?

12   A.   Him, E-Dub, Jizzle and B, I think.

13   Q.   Jizzle and who?

14   A.   B.

15   Q.   Who is B?

16   A.   Brandon Ledbetter.

17   Q.   And Harris thought E-Dub was going to talk about it?

18   A.   Right.

19   Q.   As a result of that, did -- were you asked to do

20   anything?

21   A.   I didn't hear you.

22   Q.   As a result of that, were you asked to do anything?

23   A.   He was in Mansfield.  He asked me to send a --

24   Q.   Wait.  Who was in Mansfield?

25   A.   E-Dub.

TRIAL ONE - VOL 6 -  293

1    Q.   Okay.

2    A.   So I knew a few people down there.  So I wrote a letter

3    to them to get him touched.

4    Q.   Get him touched?

5    A.   Right.

6    Q.   What's -- What's that mean, get him touched?

7    A.   Beat up, fucked up, or something.

8    Q.   Did you write that letter?

9    A.   Correct.

10   Q.   Did you send it?

11   A.   Right.

12   Q.   Do you a know a person by the name of Tyrell Davis?

13   A.   Correct.

14   Q.   Who is Tyrell Davis?

15   A.   Gauge.

16   Q.   His street name is Gauge?

17   A.   Correct.

18   Q.   What happened to Mr. Davis?

19   A.   Got shot and killed.

20   Q.   Have you ever talked to --

21       THE COURT:  Just one moment.  Mr. Wright is here.

22       Mr. Wright.

23       We'll see if we can get this on.

24    (Whereupon, there was a brief interruption.)

25       MR. DEVILLERS:  Your Honor, we would like to start --

TRIAL ONE – VOL 6 –  294

1    This is, again, Government's Exhibit --

2          I'll let him do his thing.

3          THE COURT:  He's just trying to make sure that you all

4    have your -- All right.

5          MR. DEVILLERS:  -- 150-1282, at approximately one oh

6    eight.

7          THE COURT:  All right.

8          MR. DEVILLERS:  One oh four is good.

9        (Audiotape played in open court.)

10          MR. DEVILLERS:  Can you stop there?  Okay.

11    BY MR. DEVILLERS:

12    Q.    Do you recognize those voices?

13    A.    Correct.

14    Q.    Who are those voices?

15    A.    Dog and Lynne.

16    Q.    And Lynne is who?

17    A.    His baby mom.

18    Q.    Okay.  And she is this -- I believe you had testified

19    earlier she is the stepdaughter of Nutty?

20    A.    Correct.

21          MR. DEVILLERS:  Can you continue?

22        (Audiotape played in open court.)

23          MR. DEVILLERS:  Let's stop there.

24    BY MR. DEVILLERS:

25    Q.    Did you hear what he said there?

TRIAL ONE – VOL 6 –   295

1    A.    Lucky Homo wasn't out there.

2          MR. DEVILLERS:  Continue.

3       (Audiotape played in open court.)

4          MR. DEVILLERS:  Stop there.

5    BY MR. DEVILLERS:

6    Q.    What was that last statement?  Did you hear that last

7    comment?

8    A.    No.

9          MR. DEVILLERS:  Would you play it back?

10   BY MR. DEVILLERS:

11   Q.    Let me ask you this first.

12         R.J., he went to prison.  Do you recall for what?

13   A.    For murder.

14   Q.    And do you know what he got, what his sentence was?

15   A.    Eighteen to life.

16      (Audiotape played in open court.)

17         MR. DEVILLERS:  Stop there.

18   BY MR. DEVILLERS:

19   Q.    Did you hear that?

20   A.    Right.

21   Q.    What did he say?

22         MR. GATTERDAM:  Objection.

23         THE COURT:  Overruled.

24         THE WITNESS:  Put a nigger in jail for 18 to life.

25         MR. DEVILLERS:  Continue, please.

TRIAL ONE – VOL 6 – 296

1      (Audiotape played in open court.)

2           MR. DEVILLERS:  Your Honor, we stopped at five thirty

3  nine.

4           THE COURT:  All right.  The record will so reflect.

5   BY MR. DEVILLERS:

6   Q.   In listening to that conversation, can you tell us who

7  they were talking about?

8   A.   Nutty.

9   Q.   I think we were talking about Tyrell Davis.  Who is

10  Tyrell Davis?

11  A.   Gauge.

12  Q.   And did Gauge associate with the Short North?

13  A.   Right.

14  Q.   What did he do for a living?

15  A.   Sell drugs.

16  Q.   What happened to Gauge?

17  A.   Got shot and killed.

18  Q.   Do you remember when you found out about that?

19  A.   A little bit after it happened.

20  Q.   Where were you at the time?

21  A.   In jail.

22  Q.   Do you remember who told you about it?

23  A.   I was -- I -- I talked to somebody, and they told me.

24  Q.   Okay.  Did you ever talk to Mr. Harris or Mr. Liston or

25  Mr. Wilson about it?

TRIAL ONE – VOL 6 –   297

1    A.   Right.

2    Q.   What's that?

3    A.   Right.

4    Q.   Who did you talk to?

5    A.   R.J.

6    Q.   What did R.J. tell you happened?

7    A.   They went over there to get some weed, and he got to

8    reaching.  Shots was fired, and he got shot and killed.

9    Q.   Who went?  Let me start with, did R.J. tell you who he

10   went with?

11       MS. DIXON:  Objection, Your Honor.  I'm not sure, when

12   he says "R.J.," who he's talking about.

13       THE COURT:  Distinguish between the two, please, Mr.

14   Devillers.

15   BY MR. DEVILLERS:

16   Q.   You talked about a Big R.J., who is Robert Liston, and a

17   little R.J., who is Robert Wilson; is that right?

18   A.   Correct.

19   Q.   Which one are you talking about?

20   A.   Robert Wilson.

21   Q.   Okay.  All right.  Did Robert Wilson tell you who he

22   went with?

23   A.   Him, Tone, Bucc --

24       MS. DIXON:  Objection, Your Honor.  Hearsay.

25       THE COURT:  Overruled.

TRIAL ONE – VOL 6 –  298

1    BY MR. DEVILLERS:

2    Q.   Okay.  Who is Tone?

3    A.   Tony Jones.

4    Q.   All right.  Who else?

5    A.   Bucc.

6    Q.   Okay.

7    A.   Waddle.

8    Q.   Shawn Waddell?

9    A.   Correct.

10   Q.   All right.  Same person you'd talked about before doing

11   a robbery with?

12   A.   Correct.

13   Q.   All right.  Anyone else?

14   A.   That's what he told me.

15   Q.   Did he tell you about anything else that happened during

16   that time, during that robbery/murder?

17   A.   Just that he got -- they shot and killed him.  He died.

18   They left.

19   Q.   I want to show you a few more photographs.  I want to

20   show you 1-2-055.  What are we looking at here?  Do you

21   recognize that?

22   A.   A picture of Tone.

23   Q.   Is it on something?

24   A.   Airbrushed T-shirt.

25   Q.   And which Tone are you talking about?

TRIAL ONE - VOL 6 -  299

1    A.   White Boy Tone.

2    Q.   Is that Elijah Ledbetter?

3    A.   Correct.

4    Q.   And is he doing something with his hands?

5    A.   Throwing up fours.

6         MR. DEVILLERS:  Your Honor, may I publish this to the

7    jury?

8         THE COURT:  Any objection?

9         MR. GATTERDAM:  No objection.

10        MS. DIXON:  No objection, Your Honor.

11        MR. MEYERS:  No objection.

12        MR. BERNDT:  No objection.

13        MR. NOLDER:  None, Your Honor.

14        THE COURT:  It will be received.  And you may publish

15   the photo.

16   BY MR. DEVILLERS:

17   Q.   I now want to show you what's been marked as

18   Government's Exhibit 1-2-065.  Do you recognize that person?

19   A.   Dog.

20   Q.   Is that Chris Harris?

21   A.   Correct.

22   Q.   Okay.  Is he doing something with his hand?

23   A.   Throwing up Homo.

24   Q.   What do you mean, throwing up Homo?  What does that

25   mean?

TRIAL ONE – VOL 6 –   300

1    A.    Just making a sign.

2    Q.    Explain.  Why is that Homo?  What makes it Homo?

3    A.    It looks like an H.

4         MR. DEVILLERS:  All right.  Your Honor, may I publish

5    this to the jury?

6         THE COURT:  Yes.

7       Any objection?

8         MR. GATTERDAM:  No objection.

9         MS. DIXON:  No objection, Your Honor.

10        MR. BERNDT:  No, Your Honor.

11        MR. MEYERS:  No, Your Honor.

12        MR. NOLDER:  None, Your Honor.

13        THE COURT:  It will be received.  And you may publish

14   it, Mr. Devillers.

15   BY MR. DEVILLERS:

16   Q.    Does Mr. Harris have any tattoos on his hands that

17   you're aware of?

18   A.    I can't recall what they say.

19   Q.    Can you show me a Homo sign?

20   A.    (Indicating).

21   Q.    And you're putting down your two middle fingers and

22   putting up your pinky and index finger?

23   A.    Right.

24        MR. BERNDT:  Your Honor, can he do that again?  I

25   couldn't see it at all.

1          THE COURT:  Could you do that again?

2          MR. BERNDT:  Thank you.

3          THE WITNESS:  (Indicating).

4          THE COURT:  Can you see, Mr. Meyers?

5          MR. MEYERS:  Yes, Your Honor.

6          THE COURT:  All right.

7     BY MR. DEVILLERS:

8     Q.  I'd like to show you 1-2-066.

9          COURTROOM DEPUTY CLERK:  Could you repeat that?

10    BY MR. DEVILLERS:

11    Q.  Do you recognize that individual?

12    A.  Bucc.

13         COURTROOM DEPUTY CLERK:  Could you repeat that exhibit

14    number?

15         MR. DEVILLERS:  I'm sorry.  It's 1-2-066.

16    BY MR. DEVILLERS:

17    Q.  Who is that?

18    A.  Bucc.

19    Q.  Is that Mr. Liston?

20    A.  Correct.

21         MR. DEVILLERS:  And may I publish this to the jury,

22    Your Honor?

23         THE COURT:  Yes, you may.

24         MR. BERNDT:  No objection, Your Honor.

25         MR. GATTERDAM:  No objection.

TRIAL ONE – VOL 6 –  302

1          MS. DIXON:  No objection.

2          MR. NOLDER:  None, Your Honor.

3          MR. MEYERS:  No objection.

4          THE COURT:  All right.

5    BY MR. DEVILLERS:

6    Q.   What is he doing with his right hand?

7    A.   Throwing up fours.

8    Q.   What has he got in his left hand?

9    A.   Money.

10   Q.   Mr. Liston, did you ever know him to have a job?

11   A.   No.

12   Q.   How about Mr. Harris?

13   A.   No.

14   Q.   How about Mr. Ussury?  Have you ever known him to have a

15  job?

16   A.   No.

17   Q.   Can you tell what's on his shirt?

18   A.   No, I can't tell what it is.

19   Q.   I'm going to show you what's been marked as Government's

20  Exhibit 1-2-067.

21      All right.  Can you tell me what that is?

22   A.   A picture.

23   Q.   Who is in that picture?

24   A.   Me, Dog, 40, and Jizzle.

25   Q.   Is there a couple other guys in there as well?

TRIAL ONE – VOL 6 –   303

1    A.    Correct.

2            MR. DEVILLERS:  May I publish this to the jury, Your

3    Honor?

4            THE COURT:  Yes.

5         Any objection?

6         MR. MEYERS:  No objection, Your Honor.

7         MR. GATTERDAM:  No objection.

8         MS. DIXON:  No objection.

9         MR. NOLDER:  No objection.

10         MR. MEYERS:  No objection.

11         THE COURT:  It may be admitted.

12    BY MR. DEVILLERS:

13    Q.    The person to your -- standing up, to the left, who is

14    that?

15    A.    Dog.

16    Q.    And the person to the -- standing at the far right, who

17    is that?

18    A.    R.J.

19    Q.    The two people at the bottom, the person at the bottom

20    left --

21            THE COURT:  I'm sorry, Mr. Devillers.  Could you have

22    the witness -- We have two R.J.s.  So --

23            MR. DEVILLERS:  Yes, Your Honor.

24            THE COURT:  -- use his given name.

25    BY MR. DEVILLERS:

TRIAL ONE - VOL 6 -   304

1    Q.   What's this person's, R.J.'s, name in this photograph?

2    A.   Robert Wilson.

3    Q.   All right.  The person at the bottom left, kneeling

4    down, who is that?

5    A.   Me.

6    Q.   And the person at the bottom right, kneeling down, who

7    is that?

8    A.   40.

9    Q.   Okay.  Where is this -- Is this picture taken while

10   you're in prison?

11   A.   Correct.

12   Q.   And now I want to show you what's been marked as

13   Government's Exhibit 1-2-073.  Who are we looking at here?

14   A.   Tysin.

15   Q.   Do you recognize anyone else in that picture?

16   A.   His brother.

17   Q.   What's his brother's name?

18   A.   Black Den.

19   Q.   Was Black Den a part of Cut Throat?

20   A.   Associate.

21   Q.   Associate, is that what you said?

22   A.   Right.

23   Q.   All right.  And what's Tysin doing there?

24   A.   Throwing up Crip.

25   Q.   Throwing up Crip?

```
                                    TRIAL ONE – VOL 6 –   305
```

1     A.    Right.

2     Q.    All right.  And now I want to show you what's been

3  marked as -- Sorry.

4           MR. DEVILLERS:  May I publish this to the jury, Your

5  Honor?

6           THE COURT:  Yes.

7        Any objection?

8           MR. GATTERDAM:  No objection.

9           MS. DIXON:  No objection, except I'm not sure which

10  one he's saying is Tysin.  If he could --

11   BY MR. DEVILLERS:

12   Q.    Is Tysin the one throwing up Crips?

13          THE COURT:  Why don't you rephrase it and just ask him

14  which one was Tysin?

15   BY MR. DEVILLERS:

16   Q.    Which one is Tysin?

17   A.    In the red shirt.

18          MS. DIXON:  Thank you.

19          MR. NOLDER:  No objection, Your Honor.

20          MR. MEYERS:  No objection, Your Honor.

21          MR. BERNDT:  No, Your Honor.

22          THE COURT:  It will be received.

23        Mr. Devillers, you may publish it.

24          MR. DEVILLERS:  Thank you, Your Honor.

25          Your Honor, may I go back?  I don't believe I asked the

TRIAL ONE – VOL 6 –   306

1   last exhibit to be posted.

2            THE COURT:  Yes, you may.

3            MR. DEVILLERS:  Can I go back to 1-2-067?  May I

4   publish this, Your Honor?

5            MR. BERNDT:  No objection, Your Honor.

6            THE COURT:  This wasn't published?  Yes, it was

7   published.

8            MR. DEVILLERS:  It was published?  My bad, Your Honor.

9        Could I go to 1-2-079?

10  BY MR. DEVILLERS:

11  Q.    Who are we looking at here?

12  A.    Dog, Bucc, and Fat Tone.

13  Q.    Could you tell where this is taken, where they are?

14  A.    Hu-uh.

15  Q.    Is that "yes" or "no"?

16  A.    No.

17           MR. DEVILLERS:  Your Honor, may I publish this to the

18  jury?

19           THE COURT:  Yes.

20        You said the gentleman on the right is who, on the far

21  right?

22           THE WITNESS:  Fat Tone.

23           THE COURT:  What's his name?

24  BY MR. DEVILLERS:

25  Q.    Do you know his real name?

TRIAL ONE – VOL 6 – 307

1    A.   Antonio Harris.

2    Q.   And he goes by what?

3    A.   Fat Tone.

4    Q.   Fat Tone?

5    A.   Correct.

6    Q.   Is he relations to Mr. Harris, Chris Harris?

7    A.   Cousin.

8    Q.   Is he Cut Throat or Homo?

9    A.   Not to my understanding.

10   Q.   Does he associate with Cut Throat or Homo?

11   A.   Correct.

12        MR. DEVILLERS:  May I publish this to the jury?

13        THE COURT:  Yes, you may.

14        Any objection?

15        MR. GATTERDAM:  No objection.

16        MS. DIXON:  No objection, Your Honor.

17        MR. BERNDT:  No, Your Honor.

18        MR. MEYERS:  No, Your Honor.

19        MR. NOLDER:  None, Your Honor.

20        THE COURT:  It will be received.  And you may publish

21   it.

22   BY MR. DEVILLERS:

23   Q.   The person on the far left is who?

24   A.   O-Dog.

25   Q.   The person in the middle is who?

TRIAL ONE – VOL 6 – 308

1    A.    Bucc.

2    Q.    And is he doing anything with his hand?

3    A.    Throwing up fours.

4    Q.    All right.  Is he wearing anything?

5    A.    A chain.

6    Q.    A chain?

7    A.    A chain.

8    Q.    Is there a cross on that chain?

9    A.    Look like it.

10   Q.    And the person on the far right is who?

11   A.    Fat Tone.

12   Q.    They got anything in their hands?

13   A.    Money.

14   Q.    The car, do you know whose car that is?

15   A.    No.

16   Q.    Now I want to show you what's been marked —— I'm sorry.

17   I want to show you what's been marked as Government's Exhibit

18   1-2-080.

19            COURTROOM DEPUTY CLERK:  080?

20            MR. DEVILLERS:  Yes, ma'am.

21   BY MR. DEVILLERS:

22   Q.    Okay.  Mr. Wright, what are we looking at here?

23   A.    A picture of White Boy Tone.

24   Q.    Is it on something?

25   A.    A car.

TRIAL ONE – VOL 6 – 309

1    Q.   Have you seen pictures of that car before?

2    A.   Correct.

3    Q.   Whose car is that?

4    A.   O-Dog's.

5         MR. DEVILLERS:  May I publish this, Your Honor?

6         THE COURT:  Yes.

7         Any objection?

8         MR. GATTERDAM:  No objection.

9         MS. DIXON:  No objection, Your Honor.

10        MR. BERNDT:  No, Your Honor.

11        MR. MEYERS:  No, Your Honor.

12        MR. NOLDER:  None, Your Honor.

13        THE COURT:  It will be received.

14        And you may publish it.

15   BY MR. DEVILLERS:

16   Q.   Whose car is this?

17   A.   O-Dog's.

18   Q.   And do you know when he got this spray painted on the

19   car?

20   A.   I couldn't tell you the exact date.

21   Q.   I'm now going to show you what's been marked as

22   Government's Exhibit 1-2-109.  What are we looking at here?

23   A.   A picture of Fee's party.

24   Q.   Okay.  Fee, that's Le Le, Richard Willis?

25   A.   Correct.

TRIAL ONE – VOL 6 –   310

1    Q.    Is there -- Is there an image of Fee in that photograph?

2    A.    Correct.

3    Q.    Who else is in that photograph?

4    A.    Tommy, Kiesha, T.T. and Janeka.

5    Q.    Tommy who?

6    A.    Coates.

7    Q.    And I believe you testified earlier.  Is he part of Cut

8    Throat?

9    A.    Correct.

10   Q.    And the ladies in there are who?

11   A.    Kiesha and her sister, T.T., and Janeka.

12   Q.    All right.  Are they friends of you guys?

13   A.    Kiesha is Fee's baby mom.

14         MR. DEVILLERS:  Your Honor, may I publish this to the

15   jury?

16         THE COURT:  Yes, you may.

17       Any objection?

18         MR. GATTERDAM:  No objection.

19         MS. DIXON:  No objection, Your Honor.

20         MR. BERNDT:  No, Your Honor.

21         MR. NOLDER:  None, Your Honor.

22         MR. MEYERS:  No objection.  I do wonder if we can

23   clarify who is who, though.

24         THE COURT:  I was under the impression that Mr.

25   Devillers was going to do that once it's published to the jury.

TRIAL ONE – VOL 6 –   311

1    BY MR. DEVILLERS:

2    Q.    You indicated there was an image of Fee, Le Le, in this

3    photograph.  Is that right?

4    A.    Correct.

5    Q.    Okay.  What do you mean by "image"?  Is he in there

6    anywhere, or is it just an image of him?

7    A.    It's, like, you get it made.  You have it made.  It was

8    made.

9    Q.    The image of him, is he -- can you describe which person

10   that is?

11   A.    In the royal blue.

12   Q.    The one in the blue?

13   A.    With the blue hat on.

14   Q.    In the back?

15   A.    Correct.

16   Q.    Okay.  What do you mean?  Is that him?  Is that his

17   person there?  Is that his body?

18   A.    No.  It ain't real.

19   Q.    Okay.  When was this picture taken?  Do you have an idea

20   of when it was taken?

21   A.    I couldn't tell you when the picture -- That picture, or

22   the picture of him?

23   Q.    That picture.

24   A.    Oh, I think the beginning of '06, probably.

25   Q.    Was he alive at that time?

1    A.   No.

2    Q.   Do you remember this party?

3    A.   Correct.

4    Q.   Were you at this party?

5    A.   Right.

6    Q.   What was the party about?

7    A.   I think it was his birthday, I think.

8    Q.   But he's already been killed?  He is dead at this point?

9    A.   Correct.

10   Q.   All right.  The person just left of him, who is that?

11   A.   Tony.

12   Q.   And the person just left of him, the woman standing up,

13   who is she?

14   A.   T.T.

15   Q.   And does she have anything in her hand?

16   A.   Money.

17   Q.   The person leaning down, who is she?

18   A.   Kiesha.

19   Q.   And what's Kiesha's relation to Fee?

20   A.   His baby mom.

21   Q.   And does she have money in her hand?

22   A.   Correct.

23   Q.   And is she wearing anything in particular?

24   A.   An airbrushed outfit.

25   Q.   Can you tell what's written on that airbrush outfit?

TRIAL ONE – VOL 6 – 313

1    A.   "CT."

2    Q.   What's "CT" stand for?

3    A.   Cut Throat.

4    Q.   And the female -- I don't -- You can't see her face, but

5  the female to the right, who is that?

6    A.   Janeka.

7    Q.   Janeka what?

8    A.   Johnson.

9    Q.   Do you know Janeka?

10    A.   Correct.

11    Q.   Are you friends with Janeka?

12    A.   Correct.

13    Q.   Did you have a relationship with Janeka?

14    A.   No.

15    Q.   Was she your girlfriend?

16    A.   What?

17    Q.   Was she your girlfriend?

18    A.   No.

19        MR. DEVILLERS:  Okay.  I'd like to show Government's

20  Exhibit 1-2-112.  You know, strike -- strike that.  I don't

21  want to show that.  Okay.

22        THE COURT:  Mr. Devillers, --

23    (Off-the-record discussion at side-bar.)

24        THE COURT:  Please continue, Mr. Devillers.

25  BY MR. DEVILLERS:

TRIAL ONE – VOL 6 – 314

1   Q.   Mr. Wright, did you enter into a guilty plea in this

2   case?

3   A.   Correct.

4   Q.   Do you remember what you pled to?

5   A.   Correct.

6   Q.   What did you plead to?

7   A.   Two counts of murder in the conspiracy.

8   Q.   And where did you plead guilty to?

9   A.   Right here.

10  Q.   In front of Judge Marbley?

11  A.   Correct.

12  Q.   And do you know what those charges carry?

13  A.   Correct.

14  Q.   What do they carry?

15  A.   Life without parole.

16  Q.   Life without the possibility of parole?

17  A.   Correct.

18  Q.   All right.  When is it that you pled guilty?

19  A.   I think in January.

20  Q.   Before that, did you come to talk to Agent Lauber and

21  the prosecution team?

22  A.   Correct.

23  Q.   Did you have an attorney?

24  A.   Correct.

25  Q.   What was your attorney's name?

TRIAL ONE – VOL 6 –   315

1    A.   Fred Benton, Jr., and James Ervin, Jr.

2    Q.   And do you remember where it was that you came to talk

3    to us?

4    A.   I think here.

5    Q.   And did you tell us about your involvement in this case?

6    A.   Correct.

7    Q.   The first time you came and talked to us, did you tell

8    us the truth?

9    A.   No.

10   Q.   Did you lie about something?

11   A.   Correct.

12   Q.   What did you lie about?

13   A.   The Sanikqua Hester murder.

14   Q.   Did you deny your involvement in the Sanikqua Hester

15   murder?

16   A.   Correct.

17   Q.   Why?

18   A.   Because I didn't want to be involved with it.

19   Q.   Did you talk about the Michael Teague murder?

20   A.   Correct.

21   Q.   Did you talk -- Did you come in again and talk to us?

22   A.   Right.

23   Q.   And did you tell us everything you knew to the best of

24   your recollection?

25   A.   Correct.

TRIAL ONE – VOL 6 – 316

1    Q.    Did you tell us the truth then?

2    A.    Correct.

3    Q.    Okay.  You're telling the ladies and gentlemen of the

4    jury, your plea right now, you have to do life without the

5    possibility of parole; is that right?

6    A.    Correct.

7    Q.    Unless something happens; is that correct?

8    A.    Right.

9    Q.    What is it that could happen to give you less than life

10   without the possibility of parole?

11   A.    Repeat again.

12   Q.    What -- Is there any way that you know of where you can

13   get less than life without the possibility of parole right now?

14   A.    Correct.

15   Q.    How?  How could that happen?

16   A.    You file the motion.

17   Q.    Who files a motion?

18   A.    You.

19   Q.    The United States?

20   A.    Correct.

21   Q.    And what would that motion allow?

22   A.    A lesser sentence.

23   Q.    If I don't file that motion, if the United States

24   doesn't file that motion, what will -- your sentence would be

25   what?

TRIAL ONE – VOL 6 – 317

1    A.   Life.

2    Q.   If I do file that motion, who decides whether to grant

3  it or not?

4    A.   The judge.

5    Q.   Which judge?

6    A.   Marbley.

7    Q.   If the judge does grant that motion, who decides how low

8  to go on that sentence?

9    A.   The judge.

10   Q.   Can the government make a recommendation as to how low

11 to go?

12   A.   Right.

13   Q.   Can the probation department make a recommendation?

14   A.   Correct.

15   Q.   Can your attorney make a recommendation?

16   A.   Correct.

17   Q.   Can the victim's family, the victims' families, make a

18 recommendation?

19   A.   Correct.

20   Q.   That's the victims' families of Mr. Teague and

21 Ms. Hester?

22   A.   Right.

23        MR. DEVILLERS:  May we have a moment, Your Honor?

24        THE COURT:  Yes, you may, Mr. Devillers.

25     (Whereupon, there was a brief interruption.)

TRIAL ONE – VOL 6 –  318

1    BY MR. DEVILLERS:

2    Q.   You've mentioned some people today, Mr. Wright, Chris

3    Harris being one of them.  Do you see him in the courtroom

4    today?

5    A.   Correct.

6    Q.   Can you please point to him and describe what he's

7    wearing?

8    A.   I can't see.

9    Q.   You can't see?

10        MR. DEVILLERS:  Could I ask that the witness be

11   allowed to stand up?

12        THE COURT:  Yes.

13        You may stand, Mr. Wright.

14   BY MR. DEVILLERS:

15   Q.   Do you see Mr. Harris in the courtroom?

16   A.   Yes.

17   Q.   Can you point to him and describe him?

18   A.   In a white shirt, black vest.

19        MR. DEVILLERS:  Your Honor, may the record reflect

20   that the witness has identified Christopher Harris?

21        THE COURT:  The record will so reflect.

22   BY MR. DEVILLERS:

23   Q.   You also talked about a Rashad Liston, or Bucc.  Is he

24   in the courtroom today?

25   A.   Correct.

TRIAL ONE – VOL 6 – 319

1    Q.   Could you please describe what he's wearing?

2    A.   White shirt, black vest.

3    Q.   And is he sitting to the right of Mr. Harris?

4    A.   To the left.

5    Q.   To the left of Mr. Harris.

6         MR. DEVILLERS:  Your Honor, may the record reflect

7    that the witness has identified the defendant, Mr. Liston?

8         THE COURT:  The record will so reflect.

9    BY MR. DEVILLERS:

10   Q.   You also talked about B, Brandon Ledbetter.  Do you see

11   him in the courtroom today?

12   A.   Correct.

13   Q.   Can you describe what he's wearing?

14   A.   All black suit.

15   Q.   What color tie?

16   A.   Can't see it.

17   Q.   Okay.  Is he sitting to the right of Mr. -- to the left

18   of Mr. Liston?

19   A.   Correct.

20        MR. DEVILLERS:  May the record reflect that the

21   witness has identified the defendant, Robert Ledbetter?

22        THE COURT:  The record will so reflect.

23   BY MR. DEVILLERS:

24   Q.   And the person that you've known as -- you've mentioned

25   as D Frog, or Deounte Ussury, is he in the courtroom today?

TRIAL ONE - VOL 6 - 320

1    A.    Correct.

2    Q.    Can you describe what he's wearing?

3    A.    All gray suit, black tie.

4         MR. DEVILLERS:  May the record reflect that the

5    witness has identified the defendant Mr. Ussury?

6         THE COURT:  The record will so reflect.

7         MR. DEVILLERS:  Okay.  You can have a seat.

8    BY MR. DEVILLERS:

9    Q.    Mr. Wright, you've already testified that Nutty, Stephan

10   Austin, was killed because he cooperated; is that right?

11   A.    Correct.

12   Q.    You're cooperating; aren't you?

13   A.    Correct.

14   Q.    Did we promise you anything in regards to your

15   protection or your family's protection?

16   A.    Correct.

17   Q.    Did we promise to protect them?

18   A.    Right.

19   Q.    Did we promise to protect you?

20   A.    Right.

21   Q.    Other than the promise for protection, what's written in

22   your plea agreement as far as the possibility of getting a

23   motion from us, any other promises to you?

24   A.    No.

25        MR. DEVILLERS:  No further questions, Your Honor.

TRIAL ONE - VOL 6 - 321

1      THE COURT:  Thank you, Mr. Devillers.

2      Ladies and gentlemen, it is 12:19.  And so we're going

3  to stand in -- we're going to take our lunch recess now, give

4  you an opportunity to enjoy some of this wonderful Ohio

5  sunshine, which is a rarity this time of year.

6      We're going to stand in recess until 1:30.  That should

7  give you an opportunity to kind of find your bearings, get you

8  some good lunch food, and get back for us to start the

9  cross-examination, if any, of Mr. Wright at 1:30.

10      So I'm going to ask that you be back here around 1:20,

11  or so, so that we can get everyone organized and get you back

12  where you have to be.

13      Remember the Court's admonition.  And, more importantly,

14  enjoy your lunch, ladies and gentlemen.

15    (Jury out at 12:18 p.m.)

16      THE COURT:  Mr. Devillers, is there anything we need

17  to take up, before we adjourn for lunch, from the government?

18      MR. DEVILLERS:  No, Your Honor.

19      THE COURT:  Mr. Berndt?

20      MR. BERNDT:  No, Your Honor, for Mr. Ledbetter.

21      THE COURT:  Mr. Gatterdam?

22      MR. GATTERDAM:  No, Your Honor.

23      THE COURT:  Ms. Dixon?

24      MS. DIXON:  No, Your Honor.

25      THE COURT:  Mr. Meyers?

TRIAL ONE – VOL 6 – 322

1      MR. MEYERS:  No, Your Honor.

2      THE COURT:  Mr. Nolder, anything we need to take up

3  before lunch?

4      MR. NOLDER:  No, sir.

5      THE COURT:  All right.  Thank you very much.

6    Enjoy your lunch, everyone.

7    (Lunch recess taken from 12:20 p.m. to 1:30 p.m.)

8                        – – –

9                              TUESDAY AFTERNOON SESSION

10                             APRIL 12, 2016

11                       – – –

12    (Jury in at 1:37 p.m.)

13      THE COURT:  Mr. Berndt.

14      MR. BERNDT:  Thank you, Your Honor.

15      THE COURT:  Are you ready to proceed?

16      MR. BERNDT:  I am, Your Honor.

17      THE COURT:  Please proceed.

18                       – – –

19                    CROSS-EXAMINATION

20  BY MR. BERNDT:

21  Q.   Mr. Wright, good afternoon.

22  A.   Good afternoon.

23  Q.   Can you hear me okay?

24  A.   Yes.

25  Q.   I've been having trouble hearing you most of the

TRIAL ONE – VOL 6 –   323

1    morning.  So if you could speak up, I'd appreciate it.  Okay?

2    A.    My throat.  Something wrong.

3    Q.    I understand.  Try to use that mic for me.  Okay?  Can

4    you do that?

5    A.    Okay.

6    Q.    Thank you.

7          Mr. Wright, I want to talk to you about your plea

8    agreement with the government.  Okay?

9    A.    Yeah.

10   Q.    Now, you pled guilty to three crimes, correct?

11   A.    Correct.

12   Q.    Each of those crimes individually carried a potential of

13   a life sentence, correct?

14   A.    Correct.

15   Q.    And before that life sentence can be reduced to

16   something short of that, any of those three life sentences, you

17   need the government to help you, do you not?

18   A.    Correct.

19   Q.    You need them to file a motion requesting that relief,

20   correct?

21   A.    Correct.

22   Q.    And if they don't file that motion, you don't get that

23   relief, correct?

24   A.    Correct.

25   Q.    You're certainly expecting them to file that motion, are

TRIAL ONE – VOL 6 –   324

1   you not?

2    A.   Correct.

3    Q.   And you're certainly expecting to get a far-reduced

4   sentence from three consecutive life sentences, correct?

5    A.   Correct.

6    Q.   And have you been given any type of idea by anybody as

7   to what your sentence is going to be?

8    A.   Repeat it again.

9    Q.   Have you been given a prediction by anybody, the

10   government, your lawyer, anybody at all as to what your

11   sentence will ultimately be?

12    A.   Correct.

13    Q.   You have been?

14    A.   Yes.

15    Q.   What's that prediction?

16    A.   Eighteen years.

17    Q.   Okay.  So you go from three consecutive life sentences

18   to what you expect to be 18 years?

19    A.   Correct.

20    Q.   Who told you that?

21    A.   My lawyer.

22    Q.   Okay.  Now, you were told before your first debriefing

23   that something was very important for you to do at that

24   debriefing, correct?

25    A.   No.

1    Q.   Let me back up.  You sat down with the government twice,

2    correct?

3    A.   Correct.

4    Q.   That's what I call a debriefing.

5    A.   All right.

6    Q.   Okay.  The first time that you went to a debriefing,

7    were you told what was expected of you?

8    A.   Correct.

9    Q.   And what was expected of you?

10   A.   To testify.

11   Q.   And to tell the truth, correct?

12   A.   Correct.

13   Q.   Weren't you told that what the government wants from you

14   is the unvarnished truth, correct?

15   A.   Correct.

16   Q.   And that whether the truth helped the government or hurt

17   the government, that's what they wanted, correct?

18   A.   Correct.

19   Q.   And you lied to them, didn't you?

20   A.   Correct.

21   Q.   So you walked in to this first meeting with the

22   government, correct?

23   A.   Right.

24   Q.   You were told the most important thing was to tell the

25   truth, correct?

TRIAL ONE – VOL 6 – 326

1    A.   Correct.

2    Q.   And you didn't tell them the truth, correct?

3    A.   Correct.

4    Q.   And the government still decided to continue on with

5    their deal with you, correct?

6    A.   Correct.

7    Q.   So they gave you a pass on breaking their most important

8    rule, correct?

9    A.   Correct.

10   Q.   Thank you.

11        Now, you knew Elijah Ledbetter very well, correct?

12   A.   Correct.

13   Q.   You saw Elijah Ledbetter almost daily, correct?

14   A.   Correct.

15   Q.   And you testified that you did literally dozens of

16   crimes, robberies, such things with Elijah Ledbetter, correct?

17   A.   Correct.

18   Q.   Now, you also don't know Robert Ledbetter at all,

19   correct?

20   A.   I know of him.

21   Q.   You don't know him personally, correct?

22   A.   Correct.

23   Q.   You've never even spoken to him, correct?

24   A.   That's not correct.

25   Q.   That's not correct?  Okay.  Your contacts with him have

TRIAL ONE – VOL 6 –   327

1   been minimal, correct?

2     A.   Correct.

3     Q.   No criminal activity with Robert Ledbetter, correct?

4     A.   Correct.

5     Q.   Thank you.

6          You mentioned a gentleman by the name of Troy Patterson,

7   correct?

8     A.   Right.

9     Q.   Troy Patterson is a murderer, is he not?

10    A.   Right.

11    Q.   A drug dealer?

12    A.   Correct.

13    Q.   A rapist?

14    A.   Correct.

15    Q.   And in 2003, you, Elijah Ledbetter and Troy Patterson

16   were playing the knockout game, correct?

17    A.   Correct.

18    Q.   And Troy Patterson actually killed somebody during that

19   game, didn't he?

20    A.   Correct.

21    Q.   I want to back up just a little bit about your deal,

22   too.  You pled to three life counts, correct?

23    A.   Correct.

24    Q.   But you were also given a pass on every other crime that

25   you talked to the government about, correct?

1    A.    Correct.

2    Q.    So, for instance, you were given a pass on this murder

3    that occurred during the knockout game, correct?

4    A.    No.  I wasn't charged with that.

5    Q.    Okay.  But you spoke about it, correct?

6    A.    Correct.

7    Q.    You participated in it, correct?

8    A.    Correct.

9    Q.    And you're not going to be charged with it as part of

10   your plea agreement, correct?

11   A.    Correct.

12   Q.    So that would be four life sentences, correct?

13   A.    Correct.

14   Q.    Along with the dozens of crimes that you said you

15   committed, say, for instance, with Elijah Ledbetter, correct?

16   A.    Correct.

17   Q.    All of that boils down to 18 years, correct?

18   A.    Correct.

19   Q.    Now, do you consider Troy Patterson to be credible?

20   A.    It's not my choice.

21   Q.    Okay.  Chris Harris.  Do you know Chris Harris?

22   A.    Correct.

23   Q.    Saw him daily?

24   A.    Right.

25   Q.    Said that he was a member of the Homicide Squad,

TRIAL ONE – VOL 6 –   329

1   correct?

2    A.   Right.

3    Q.   Remember when you sat down with the government and they

4   asked you to identify the people that were in the Homicide

5   Squad?

6    A.   Right.

7    Q.   And you identified yourself, Fee, Leak, Freddie Johnson.

8   Remember that?

9    A.   They wrote it wrong.

10    Q.   They wrote it wrong.  Who was in the Homicide Squad?

11    A.   Dog, RJ, Buck and Jizzle.

12    Q.   Yourself too?

13    A.   No.

14    Q.   That's it?

15    A.   Right.

16    Q.   Complete list?

17    A.   What?

18    Q.   The complete list you just mentioned to the jury?

19    A.   Right.

20        THE COURT:  I'm sorry.  I didn't get the last one.

21   Would you repeat those four names again, please?

22        THE WITNESS:  Dog, Buck, 40 and Jizzle.

23    BY MR. BERNDT:

24    Q.   And the Cut Throat Committee, who was in the Cut Throat

25   Committee?

TRIAL ONE – VOL 6 – 330

1    A.    Numerous of people.

2    Q.    Okay.  Can you name them?

3    A.    Every single one?

4    Q.    As many as you can.

5    A.    Me, Jigg, Tysin, Freddie, Tommy, Leak, Fee, Dog.

6    Q.    Not Robert Ledbetter, correct?

7    A.    Correct.

8    Q.    Do you know Anthony Jones?

9    A.    Correct.

10   Q.    Murderer?

11   A.    Right.

12   Q.    Serious criminal?

13   A.    Right.

14   Q.    No integrity at all, does he?

15   A.    If you say.

16   Q.    I'm asking you.

17   A.    Don't matter to me.

18   Q.    Okay.  Earl Williams, murderer?

19   A.    I don't know him.

20   Q.    You don't know him.  Okay.

21         You said that on direct examination that Chris Harris

22   told you that Robert Ledbetter was involved in the murder of

23   Alan Johnson, correct?

24   A.    Correct.

25   Q.    You were in prison then, correct?

TRIAL ONE – VOL 6 –  331

1     A.   Correct.

2     Q.   And you have no personal knowledge as to whether or not

3  that statement is accurate, correct?

4     A.   Correct.

5     Q.   And this statement came from Chris Harris, correct?

6     A.   Correct.

7     Q.   And you also stated on direct examination that you were

8  asked by Mr. Harris to harm somebody, correct?

9     A.   Correct.

10    Q.   And that would be Earl Williams, correct?

11    A.   Correct.

12    Q.   And that came from Chris Harris, correct?

13    A.   Correct.

14    Q.   It didn't come from Robert Ledbetter, correct?

15    A.   Correct.

16    Q.   Thank you.

17        MR. BERNDT:  If I may have just a moment, Your Honor.

18        THE COURT:  Yes, you may.

19  BY MR. BERNDT:

20    Q.   Tell me who was in charge of the Cut Throat Committee?

21    A.   Jigg.

22    Q.   And who was in charge of the --

23        THE COURT:  Who, I'm sorry?  What's the name?

24        THE WITNESS:  Jigg.

25        THE COURT:  What was his given name?

1          THE WITNESS:  Lance Green.

2     BY MR. BERNDT:

3     Q.   And who was in charge of the Homicide Squad?

4     A.   Couldn't tell you.

5     Q.   Nobody?

6     A.   I said I couldn't tell you.

7     Q.   Because you don't know?

8     A.   I couldn't tell you.  If I knew, I could tell you.

9     Q.   Okay.  So you don't know?

10    A.   Correct.

11    Q.   So you wouldn't know if there was any type of hierarchy

12    or any type of ranking amongst the Homicide Squad?

13    A.   Correct.

14    Q.   No?

15    A.   No.

16    Q.   Okay.

17         MR. BERNDT:  Your Honor, if I may have just a moment

18    with my co-counsel.

19         THE COURT:  Yes, you may.

20         MR. BERNDT:  Your Honor, thank you very much.  I have

21    nothing further.

22         Thank you, Mr. Wright.

23         THE COURT:  Thank you, Mr. Berndt.

24         Mr. Gatterdam, on behalf of Mr. Harris.

25         MR. GATTERDAM:  May I proceed, Your Honor?

TRIAL ONE – VOL 6 – 333

1    THE COURT:  Please proceed, Mr. Gatterdam.

2                         – – –

3                    CROSS-EXAMINATION

4    BY MR. GATTERDAM:

5    Q.   Mr. Wright, just before I go further, I want to pick

6    back up on where Mr. Berndt left off.  To the best of your

7    knowledge, there's nobody in charge of the Homicide Squad,

8    correct?

9    A.   Correct.

10   Q.   And you talked about on direct examination all these

11   licks that you went on, right?

12   A.   Correct.

13   Q.   Nobody told you to go on these licks, right?

14   A.   Right.

15   Q.   Nobody told you what to do with the money when you went

16   on the licks, right?

17   A.   Right.

18   Q.   Just basically what happened was you and whoever you

19   went on these licks with generally split the money, right?

20   A.   Right.

21   Q.   You didn't put it somewhere else for some other use

22   later.  You used it for whatever you wanted to use it for,

23   right?

24   A.   Correct.

25        THE COURT:  Mr. Gatterdam, could you clarify for the

TRIAL ONE – VOL 6 – 334

1    record what you and the witness mean by licks?

2            MR. GATTERDAM:  Certainly, Your Honor.

3     BY MR. GATTERDAM:

4     Q.   Mr. Wright, since I can't testify, could you please

5     say -- tell the jury what a lick is.

6     A.   A robbery.

7     Q.   Okay.

8            THE COURT:  Thank you.

9            MR. GATTERDAM:  Certainly.

10    BY MR. GATTERDAM:

11    Q.   Let's go back to -- let me ask you this.  You were asked

12    about some of these proffers or statements you made with the

13    government.  You remember that?

14    A.   Correct.

15    Q.   So how many -- you were arrested and charged with this

16    indictment June 30 of 2014, does that sound about right?

17    A.   Correct.

18    Q.   That day you made a statement to the police, correct?

19    A.   No.

20    Q.   You talked to the police that day, correct?

21    A.   No.

22    Q.   Okay.  So if I have a transcript of an audiotape of you

23    talking to the police, tell me what's the problem with that?

24    A.   I don't recall talking to them.

25    Q.   It doesn't exist?

TRIAL ONE – VOL 6 –   335

1     A.   I said I don't recall.

2     Q.   Okay.  Would you like an opportunity to review that to

3   know that you actually made a statement or do you have any

4   doubt that you actually spoke to the police on June 30th?

5     A.   Show me where I made it by playing that.

6          MR. GATTERDAM:  Your Honor, may we approach?

7          THE COURT:  Yes.

8      (Thereupon, the following proceeding was held at side-bar.)

9          THE COURT:  Go ahead.

10         MR. GATTERDAM:  I don't know how you want me to do

11  this with him.  I need to refresh his recollection that he

12  actually made a statement June 30th because I'm going to ask

13  him some questions about that statement.  So I would ask, I

14  have it marked here.  I'd have the government start playing it

15  for him but I need to do that outside the presence of the jury,

16  my understanding is, to refresh his recollection.  So I don't

17  know how you want to do that.

18         MR. DEVILLERS:  I have no objection playing the whole

19  thing.

20         MR. GATTERDAM:  I'm not going to play the whole thing.

21  I need to play the start so it refreshes.

22         THE COURT:  The first thing that you need to do

23  technically is to establish that that tape will refresh his

24  recollection or else he might tell you that something else will

25  refresh his recollection and we could provide that to him.  So,

TRIAL ONE – VOL 6 –   336

1   you know, you have him on cross.  You can lead him.  If that's

2   what refreshes his recollection, that's what refreshes his

3   recollection.  And if that is the case, I will excuse the jury

4   until his recollection is refreshed and then you can bring the

5   jury back in.

6          MR. GATTERDAM:  Okay.  I'll ask him.

7          THE COURT:  But don't -- just let him establish it and

8   then if he tells you that the tape will refresh his

9   recollection, then I'll excuse the jury.

10         MR. GATTERDAM:  Okay.

11         THE COURT:  Any objection to that, Mr. DeVillers?

12         MR. DEVILLERS:  None, Your Honor.

13      (The following proceedings were had in open court.)

14         THE COURT:  Please proceed, Mr. Gatterdam.

15         MR. GATTERDAM:  Thank you.

16    BY MR. GATTERDAM:

17    Q.   Mr. Wright, you recall being arrested and charged with

18   the offenses in this case, correct?

19    A.   Correct.

20    Q.   And if I indicated that there was a video and/or audio

21   of that, do you believe seeing that and perhaps seeing you

22   would refresh your recollection about that day and what you

23   said or didn't say?

24    A.   Maybe.

25         THE COURT:  Ladies and gentlemen, at this time I'm

TRIAL ONE – VOL 6 –   337

1    going to excuse you just briefly so that we can play this tape

2    to determine whether it will refresh his recollection.  You

3    need not hear the tape because theoretically Mr. Wright is

4    going to testify independent of that; that is, the tape or the

5    video will jar something in his memory that will enable him to

6    testify to you about what he recalls on that date.  You're not

7    to speculate as to what the tape might show or what it might

8    say.  And we'll just proceed when you return.  Thank you,

9    ladies and gentlemen.

10        (Jury out at 1:55 p.m.)

11            THE COURT:  Mr. Gatterdam, you may proceed with

12   playing the tape.

13            MR. GATTERDAM:  165-23.04.

14        (Audiotape played in open court.)

15    BY MR. GATTERDAM:

16    Q.   Mr. Wright, do you see that person in that -- on the

17   tape?

18    A.   Right.

19    Q.   Who is that?

20    A.   Me.

21    Q.   Okay.  That's you.

22            MR. GATTERDAM:  Can you keep playing for a little bit,

23   Erick?

24        (Audiotape played in open court.)

25

TRIAL ONE - VOL 6 - 338

1    BY MR. GATTERDAM:

2    Q.   Mr. Wright, having listened to a little bit of the tape,

3    does it now refresh your recollection on that particular day

4    your statement to the police?

5    A.   Correct.

6    Q.   Okay.

7         MR. GATTERDAM:  And I guess we'll have to take it

8    statement by statement, Your Honor.  I don't know whether

9    he'll --

10        THE COURT:  Now that his recollection is refreshed, I

11   think we can bring the jury back and we'll continue with your

12   examination.

13        MR. GATTERDAM:  Thank you.

14        THE COURT:  Bring in the jury, please.  All rise for

15   the jury.

16     (Jury in at 2:00 p.m.)

17        THE COURT:  Mr. Gatterdam, please proceed.

18        MR. GATTERDAM:  Thank you.

19   BY MR. GATTERDAM:

20   Q.   Mr. Wright, you've had an opportunity to review a

21   statement you made on June 30 of 2014, correct?

22   A.   Correct.

23   Q.   So does that now refresh your recollection that you did

24   actually speak to the police on that date?

25   A.   Right.

1   Q.   And then subsequent to that, you spoke to the police on

2   several other different occasions, correct?

3   A.   Correct.

4   Q.   Now, prior to coming into Court today did you have an

5   opportunity to review those statements with your attorney?

6   A.   Correct.

7   Q.   And did you have an opportunity to review those

8   statements with the prosecutors?

9   A.   Correct.

10  Q.   And did you have an opportunity to review all those

11  statements with the agents in this case?

12  A.   Correct.

13  Q.   Now, before I get to specifics of the June 30th

14  statement, your prior record as an adult, you got a carrying

15  concealed weapon conviction in 2004; is that correct?

16  A.   Probably.

17  Q.   And got a sentence of approximately six months, correct?

18  A.   Incorrect.

19  Q.   Okay.  What did you get?

20  A.   I ain't do no jail time.

21  Q.   And you spoke on direct examination about this felonious

22  assault, correct?

23  A.   Correct.

24  Q.   And would you agree that while you were in the local

25  jail before you went to prison on that, you picked up an

TRIAL ONE – VOL 6 –  340

1    aggravated assault charge for punching an inmate in the jail?

2    A.    Correct.

3    Q.    And you got time for that but it was run concurrent, at

4    the same time as your felonious assault, correct?

5    A.    Correct.

6    Q.    Now, you talked about all these things that were

7    supposedly going on, but let's get it clear in terms of time,

8    you were actually out on the streets.  You were arrested

9    March 5th of 2006, correct?

10   A.    Correct.

11   Q.    Prior to that, did you do some time, local time for the

12   carrying a concealed weapon so that you were in jail part of

13   2005?

14   A.    No.

15   Q.    Okay.  So if the entry indicates that you got a

16   six-month sentence, would that be incorrect?

17   A.    I never did six months in no county jail for no charge

18   or nothing.

19   Q.    So the time frame you're talking about that these things

20   that you're saying happened would have been up to March 5th of

21   2006?

22   A.    What am I actually saying happened?

23   Q.    What you testified to on direct examination.

24   A.    You got to be more specific.

25   Q.    Everything.  All these licks that you supposedly did,

TRIAL ONE – VOL 6 – 341

1   these murders, these things that Mr. Harris was involved in.

2   As far as you being involved, after March 5th, 2006, you

3   weren't around anymore, correct?

4      A.   Correct.

5      Q.   Now, back when you were on the street before March 5th,

6   were you living with your parents over on St. Clair or did you

7   live in your own place?

8      A.   Own place.

9      Q.   Did your parents live on St. Clair?

10     A.   Correct.

11     Q.   Is it fair to say that you didn't necessarily hang out

12  in the Short North because you didn't stay there, correct?

13     A.   Incorrect.

14     Q.   Is it true that in 2003, 2004 you identified yourself to

15  be a member or an associate of the Cordell Bloods?

16     A.   Never.

17     Q.   Did you ever hang out with any of the members of the

18  Cordell Bloods?

19     A.   I can't recall.

20     Q.   Weren't you hanging out with them when they were holding

21  White Boy Tone's girlfriend hostage?

22     A.   Not at all.

23     Q.   Are you aware of that incident?

24     A.   Correct.

25     Q.   And she was being held by Cordell Bloods, correct?

TRIAL ONE - VOL 6 -   342

1    A.    Not to my recognition.

2    Q.    Do you have any run-ins with the police during this time

3    up to March 5th, 2006?

4    A.    Probably.

5    Q.    How'd they treat you?

6    A.    Depends on what situation.

7    Q.    Did you ever have any problems with them roughing you

8    up?

9    A.    Probably a few times.

10   Q.    You ever feel like they were picking on you just because

11   you were in the wrong neighborhood?

12   A.    Probably.

13   Q.    Did you ever have words with them because you were tired

14   of them doing that to you?

15   A.    Right.

16   Q.    And is it fair to say that a lot of times you were

17   stopped by them, you weren't even doing anything wrong?

18   A.    Correct.

19   Q.    And it wasn't just you, it was any of your friends.

20   Same thing was happening to them, correct?

21   A.    Correct.

22   Q.    So at times, you weren't afraid to give them back a

23   little bit of lip, right, like mouth talking to them?

24   A.    Correct.

25   Q.    Fair to say they usually just put up with it, they

TRIAL ONE – VOL 6 –   343

1   didn't haul you away?

2   A.   No.

3   Q.   Or did they sometimes take you away?

4   A.   Not at all.

5   Q.   Now, when you first got arrested for these charges, and

6   you listened to this part of the tape, when they were asking

7   you about gangs, do you remember that?

8   A.   Correct.

9   Q.   Do you remember saying, all this bullshit, that ain't no

10  gang?

11  A.   Correct.

12  Q.   And they were talking about Short North, weren't they?

13  A.   Correct.

14  Q.   And do you recall also saying to them that the feds are

15  dirty, they try to trick people?

16  A.   Correct.

17  Q.   And you also said, the prosecutor tries to trip people

18  up?

19  A.   I don't remember.  Probably.

20  Q.   And you recall that day that you came in and were

21  arrested, you denied committing the two murders that you ended

22  up pleading guilty to, correct?

23  A.   Correct.

24  Q.   And you said you weren't part of any RICO or

25  racketeering, correct?

TRIAL ONE – VOL 6 – 344

1    A.    Correct.

2    Q.    And they asked you later and you denied any knowledge of

3  the SNP, the Cut Throw squad or the Homicide Squad, correct?

4    A.    Correct.

5    Q.    So your testimony today is that you lied to the police

6  on that day or you're lying today?

7    A.    That day.

8    Q.    And you asked them about your kids.  You wanted to make

9  sure your kids were taken care of, correct?

10    A.    What are you talking about?

11    Q.    On June 30th, when you were speaking to the police?

12    A.    Because I had my kids with me when I got arrested.

13    Q.    So you wanted to make sure they were taken care of?

14    A.    No.  Get to their parents where they were supposed to

15  be, not taken care of.

16    Q.    I didn't mean it -- I meant make sure they had a place

17  to go?

18    A.    To call their mothers, yes.

19    Q.    Now, in April of 2007, were you in prison?

20    A.    Correct.

21    Q.    And did you write a letter to somebody that you said was

22  Dear Mom?

23    A.    Correct.

24    Q.    Do you recall that letter?

25    A.    Right.

TRIAL ONE - VOL 6 -   345

1    Q.   Do you recall -- And who were you actually writing that

2    letter to?

3    A.   One of my friend's mom.

4         MR. GATTERDAM:  Can you put up 165-23.01?

5    BY MR. GATTERDAM:

6    Q.   Do you see on your screen what purports to be a letter

7    dated April 13, 2007?

8    A.   Correct.

9    Q.   And is that the letter I was just asking you about that

10   you wrote to Dear Mom?

11   A.   Right.

12   Q.   Who were you actually writing to?

13   A.   A friend's mom.

14   Q.   And what friend?

15   A.   Anthony Martin.

16   Q.   And I'm going to ask you to see if I can see down about

17   the second paragraph.  Is it fair to say that you say, I'm --

18   I'm sorry if I get this wrong.  I'ma street nigga and snitching

19   ain't in my blood.  Did you say that?

20   A.   Correct.

21   Q.   And then you go on.  Can you read what the next sentence

22   says?

23   A.   I don't see where you're talking about.

24   Q.   Right where I finished off.  But one thing for sure

25   ain't nobody from the Short North have nothing to do wit it,

TRIAL ONE – VOL 6 – 346

1    Erica cousin Tashea baby dad brother did it.  What's that in

2    reference to?  Do you see that, sir?

3      A.    I'm getting to it.  Now repeat the question.

4      Q.    What's that sentence in reference to that you wrote?

5      A.    At the time I was telling her who I heard done it or had

6    something to do with it.

7      Q.    And had done what, had done a murder?

8      A.    Correct.

9      Q.    And you're saying the Short North had nothing to do with

10   it?

11     A.    At that time.

12            THE COURT:  Which murder was this?

13            THE WITNESS:  Anthony Martin.

14            THE COURT:  Okay.

15   BY MR. GATTERDAM:

16     Q.    Now, if you can go down to the next paragraph.  You see

17   where it says "see mom"?

18     A.    Right.

19     Q.    Tell me if I read this correctly.  See mom, I'm a real

20   nigga and I promise you when I come -- whenever I come home

21   they goin to pay.  Did I read that sort of correctly?

22     A.    Correct.

23     Q.    And what's that mean?  Does that mean you're going to

24   take care of business when you get home, right?

25     A.    Correct.

1    Q.    You're going to kill somebody?

2    A.    That's how you put it.

3    Q.    No.  I'm asking how you put it.  You said they gonna

4    pay.  What's it mean to you?

5    A.    It's meaning however I decided they was gonna pay.

6    Q.    And the next sentence you say, but listen I got a plan

7    that can get me home but you have to keep it between us.  What

8    does that mean?

9    A.    It means what I tell her ain't nobody else business.

10   Q.    Okay.  But you're here now under oath testifying.  What

11   did you mean?  Does that mean the plan like to come --

12   A.    That was in 2007.  This is 2016.

13   Q.    All right.  Well, tell me what you meant in 2007?

14   A.    Exactly what you read.

15   Q.    That you had a plan.  What's the plan?  What was the

16   plan back then?

17   A.    I don't know.  It's 2007.

18   Q.    Was the plan to lie about people so you can get out

19   early?

20   A.    Not at all.

21   Q.    But you don't remember what the plan was?

22   A.    Correct.

23   Q.    But you were concerned enough about it that you wanted

24   her to be sure not to tell anybody what you were talking about,

25   correct?

TRIAL ONE – VOL 6 –   348

1    A.    That's what me and her talk about is what me and her

2    talk about.

3    Q.    I think Mr. Berndt asked you some questions about the

4    first time you actually spoke here in this courthouse to the

5    agents.  Do you have any reason to doubt if the report

6    indicates it was on or about June 29th of 2015?

7    A.    I couldn't tell you the exact date.

8    Q.    Okay.  And do you recall when you were speaking to them

9    that you talked about -- first about the Teague murder,

10   correct?

11   A.    Correct.

12   Q.    And do you recall indicating that when there was a

13   discussion about the Teague murder before it happened, there

14   was people discussing committing the Teague murder and you said

15   Chris Harris was there but said he wasn't going to be a part of

16   that and walked out.  Do you recall that?

17   A.    Correct.

18   Q.    And then they asked you about the Sanikqua Hester

19   murder.  And you said you didn't have anything to do with that,

20   correct?

21   A.    Correct.

22   Q.    And actually let me back up a minute.  Do you recall

23   being asked, the gun that you used for the Teague murder, they

24   asked you if you had used that gun prior to that day because a

25   casing was found earlier.  Do you recall that question?

TRIAL ONE – VOL 6 –   349

1    A.    Maybe.

2    Q.    Do you recall saying that maybe it was test fired?

3    A.    Probably.

4    Q.    In that first statement when you were talking to the

5    police, you indicated that you were at a hotel in relation to

6    the Sanikqua Hester murder, that you were at a hotel and you

7    stayed at the hotel when Green and others left to go do the

8    murder, correct?

9    A.    Correct.

10        MR. GATTERDAM:  Your Honor, I'm sorry, I'm going to do

11   this.  Because I still see it up on my screen.  I would move

12   for admission into evidence of 165-23.01 before I forget.

13        THE COURT:  Any objection, Mr. DeVillers?

14        MR. DEVILLERS:  None, Your Honor.

15        THE COURT:  165-23.01 will be received.  Is there, for

16   the record, any objection from any defense counsel?

17        MR. BERNDT:  Not on behalf of Mr. Ledbetter, thank

18   you.

19        MR. MILLER:  No, Your Honor.

20        MR. MEYERS:  No, Your Honor.

21        MR. NOLDER:  I do not, Your Honor.

22        THE COURT:  You may publish it, Mr. Gatterdam.

23        MR. GATTERDAM:  Can you also just flip to the second

24   page real quickly?

25

TRIAL ONE – VOL 6 –   350

1    BY MR. GATTERDAM:

2    Q.   After the first time you met with the police about the

3    Sanikqua Hester murder, you then came back a couple weeks later

4    and you continued to deny being involved, correct?

5    A.   I don't recall.

6    Q.   Do you have any reason to doubt if there's a summary of

7    the second time you went in to talk to that which indicates you

8    continued to deny being involved?

9    A.   Show me.

10        MR. GATTERDAM:  Your Honor, I'm going to need an

11   opportunity to show the witness to retry to refresh --

12   BY MR. GATTERDAM:

13   Q.   If I showed you a summary of the statement, do you

14   believe it would refresh your recollection?

15   A.   Right.

16        THE COURT:  You may show him.

17        MR. GATTERDAM:  May I approach the witness?

18        THE COURT:  Yes, you may.

19   BY MR. GATTERDAM:

20   Q.   I'm going to show you a date.  Do you see that date?

21   A.   Right.

22   Q.   I just want you to look at that paragraph there.  It

23   say, Wright never met Hester.  Do you see that?

24   A.   Right.

25   Q.   Read it to yourself.

TRIAL ONE – VOL 6 – 351

1      Does that help refresh your recollection that there was

2  another meeting where you continued to deny having any

3  knowledge or being a part of the Sanikqua Hester murder?

4  A.   Maybe he wrote it wrong.

5  Q.   Okay.  So this is the agent's fault, not yours?

6  A.   I ain't write it up.

7  Q.   You don't recall having, based on reviewing that, having

8  a second conversation with the agents where they continued to

9  tell you, we don't believe you, we think you had something to

10  do with it?

11  A.   I remember the first one.

12  Q.   And then do you recall another meeting with the agents

13  and the prosecutors where you said you did in fact have

14  something to do with the Sanikqua Hester murder?

15  A.   Correct.

16  Q.   And then you explained in more detail what your role

17  was?

18  A.   Correct.

19  Q.   Now, if the summaries reflect that that was about six

20  weeks after the last time you spoke to the police, do you have

21  any reason to doubt that?

22  A.   I don't know the exact dates.

23  Q.   Okay.  So in between the time when the police were

24  telling you they didn't believe you and you went back in and

25  said, okay, I had something to do with it, you met with your

TRIAL ONE – VOL 6 –   352

1  lawyer, didn't you?

2    A.   Correct.

3    Q.   And you have a really good lawyer, Fred Benton, don't

4  you?

5    A.   Correct.

6    Q.   And he told you, you weren't going to get your deal if

7  you didn't own up to the Sanikqua Hester murder, correct?

8    A.   I don't recall that.

9    Q.   Well you knew you weren't going to get a deal unless you

10  admitted to both the Teague murder and the Hester murder,

11  correct?

12    A.   Correct.

13    Q.   So by the time you come back in September, you're now

14  saying you were involved in the Sanikqua Hester murder,

15  correct?

16    A.   Correct.

17    Q.   And I think you indicated on direct examination that you

18  were going to do a robbery and you saw Darthard on the porch,

19  correct?

20    A.   Correct.

21    Q.   Did you see the little kids on the porch, too?

22    A.   Was none.

23    Q.   And you then said I think on direct that you called Jigg

24  which was Lance Green, correct?

25    A.   Correct.

TRIAL ONE – VOL 6 – 353

1   Q.   And do you recall telling the police that you didn't

2   call Lance Green because you didn't have his phone number.  You

3   called Tommy Coates?

4   A.   Correct.

5   Q.   So which is it, you called Tommy Coates or Lance Green?

6   A.   Same thing.  He got the call.

7   Q.   It's the same thing?

8   A.   He got the call.

9   Q.   Who got the call?

10  A.   Jigg.

11  Q.   So the story of you being at a hotel and Lance Green

12  doing this is not true, correct?

13  A.   Be more specific.

14  Q.   You were actually driving by the scene.  You weren't at

15  a hotel having nothing to do with this, correct?

16  A.   Correct.

17  Q.   You spoke about a lot of things that you supposedly did

18  up until March 5th, 2006, a lot of robberies, drugs, murders,

19  correct?

20  A.   Correct.

21  Q.   Do you recall being involved in an incident where you

22  choked Chris Harris' baby's mom, India Hawk?

23  A.   I don't recall that.

24  Q.   Do you ever recall being upset at Mr. Harris because he

25  was going with one of your girlfriends?

TRIAL ONE – VOL 6 –  354

1    A.    I don't recall that.

2    Q.    And if I got your testimony correct, you indicated when

3    you were out, you were doing these robberies or these licks

4    like almost every other day, correct?

5    A.    Correct.

6    Q.    And you're no stranger to the system.  You know that

7    doing a burglary or a robbery is a felony of the first degree,

8    three to eleven years, right?

9    A.    I don't know.

10   Q.    And you always had a gun with you, right?

11   A.    Correct.

12   Q.    So you can't put an estimate on it but if you were out a

13   year or so before all this, 180 times eleven, those are the

14   sentences you could get possibly?

15   A.    Repeat it.

16   Q.    180, if you were out for about a year before you got

17   locked up and you were doing a robbery every other day?

18   A.    Before I got locked up what time?

19   Q.    March 5th, 2006.  From 2005 until you got locked up in

20   2006.  How many different robberies do you think you committed,

21   50, 60?

22   A.    I can't recall.

23   Q.    Okay.  But you could have gotten hundreds of years in

24   prison, correct?

25   A.    Probably.

1    Q.   And all that gets wiped out the door.  You don't have to

2   worry about that ever again, right?

3    A.   Correct.

4    Q.   But it's not that simple, is it?  You've got to give

5   them somebody.  They don't care about you talking.  You've got

6   to give them names of other people to get your deal, right?

7    A.   As you say.

8    Q.   No.  I'm asking you.  That's what they told you, right?

9   That's what you have to do.  Give it up.

10    A.   Correct.

11    Q.   If you don't give it up, you're going away for the rest

12   of your life.  Fair to say?

13    A.   Correct.

14    Q.   Now, do you recall in 2005 testifying against a guy

15   named Tommy Strickland?

16    A.   Correct.

17    Q.   And you testified that Tommy Strickland supposedly

18   confessed to you that he shot DeShawn Parks, correct?

19    A.   Correct.

20    Q.   And that was initially at a bindover hearing.  And then

21   it came time to go to trial in 2006, you refused to testify,

22   right?

23    A.   Correct.

24    Q.   Because you knew your story about him confessing to you

25   was a lie, right?

TRIAL ONE – VOL 6 –   356

1    A.    I just ain't want to go.

2    Q.    Because you knew you could have been prosecuted for

3    perjury for lying, right?

4    A.    No.  I just ain't want to go.

5    Q.    So what happened when you just didn't want to go, did

6    you get arrested for that?

7    A.    Not at all.  Pleaded the Fifth.

8    Q.    Before you pleaded the Fifth in the bindover, the first

9    hearing you did go and you did testify, correct?

10   A.    Correct.

11   Q.    And you remember being asked by the attorney, you were

12   also a member of the Crips, the Cut Throats, and the answer was

13   no.  You remember that?

14   A.    Correct.

15   Q.    And you remember also being asked, you're not a member

16   of the Cut Throats, and your answer is, I don't know what that

17   is, sir.  Is that what you said under oath?

18   A.    Maybe.  Probably could have.

19   Q.    Did you ever get prosecuted for perjury for that?

20   A.    No.

21   Q.    Now, you testified on direct examination about

22   supposedly you and Mr. Harris shooting at some police officers.

23   Do you remember that?

24   A.    Correct.

25   Q.    What date was that, do you recall?

TRIAL ONE – VOL 6 – 357

1    A.    I can't recall.

2    Q.    And when did you talk to the prosecutors or police about

3    having knowledge of that?

4    A.    I don't remember the exact date.

5    Q.    Well, correct me if I'm wrong, you didn't talk to them

6    about it the day you were arrested, June 30, 2014, correct?

7    A.    Correct.

8    Q.    You didn't talk to them about it in any of your proffers

9    last year which is two or three, depending on your memory,

10   correct?

11   A.    I don't recall.

12        MR. DEVILLERS:  Objection, Your Honor.  That hasn't

13   been established yet, Your Honor.

14        MR. GATTERDAM:  I'll ask it then.

15        THE COURT:  Your objection was to foundation,

16   Mr. DeVillers?

17        MR. DEVILLERS:  Yes, Your Honor.

18        THE COURT:  Sustained.

19   BY MR. GATTERDAM:

20   Q.    Do you recall telling them in any of the proffers that

21   you did in 2015 about you being a shooter at police officers?

22   A.    Maybe.

23   Q.    Okay.  What kind of gun did you have?

24   A.    I don't recall.

25   Q.    Sorry?

TRIAL ONE – VOL 6 –   358

```
1    A.   Can't recall.

2    Q.   Can't recall.  What kind of gun did Mr. Harris have?

3    A.   Can't recall.

4    Q.   What time of night was it, or day?

5    A.   Probably was night.

6    Q.   Early night, late night, early morning?

7    A.   Can't remember exact time.  Don't know.

8    Q.   Who else knew that you were going out to do this?

9    A.   Wasn't planned.

10   Q.   Who else knew?  Who else saw you?

11   A.   Can't remember.

12   Q.   Where were you before you went to do it?

13   A.   In the house.

14   Q.   Whose house?

15   A.   On Fifth and Seventh.

16   Q.   Whose house?

17   A.   On Fifth and Seventh.

18   Q.   Who lives there?

19   A.   Tommy.

20   Q.   Tommy Coates?

21   A.   Correct.

22   Q.   Where did you actually fire the shots from?

23   A.   Probably the alley.  Can't remember.

24   Q.   Probably the alley, you can't remember?

25   A.   Correct.
```

TRIAL ONE – VOL 6 –   359

1    Q.   And you said I believe on direct, a couple of shots?

2    A.   Right.

3    Q.   Now, I'm jumping around a little bit but we were talking

4    a minute ago about DeShawn Parks' shooting and Tommy

5    Strickland.  Do you recall that?

6    A.   Correct.

7    Q.   Now, Mr. Harris was aware that you had offered testimony

8    at that bindover hearing, right, because that was his cousin

9    that was shot?

10   A.   Correct.

11   Q.   So he knew you had worked with the police then?

12   A.   Correct.

13   Q.   So even after knowing you'd worked with the police,

14   you're saying he subsequently told you all these things that he

15   did, correct?

16   A.   Correct.

17   Q.   And another thing about the Teague murder, you testified

18   that Jigg put a bounty on Teague or something like that?

19   A.   Correct.

20   Q.   So you did that because there was money on the line.

21   Not because there was any kind of code to do something for

22   somebody?

23   A.   Correct.

24   Q.   It was all about the money, right?

25   A.   Right.

TRIAL ONE – VOL 6 –   360

1        MR. GATTERDAM:  May I have a moment, Your Honor?

2        THE COURT:  Yes.

3    BY MR. GATTERDAM:

4    Q.   Just a couple more questions, Mr. Wright.  You and

5    Mr. Berndt went over this so I'll try to be brief.  You

6    originally faced life without parole in this case, correct?

7    A.   Correct.

8    Q.   And now, if everything goes right, you face 18 years,

9    correct?

10   A.   Correct.

11   Q.   But you've got to, as I said before, you've got to

12   provide -- you've got to wow them.  You have to wow the jury to

13   get your deal, correct?

14   A.   Incorrect.

15   Q.   You have to give them -- you have to give the

16   prosecutors something other than what Allen Wright did.  You

17   have to say what everybody else did, correct?

18   A.   Correct.

19   Q.   And how many times did they tell you when asked about

20   this to just say you were told to tell the truth?

21   A.   Can't recall that conversation.

22   Q.   They never told you to just say you were told --

23   A.   I can't recall that conversation.

24   Q.   So it may have happened, you just don't remember?

25   A.   Maybe.

1    Q.    You agree you'd do anything to avoid spending the rest

2    of your life in prison?

3    A.    Repeat it.

4    Q.    You agree you'd do anything to avoid spending the rest

5    of your life in prison?

6    A.    No.

7    Q.    No?

8    A.    Not say anything.

9    Q.    You'd come up here and say whatever you had to say if it

10   means going home to your family, right?

11   A.    I come up here and say what I know.

12   Q.    But if you come up here and say Chris Harris had nothing

13   to do with something, are you going to get your 18 years or are

14   you going to go to prison for the rest of your life?  What do

15   you think?

16   A.    I couldn't tell you that.

17   Q.    You couldn't?  If you don't give up Chris Harris do you

18   think you're going to go to prison for 18 years?

19   A.    Couldn't tell you that.

20   Q.    Do you think the prosecution is going to put in a good

21   word for you if you said Chris Harris had nothing to do with

22   this?

23   A.    Couldn't answer that for you.

24   Q.    You can't answer what you think?

25   A.    I'm answering it.  I can't answer it for you.

TRIAL ONE – VOL 6 –   362

1   Q.   You were charged with all these crimes with this

2   racketeering, with the Teague murder, with the Hester murder,

3   correct?

4   A.   Correct.

5   Q.   What's a motion for discovery?

6   A.   I guess a motion with all the evidence.

7   Q.   I'm sorry?

8   A.   A motion with all the evidence.

9   Q.   As a defendant in this case, you agree you got all the

10  evidence that the prosecution turned over to your attorney,

11  correct?

12  A.   Correct.

13  Q.   So all these things that you talked about you had a

14  chance to review before sitting on that witness stand today,

15  didn't you?

16  A.   Correct.

17  Q.   You had an opportunity to fine tune your story.  You

18  went over it time and time again with your lawyer before you

19  sat up there today.

20  A.   Incorrect.

21  Q.   You didn't have a chance to go over it with your lawyer?

22  A.   Not time and time again like you're putting it, but,

23  yeah, we reviewed it.

24  Q.   So all these incidents, you had the benefit of seeing

25  what their evidence was before you came up here and said what

TRIAL ONE – VOL 6 –   363

1   you just said today?  Yes or no?

2   A.   No.

3   Q.   You did not have the benefit of looking at discovery

4   before you came up here?

5   A.   It's a protection order on it so a lot of the evidence

6   we couldn't see because it's a protection order on half our

7   motion.

8   Q.   I'm not talking about whether you got to keep it.

9   A.   You asked me did I see my motion.  I'm letting you know

10  there's a protection order on half of it, sir.

11  Q.   I'm saying you're not listening.  You need to -- Your

12  attorney was able to get all the evidence, correct?

13  A.   I guess so.  I don't know.

14  Q.   And he was able to tell you about all the evidence,

15  correct?

16  A.   Tell me about it.

17  Q.   Right.  And so you were able to know what all the

18  evidence is either looking at it personally or hearing about it

19  from your lawyer?

20  A.   Half then; some about a few weeks ago.

21  Q.   So you continue to get evidence before you came up here

22  on the stand?

23  A.   Correct.

24        MR. GATTERDAM:  Nothing further.

25        THE COURT:  Thank you, Mr. Gatterdam.

TRIAL ONE - VOL 6 -  364

1      Mr. Miller, on behalf of Mr. Liston.

2          MR. MILLER:  Thank you, Your Honor.

3                    - - -

4                CROSS-EXAMINATION

5    BY MR. MILLER:

6    Q.   Mr. Wright, I want to get this straight in my own mind.

7    What you've pled to involved the deaths of Ms. Hester,

8    Mr. Teague and a general conspiracy; is that correct, sir?

9    A.   Correct.

10   Q.   Each one of those would have carried or will carry a

11   possibility of life imprisonment without parole; is that

12   correct, sir?

13   A.   Correct.

14   Q.   You are in prison right now also on a state charge, is

15   that not right?

16   A.   No.  That's incorrect.

17   Q.   What are you in for right now in custody?  What are you

18   serving time on, if anything?

19   A.   What I'm being charged with in this federal Indictment.

20   Q.   And that's the extent of it?

21   A.   Huh?

22   Q.   That's the extent of it?

23   A.   Right.

24   Q.   Nothing else.  All right.  So when we talk about the

25   shootings out at the club where those two young girls were

TRIAL ONE – VOL 6 –  365

1   shot, I think they were 18, 19, you're all done with that?

2   A.   Correct.

3   Q.   The killing of Mike Teague that you refer about, I

4   believe that's been established that was a contract killing; is

5   that correct?

6   A.   Correct.

7   Q.   And you just did that for the money and no other reason?

8   A.   Correct.

9   Q.   I'd like to jump on that theory, too.  You talked about

10  mailing a friend of yours, if that's the right word, a letter

11  while that person was incarcerated asking to see if he could

12  kill Earl Williams, E-Dub; is that correct?

13  A.   Incorrect.

14  Q.   Incorrect.  Would you explain to me what I missed, what

15  I'm wrong about?

16  A.   You saying I wrote a letter to somebody for somebody to

17  get killed.

18  Q.   Yes.  Earl Williams.

19  A.   That's incorrect.

20  Q.   Did you do that?

21  A.   That's incorrect.

22  Q.   All right.  Did you contact anybody?

23  A.   Right.

24  Q.   How did you contact that person?

25  A.   A letter.

1    Q.   All right.  So you wrote that person a letter?

2    A.   You telling me I said kill and I never mentioned the

3 word kill.

4    Q.   You did not?

5    A.   Yes.

6    Q.   What was the letter about?

7    A.   To fuck him up or something, beat him up or something.

8 Not kill.

9    Q.   Not kill.  And my understanding was you did not know

10 Mr. Williams at all?

11   A.   Correct.

12   Q.   And who were you doing this in behalf of?

13   A.   O-Dog.

14   Q.   Where was Mr. Williams incarcerated at that time?

15   A.   Mansfield.

16   Q.   You mentioned earlier that you were involved at one time

17 in the homicide of a person who died because he was simply beat

18 up for no reason; is that right?

19   A.   Correct.

20   Q.   And who did you say was involved in that homicide?

21   A.   White Boy Tone and 40.

22   Q.   And can you tell me how that homicide came about?

23   A.   Repeat it.

24   Q.   Can you tell me how that person got to be killed?  What

25 was going on?  What caused it?  Did they yell at you?  Did they

1   shoot at you?  Did they do anything?

2   A.    Not at all.

3   Q.    Please tell me what happened.

4   A.    Just walk and seen him, punched him and hit him and he

5   died.

6   Q.    And this was, if you will, my words, a game that you

7   sometimes played?

8   A.    Correct.

9   Q.    So just anybody coming along, any citizen does nothing

10  to you, says nothing to you but you or Mr. Patterson, 40 as you

11  call him, and the late Mr. Ledbetter would just do that to

12  whoever just happened to walk by, correct?

13  A.    Correct.

14  Q.    And if they died, they died?

15  A.    Correct.

16  Q.    You talked earlier, sir, of tattoos.  I think mainly

17  from Mr. DeVillers on direct examination.  You spent how many

18  years approximately in prison?

19  A.    Eight.

20  Q.    Eight years.  Am I correct in saying that you can get

21  tattoos while you're in prison?

22  A.    Correct.

23  Q.    It's not that difficult to do?

24  A.    Not at all.

25  Q.    So you've known a lot of people who you've been

TRIAL ONE – VOL 6 –  368

1  incarcerated with, perhaps including yourself, that you've

2  gotten tattoos while you were incarcerated in prison?

3  A.   Correct.

4  Q.   You also, I believe, sir, spoke of a burglary, if that's

5  the right word, that you were involved in with some people at

6  Mr. DeWitt's home.  Do you remember that, sir?

7  A.   Correct.

8  Q.   And I believe you said in direct examination from the

9  government that during the process of that, a rape occurred; is

10  that correct?

11  A.   Correct.

12  Q.   And I believe you testified that the individual who had

13  done that rape was a Shawn Waddell?

14  A.   Correct.

15  Q.   Is it not true that you previously have given

16  information that there was also another individual involved in

17  that assault?

18  A.   Repeat it.

19  Q.   Is it true that you had given information that there was

20  yet another individual besides Mr. Waddell who was also

21  involved in that rape?

22  A.   Correct.

23  Q.   And who was that person?

24  A.   Carlos Gardner.

25  Q.   Is there any reason why you did not mention that on

TRIAL ONE - VOL 6 -  369

1   direct?

2   A.   Mention it when?

3   Q.   The other individual along with Mr. Waddell?

4   A.   When?

5   Q.   Today.

6   A.   I mentioned it.

7   Q.   You mentioned it?

8   A.   Earlier.

9   Q.   Earlier when, today?

10  A.   Whoever the first person that asked me.

11  Q.   You're saying so you used both names?

12  A.   Correct.

13  Q.   How old was the young lady that was the victim of that?

14  A.   Probably around my age at the time.

15  Q.   Which was?

16  A.   Nineteen, 20.

17  Q.   And these were two of your cohorts that raped her?

18  A.   Correct.

19  Q.   And that was done while you were there?

20  A.   Correct.

21  Q.   I also want to ask you about an incident involving a

22  person by the name of Den Den.  Do you know who Den Den is?

23  A.   Correct.

24  Q.   May I have his correct name, please, if you know?

25  A.   Couldn't tell you.

TRIAL ONE – VOL 6 –   370

1    Q.    You just know him by the name Den Den?

2    A.    Correct.

3    Q.    Was there a situation that you and another individual

4    were out to harm him?

5    A.    Correct.

6    Q.    And you got him in a bathroom at one point; is that

7    correct?

8    A.    Correct.

9    Q.    Was that a club or some sort of a public establishment?

10   A.    Right.

11   Q.    Which one, sir?

12   A.    Excuse me?

13   Q.    Which one, a public establishment, a club, what?

14   A.    Oh, a club.

15   Q.    And there were a total of three of you; is that correct,

16   or was it two?

17   A.    Probably three.  Two, three.

18   Q.    And you got Den Den in the bathroom.  Can you tell me

19   what happened in there?

20   A.    Beat him up.

21   Q.    The three of you beat him up?

22   A.    Correct.

23   Q.    And then left?

24   A.    Pissed on him, stripped him, took anything he had left.

25   Q.    So before you left did I hear you say you pissed on him?

TRIAL ONE – VOL 6 –   371

1    A.    Correct.

2    Q.    All of you?

3    A.    Correct.

4    Q.    And then you left?

5    A.    Right.

6    Q.    Mr. Wright, in speaking about the involvement that you

7    had or did not have in the death of Ms. Hester, I would like to

8    read you part of the FBI quote.  I think this was touched on by

9    counsel prior to me in this matter but I wanted to mention it

10   briefly.

11        It's a quote from the FBI report, sir, and when you're

12   talking about the incident regarding the death of Ms. Hester.

13   I quote, Wright advised that on the day of Hester's death,

14   Wright was with Green, Willis, Tabby, which is Tabby

15   Broomfield, Shanello White, a.k.a. Mel Mack, at the Cross

16   Country Inn.  Wright advised he was there when Hester called

17   Green and told Green that Darthard was at her house.  Wright

18   advised that Green and Willis left.  Green said he was going

19   after Darthard.

20        Wright advised when he saw Green the following day or

21   two after Hester's death, Wright advised that Green said they

22   had shot the place up.

23        Do you remember making that statement, sir?

24   A.    Correct.

25   Q.    Then we have a second one, again an FBI report on a

1    different date.  Let me quote this exactly, too, sir.

2         Wright advised that he was involved in a robbery of

3    DeWitt's house -- I've got the wrong section here.  Let me

4    scratch that.

5         Same situation with the death of this young lady.  On

6    the way to the location, Wright and the group drove by the

7    house on Lilley Avenue which was Kincaide Edwards, a.k.a.

8    Kincaide Wilkerson's mother's house where Hester happened to

9    be.  Wright advised he circled the block again and saw that on

10   the porch of the house was Ricky Darthard, DeWitt, Kincaide

11   Edwards and Kincaide Edwards' brother and some kids.

12        Wright advised that he, Glass and Martin set up

13   surveillance on the house they planned to rob at Berkley and

14   Cole.  Wright advised he knew that Lance Green a.k.a. Jiggs

15   wanted to kill Ricky Darthard.  Wright further advised that he

16   knew that Green was with Tabby at a hotel.  Tabby advised that

17   he had just bought a -- Wright advised that he had just bought

18   a new phone which did not have Green's phone number in it.

19   Wright advised he called Tommy Coates who was with Little Leak

20   and had Coates call the hotel and tell Green that Darthard was

21   over at Lilley and Kincaide Edwards' mother's house.  Wright

22   was not sure if Coates spoke with Green or Broomfield.

23        Wright advised that he, Glass and Martin broke into the

24   residence at Berkley and Cole.  Wright advised the group came

25   away with approximately a pound of marijuana, a gun, between

1   7500 and $8,500.  Wright advised that he and Glass and Martin

2   returned, split the proceeds and went their separate ways.

3   Wright advised the group separated earlier before Hester was

4   murdered.

5        Wright advised that later that day, Martin returned to

6   pick up Wright.  Martin advised that Green had killed Hester.

7   Martin drove right over to the hotel off 17th Avenue next to

8   McDonald's.  In the hotel room was Broomfield and Green.  Green

9   was very upset.  Wright advised that Martin and Broomfield left

10  so that Green and he could discuss the matter.  Wright advised

11  that Green kept saying that Fee, Richard Willis, shot the

12  bitch.  Fee shot the bitch.  Wright advised Green was most

13  upset that the car that Green and Willis had taken to do the

14  shooting was in his girlfriend's name.

15       Now, in one of those stories, do you remember making

16  those two comments, sir?

17  A.   Correct.

18  Q.   In one of them, you make sure the phone call gets made

19  to Mr. Green to tell him his prey is at this house and the

20  other one you say you're there with Mr. Green when somebody

21  else calls and repeats the same information?

22  A.   Repeat it all over.  I ain't following you.

23  Q.   In one of those stories you say you're driving around

24  there with your group and you see Ricky D on the porch with

25  other people including children.  You know Lance Green wants

1    him killed.  You can't call Lance Green because you got a new

2    phone, his number is not in there.  So you call Tommy Coates

3    and say pass the message on to Lance.  He's at this hotel.  And

4    you say later on after you've done your burglary and so forth,

5    they come and tell you, somebody, that it's all over and

6    unfortunately Ms. Hester died and not Ricky D.

7           The other one you say, I'm up in the hotel with Green

8    and somebody else calls and gives him that information and

9    Green and his cohort then leave looking for Ricky D and

10   ultimately Ms. Hester is killed.

11          Do you remember making those two statements, sir?

12    A.   Correct.

13    Q.   And they are obviously different, correct?

14    A.   Right.

15    Q.   Would you tell me why?  Why they are different and which

16   one is true?

17    A.   The second one true.

18    Q.   The second one meaning you're in the hotel with

19   Mr. Green when this happens?

20    A.   No.  The second one being I was in the area.

21    Q.   That's the truthful one?

22    A.   Correct.

23    Q.   In either one of these incidents the difference is who

24   supplies Mr. Green the information, correct?

25    A.   Say it again.

1   Q.   The difference between them is who supplies Mr. Green

2   the information?

3   A.   Me.

4   Q.   So the first time you told the story was in fact false?

5   A.   Correct.

6   Q.   To protect yourself?

7   A.   Correct.

8   Q.   Can you tell me, sir, when you joined, if that's the

9   proper word, the Cut Throat Committee?

10   A.   Repeat it.

11   Q.   Can you tell me when you joined the Cut Throat

12   Committee?

13   A.   Couldn't tell you when I joined.  You don't join

14   something like that.

15   Q.   You can't tell me because you don't remember the date or

16   why?

17   A.   I don't remember the date.

18   Q.   Any approximation?

19   A.   Probably 2003 or '4.

20        MR. MILLER:  May I have one moment, Your Honor?

21        THE COURT:  Yes, you may.

22   BY MR. MILLER:

23   Q.   Mr. Wright, you heard of Project Pat; is that correct?

24   A.   Who?

25   Q.   Project Pat.  Does that ring a bell to you at all?  Do

1   you know what that is?

2      A.   Not at all.

3      Q.   Is he -- would it refresh your recollection if I told

4   you he was a gangster rapper?

5      A.   Say the name again.

6      Q.   Project, just like the projects, Pat, P-A-T?

7      A.   I don't know.

8      Q.   Doesn't ring a bell?  All right.

9           Have you ever heard of a rap song called *Homicide for*

10  *the Cash*?

11     A.   Correct.

12     Q.   Would he have made that song perhaps?

13     A.   Can't recall.

14     Q.   Do you have any idea approximately when that song came

15  out?

16     A.   Couldn't tell you.

17     Q.   Would you have been in prison at the time?

18     A.   Correct.

19     Q.   Would 2009 be reasonably close, to your recollection?

20     A.   Can't recall.

21     Q.   Do you have stars tattooed on your body?

22     A.   No.

23     Q.   Not even one?

24     A.   Stars?

25     Q.   Yes.

TRIAL ONE – VOL 6 – 377

1   A.   Can't recall.  No.

2   Q.   Any teardrops?

3   A.   No.

4   Q.   Was your friend Ant Man, Mr. Martin, a Blood or a Crip?

5   A.   Blood.

6   Q.   And how about for Mr. Green?

7   A.   Blood.

8   Q.   The sign of 4, if you will, is that like a neighborhood

9   sign or a gang sign?

10  A.   Neighborhood sign.

11  Q.   Neighborhood sign.

12       MR. MILLER:  I have nothing further.  Thank you, Your

13  Honor.

14       THE COURT:  Thank you, Mr. Miller.

15      Mr. Meyers.

16       MR. MEYERS:  Thank you, Judge.

17       THE COURT:  On behalf of Mr. Ussury.

18                        – – –

19                  CROSS-EXAMINATION

20  BY MR. MEYERS:

21  Q.   Good afternoon, Mr. Wright.  My name is Mr. Meyers.  I'm

22  one of the lawyers for Mr. Ussury.  If I understood it you've

23  testified once before in your life at the bindover hearing?

24  A.   Correct.

25  Q.   How long ago was that?

TRIAL ONE – VOL 6 –   378

1    A.    Can't recall.

2    Q.    Not near as much hanging on the line for you at that

3    hearing as there is in this courtroom today, correct?

4    A.    Correct.

5    Q.    I've got to guess it was a much smaller courtroom, there

6    were no jury in a bindover hearing, just a Judge sitting there;

7    is that right?

8    A.    Maybe.

9    Q.    If you remember.  There's twelve lawyers in this

10   courtroom for everybody involved.  Were there twelve lawyers

11   around that bindover hearing?

12   A.    Can't recall.

13   Q.    The point is, this is your second time testifying.  You

14   have a lot on the line, right?

15   A.    Correct.

16   Q.    You've talked to other lawyers about it.  I won't

17   belabor it.  But it's important for the government to see how

18   you perform here today, right?

19   A.    In your words.

20   Q.    Is it important for the government to see how you

21   testify here today?

22   A.    I couldn't answer that.

23   Q.    It's important for you if you want that step down, if

24   you want that good grace motion filed by the government, right?

25   A.    Correct.

1    Q.   It's important for your lawyer to help you try to

2    persuade Judge Marbley to lighten the load of life without

3    parole; is that correct?

4    A.   Correct.

5    Q.   And your lawyer's been here all day in case you need him

6    to help you respond appropriately in this courtroom; is that

7    right?

8    A.   If you say.

9    Q.   Well, he's been here all day.

10    A.   Ask him why he been here.

11    Q.   I'm not going to go over and over everything everybody's

12    already talked to you about but I do want to talk about a

13    potential contract killing I don't think you've had occasion to

14    comment on yet.  And that would be Mike the Barbershop Man put

15    a contract out on a guy you knew as G.  Is that ringing a bell?

16    A.   Correct.

17    Q.   Yes?

18    A.   Correct.

19    Q.   And you talked to these gentlemen when you went to your

20    proffer, that was one of the things you described to them; is

21    that correct?

22    A.   Maybe.  I could have.

23    Q.   Well if it's in their written report about it I assume

24    that.  You remember talking about it?

25    A.   Right.

TRIAL ONE – VOL 6 –   380

1    Q.    A guy named Mike owned a barbershop somewhere near

2    Cleveland and 161?

3    A.    Correct.

4    Q.    He had some kind of problem with a guy named G?

5    A.    Correct.

6    Q.    And he put 30,000 bucks on the line, $30,000 to have

7    that man killed; is that right?

8    A.    Correct.

9    Q.    And once again, for the money, you were interested in

10   cashing in that 30K, right?

11   A.    Correct.

12   Q.    And at one point did a guy, you've talked about this

13   Tabib, Tabib Broomfield.  I think the government showed you a

14   picture of him this morning.  Do you remember telling the

15   government at one point Tabib gave you a ring, gave you a phone

16   call that says, I'll tell you what, for a cut of $5,000, I can

17   lure this guy named G out to where you can kill him.  Remember

18   that?

19   A.    Correct.

20   Q.    That never happened, did it?

21   A.    Correct.

22   Q.    But did it anger you that Tabib was trying to move in on

23   that pile of $30,000?

24   A.    Not at all.

25   Q.    Well do you remember telling the government here -- When

TRIAL ONE – VOL 6 –   381

1   we say the government, you had a meeting, a couple of meetings,

2   proffers, where at least two of these lawyers were there,

3   right, you recognize their faces, maybe more?

4       A.   Correct.

5       Q.   The FBI agent?

6       A.   Right.

7       Q.   Both of your lawyers at the time, Mr. Benton?

8       A.   Correct.

9       Q.   And when you were talking to them about G, you remember

10   telling them that Broomfield called you, he said for $5,000 I

11   could, in so many words, get G out to where you could target

12   practice, you could hit him, true?

13      A.   Correct.

14      Q.   And Wright was not happy with this.  That's how they

15   wrote it down.  You think they captured the tone of that

16   correctly, that you were not happy with Broomfield?

17      A.   Correct.

18      Q.   Is that right?

19      A.   Right.

20      Q.   And in fact, you advised them in the proffer that you

21   planned to kill G and then go back and kill Broomfield.  You

22   say that to them?

23      A.   Right.

24      Q.   So apparently no love lost between you and Tabib

25   Broomfield.  Is that fair?

TRIAL ONE – VOL 6 –   382

1   A.   Correct.

2   Q.   Broomfield is quite the hustler, isn't he?

3   A.   Correct.

4   Q.   He'd play anybody for anything, won't he, out there on

5   the street?

6   A.   Correct.

7   Q.   He got no loyalty to anybody but Tabib Broomfield, is

8   that fair?

9   A.   Fair to say.

10   Q.   You had no loyalty to him, apparently, did you?

11   A.   He ain't had none to me.

12   Q.   Why was he going to die?  Had you been able to execute G

13   to collect on the 30K, why did Broomfield also have to die?  To

14   save the five grand?

15   A.   He gave me a different number.

16   Q.   He gave you a different number.  What do you mean?

17   A.   Instead of 30- he said it was 20-.

18   Q.   Who's he in that sentence, Barbershop Mike or Tabib

19   Broomfield?

20   A.   Tabib Broomfield.

21   Q.   So Tabib was the go-between between Barbershop Mike and

22   Al-Nuts Wright?

23   A.   Say it again.

24   Q.   Tabib -- Let me put it this way.  From whom did you

25   learn that Barbershop Mike put money on the head of G?

TRIAL ONE – VOL 6 –  383

1    A.    Jigg.

2    Q.    When you say Broomfield gave you a different number, I'm

3    lost.  You're going to have to tell me.  I don't understand

4    what that means.

5    A.    It was 30- on his head.  He brung it to me and said it

6    was only 20- and then he wanted 5- to get him outside.

7    Q.    So had it gone down as you learned of it later on, you

8    would have gotten -- you would have pocketed 15- of what truly

9    was 30-?

10   A.    Correct.

11   Q.    And Broomfield would have swiped the other 15-?

12   A.    Correct.

13   Q.    And that was worth Broomfield's life in your mind,

14   right?

15   A.    Correct.

16        MR. MEYERS:  Can we get this letter back up,

17   165-23.01.

18   BY MR. MEYERS:

19   Q.    I'm asking to have that letter brought back up.  Can we

20   get to page one, please.

21        What's now on the screen and I believe is moved into

22   evidence has been labeled by the government 165.23-01.

23        THE COURTROOM DEPUTY:  Would you like it published?

24        MR. MEYERS:  Yes, please.  Thank you for reminding me.

25

TRIAL ONE – VOL 6 –  384

1  BY MR. MEYERS:

2  Q.   Mr. Wright, that's your handwriting?

3  A.   Correct.

4  Q.   And the mom to whom this letter is written if I

5  understood it, that is Ant Man's mom, you're writing Ant Man's

6  mom?

7  A.   Correct.

8  Q.   Ant Man was close to you?

9  A.   Correct.

10  Q.   Certainly broke her heart.  Whatever Ant Man did or

11  didn't do in his days, he was dead when you wrote this letter,

12  right?

13  A.   Correct.

14  Q.   Now, when we look -- look together with me for a minute.

15  The second paragraph that begins with the word yea.  Do I

16  understand what you're telling Ant Man's mom -- Let me back up

17  a minute.

18      I get the feel from the letter, and you check me out in

19  I'm right on this, that you were close to Ant Man's mom, too,

20  right?

21  A.   Correct.

22  Q.   You'd known her a long time?

23  A.   Correct.

24  Q.   So when you write this and you speak at a couple of

25  places, you still have a son left, did you mean yourself to

TRIAL ONE – VOL 6 – 385

1 that grieving woman?

2 A. Correct.

3 Q. So in the beginning of the second paragraph do I read

4 that correct that the detectives came into the workhouse to

5 holler at you, meaning they wanted to talk to you, but you

6 weren't going to be talking to them?

7 A. Correct.

8 Q. And you tell her, Mom, you got to understand, in your

9 words, I'm a street nigga and snitchin ain't in my blood,

10 right?

11 A. Correct.

12 Q. Your blood's changed since that day apparently.

13 A. Guess so.

14 Q. Now, you go on in that very same paragraph towards the

15 bottom, in fact I guess it's that last sentence, I ain't tell

16 them pigz is because I ain't want the nigga in jail. I wanted

17 his mom to feel how our mom is feeling "real talk". Right?

18 A. Correct.

19 Q. When you say our mom, you mean Ant Man's mom and the

20 good woman to whom you wrote this letter that you treated like

21 a mother, right?

22 A. Correct.

23 Q. And your mother, as you phrase it in this letter, had a

24 dead son, right?

25 A. Correct.

TRIAL ONE – VOL 6 –  386

1   Q.   You wanted the murderer of Ant Man's mom to feel that

2   same pain, right?

3   A.   Correct.

4   Q.   And you told her, ain't nobody in the Short North did

5   this to Ant Man, right?

6   A.   Correct.

7   Q.   Even though he was a Blood, nobody in the Short North

8   killed that man, right?

9   A.   Right.

10   Q.   Who killed him?

11   A.   That's at that time when that letter was wrote.

12   Q.   Pardon?

13   A.   At that time.

14   Q.   You go on, the bottom of that letter and carrying over

15   to the top towards the next page, you're talking to Ant Man's

16   mom about first having told her, I'm no snitch.  You said that

17   to her in the earlier part of the letter, right?

18   A.   Correct.

19   Q.   Said, you want that guy to pay.  You want his mom to

20   feel the pain she was feeling, right?

21   A.   Correct.

22   Q.   And then you go on on page 2 and you say, you go ahead

23   and tell, I think the way you phrase it is –– can we get page 2

24   up, please, for our witness somewhere in there, I got my arrow

25   the wrong way.  Tell the pigz, come on and holla at me but you

1    have to be here or I'm not gonna talk to them.  You wrote that

2    in your handwriting, right?

3      A.    Correct.

4      Q.    That means, if I understand it, you're asking Ant Man's

5    mother in her grief to call the police to come in and talk to

6    you about Ant Man's death, right?

7      A.    Correct.

8      Q.    And you want her there with you, right?

9      A.    Right.

10     Q.    And you're going to spin them a web of lies so you can

11   get out on the streets and get some pay back on the man that

12   you thought did it at the time, is that fair?

13     A.    In your words.

14     Q.    I'm asking you?

15     A.    No.

16     Q.    When you say to her --

17     A.    No.

18     Q.    Are you lying to her in this letter?

19     A.    About what part?

20     Q.    Oh, about the part I didn't talk to the pigz because I

21   want -- I don't want that man in jail.  I want his mom -- you

22   don't want him to jail.  You want him dead, right?

23     A.    Correct.

24     Q.    You want to kill him for payback?

25     A.    Correct.

TRIAL ONE – VOL 6 –  388

1    Q.    So you don't really want to tell the police whodunit.

2  You want to get out of that jail so you could go take care of

3  your own business?

4    A.    That's how you put it.  Your words.

5    Q.    I'm asking you, Mr. Wright.

6    A.    No.

7    Q.    I'm asking you.

8    A.    No.

9    Q.    So that's the story today's version?

10   A.    Whatever version you put it.

11         MR. MEYERS:  Can I have one moment briefly?

12         THE COURT:  Yes, you may, Mr. Meyers.

13         MR. MEYERS:  Nothing further.

14         THE COURT:  Thank you, Mr. Meyers.

15       Mr. Nolder, cross on behalf of your client.

16         MR. NOLDER:  No questions.

17         THE COURT:  No questions.  Mr. DeVillers, any

18  redirect?

19         MR. DEVILLERS:  Yes, Your Honor.

20                         - - -

21                   REDIRECT EXAMINATION

22   BY MR. DEVILLERS:

23   Q.    Mr. Wright, do you know who killed Ant Man?

24   A.    Correct.

25   Q.    Back when you wrote that letter to his mother did you

TRIAL ONE – VOL 6 –   389

1    know who killed Ant Man?

2      A.    No.

3      Q.    Eventually how did you find out who killed Ant Man?

4      A.    Somebody told me.

5      Q.    What's that?

6      A.    Somebody told me.

7      Q.    Who told you?

8      A.    O-Dog.

9      Q.    Who did he tell you killed Ant Man?

10     A.    Tysin and Tommy.

11     Q.    How did you feel about that?

12     A.    It was some type of way.

13     Q.    What do you mean some type of way?

14     A.    I don't feel good about it.

15     Q.    Were you surprised?

16     A.    Correct.

17     Q.    Did you think someone else killed Ant Man before you

18   found out it was Tysin and Tommy?

19     A.    Right.

20     Q.    Who did you think it was?

21     A.    Somebody from Milo.

22     Q.    Do you remember the person's name?

23           THE COURT:  Someone from where?

24           THE WITNESS:  Milo.

25

TRIAL ONE – VOL 6 –   390

1    BY MR. DEVILLERS:

2    Q.    Where is Milo?

3    A.    Off of Second and St. Clair.

4    Q.    When you wrote that letter to Ant Man's mom, did you

5    think that this person from Milo killed Tommy or killed Ant

6    Man?

7    A.    Correct.

8    Q.    And what did you want to do?

9    A.    To him or what?

10   Q.    To him.

11   A.    Kill him.

12   Q.    I think on cross-examination it was brought out that you

13   talked to the United States both in June and August of last

14   year, 2015; is that right?

15   A.    Right.

16   Q.    You were also asked on cross-examination by

17   Mr. Gatterdam that you got discovery and you got all the

18   evidence in this case.  Do you recall being asked that?

19   A.    Correct.

20   Q.    Is that accurate?

21   A.    It ain't accurate.

22   Q.    You talked about protective orders; is that right?

23   A.    Right.

24   Q.    Did you before this year, before January of this year,

25   did you or anyone else get any of the witness statements?

TRIAL ONE – VOL 6 –   391

1    A.    No.

2    Q.    When were they given?

3    A.    I received mines probably a week or two ago.

4    Q.    Was there another round before that in the beginning of

5    the year in January?

6    A.    Not to my recollection.

7    Q.    The witness statements that you got, was that before or

8    after you talked to us?

9    A.    After.

10    Q.    Knockout game, you were asked by Mr. Berndt about the

11    knockout game.  Do you recall that?

12    A.    Correct.

13    Q.    And I believe you testified that it was you, Elijah

14    Ledbetter and 40?

15    A.    Correct.

16    Q.    And what year was this do you think?

17    A.    '04 or '05 probably.  I can't recall.  '03.  I don't

18    know.

19    Q.    How old were you, say, in '04?

20    A.    Eighteen.

21    Q.    How old was Elijah Ledbetter, if you know?

22    A.    Nineteen, 20.  Probably a couple years older than me.

23    Q.    And how old was 40?

24    A.    Probably 14, 15.  A little younger.

25    Q.    Where were you when this happened?

TRIAL ONE – VOL 6 – 392

1  A.   Fourth and 8th.

2  Q.   So right near the D & J Carryout?

3  A.   Correct.

4  Q.   Tell us what you remember.  Was someone walking down the

5  street?  Describe it.  What happened?

6  A.   Might have been coming from the block party or

7  something.  We was all on the corner of Fourth and 8th just

8  chilling.  He was a crackhead, he got punched and got knocked

9  out.

10 Q.   Did you stick around the scene after he got knocked out?

11 A.   Yeah.  I think I was still in the area.

12 Q.   Did you see an ambulance or anything like that come?

13 A.   Right.

14 Q.   Did you see the ambulance take him away?

15 A.   Correct.

16 Q.   Did you read anything -- How did you know he died?

17 A.   It end up being mentioned.  They was talking about the

18 crackhead died or whatever.

19 Q.   Who was talking about it?

20 A.   Everyone.  It was all over the place, the news, all

21 type.

22 Q.   So the crackhead that died you assume was the same

23 person that got knocked out?

24 A.   Correct.

25 Q.   Did you punch him?

TRIAL ONE – VOL 6 –   393

1    A.    No.

2    Q.    But you were there?

3    A.    Right.

4    Q.    You were also asked by Mr. Gatterdam about what happened

5    to White Boy Tone's girlfriend, something about an abduction.

6    Do you recall being asked that?

7    A.    Correct.

8    Q.    Tell us about that, what's that about?

9    A.    White Boy Tone, my baby mom stayed off of Joyce and her

10   and White Boy Tone's baby mom was friends or whatever.

11   Q.    Who is your baby's mom?

12   A.    Tia Bowers.

13   Q.    Okay.

14   A.    And White Boy Tone's baby mom.

15   Q.    Who is White Boy Tone's baby's mother?

16   A.    I forget her name.  Nu-Nu.

17   Q.    What's that, Nu-Nu?

18   A.    Correct.

19   Q.    So go ahead.

20   A.    So Nu-Nu went over Tia's house.  Something came up

21   missing and they accused her of taking it over.

22          THE COURT:  Accuse her who?  Which one got accused of

23   taking it?

24          THE WITNESS:  Nu-Nu.  So whatever she took, I guess

25   she end up giving it to Tone or whatever.  So when I went over

TRIAL ONE – VOL 6 –   394

1   there, one of her cousins had they wasn't like no abduction or

2   nothing.  Wasn't nothing going to happen to them but he said he

3   wasn't going to let them out the car until he got whatever she

4   took until they got it back.

5       BY MR. DEVILLERS:

6       Q.   What was it that was taken?

7       A.   I think a chain and gun or something like that.  I can't

8   remember.

9       Q.   What happened with it, did anybody get anything back?

10      A.   Yeah.  The cousin end up buying the chain back and it

11  was over.

12      Q.   You were also asked about someone got beat up in a club

13  and urinated on.  Do you recall that?

14      A.   Correct.

15      Q.   What club was it?

16      A.   The Plush.

17      Q.   Plush?

18      A.   Plush.

19      Q.   Do you remember who was there?

20      A.   Me, Jigg, Shark, Ant Man.

21      Q.   Was Mr. Liston there, was Buck there?

22      A.   I don't recall that.

23      Q.   What happened?

24      A.   Den Den said he was going to piss on Fee's grave or

25  whatever.

1   Q.   Hold on a second.  Who is Dan Dan (sic)?

2   A.   The person we beat up in the club.

3   Q.   He was going to piss on someone's grave?

4   A.   Correct.

5   Q.   And whose grave is that?

6   A.   Richard Willis.

7   Q.   Richard Willis part of Cut Throat?

8   A.   Correct.

9   Q.   So this guy said he was going to piss on a Cut Throat

10  member's grave; is that right?

11  A.   Correct.

12  Q.   What did you do?

13  A.   So when he came in, he came in.  He was in there for a

14  little minute or whatever.  He end up going to the restroom and

15  then we went in behind him.

16  Q.   What did you do to him?

17  A.   Punched him.  He fell, we got to stomping him, took

18  everything he had on him, pissed on him, left.

19  Q.   You're testifying in this current trial.  Are you

20  expected to testify in other trials?

21  A.   Correct.

22  Q.   You were asked about Lance Green and Tommy Coates.  Are

23  you expected to testify against them?

24  A.   Right.

25  Q.   And to be clear, it was said you talked to us in June

TRIAL ONE – VOL 6 –   396

1   and August of 2015.  Is that accurate?

2   A.   Sound about right.

3   Q.   The first time you came in and talked to us, did you

4   talk about the Michael Teague murder?

5   A.   Correct.

6   Q.   And you tell us the truth today?

7   A.   Correct.

8   Q.   Did you talk about the Hester murder?

9   A.   Correct.

10   Q.   Did you tell us the truth about that?

11   A.   No.

12   Q.   The second time you came in, in August when you came in,

13   did you talk about the Hester murder?

14   A.   Correct.

15   Q.   Did you tell us what your role in that was?

16   A.   Correct.

17   Q.   And did you tell us about the other things you testified

18   about today?

19   A.   Correct.

20   Q.   And this was August or earlier of 2015?

21   A.   Say it again.

22   Q.   Was this in August of 2015, June of 2015?

23   A.   When I talked to you?

24   Q.   Correct.

25   A.   Yeah.

TRIAL ONE – VOL 6 – 397

1    Q.   And this was before the witnesses' statements were

2    provided in discovery?

3    A.   Correct.

4    Q.   You were asked by Mr. Gatterdam if all of the -- strike

5    that.

6         You pled guilty to two counts of murder; is that right?

7    A.   Correct.

8    Q.   And one count of what?

9    A.   Racketeering conspiracy.

10   Q.   And does that racketeering conspiracy involve all the

11   crimes that you committed from 2005 on?

12   A.   I think whatever is in the Indictment.

13   Q.   Were there a lot of -- was there a lot of robberies?

14   A.   Correct.

15   Q.   Murders?

16   A.   Correct.

17   Q.   Attempted murders?

18   A.   Correct.

19   Q.   And even if the United States files its motion and even

20   if the Judge grants it, can the Judge still sentence you to

21   life imprisonment?

22   A.   Correct.

23   Q.   We talked about you and I talked last Friday; is that

24   right?

25   A.   Right.

TRIAL ONE – VOL 6 –  398

1    Q.    Did I tell you there was one rule?

2    A.    Say it again?

3    Q.    Did I tell you there was one rule?

4    A.    One rule?

5    Q.    Rule number one?

6    A.    I think you did.

7    Q.    Do you remember me talking about rule number one at all?

8    A.    I don't know.  You might need to refresh my memory.

9    Q.    No.  You remember me telling you what rule number one1

10   was?

11   A.    I can't recall.

12   Q.    Did we tell you to lie?

13   A.    No.

14   Q.    What did we tell you to do?

15   A.    Tell the truth to my best knowledge.

16        MR. DEVILLERS:  May I have a moment, Your Honor?

17        THE COURT:  Yes.

18        MR. DEVILLERS:  No further questions.

19        THE COURT:  Any recross, Mr. Berndt?

20        MR. BERNDT:  Your Honor, just very briefly.

21                     - - -

22                RECROSS-EXAMINATION

23   BY MR. BERNDT:

24   Q.    Mr. Wright, Mr. DeVillers asked you about the knockout

25   game, you, Troy Patterson, Elijah Ledbetter, correct?

TRIAL ONE – VOL 6 – 399

1    A.    Correct.

2    Q.    You say that Troy Patterson was 15 years old?

3    A.    Around that age.

4    Q.    First murder at 15, Troy Patterson?

5    A.    Guess so.

6    Q.    Were you ever told what rule number one was before last

7    Friday?

8    A.    Can't recall.

9    Q.    Can't recall.  So it's your testimony to this jury that

10   you were never told before you started talking to the

11   government that what they wanted you to tell them was the

12   truth.  Before the first statement in June of 2015, your

13   testimony to this jury is they never told you they expected you

14   to tell the truth?

15   A.    They told me when I first talked to them.

16   Q.    Right.  And you didn't tell them the truth, correct?

17   A.    Correct.

18        MR. BERNDT:  Thank you.

19        THE COURT:  Any recross, Mr. Gatterdam?

20        MR. GATTERDAM:  Yes, Your Honor.

21                         – – –

22                    RECROSS-EXAMINATION

23   BY MR. GATTERDAM:

24   Q.    You were asked some questions by Mr. DeVillers about

25   discovery.  You agree you were getting police reports

TRIAL ONE – VOL 6 –   400

1   throughout this process since you've been charged with this?

2   A.   I got what was in the motion.

3   Q.   Okay.  And would you agree that you were getting

4   discovery off and on for almost two years?

5   A.   I got what was in the motion.

6   Q.   And would you agree that you've admitted today on the

7   witness stand that you've told different stories during various

8   times you've talked to the prosecutors?

9   A.   Correct.

10   Q.   And you talked to your attorney a lot over the course of

11   these last two years, correct?

12   A.   Correct.

13   Q.   And you admitted that you got the discovery of the

14   witness statements before you got on the witness stand today?

15   A.   Correct.

16   Q.   And you were asked about RICO and the murders.  You're

17   getting all these things that you've testified to numbering

18   perhaps over 100 crimes, you're getting -- you're told you're

19   going to get 18 years if they think that you did a good job,

20   correct?

21   A.   Correct.

22           MR. GATTERDAM:  Thank you.

23           THE COURT:  Any recross, Mr. Miller?

24           MR. MILLER:  Briefly, Your Honor.  Thank you.

25                            - - -

1                    RECROSS-EXAMINATION

2    BY MR. MILLER:

3    Q.   Mr. Wright, I just want to talk about one issue and

4    that's the beating up of Den Den in the bathroom.

5    Mr. DeVillers asked you was Mr. Liston there.  You said, I

6    can't recall.  Let me again quote you your comments according

7    to the FBI.  Wright was asked about the Plush shooting.  Wright

8    Stated that the shooting arose out of a beef with first name

9    unknown, last name unknown, a.k.a. Den Den.  Wright advised

10   that Den Den was in Plush with first name known, last name

11   unknown, Kilo.  Wright advised that he, Norton and Green got

12   Den Den into the bathroom, beat him up and pissed on him.  Once

13   they got outside of the club, Green was driving and Wright and

14   Norton started shooting at Den Den.  Wright had a MAC but was

15   not sure what Norton was shooting.

16        That was the end of that inquiry.  Now, you specifically

17   name who was with you and that's correct, is it not?

18   A.   Correct.

19   Q.   All right.  And there was nothing said in here at least

20   I received about any sort of a beef because somebody was going

21   to piss on the grave of a member?

22   A.   Say it again.

23   Q.   There's nothing when I read what they said that you said

24   that had anything to do with the reason for this beef was that

25   Den Den said he was going to piss on the grave --

TRIAL ONE - VOL 6 - 402

1    A.    There was numerous of reasons.  That's probably the

2   reason I gave them.

3    Q.    I'm sorry?

4    A.    It was probably numerous of different reasons.

5    Q.    For numerous different reasons.  Okay.

6         MR. MILLER:  Thank you.

7         THE COURT:  Mr. Meyers, anything further?

8         MR. MEYERS:  No, Your Honor.

9         THE COURT:  I take it, Mr. Nolder, that you have none.

10        MR. NOLDER:  Correct, Your Honor.

11        MR. DEVILLERS:  Nothing, Your Honor.

12        THE COURT:  Mr. Wright, thank you very much, sir.  You

13   may be excused.

14      Mr. DeVillers, your next witness.

15        MR. DEVILLERS:  Detective Caffey, Your Honor.

16        THE COURT:  Before you do that, let me check.  Ladies

17   and gentlemen, it's 3:25 now.  We started at 1:30.  We've been

18   going a couple hours.  We can go until 4:00, we can take our

19   afternoon recess at 4:00.  Would you rather take it now?

20        A JUROR:  Now.

21        THE COURT:  All right.  3:25.  We'll stand in recess

22   until 3:40.

23      (Recess taken from 3:25 p.m. to 3:40 p.m.)

24         (Whereupon, the Jury entered the courtroom.)

25        THE COURT:  Mr. DeVillers, your next witness, please.

TRIAL ONE – VOL 6 – 403

1    MR. DeVILLERS: Your Honor, the United States would

2  call Detective Wayne Caffey.

3    THE CLERK: Sir, come forward and be sworn, please.

4   (Witness Sworn.)

5    THE COURT: Mr. DeVillers, please proceed.

6    MR. DeVILLERS: Thank you, Your Honor.

7               – – –

8               WAYNE CAFFEY

9   Called as a witness on behalf of the Plaintiff,

10  being first duly sworn, testified as follows:

11            DIRECT EXAMINATION

12  BY MR. DEVILLERS:

13  Q.   Good afternoon, Detective.

14  A.   Good afternoon.

15  Q.   Could you please state your full name and spell your

16  last name?

17  A.   Wayne Joseph Caffey, C-A-F-F-E-Y.

18  Q.   Who do you work for, Detective?

19  A.   Los Angeles police department.

20  Q.   How long have you worked for the Los Angeles police

21  department?

22  A.   35 years.

23  Q.   What are your current duties with the Los Angeles police

24  department?

25  A.   I'm a night watch detective at 77th Street Division.

1    Q.   Give us a little background on your career.

2    A.   Most of my career has been spent working gang

3    assignments.  I worked four different gang uniformed units, two

4    undercover units, narcotics, homicide, storefront sting

5    operation undercover, robbery decoy detail undercover.  And

6    then I worked a gang surveillance unit for 12 years where I

7    coordinated gang intelligence on black street and prison gangs

8    for 12 years.

9    Q.   So you have gangs in Los Angeles?

10   A.   Just a few.

11   Q.   Just a few?

12        Have you had any training as far as gangs are concerned?

13   A.   Started off with the academy training and went to

14   courses that were provided by the California Gang Prevention

15   Association, the attorney general's office of the State of

16   California, and then several different gang associations

17   throughout the country.

18        I now teach gangs.  I've been teaching gangs for 25

19   years.  I'm a board member of the California Gang Investigators

20   Association and also a training coordinator.

21   Q.   Can you tell us some of the places you've done -- when

22   you say gang training, who are you training?

23   A.    It's been mostly law enforcement, but I've trained Arch

24   Diocese of Los Angeles and San Bernardino Catholic Arch

25   Diocese, teacher associations.  I'll train anybody who wants

TRIAL ONE – VOL 6 –   405

1  training on gangs.

2      Q.    And do you travel around the country doing that?

3      A.    All the time, yes.

4      Q.    How long have you been teaching about gangs?

5      A.    About 25 years.

6      Q.    Have you testified in court in relation to gangs and

7  gang culture?

8      A.    In California Superior Court about 500 times, in federal

9  court, five times.

10     Q.    Have you testified in different states?

11     A.    Yes.

12     Q.    What's the closest state to Ohio you've testified in?

13     A.    Let's see, I've testified twice in Nashville, Tennessee,

14  and Alabama and several times in Los Angeles.

15     Q.    I'd like to -- what I would like to do, Detective, is

16  talk to you a little bit about -- ask you a little about the

17  history of certain gangs and how it's spread, and then I would

18  like to talk in general terms nationally about gang culture.

19     A.    Okay.

20     Q.    Can you give us, I guess, a bit of a history lesson as

21  to -- well, what are Crips?

22     A.    Crips are a -- or it's a name for several street gangs

23  in the city of Los Angeles.  They started off as -- some of the

24  gangs were already in existence, but the original Crips

25  actually started on the east side of the city of Los Angeles by

TRIAL ONE – VOL 6 –   406

1  a guy by the name of Raymond Washington.

2     Q.    Raymond Washington?

3     A.    Yes.

4     Q.    What year was that?

5     A.    1969.

6     Q.    What are Bloods?

7     A.    Bloods were gangs that already existed that Raymond and

8  his crew tried to recruit.  Most of them were gangs that didn't

9  get along with Raymond.  A lot of those existed long before the

10 Crips were in existence.  And when I was growing up in South

11 Central Los Angeles, they used to call themselves Anti-Crips.

12 They weren't Bloods yet, but they were gangs that didn't get

13 along with the Crips.

14    Q.    What decade are you talking about then?

15    A.    Late '60s, early '70s.

16    Q.    Did those gangs basically evolve over the years?

17    A.    Yes.  And to explain it better, each gang neighborhood

18 is a set, and each set has cliques inside a gang.  So you have

19 Crip sets, you have Blood sets.  There are some alliances based

20 on geographics or some alliances based on -- one of the major

21 ones would be the Neighborhood Crip Alliance, which is gangs

22 that use the term Neighborhood Crips to identify themselves,

23 and you have the Gangster Crip Alliance.

24    Q.    You said set.  Explain that again.  What's a gang set?

25    A.    A set is the actual gang itself.  That's a gang name

TRIAL ONE – VOL 6 –   407

1   like Rollin 60s, Eight-Tray Gangsters, Neighborhood Pirus.

2   Those are sets.  So that's the actual gang itself, which they

3   are all independent groups.

4     Q.   But are you a set of a Blood or a set of a Crip?

5     A.   No.  There's -- the problem that the media has done,

6   over the years they've painted in a big broad picture Crips and

7   Bloods of being one umbrella, and then everybody runs under

8   this umbrella and there's one shot caller.  That's never been

9   the fact.

10        When the gangs first started, it was one gang founded by

11   a guy named Raymond Washington on the east side that was the

12   original East Side Crips.  And then when Tookie Williams came

13   on board with Raymond, he founded the West Side Crips, but

14   these have always been individual sets which are in individual

15   neighborhoods that have been in existence since the beginning.

16     Q.   So for Crips in Columbus or New York or Miami, is there

17   a leader in Los Angeles?

18     A.   No.

19     Q.   Has there ever been a leader in Los Angeles of the

20   Crips?

21     A.   No.

22     Q.   How about Bloods?  Bloods in New York, Columbus,

23   Nashville, was there a leader in Los Angeles that was in charge

24   of those guys?

25     A.   No.  They are individual neighborhoods that became sets.

TRIAL ONE – VOL 6 –   408

1    The gangs that became Bloods, again, were gangs that didn't get

2    along with the Crips.

3         MR. NOLDER:  Your Honor, may we approach?

4         THE COURT:  Yes.

5                        –  –  –

6    Thereupon, the following proceeding was held at side bar

7    out of hearing of the jury:

8         MR. NOLDER:  Your Honor, it's evident that this

9    witness is going to testify about gangs, gang culture, anything

10   relevant to gangs.  My client is not alleged to be in a gang.

11   And I had moved for severance in this trial, and it's been

12   denied so I would ask the court to give a limiting instruction

13   to this jury that any of this witness's testimony is not to be

14   used to determine Clifford Robinson's guilt or innocence.

15        MR. DeVILLERS:  And I would object, Your Honor.  I

16   have to prove for this case that an enterprise existed, and I

17   also have to prove that he was associated with that enterprise

18   at least on the one day, and I think that is relevant and this

19   is relevant to be able to prove that enterprise.

20        THE COURT:  I agree.  And I think that the

21   instructions will sort of delineate where the lines of

22   demarcation are.

23        I thought that you did an excellent job in your opening

24   statement of setting your client apart, making it quite clear

25   what the allegations against him are.

TRIAL ONE - VOL 6 - 409

1       And Mr. DeVillers is absolutely right.  He still has to

2  prove that there was a criminal enterprise and that

3  Mr. Robinson was associated with it on that one day.

4       So your objection is preserved but overruled.

5       MS. DIXON:  Your Honor, while I'm here, I'm not sure,

6  and I could have totally missed it, but has he been qualified

7  and declared an expert?

8       THE COURT:  I'll let him answer it.

9       You know, under Johnson he doesn't have to be qualified

10  as an expert because -- and you understand the theory.  You

11  don't want to give the jury the Court's imprimatur by having

12  him declared an expert.  I've already instructed the jury that

13  we might hear from an opinion witness.  He's going to testify

14  as an opinion witness.

15      MS. DIXON:  And not an expert?

16      THE COURT:  I'm sorry?

17      MS. DIXON:  Okay.  Okay.

18      THE COURT:  To the extent, though, if his -- I've

19  seen -- I've been provided his CV.  If he testifies

20  consistent -- if he sets up his background consistent with his

21  CV, I would declare him an expert under the old regime or if he

22  was in state court because, you know, I can't imagine too many

23  people having more credentials, and then the rest of his

24  testimony will all go to weight and not to the admissibility of

25  his --

1          MS. DIXON:  I just want to be sure when we get to

2     e-mails and whatnot, I want to be sure of what --

3          THE COURT:  Okay.  All right.

4          MS. DIXON:  So that clears it up for me.

5        (The following proceedings were had in open court.)

6          THE COURT:  Mr. DeVillers, please continue.

7          MR. DeVILLERS:  Detective, I'm trying to think where

8     we were.  I believe --

9          THE COURT:  Do you want to have Ms. Coulter read it

10    back?

11         MR. DeVILLERS:  That would be fantastic.

12       (Thereupon, the last question was read by the court

13    reporter.)

14      BY MR. DeVILLERS:

15    Q.   I guess my next question is then how is it that we

16    have -- or do we -- let me ask you this:

17         Do we have gangs that call themselves Crips and Bloods

18    in different cities throughout the country?

19    A.   Yes, we do.

20    Q.   How is that?  How did that happen if there's no real

21    connection to Los Angeles?

22    A.   Originally, it was gang members from Los Angeles that

23    spread out throughout the country.  Some had relatives in

24    neighborhoods throughout the country, and they would go visit

25    them.  Sometimes the relatives would come to Los Angeles and

TRIAL ONE – VOL 6 –   411

1  visit them, and they would take this culture back with them.

2    Q.   Okay.  About when did that start happening where we saw

3  it spread out of Los Angeles or out of California, let's say?

4    A.   I knew guys in the neighborhood that were going to other

5  states back in the mid '70s.

6    Q.   Is there a time period or a particular decade or decades

7  where it became common, if not rampant?

8    A.   Probably the '80s once narcotics became the mainstay for

9  most gang members to make money selling especially rock cocaine

10  because the guys were now going out to other states to find new

11  avenues to sell.  There was more money to be made outside of

12  California.  You could sell it for a higher price.

13    Q.   So nationally do we see Blood sets and Crip sets in

14  different states and different cities?

15    A.   Yes, we do.

16    Q.   You had mentioned a clique.  Is a clique within a set?

17    A.   Yes.

18    Q.   Explain what a clique is.

19    A.   Cliques are individuals inside the sets that can be

20  related by the fact that they grew up and they're in the same

21  age bracket, they grew up in the same area.  They're on the

22  same block, same street.  So each set in Los Angeles has

23  several different cliques.  And, again, they are broken down

24  depending on how these guys formed up as a clique.

25    Q.   Go ahead.

1    A.    For instance, in certain neighborhoods it's the street

2    alone.  Like, if you're talking about Rollin 20s Bloods in Los

3    Angeles, they have 25th Street clique, 27th Street clique,

4    Belizean Posse and several other different cliques.

5    Q.    So that Bloods set would be called what?

6    A.    Rollin 20s.

7    Q.    And that would have cliques within it?

8    A.    Yes.

9    Q.    From different streets?

10    A.    Yes.

11    Q.    Other than geographical area or age groups, is there

12    anything else that you see with cliques within a set, any other

13    category that you see?

14    A.    Sometimes the cliques or the name they evolved with is

15    the name where it's common with the criminal activity they like

16    to be involved in.

17        For instance, I worked a gang called the Bounty Hunter

18    Bloods.  They were out of the Nickerson Garden Projects, and

19    they had a group called the Kill Squad, they had a group called

20    the Brazy Brew.  Most of these gangs were formed along the age

21    group that they were found with.

22    Q.    Is there -- in a general sense is there a rival between

23    Bloods and Crips?

24    A.    Yes.

25    Q.    Is that always the case?

TRIAL ONE - VOL 6 -   413

1    A.   It was for a long period of time.  It probably started

2  to change about the late '80s or early '90s where you saw some

3  alliances with different Crip and Bloods neighborhoods.

4  Sometimes you had members that had family members.

5        For instance, I have cousins that are Crips and I have

6  cousins that are Bloods.  When we're together we're family, but

7  they run with their own neighborhoods.

8    Q.   Okay.  Are there rivalries within or between different

9  Blood sets or Crip sets?

10    A.   Yes, several.

11    Q.   Nationally today is there a particular color associated

12  with Crips?

13    A.   Blue is the color associated with Crips.

14    Q.   Is there a particular color associated with Bloods?

15    A.   Red.

16    Q.   What's tagging?

17    A.   Well, tagging is basically a form of street writing

18  where they paint walls or use markers.  And for gang members

19  it's different than what we call taggers, which are -- they

20  consider themselves artists.  But gang members, it's a way of

21  marking territory, putting roll calls up, putting the

22  information about who has been killed in their neighborhood,

23  their enemies, stuff like that.

24    Q.   You said roll call.  What's a roll call?

25    A.   Well, most tagging on a wall, if you see names, you see

TRIAL ONE – VOL 6 –   414

1   monikers up there on the wall, it's going to be the roll call

2   of that clique, and it's going to be several monikers listed on

3   the wall with the gang name and the clique's name.

4      Q.   I'm going to show you -- did we meet last night?

5      A.   We did.

6      Q.   In your hotel?

7      A.   Yes.

8      Q.   Did I show you some photographs?

9      A.   Yes, you did.

10     Q.   I would like to show you a couple of those photographs

11   again.  I'm going to show you what's been marked as Government

12   Exhibit 1-2-056.

13          MR. DeVILLERS:  Your Honor, this has already been

14   admitted into evidence so I would ask that this be published to

15   the jury?

16          THE COURT:  It may.

17     BY MR. DeVILLERS:

18     Q.   Detective, did I show you this last night?

19     A.   Yes, you did.

20     Q.   All right.  Is there anything on this wall that looks

21   familiar to you?

22     A.   Yes.

23     Q.   Can you tell us what that is?

24     A.   Well, you see Rollin 20s, you see N-Hood in the blue box

25   standing for Neighborhood Crips.  Rollin 20s, obviously a

TRIAL ONE – VOL 6 –   415

1    Rollin 20s Crip set.

2           You see Ps and Bs that are crossed out, which is a

3    reference that the B is for Bloods; Ps usually stand for Piru,

4    which is one of the original Blood sets out of Compton.  And

5    you see monikers.

6    Q.   Let me ask you this:  Rollin 20s, what is that?

7    A.   Well, in Los Angeles we have Rollin 20s Bloods.  We have

8    the West Side Rollin 20s Bloods, and we have Rollin 20s Outlaws

9    on the east side.  There are no Rollin 20s Crips in LA, but

10   there is a Rollin 20s Crip set in Long Beach, California, which

11   is a city that's neighboring to LA.

12   Q.   Is there somebody that's particularly famous for being a

13   Rollin 20 Crip?

14   A.   He ran with the gang back in the day, and that was the

15   rapper Snoop Dogg.

16   Q.   Snoop Dogg?

17   A.   Yes.

18   Q.   Why do we have a Rollin 20 Crip moniker on a wall in

19   Columbus, Ohio?

20   A.   Probably that either somebody from Long Beach Rollin 20s

21   visited here or --

22           MR. GATTERDAM:  Objection.

23           THE COURT:  Overruled.  Because it's not speculation

24   since Mr. Caffey is testifying as an opinion witness.

25           You may complete your answer, Mr. Caffey.

TRIAL ONE – VOL 6 – 416

1        THE WITNESS:  Thank you, Your Honor.

2        Either somebody visited from Long Beach or somebody

3   picked up the identity as Rollin 20s.  It also comes up from

4   social media, movies, rap music, rap videos.

5     BY MR. DeVILLERS:

6   Q.   So Snoop Dogg isn't in charge of the Crips here in

7   Columbus that you're aware of?

8   A.   Not that I'm aware of.

9   Q.   All right.  There's a word spelled on this wall if you

10   see it in kind of the middle left, black is spelled

11   incorrectly, I think.  Why is that?

12   A.   Because if the word black is spelled correctly, it would

13   be C-K, which would stand for Crip Killer.  A Crip set can't

14   put that on the wall because they are disrespecting themselves

15   so they take the K out and put two Cs.

16   Q.   I want to show you what's been marked as Government

17   Exhibit 1-2-057.

18        MR. DeVILLERS:  Your Honor, I would also request to

19   publish this.

20        THE COURT:  Yes.

21     BY MR. DeVILLERS:

22   Q.   Again, Detective, did we talk about this last night as

23   well?

24   A.   Yes, we did.

25   Q.   There appears to be on the left side of this screen a

TRIAL ONE – VOL 6 – 417

1   drawing of a hand down somehow.  Does that mean anything to

2   you?

3    A.   Yeah.  The way the hand is formed up is the normal sign

4   for Rollin.  Most of the Rollin gang neighborhoods use that

5   kind of hand sign.  You also have two fingers down, and that

6   also stands for 20s.

7    Q.   Okay.  Have you -- are there any other typical gang

8   signs that are associated with Crips?

9         What's a hand sign?  Is there hand gang signs?

10   A.   Yes.  Hand signs were developed by gangs to help

11   identify themselves and also to show themselves off to rival

12   neighborhoods, the gangs that didn't get along.

13        The most common ones to see is when the hand is formed

14   into a C for Crip.  You will have Blood Killer, which is formed

15   up with a lower case b and k meaning Blood Killer.

16        Bloods will throw up B.  Piru, you have -- and then

17   every gang has their own hand sign to describe their gang

18   itself.

19   Q.   Would different sets have different gang signs depending

20   on where they're located?

21   A.   Yes.

22   Q.   How about cliques, would certain cliques have their own

23   hand sign?

24   A.   Most cliques do, yes.

25   Q.   Terminology.  Are there -- is there terminology that

TRIAL ONE – VOL 6 –   418

1    Bloods traditionally adopt and Crips traditionally adopt for

2    terms of endearment?

3     A.   Yes.

4     Q.   Such as?

5     A.   Crips would use the word cuzz.  When the gang was first

6    founded, Raymond Washington and his crew were trying to show a

7    relationship that they were all tied in together, and they

8    called themselves cousins.  Most of these kids were in CYA at

9    the time.  These were all juveniles when the gang was first

10   founded.

11    Q.   What's that, CYA?

12    A.   CYA, which is California Youth Authority which was the

13   California youth prison back then.

14         So they were showing terms in endearment and a

15   relationship so they took the term cousin.  They called each

16   other cousins which shortened down to cuzz.

17    Q.   How about Bloods?  Is there a term of endearment for

18   Bloods?

19    A.   The Bloods also wanted to show that -- the guy that

20   found the Bloods was a guy from Compton Piru, Sylvester Puddin

21   Scott --

22    Q.   I'm sorry, what was his name again?

23    A.   Puddin, P-U-D-D-I-N, pronounced Puddin Sylvester Scott

24   and a guy named Vincent Owens who was from Bishops, which was

25   another Blood gang.

TRIAL ONE – VOL 6 –   419

1    Q.    I'm going to ask you to slow down a little bit.  I drink

2    a lot of coffee and I'm originally from New York so I'm scolded

3    quite a bit.  So you're from California, you're supposed to be

4    talking slower.  Could you do that for me?

5    A.    That's not hard.

6    Q.    I don't know.  All right.  Go ahead, sir.

7    A.    But, anyway, they also wanted to show that the Blood

8    gang members, this new alliance they put together in the mid

9    '70s, also were founded.  It was a common terminology when I

10   was growing up that older black males would call –– talk to

11   younger black males and call us Young Bloods.  All my uncles

12   were in Vietnam and they came back with that terminology, and

13   called me, hey, what's up, Young Blood.

14        So when Vincent and Sylvester were putting this alliance

15   together of Blood gangs, they used that term as Blood Brothers

16   and they started calling themselves Bloods.

17   Q.    And did those terms and terminology, did they pass on to

18   other parts of the country?

19   A.    Yes.

20             THE COURT:  What was Vincent's last name?

21             THE WITNESS:  Owens.

22      BY MR. DeVILLERS:

23   Q.    How about do they have derogatory names for each other?

24   Will a Crip call a Blood something to offend them or vice

25   versa?

TRIAL ONE - VOL 6 -   420

1   A.   Yeah.  The first term was slob.

2   Q.   Who was that for?

3   A.   That was what Crips would call Bloods.  They would call

4   them slobs.

5   Q.   Crips would call Bloods slobs?

6   A.   Yes.

7   Q.   And that's a derogatory term?

8   A.   Yes.

9   Q.   Do you know why that's derogatory?

10   A.   It was supposed to be the reverse of Bloods.  They just

11   flipped it.

12   Q.   How about do Bloods have derogatory terms for Crips?

13   A.   Yes.

14   Q.   What's that?

15   A.   E-rickets, crabs.

16   Q.   Can we go back to 1-2-056, please?

17        It appears, Detective, in the middle there seems to be

18   some sort of intersection street sign.  Do you see that?

19   A.   Yes.

20   Q.   Is that significant in any way?

21   A.   Usually when the gang puts that on a wall, they are

22   claiming a block or corner, and that's significant to that gang

23   because that will be their gang nickname or a clique.

24   Q.   To cooperate with the police or law enforcement in any

25   way, how traditionally in either Bloods or Crips is that taken?

TRIAL ONE – VOL 6 –   421

1    A.    That's considered breaking the street rules.

2    Q.    And is there any sort of the penalty for breaking the

3  street rules?

4    A.    Usually it's death.

5    Q.    Have you ever been to Columbus before?

6    A.    No, I haven't.

7    Q.    Welcome.

8    A.    Thank you.

9    Q.    Have you heard of any gang sets in Columbus?

10   A.    No.

11   Q.    The testimony that you've given today thus far, is that

12  just generally what you see nationally?

13   A.    Yes.

14        MR. DeVILLERS:  May I have a moment, Your Honor?

15        THE COURT:  Yes.

16        MR. DeVILLERS:  I have no further questions,

17  Your Honor.

18        THE COURT:  Thank you, Mr. DeVillers.

19       Mr. Durden or Mr. Berndt on behalf of Mr. Ledbetter?

20       Mr. Durden?

21        MR. DURDEN:  Yes, Your Honor.

22                          – – –

23                     CROSS-EXAMINATION

24    BY MR. DURDEN:

25   Q.   Good afternoon, Detective.  My name is Aaron Durden.  I

TRIAL ONE – VOL 6 – 422

1   represent Robert Ledbetter, along with Jeff Berndt.

2        I have just a few questions for you, Detective.  So this

3   is your first visit to Columbus?

4   A.   Correct.

5   Q.   Again, welcome to Ohio.

6   A.   Thank you.

7   Q.   But you have traveled to both Tennessee and Alabama?

8   A.   Yes.

9   Q.   And since we're talking about -- I guess you have some

10  knowledge on Crips and Bloods.  Do you specifically address the

11  issues with those two gangs itself versus motorcycle gangs and

12  things of that sort?

13  A.   Well, again, Crips and Bloods is not a gang itself.

14  It's several different gangs that use that title all over the

15  country.  So I teach all over the country, and in Alabama and

16  Tennessee I testified in federal court on different Blood and

17  Crip gangs.

18  Q.   It's my understanding, though, that you put on seminars

19  to teach other police officers how to recognize gang signs,

20  gang memorabilia, things of that sort.

21  A.   That's correct.

22  Q.   So what you are giving is a broad swath of what gang

23  life with Crips and/or Bloods may be like here.

24  A.   That's correct.

25  Q.   But we're talking about Crips.

TRIAL ONE – VOL 6 –    423

1    A.   Crips, yes.

2    Q.   The question was asked, and I think you said no, but is

3    there a hierarchy in a particular gang such as you spoke of --

4    what was that gentlemen's name, Raymond Washington for the

5    Crips and Vincent Owens for the Bloods, was there a hierarchy

6    there?

7    A.   When the gangs were first started, those were the

8    founding members.  Those were the guys that were considered the

9    leaders of the gangs.  But as they evolved over the '70s and

10   '80s, each gang set had several different shot callers, which

11   are guys that basically run different cliques in the gang.  So

12   there's no one person that calls the shots for any one gang.

13   Q.   Now, there are gangs in Chicago.

14   A.   Correct.

15   Q.   Do you know whether or not they have hierarchies as

16   well?

17   A.   In some gangs they did.  My father is from Chicago.  I

18   used to visit there as a kid so I'm very familiar with Gangster

19   Disciples, Vice Lords.  My dad had friends that were Vice

20   Lords.

21   Q.   You would agree that gangs around the nation differ in

22   how they set themselves up.

23   A.   Yes.

24   Q.   Is there a code book or a rule book that they all adhere

25   to?

TRIAL ONE – VOL 6 –   424

1    A.   No.

2    Q.   So how do they learn to understand the rules?

3    A.   It depends on the individuals.  Either -- like, again,

4   they will have somebody that's a member of that gang or

5   originally came from that might visit that area.  Sometimes

6   they will have a family member who will visit them in Los

7   Angeles or Chicago, and they will bring that culture back to

8   wherever they are from.  And a lot of it is from social media,

9   rap music, TV, whatever.

10   Q.   Is there a person -- a local person, local

11   representative, to coin a phrase, that will represent -- that

12   will speak with the persons in LA where the gang originated?

13   A.   There are some gangs that will try to get what they call

14   credibility so they'll have a couple of their homeboys come to

15   Los Angeles or try to come to Los Angeles to meet with the

16   gangs that have the original name to try to get that kind of

17   credibility.  Sometimes it happens, most of the time it

18   doesn't.

19   Q.   But you did say the gangs differ in different parts of

20   the country, right?

21   A.   Yes.

22   Q.   You said something that was quite telling.  A clique, as

23   you called it, usually are of similar or same age bracket,

24   correct?

25   A.   In most cases.  Sometimes they're not.  It depends.

TRIAL ONE – VOL 6 – 425

1    Q.    And also, most importantly, generally in the same

2    community.

3    A.    Pretty much so, yes.

4    Q.    And we're talking about one or two blocks of the same

5    living area, correct?

6    A.    That just depends.  Geographically you can't say that

7    because it could be a project which would be several blocks, it

8    could be one street.  It could be a park they all hang out in.

9         I mean, cliques are named after wherever these guys

10   happen to meet up and whatever commonalities they have.

11   Q.    So it could be a park or it could be a street?

12   A.    Correct.

13   Q.    Like Fourth and Eighth, correct?

14   A.    Correct.

15   Q.    As we were looking at in Exhibit Number 1-2-057?

16   A.    Yes.

17   Q.    Okay.  Now, when you met with Mr. DeVillers last night,

18   I'm hoping he took you out to dinner.

19   A.    I was too tired for that, but thank you.

20   Q.    So you did not tour the Short North area, sir?

21   A.    No.  I was on 24 hours of being straight up.  I had

22   worked as a night watch detective and so I hadn't been to sleep

23   all day.

24   Q.    So is it fair to say, Detective, that you have no

25   information as to the association of any of these four

TRIAL ONE – VOL 6 –   426

1   gentlemen here that may or may not be associated with some gang

2   called the Crips?

3   A.    No, not at this time.

4         MR. DURDEN:  May I have a moment, Your Honor?

5         THE COURT:  Yes.

6         MR. DURDEN:  No further questions, sir.

7         THE COURT:  Thank you, Mr. Durden.

8       Mr. Gatterdam, any cross?

9         MR. GATTERDAM:  Yes, Your Honor.

10                           – – –

11                    CROSS-EXAMINATION

12   BY MR. GATTERDAM:

13   Q.    Good afternoon, Detective.

14   A.    Good afternoon.

15   Q.    Are you even aware based on what you know about this

16   case when this indictment came out in this case?

17   A.    I was sent a copy of some transcripts and an indictment.

18   I don't remember the exact date that it was filed, though.

19   Q.    Okay.  And you've been doing gang work for quite some

20   time, correct?

21   A.    Correct.

22   Q.    And how long ago did the government in this case contact

23   you about being an expert?

24   A.    Little over two weeks ago.

25   Q.    And are you getting paid for your testimony?

TRIAL ONE – VOL 6 –   427

1    A.   No, I'm not.

2    Q.   And did you do a written report?

3    A.   No, I didn't.

4    Q.   And I think you've sort of answered this, but you

5    weren't provided any specifics about the alleged gang in this

6    case, correct?

7    A.   Yeah, I read a transcript of some testimony so I had

8    some knowledge of it.

9    Q.   Okay.  And you agree that as to gangs, each gang is

10   different.  It's no one size fits all, correct?

11   A.   Correct.

12   Q.   And you said the Crips like the color blue and Bloods

13   like the color red, correct?

14   A.   Primarily, yes.

15        MR. GATTERDAM:  Okay.  Can I have 1-3-11?

16     BY MR. GATTERDAM:

17   Q.   And do you see that picture on your screen now?

18   A.   Yes, I do.

19   Q.   And can you describe for the jury the top part of that

20   picture, what that appears to be?

21   A.   It's a photograph that's framed in red all the way

22   around it with two five-pointed stars in the top corners and

23   two individuals throwing up hand signs with a Rest In Peace,

24   Ant Man, and My Blood and a derogatory term I won't pronounce.

25   Q.   So what gang would that in your experience be affiliated

TRIAL ONE – VOL 6 –   428

1    with?

2    A.   It would be some Blood set.

3    Q.   All right.  1-3-18.

4    A.   Are you talking about the bottom photograph?

5    Q.   No.  No.  They're going to put another one up.  Sorry.

6         And do you see this series of photos?

7    A.   Yes, I do.

8    Q.   Four photos?

9         And do you see that several individuals are dressed in

10   red in these photos and several in white?

11   A.   Yes.

12   Q.   And there's one in blue?

13   A.   Yes.

14   Q.   So there's a whole mix of different colors in this

15   photo, correct?

16   A.   Correct.

17   Q.   19.

18        THE COURT:  Officer, does white have any gangs -- the

19   color white have any gangs with significance such as blue and

20   red?

21        THE WITNESS:  Well, in Los Angeles you have gangs that

22   use several different colors.  Blue is the primary color the

23   Crips wear, but you have a gang called Grape Street, they only

24   wear purple.  You have a gang called Fudge Down Mafia Crips,

25   they only wear light brown.  You have Hoovers who used to be

TRIAL ONE – VOL 6 –   429

1   Crips don't wear blue any more, they wear orange.  And because

2   they associate themselves with Bloods now, they wear red and

3   orange.

4           THE COURT:  And how about white?

5           THE WITNESS:  White, there are some gangs that mix

6   white with it, but offhand I can't think of which ones.

7           THE COURT:  Please continue, Mr. Gatterdam.

8     BY MR. GATTERDAM:

9   Q.   If I could follow up on that, Judge, so the color white

10  really has no significance, correct?

11  A.   Not in Los Angeles, it doesn't.

12  Q.   All right.  And you see that picture in front of you

13  now.  Would you agree there's sort of a mix of all different

14  colors in that, red, white, one blue or two blue?

15  A.   Yes.

16  Q.   Dash 20.

17       Same thing in that picture.  Do you see a red, a blue,

18  some white, a whole mix of different colors?

19  A.   Yes.

20  Q.   And dash 21.

21       Same thing there, the top photo has mostly white, fair

22  to say, and one yellow shirt?

23  A.   Yes.  I would call it gold, but yes.

24  Q.   Okay.  And down below it looks like red or orange; is

25  that fair to say?

TRIAL ONE – VOL 6 –   430

1     A.   Yes.

2     Q.   All right.  Thanks.

3          You were talking about the different signs or things

4     being tagged.  1-2-27.

5          MR. GATTERDAM:  And I believe this has been admitted,

6     Dave, you admitted this or --

7          MR. DeVILLERS:  I don't believe it has.  I don't have

8     an objection.

9          MR. GATTERDAM:  Your Honor, I would ask this be shown

10    to the jury.

11         THE COURT:  Well, it's not admitted.  If the parties

12    want to stipulate, that's fine.  But, otherwise, a foundation

13    needs to be laid.

14         MR. GATTERDAM:  I'll let this witness talk about it.

15         MR. DeVILLERS:  Your Honor, I have no problem

16    stipulating to it.

17         THE COURT:  What do you want?  Since government

18    counsel has stipulated to it, you can have it displayed to the

19    jury if you wish.

20         MR. GATTERDAM:  That's okay.  I'll just have the

21    witness describe it.

22      BY MR. GATTERDAM:

23    Q.   Do you see the picture in front of you, sir?

24    A.   Yes, I do.

25    Q.   And you see N-Hood, Rollin 20 and Crip Gang in there in

TRIAL ONE – VOL 6 –   431

1    that, correct?

2    A.    Yes.

3    Q.    Now, in your world is that describing separate gangs,

4    N-Hood, Crip Gang and Rollin 20s?  Are they different?

5    A.    No.

6    Q.    Okay.  Are they the same gang?

7    A.    It's all one gang, yes.

8    Q.    And that would indicate to you that somebody -- somebody

9    has tagged that gang in that area, correct?

10   A.    Correct.

11   Q.    All right.  And is it uncommon in your world to have

12   multiple gangs in the same area?

13   A.    No.

14         Well, the only thing we see in Los Angeles, we have

15   overlapping where black gangs and Hispanic gangs overlap in

16   areas, but the gang territory has been established for over 40

17   years so you're not going to have gangs share territory.

18   Q.    So in this territory, based on your world, this means

19   that that's the gang in that area.

20   A.    Correct.

21   Q.    N-Hood, Rollin 20, Crip Gang?

22   A.    Yes.

23   Q.    Now, how about the Gangstas, are the Gangstas a gang?

24   A.    Well, you have gangs that use gangster in their name.

25   Q.    Okay.

TRIAL ONE - VOL 6 - 432

1    A.   In Los Angeles when Crips first started, all Crips got

2    along.  Around '77, '78 a war broke out between two

3    neighborhoods, Rollin 60s which are a neighborhood Crip set,

4    and Eight-Tray Gangsters which are a gangster Crip set.  This

5    caused a basic rift in all the Crip sets where the gangs that

6    claimed gangster sets became aligned together and all the gangs

7    that claimed neighborhood sets aligned together, and it still

8    goes on today.

9    Q.   So if there was some tagging that said Rollin 20

10   Gangstas, what does that mean to you?

11   A.   If it's Los Angeles, it would be Long Beach which is the

12   only Rollin 20s Crips that we have.

13   Q.   Would it be different than the N-Hood Rollin Crip 20

14   gang?

15   A.   Well, Rollin 20s Long Beach are a neighborhood Crip.

16   N-Hood stands for neighborhood.

17   Q.   Okay.  But what I'm saying is that picture in front of

18   you, you have that, have that in your mind, okay.  And then if

19   you saw another picture that just said Rollin 20 Gangstas,

20   would that say to you it's the same gang or a different gang?

21   A.   If they put gangsters -- if it was a neighborhood Crip

22   set, they're not going to write gangsters.  They will write

23   gang but not gangsters.

24   Q.   Okay.  But I guess I'm not sure then whether or not if

25   you saw that, would that still be the same gang, same set?

TRIAL ONE – VOL 6 –   433

1  A.   I would think it's different or somebody is confused.

2  Q.   Okay.

3       MR. GATTERDAM:  Your Honor, may I approach the

4  witness?

5       THE COURT:  Yes, you may.

6  BY MR. GATTERDAM:

7  Q.   I'm handing you what's been marked Defendants' Exhibit

8  D5 and ask if you could describe for the jury what it is you

9  see in that photo?

10  A.   I see the word Rollin spelled with an E, R-O-L-L-E-N,

11  20s, and the word gangster with a Z at the end of it.

12  Q.   Okay.  Now, did I accurately describe to you a minute

13  ago that that's -- is that what I'm describing, is that what

14  you're looking at now, Rollin 20 Gangsta?

15  A.   Yes.

16  Q.   And that would be different than the picture up on your

17  screen, correct?

18  A.   Correct.

19  Q.   Okay.  Thank you.

20       And with any of these pictures that you've been shown,

21  you don't know here or out in California unless you saw it who

22  actually put it up there, right?

23  A.   Correct.

24  Q.   Or when it was put up there unless you happened to be

25  monitoring that neighborhood.

TRIAL ONE – VOL 6 –   434

1    A.   Correct.

2    Q.   Do you know, sir, if there's any definition in Ohio, a

3    legal definition of a gang member?

4    A.   I read it, but I don't remember it offhand.

5    Q.   And how about nationally, is there a federal definition

6    of a gang member?  Not a gang, but a gang member.

7    A.   Yes.

8    Q.   Okay.  Where does that come from?

9    A.   It came from the Department of Justice.

10   Q.   Okay.  What does it mean to be a documented member of a

11   gang?

12   A.   Well, each state has their own system.  In California we

13   document gang members in a system by using certain identifiers

14   three or more to show that they are a member of the gang, an

15   active member of the gang.

16   Q.   And I think it's sort of evident in your answer, but you

17   would agree that Ohio could do it totally different than

18   California, correct?

19   A.   That's possible, yes.

20   Q.   I see in your resume you worked for a period of time in

21   the CRASH unit.  What did that stand for?

22   A.   Community Resources Against Street Hoodlums.

23   Q.   And you worked there roughly what, '88 to '95?

24   A.   Well, I worked four different CRASH units.

25   Q.   Okay.  Would you agree that CRASH was part of a very

TRIAL ONE – VOL 6 –   435

1   huge scandal in Los Angeles?

2   A.   No, I wouldn't.

3   Q.   Okay.  Would you agree that a number of officers lost

4   their jobs when they were working at CRASH?

5   A.   There was four officers, only three of them were

6   assigned to CRASH.  The original one you are talking about,

7   Rafael Perez, was assigned to CRASH, but he was working

8   narcotics when he got in trouble, not CRASH.

9   Q.   Did 70 officers have to go in front of a review board

10  for their work at CRASH?

11  A.   No.  What happened was that when Rafael Perez began to

12  give testimony, he implicated a bunch of officers in different

13  incidents, most of which were found to be untrue.  Rafael Perez

14  was basically trying to deflect attention from him.  Only four

15  officers were actually indicted.

16  Q.   And they were indicted for framing innocent individuals,

17  correct?

18  A.   They were indicted for different things, not all that.

19  Q.   And the work was involving gangs, correct?

20  A.   No.  Rafael Perez and his partner were working together

21  working CRASH at Rampart Division.  They were indicted for

22  framing individuals and several other things.  One officer was

23  indicted for abuse, and one officer was indicted for theft.

24  Q.   And before this scandal hit, you had left CRASH,

25  correct?

TRIAL ONE – VOL 6 –   436

1    A.    No, I hadn't.  I went to a different CRASH unit.

2    Q.    Okay.  And you've testified a number of times around the

3    country.  You even have a video out, right, on how to become a

4    gang expert?

5    A.    No, I don't.  I put -- I've been videotaped speaking on

6    different topics about gang investigations, but I don't have a

7    video itself.

8    Q.    Did you put anything up on PoliceOne, the site

9    PoliceOne?

10   A.    Those are the videos they took of me on communications

11   in gangs.  There's a couple different topics, but not how to be

12   a gang officer.

13   Q.    Is it fair to say that if anybody testifies for the

14   defense against a gang expert you say they've gone to the dark

15   side, right?

16   A.    Yes, I have.

17        MR. GATTERDAM:  Okay.  Nothing further.

18        THE COURT:  Thank you, Mr. Gatterdam.

19        Ms. Dixon?

20                        - - -

21                 CROSS-EXAMINATION

22   BY MS. DIXON:

23   Q.    Good afternoon, Detective Caffey.

24   A.    Good afternoon.

25   Q.    Just a couple of questions here.

TRIAL ONE – VOL 6 –   437

1           Now, your most recent time being an instructor or

2   facilitator would have been about four years ago; is that

3   right?

4   A.    No.   I teach constantly.   I teach in-service class for

5   LAPD. I teach a class for a state gang investigation course

6   that's put on by LAPD and other agencies.   I teach all the

7   time.

8   Q.    I'm just looking at the resume you gave us because also

9   you indicated on there that you -- on the resume at least that

10  we were provided that you had testified twice in federal court.

11  So how recent is this resume?

12  A.    That resume is from 2013.

13  Q.    Okay.   And so in the last three years, you've testified

14  four more times in federal court?

15  A.    I provided testimony in depositions in four other

16  federal cases.

17  Q.    Okay.   And this is your first time in Columbus or your

18  first time in Ohio or both?

19  A.    Columbus.

20  Q.    Columbus.   Okay.   So you've been in Ohio before?

21  A.    Yes.

22  Q.    Very different between Ohio and California, right?

23  A.    There's some similarities, but yes.

24  Q.    Really?

25  A.    Of course.

TRIAL ONE – VOL 6 – 438

1   Q.   What?

2   A.   People are people everywhere.

3   Q.   Oh, okay.  Let me ask you about -- and I understand, and

4   correct me if I'm wrong, your expertise, is it basically Crips

5   and Bloods?

6   A.   Well, I'm also --

7   Q.   It's not gangs or --

8   A.   Well, I'm an expert in prison gangs, Hispanic --

9   basically the Black Guerilla found in the Mexican Mafia.  I've

10  testified as an expert in those cases.  I've done

11  investigations on both those groups.

12       I've also testified on several Hispanic gangs.  I

13  started off working CRASH at Rampart Division so I'm an expert

14  in 18th Street, MS.  Those are gangs I worked for

15  four-and-a-half years.

16  Q.   Is there a difference between a gang and a group?

17  A.   Yes.

18  Q.   What is it?

19  A.   Well, a group would be individuals that can form for any

20  reasons whatsoever.  A gang is a group that forms up, and they

21  have a common symbol and they do common criminal activity

22  together.

23  Q.   So the difference is the criminal activity?

24  A.   Correct.

25  Q.   Okay.  So when we hear the term Radical Islamic Group,

TRIAL ONE – VOL 6 –   439

1   don't they commit crimes by blowing up stuff and --

2   A.   Yes.   That's a whole other topic though.

3   Q.   But I'm saying they're not a gang, they're a group.

4   A.   They do activities that are gang-like in nature.

5   Q.   Uh-huh.

6   A.   But I wouldn't call them a gang.

7   Q.   Okay.   Are there gangs in affluent neighborhoods?

8   A.   Yes, there are, actually.

9   Q.   Tell me about those.

10  A.   The ones I would know about, there's gangs in Orange

11  County, which is a affluent area in Los Angeles next to Los

12  Angeles County, and they have white gangs and Hispanic gangs in

13  Orange County.

14  Q.   Are they Bloods and Crips?

15  A.   No.   They're white gangs and Hispanic gangs.   They

16  couldn't be Bloods and Crips.

17  Q.   Pardon me?

18  A.   They're white gangs and Hispanic gangs.   They're Skin

19  Heads and Hispanic gangs.   They couldn't be Bloods and Crips.

20  Q.   So Bloods and Crips are only blacks?

21  A.   They are traditionally black, but there are Crips and

22  Bloods sets that have non-black members.

23  Q.   Okay.   And can females be in the groups?

24  A.   In Los Angeles we have females that are members of Crip

25  and Blood sets, but we don't have any female Blood gangs or

TRIAL ONE - VOL 6 -   440

1    Crip gangs.

2      Q.   Okay.  And do -- and maybe you answered this.  What's

3    the difference between a made member of a gang and an associate

4    member?

5      A.   Well, a made member is not a term we use for street

6    gangs.  That's used for prison gangs.

7      Q.   Okay.  So what does that mean to be a made member if

8    you're in a prison gang?  What does it mean to be a made

9    member?

10     A.   Well, in prison gangs you are basically put up for

11   membership by somebody in that gang, and then the membership

12   itself has to vote on whether or not you're allowed to be a

13   member of the gang.

14     Q.   Okay.  So the prison gang is more organized?

15     A.   Yes.

16     Q.   Okay.  And so if -- how does someone join a gang then if

17   they're not in prison?

18     A.   It depends on the gang.  Each gang has their own

19   criteria for how you become a member.

20     Q.   Okay.  So there's no general way to join -- be a Blood

21   or a Crip?

22     A.   It just depends on the gang.

23     Q.   Well, I mean, you spoke about general things, the

24   Bloods, the Crips.  If somebody said, hey, I want to be a

25   Blood, I mean, could they do that?  Do they have to go commit a

TRIAL ONE - VOL 6 -   441

1   crime?  Do they have to -- I mean, what has to happen?

2   A.   Primarily you're going to be a kid from that

3   neighborhood if you're going to be a part of that gang.  You're

4   going to be somebody that grew up in that neighborhood with

5   those kids that founded that gang or the guys that actually

6   were part of that gang itself.  So you're not going to just

7   walk into somebody's neighborhood and say I want to join your

8   gang.  That doesn't happen.

9   Q.   So if you're a kid born into a neighborhood and you

10  commit a crime, you're automatically in that gang?

11  A.   No.

12  Q.   What disassociates you from that gang?

13  A.   Whether or not you're a member or not, that's your

14  choice.  Being a member is a choice.

15  Q.   Well, let's say if you chose a life of crime.  Okay?

16  That's a choice, right?

17  A.   Correct.

18  Q.   But you don't want to be in the gang.  How do you

19  disassociate yourself?

20  A.   Whatever crime you do, you're not going to do it around

21  the gang or in their area because they're not going to let you.

22  Q.   Okay.  So you disassociate yourself by doing your crimes

23  elsewhere?

24  A.   For the most part, yeah.  There are some associates with

25  each gang.  There might be kids that grew up in the

TRIAL ONE – VOL 6 –   442

1   neighborhood who will commit crimes with the gang members.

2       Q.    Okay.

3       A.    But they don't claim membership in the gang.

4       Q.    All right.  And you do have to at least claim membership

5   in the gang, don't you?

6       A.    If you want to be a member, you have to claim it.

7       Q.    Okay.  Like, somebody else just can't say, oh, this

8   person is in the gang.  That doesn't automatically mean you're

9   in the gang, does it, just because somebody says they're in it?

10      A.    No.  Again, each gang has their own criteria of how they

11  bring members into the gang.  There are kids that are born and

12  raised in the gang itself because they have family members,

13  they are second generation, a cousin, older cousin or a brother

14  or somebody is a member of the gang so sometimes the term is

15  grandfathered in so they don't have to go through a jumping-in

16  process or any other kind of a work process that they would put

17  in.

18      Q.    And is it fair to say the landscape, the gang landscape

19  is radically different now than it was back in 1969?

20      A.    Yes, definitely.

21      Q.    Okay.  And so, you know, we have social media, right?

22      A.    Yes.

23      Q.    Makes a big difference, doesn't it?

24      A.    Yes, unfortunately.

25      Q.    And would you say that social media can contribute to

TRIAL ONE – VOL 6 –   443

1    maybe some copycat or kind of people faking something, or

2    especially when it's painting stuff on walls and that sort of

3    thing?

4        A.   I don't believe you're faking it.  I think you emulate

5    what you see.  And there are a lot of gangs throughout the

6    United States that emulate what they see in Los Angeles or hear

7    about or what they see on social media or movies or rap videos.

8    They emulate it, but I don't say faking.  You don't want to

9    fake it.  Faking it will get you killed.

10       Q.   I'll use your term.  Kids will emulate what they see,

11   right?

12       A.   Correct.

13       Q.   Not necessarily understanding what it is?

14       A.   True.

15       Q.   Okay.  And so it might be something that they might feel

16   like it's a pop culture thing.

17       A.   No, I doubt that.  Everybody that's -- if you are of any

18   age I'd say past 10 years old, you understand what gang

19   lifestyle is.

20       Q.   Really?

21       A.   Yes.

22       Q.   Okay.  Over 10 you understand gang lifestyle?

23       A.   Most kids do, yes.

24       Q.   Okay.  You talked about the colors.  The red is Blood,

25   and the blue is Crip, right?

1    A.   Correct.

2    Q.   Would a Crip wear red?  Is it an insult if a Crip had on

3  red?

4    A.   Well, see, that's the thing.  The landscape, as you

5  said, has changed.  In Los Angeles we have a Crip set Hoovers

6  who no longer claim Crips, they claim criminals, and they wear

7  red because they associate themselves with other Blood sets now

8  because they say they are anybody killers and they are no

9  longer Crips.  But you have older members of the gangs, the

10  older members today don't care about colors so they'll wear red

11  clothing, they might wear a red shirt or a blue shirt because

12  they're trying to get away from being pigeon-holed into wearing

13  a certain color all the time.

14      MS. DIXON:  Okay.  Now, what was my question?  I

15  forgot my question.

16    (Thereupon, the last question was read by the court

17  reporter.)

18      MS. DIXON:  Is that a yes or a no?

19      THE WITNESS:  Well, in certain neighborhoods it, yes,

20  would be an insult.

21    BY MS. DIXON:

22    Q.   Okay.  So it depends?

23    A.   It depends, yes.

24    Q.   And has rap music had an influence on gang culture?

25    A.   In my opinion, yes.

TRIAL ONE – VOL 6 – 445

1   Q.   And what has that influence been?

2   A.   Because rap music was the first exposure a lot of kids

3   had all over the country to LA gangsters, they took that as

4   gospel and began to emulate what they saw in rap music and

5   videos.

6   Q.   And this is, again, black kids?

7   A.   Well, no.  When it got outside of Los Angeles, everybody

8   was involved, white kids, Hispanic kids, Asian kids.

9   Q.   So the white gangs didn't start until rap music?

10  A.   No, there were white gangs.  But there are white Crips

11  and Bloods in other cities just like they are in certain parts

12  of Los Angeles.

13  Q.   Okay.  But, again, the Crips and the Bloods typically

14  are not in any affluent neighborhoods, right?

15  A.   Typically, no.

16  Q.   What are the names of some of the gangs in the affluent

17  neighborhoods?

18  A.   It just depends on the neighborhood.  In Orange County

19  you have Skin Head gangs.  There's one that's Public Enemy

20  Number One, aka PENI Death Squad, PDS.  There are members who

21  have lived in affluent parts of Orange County.  There's areas

22  of Los Angeles that are considered upper middle class that are

23  actually minority neighborhoods where, like, the Rollin 60

24  Crips live, the area I grew up in.

25  Q.   And I think you indicated that you were first contacted

TRIAL ONE – VOL 6 –   446

1   two weeks ago to come here and testify?

2   A.   Just over two weeks, yes.

3   Q.   And was that a telephone conversation?

4   A.   Yes.

5   Q.   And did you discuss what the goal was?

6   A.   We talked briefly about it, but we talked more about it

7   once I got here.

8   Q.   Okay.  And you said you reviewed pictures and

9   transcripts?

10  A.   Yes.

11  Q.   Okay.  And what did you -- what was your goal from your

12  understanding?

13  A.   To basically explain the culture.

14  Q.   To explain the culture?

15  A.   Yes.

16  Q.   And so you feel like explaining the culture for the

17  defense side would be bad?

18  A.   I didn't say that.

19  Q.   Oh, okay.  I'm just asking.  I thought that's what you

20  said prior when --

21  A.   No.  What he was referring to is that -- when I talked

22  about law enforcement officers that would now testify for the

23  defense in certain cases, the term we use is they've gone to

24  the dark side.

25  Q.   Okay.  And tell me about -- do you know about tattoos?

TRIAL ONE – VOL 6 – 447

1  I know you told me about gang signs.  What about tattoos?

2  A.  Yes.

3  Q.  What about stars?  What do those mean?

4  A.  Stars are a Chicago thing.  It has nothing to do with

5  Los Angeles.  In Los Angeles we don't use stars.

6  Q.  So in general there's no -- you don't know what stars

7  means?

8  A.  I do.  I know what they mean.  I know with Chicago gangs

9  how they use the 6-point stars and the 5-point stars, yes.

10  Q.  What does it mean?

11  A.  Well, it belongs to the Folk and People Nation.  One

12  group uses the 5-point star and one group uses the 6-point

13  star.  They use pyramids, they use pitchforks.  This is totally

14  from the Chicago-based gang activity, nothing from Los Angeles.

15  Q.  What about teardrops?

16  A.  Well, teardrops started in Los Angeles, but that used to

17  mean one year in county jail.

18  Q.  What does it mean now?

19  A.  It depends on what area you're in.

20  Q.  Well, tell me what some of the different meanings are?

21  A.  One year in county jail, my sadness for family members.

22  If it's in blue, he's indicating he's a Crip.  If it's in red

23  on his face, he's indicating he's a Blood.  Again, it depends

24  on what area he's in.

25  Q.  So what about Ohio?

TRIAL ONE – VOL 6 – 448

1    A.    I wouldn't know.

2              MS. DIXON:  Okay.  Thank you.

3              THE COURT:  Mr. McVay?

4              MR. MCVAY:  Thank you, Your Honor.

5                             – – –

6                        CROSS-EXAMINATION

7    BY MR. MCVAY:

8    Q.    Good afternoon, Detective Caffey.

9    A.    Good afternoon.

10   Q.    My name is Kirk McVay, and Greg Meyers and I represent

11   Deounte Ussury in this case.  And you've probably got a plane

12   to catch --

13   A.    Not until tomorrow.

14   Q.    Nevertheless, it's late in the day.  I'll try and keep

15   it to the point and short.

16         You have described the Crip culture, as you will, in the

17   organization as being one which has no national leader.  Is

18   that fair to say?

19   A.    That's correct.

20   Q.    And that there would be no national dictate coming from

21   Los Angeles or whatever as to how each Crip set in whatever

22   city would be in whatever neighborhood it would be as to how it

23   would be run or operated; is that fair to say?

24   A.    Well, I'm going to say this:  The Los Angeles Crip and

25   Blood sets love to be able to say that the gangs that use their

1    name that are not in California, that they're doing it under

2    the umbrella, but 90 percent of that is not true.

3    Q.   Okay.  You say that the Crips and Bloods in Los Angeles

4    would like to say that they're the umbrella for the rest of the

5    country, and the rest of the country isn't saying that; is that

6    fair to say?

7    A.   That's fair to say.

8    Q.   Now, again, you described a loose organization of sorts

9    with no national leader, no one dictating as to how each set is

10   to be run, correct?

11   A.   Yeah.  There are contacts with certain sets from

12   different parts of the country with Los Angeles sets, but those

13   are on an individual basis.

14   Q.   But you studied other gangs than the Crips and Bloods,

15   correct?

16   A.   Yes.

17   Q.   Latin Kings, Gangster Disciples, others?

18   A.   I know more about Gangster Disciples and Black Disciple

19   Nation, Vice Lords because of the time period I spent in

20   Chicago when I would go there during the summers where my dad

21   was from and the time period I lived there about three years

22   before we moved back to California.  We don't have Latin Kings

23   in California.

24   Q.   Okay.  But in your studies in terms of being able to

25   relate to what gang activity there is in your city or in other

TRIAL ONE – VOL 6 –  450

1   cities when you go to educate and train other law enforcement

2   personnel or Catholic Diocese or whoever that would be, you've

3   looked into what other gangs are doing other than the Crips and

4   Bloods, correct?

5    A.   That's correct.

6    Q.   Is it fair to say that there's a continuum, if you will,

7   from -- of gang organizations and structure going from, let's

8   say, the Spanky and Our Gang neighborhood clubhouse type of

9   thing to what we would ordinarily think of in terms of

10  organized crime, the Cosa Nostra Mafia, that sort of thing?

11   A.   I don't know that it would be a continuum.  I mean,

12  you're talking about a TV show where those kids really weren't

13  a gang.  They were just kids who hung out together.

14   Q.   Well, let's not make it that broad of a spectrum then.

15  Let's talk in terms of just a neighborhood set, for example, to

16  that of the organization of something that we ordinarily think

17  of as organized crime.

18   A.   For the most part, yes.

19   Q.   And is it fair to say that that continuum, if you will,

20  is the characteristics you would see the difference from one

21  gang set or one gang to that of what we ordinarily think of as

22  organized crime would be pretty much based on the structure of

23  whatever organization we're talking about?

24   A.   That would be good, yes.

25   Q.   And the organization when I talk of structure would be

TRIAL ONE – VOL 6 – 451

1  talking about in terms of the nature of the leadership, is

2  there someone at the top who is directing things and through a

3  downward hierarchy, if you will, a chain of command?

4  A.   Not in California gangs, no.

5  Q.   I'm saying in, like, an organized -- the more typical

6  what we think of as organized crime, that would be an example

7  of what would make it more organized than what you've described

8  the Crips to be.

9  A.   Yes.

10  Q.   And in that leadership there would be more of a buffered

11  sense of that leadership in that they would be more removed

12  from the street, so to speak, than what you would see in a Crip

13  gang or a Crip set?

14  A.   Correct.

15  Q.   Additionally, you would have a difference in the

16  traditional sense of the organized crime being that it would be

17  multi-jurisdictional; it might cross city lines, county lines,

18  state lines and be national; is that fair to say?

19  A.   Yes.

20  Q.   And Crips, we've already talked about how, generally

21  speaking, they would be neighborhood sets.  They might claim

22  Crip association or affiliation, correct?

23  A.   Correct.

24  Q.   Okay.  Another difference would be that as you get more

25  organized and more structured, you would see that these gangs

TRIAL ONE – VOL 6 –   452

1    would be larger; is that fair to say?

2    A.    Yes.

3    Q.    Not only would they be larger, but they would also be

4    getting into other things other than just direct street crime,

5    robberies, drug dealing, possession of guns or drugs; fair to

6    say?

7    A.    Fair to say.

8    Q.    Including the purchase of legitimate businesses, the

9    operation of legitimate businesses to launder money that might

10   be gained through criminal activities?

11   A.    Yes.

12   Q.    And that would be more as we think of the organized

13   crime structure of things, right?

14   A.    Well, we have Crips and Blood gang members who have

15   risen to what would be similar to organized crime and have gone

16   about purchasing businesses to launder their money.

17   Q.    And what would also make those similar to organized

18   crime is they would get involved in the purchase of legitimate

19   businesses and perhaps involved in the influence upon labor

20   unions and things like that to get labor contracts?

21   A.    I've never seen a Crip or Blood get that high up, but

22   there was one Blood set where they tried to influence

23   construction workers in their neighborhood.

24   Q.    And, again, speaking of the traditional sense of

25   organized crime, that's what we've come to know; is that fair

TRIAL ONE – VOL 6 –   453

1    to say?

2    A.    Yes.

3    Q.    And, additionally, you might not only have that, but you

4    could also have corruption of public officials?

5    A.    Yes.

6    Q.    Okay.  Which you don't see generally in Los Angeles; is

7    that fair to say by Crips?

8    A.    I don't know about that.  I would say that it's not

9    evident, but there are some issues, yes.

10   Q.    Okay.  Additionally, you would see in the more

11   traditional sense of organized crime the accumulation and

12   purchase of assets, is that fair to say, properties, real

13   estate?

14   A.    Yes.

15   Q.    Okay.  And valuable assets of whatever nature and kind?

16   A.    Yes.

17   Q.    Okay.  Additionally, is it fair to say that when it

18   comes to the more traditional sense of organized crime, based

19   on your study and your evaluation of crime organizations

20   throughout your career, that the way individuals are taken care

21   of while they're in prison is heightened not only in the sense

22   of money being placed on their books and things like that, but

23   also their families being taken care of to make sure that their

24   livelihood is not diminished by virtue of the fact that their

25   loved one is in prison as a member of La Cosa Nostra, for

TRIAL ONE – VOL 6 –   454

1    example?

2      A.   You would see that more with traditional organized

3    crime, yes.

4      Q.   Okay.  Now, you indicated that from time to time there

5    may be sets, local sets, neighborhoods sets that would go to

6    Los Angeles for purposes of meeting with the old gang members

7    or the original Crip set?

8      A.   Yes.

9      Q.   Is that fair to say?

10         And how did you describe that?

11     A.   There would be -- there were -- if neighborhoods outside

12   of Los Angeles were using a name or their gang was named after

13   a traditional set out of Los Angeles, sometimes members from

14   that gang will come to Los Angeles to meet with the original

15   members for that neighborhood.  A lot of it is for street

16   credibility, but also to try to form a relationship.

17     Q.   And I think I heard you say that that is not usually

18   granted, that street cred isn't usually granted for them to

19   bring back to their city.  Is that fair to say?

20     A.   My experience has been that LA guys just try to take

21   advantage of the other guys by making them pay tribute or

22   something like that.

23     Q.   Making them pay tribute.  So perhaps counter-productive

24   to the neighborhood set going to LA and trying to get that

25   credibility?

TRIAL ONE – VOL 6 –   455

1    A.    Correct.

2    Q.    So essentially what we have is throughout the country,

3    those who haven't gotten that credibility with the stamp of

4    approval from the LA Crips is just individuals claiming the

5    Crip name?

6    A.    Well, no.  Because when they start claiming Crips,

7    they're Crips.  They're local Crips.  They're just not the Los

8    Angeles Crips.  But when individuals start claiming to be Crips

9    or Bloods and they claim to be gang members, they're gang

10   members.  Okay.  They're gang members for that local area.

11   They just don't have the same status as the original gangs from

12   Los Angeles, but they're still gang members.  They're not

13   wannabes, their gang members.

14   Q.    So it's fair to say they could be a gang member just

15   claiming any name, any name they want?

16   A.    No.  If you're going to claim a name, you're going to

17   back the name up.  You just can't walk in and just claim a name

18   because if they didn't like their name, they could change it if

19   they wanted to and that's not going to happen.

20        You claim a gang and you have other members that claim

21   that gang, you become part of the nucleus of that gang.  You

22   stick with it.  You're not going to change it.  So you're not

23   going to just claim a gang.  Usually there's some kind of

24   influence in how you choose the name of your gang.

25   Q.    But through your own testimony you've talked about how

TRIAL ONE – VOL 6 – 456

1   some of the original Crips changed their name and decided to be

2   something else other than Crips.

3    A.   There's only one gang that's done that.  I was talking

4   about the Hoovers which are the only gang that's ever done

5   that.  They just did it about 15 or 20 years ago, and that

6   was -- the Hoovers are a gang that's been around since the

7   '70s.  They are one of the original Crip sets.  They're an

8   alignment of all these Hoover sets.  And when we found out that

9   they were no longer claiming Crip, I did several interviews and

10  they started saying that basically they were disrespecting the

11  big Homie in prison.  They were talking about Tookie Williams

12  because they were a Crip set that had been killing other Crips

13  for a long time so they decided to change their name and say

14  we're not Crips anymore, we're criminals because we kill Bloods

15  and Crips.

16   Q.   And, lastly, again just to clear this up in my mind,

17  when you arrived in town, you didn't tour any areas of town to

18  look for any evidence or indicia of gang activity; is that fair

19  to say?

20   A.   No.

21   Q.   You didn't meet with any gang members or discuss

22  anything with any purported gang members?

23   A.   No.

24   Q.   You just came in here to take the stand and testify and

25  tell these people what you know; is that fair to say?

TRIAL ONE – VOL 6 – 457

1    A.    Yes.

2          MR. MCVAY:  Thank you very much for your time.  Have

3    safe travel home.

4          Thank you, Your Honor.

5          THE COURT:  Thank you, Mr. McVay.

6          Mr. Nolder, anything?

7          MR. NOLDER:  No, sir.

8          THE COURT:  Mr. DeVillers, any redirect?

9          MR. DeVILLERS:  Briefly, Your Honor.

10                            – – –

11                    REDIRECT EXAMINATION

12   BY MR. DEVILLERS:

13   Q.    Detective, you indicated on cross-examination that while

14   Bloods and Crips tend to wear blue and red, it depends on the

15   factors.

16   A.    Correct.

17   Q.    What sort of factors?

18   A.    Well, it just depends on some gangs will wear different

19   colors to represent the area they're in.  Like, there's a gang

20   called Grape Street Crips.  They wear purple because it's part

21   of their gang name.  They're the only Crips that wear purple in

22   Los Angeles.  The Hoovers wear orange because they had adopted

23   the Houston Astros colors, which they went to a blue and orange

24   uniform several years ago, but now they wear red also but they

25   don't wear blue as much.

1    Q.    Sports teams, is that a factor?

2    A.    It depends on the neighborhood but, yeah, sports

3    clothing are used quite often as a symbol of the gang

4    neighborhoods.

5    Q.    Let's say hypothetically speaking that there was a Crip

6    gang that was, oh, I don't know, a block away from the Ohio

7    State Buckeyes.  Might they sometimes wear different colors?

8    A.    They could, yes.

9    Q.    Do you know what the Buckeye's colors are?

10    A.    Red and white.

11         THE COURT:  Do you want to correct that for the

12    record, Mr. DeVillers?

13      BY MR. DeVILLERS:

14    Q.    That would be scarlet and gray.

15    A.    I am a UCLA fan and anybody who plays USC so.

16    Q.    Back to my questions, you were shown by defense counsel,

17    I believe Mr. Gatterdam, Government Exhibit 1-2-27.

18         Do you see that on your screen?

19    A.    Yes.

20    Q.    And you indicated on cross-examination that there's --

21    it's a wall, is that right, of some sort?

22    A.    It looks like a house, yes.

23    Q.    And it says N-Hood, Rollin Crip 20 gang?

24    A.    Yes.

25    Q.    To the left of that, is there something else it says?

TRIAL ONE – VOL 6 – 459

1    A.    Yes.

2    Q.    All right.  What is that?

3    A.    It says Cripin in the Short Town.

4          MR. DeVILLERS:  Your Honor, may I publish this to the

5    jury?

6          THE COURT:  Yes.  Any objection, Mr. Durden?

7          MR. DURDEN:  No objection, Your Honor.

8          MR. GATTERDAM:  No objection.

9          MS. DIXON:  No objection.

10         THE COURT:  Mr. McVay?

11         MR. MCVAY:  No, sir.

12         THE COURT:  It may be published.  It will be received.

13         MR. DeVILLERS:  No further questions, Your Honor.

14         THE COURT:  All right.  Any recross, Mr. Durden?

15         MR. DURDEN:  No, Your Honor.

16         THE COURT:  Mr. Gatterdam?

17         MR. GATTERDAM:  No, Your Honor.

18         THE COURT:  Ms. Dixon?

19         MS. DIXON:  Just real brief.

20         THE COURT:  All right.

21                        – – –

22                  RECROSS-EXAMINATION

23    BY MS. DIXON:

24    Q.   With respect to the color thing, were you talking about

25    California, here, or in general?

TRIAL ONE – VOL 6 –   460

1    A.    In general.

2    Q.    And I think you stated, and help me if I'm misquoting

3    you, that some people are just criminals who kill Bloods and

4    Crips.

5          Did you say that?

6    A.    No, I didn't say that.

7    Q.    Then I heard it wrong.

8          MS. DIXON:  Thank you.

9          THE WITNESS:  Okay.

10         THE COURT:  Mr. McVay?

11         MR. MCVAY:  Nothing further, Your Honor.  Thank you.

12         THE COURT:  Mr. Nolder?

13         MR. NOLDER:  No, Your Honor.

14         THE COURT:  All right.  Thank you very much, sir.  You

15   may be excused.  Safe travels.

16         Mr. DeVillers, it's 5 minutes to 5:00.  That will end

17   your case for today.

18         Ladies and gentlemen, that will end the presentation of

19   the government's case for today.  We will resume tomorrow

20   morning again at 9:00 o'clock.  Thank you very much for your

21   patience and attentiveness.

22         Remember the Court's admonition.  Travel safely going

23   home.  We look forward to seeing you in the morning.

24     (Whereupon, the Jury exited the room.)

25         THE COURT:  Mr. DeVillers, is there anything from the

TRIAL ONE – VOL 6 –   461

1    government before we adjourn for the evening?

2              MR. DeVILLERS:  No, Your Honor.

3              THE COURT:  Mr. Durden?

4              MR. DURDEN:  Only that we anticipate both police

5    officers in the morning and --

6              THE COURT:  We'll get to that.  You mean the list and

7    order of witnesses?  Yes, the government will have to provide

8    that to you.  But anything other than that?

9              MR. DURDEN:  Nothing further, Judge.

10             THE COURT:  Mr. Gatterdam, anything?

11             MR. GATTERDAM:  No, Your Honor.

12             THE COURT:  Ms. Dixon?

13             MS. DIXON:  No Your Honor.

14             THE COURT:  Mr. McVay?

15             MR. MCVAY:  No, Your Honor.

16             THE COURT:  Mr. Nolder?

17             MR. NOLDER:  No, Your Honor.

18             THE COURT:  The only thing before you depart for the

19   evening, Mr. DeVillers, would you provide defense counsel with

20   the list and order of tomorrow's witnesses?

21             MR. DeVILLERS:  Yes, Your Honor.  We'll e-mail that to

22   defense counsel and to the Court after every evening.  Does

23   that sound reasonable?

24             THE COURT:  That's fine.  That's fine.

25             MR. MCVAY:  We wonder what time?  Some of us are

TRIAL ONE – VOL 6 –   462

1   working in the evening.

2          MR. DeVILLERS:  As soon as we get out of here, we'll

3   decide and get it to you.

4          THE COURT:  All right.  Because I would say if you

5   have already decided, just tell them before they leave and that

6   would be the most efficient.  But if you haven't nailed it down

7   yet, as soon as you determine it, let's let them know.

8          MR. DeVILLERS:  Within a half hour, Your Honor, we'll

9   get it to them.

10          THE COURT:  Okay.  All right.  If there's nothing else

11   then, I will see everyone at 9:00 o'clock when we begin.

12          Thank you very much, everyone.

13          (Proceedings adjourned at 5:00 p.m.)

14                              – – –

15

16

17

18

19

20

21

22

23

24

25

```
                                          TRIAL ONE — VOL 6 —   463
1                              — — —

2                          WITNESS INDEX

3                              — — —

4     WITNESSES              DIRECT   CROSS   REDIRECT   RECROSS

5     PLAINTIFF'S:

6     Allen Wright            166      322      388        398
         By Mr. Gatterdam              333                 399
7        By Mr. Miller                 364                 400
         By Mr. Meyers                 377
8     Wayne Caffey            403      421      457
         By Mr. Gatterdam              426
9        By Ms. Dixon                  436                 459
         By Mr. McVay                  448
10                             — — —

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

TRIAL ONE – VOL 6 – 464

1                         INDEX OF EXHIBITS

2                              – – –

3     PLAINTIFF'S:                              RECEIVED

4     1-2-056                                      178
      1-2-057                                      185
5     1-2-031                                      196
      1-2-036                                      206
6     1-2-037                                      207
      1-2-039                                      209
7     1-2-055                                      299
      1-2-065                                      300
8     1-2-066                                      302
      1-2-067                                      303
9     1-2-073                                      305
      1-2-079                                      307
10    1-2-080                                      309
      1-2-109                                      311
11    1-2-27                                       459
      150-1282                                     290
12    153-116                                      276
      153-173                                      285
13    154-1-4                                      227
      154-1-85                                     249
14    154-1-31                                     269
      154-1-13                                     279
15    155-2                                        198
      155-6                                        220
16    155-17                                       248
      165-23.01                                    349

17

18

19

20

21

22

23

24

25

TRIAL ONE – VOL 6 –   465

1                        C E R T I F I C A T E

2

3          We, Shawna J. Evans, Denise N. Errett, Lahana DuFour,

4    Darla J. Coulter, do hereby certify that the foregoing is a

5    true and correct transcript of the proceedings before the

6    Honorable Algenon L. Marbley, Judge, in the United States

7    District Court, Southern District of Ohio, Eastern Division, on

8    the date indicated, reported by us in shorthand and transcribed

9    by us or under our supervision.

10

11                         s/Shawna J. Evans
                           Shawna J. Evans, RMR
12                         Official Federal Court Reporter

13

14                         s/Denise N. Errett
                           Denise N. Errett, RMR CRR
15                         Official Federal Court Reporter

16

17                         s/Lahana DuFour
                           Lahana DuFour, RMR, CRR.
18                         Official Federal Court Reporter

19

20                         s/Darla J. Coulter
                           Darla J. Coulter, RMR, CRR
21                         Former Official Federal Court Reporter

22

23                         April 12, 2016

24

25