UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

UNITED STATES OF AMERICA,            )
                                     )
   PLAINTIFF,                        )        CASE NO. 2:14-CR-127
                                     )
        vs.                          )        MAY 18, 2016
                                     )
ROBERT B. LEDBETTER, ET AL.,         )        9:00 A.M.
                                     )
   DEFENDANTS.                       )        VOLUME 23
_____)


**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
BEFORE THE HONORABLE ALGENON L. MARBLEY
UNITED STATES DISTRICT JUDGE, and a jury
COLUMBUS, OHIO


APPEARANCES:

FOR THE PLAINTIFF:

BENJAMIN C. GLASSMAN
United States Attorney
By:  DAVID M. DEVILLERS
     KEVIN W. KELLEY
     BRIAN J. MARTINEZ
Assistant United States Attorneys
303 Marconi Boulevard
Columbus, Ohio  43215


FOR THE DEFENDANT ROBERT B. LEDBETTER:

JEFFREY A. BERNDT, ESQ.
575 South High Street
Columbus, Ohio  43215

AARON G. DURDEN, ESQ.
10 West Monument Avenue
Dayton, Ohio  45402
                              - - -


     Proceedings recorded by mechanical stenography,
transcript produced by computer.

APPEARANCES CONTINUED:


FOR THE DEFENDANT CHRISTOPHER A. HARRIS:

Carpenter, Lipps & Leland, LLP
By:  KORT W. GATTERDAM, ESQ.
280 North High Street
Columbus, Ohio  43215

KEVIN P. DURKIN, ESQ.
367 East Broad Street
Columbus, Ohio  43215


FOR THE DEFENDANT RASHAD A. LISTON:

ISABELLA DIXON, ESQ.
98 Hamilton Park
Columbus, Ohio  43203

Kegler, Brown, Hill & Ritter
By:  S. MICHAEL MILLER, ESQ.
65 East State Street
Columbus, Ohio  43215


FOR THE DEFENDANT DEOUNTE USSURY:

Office of the Ohio Public Defender
By:  GREGORY W. MEYERS, ESQ.
     KIRK A. MCVAY, ESQ.
250 East Broad Street
Columbus, Ohio  43215


FOR THE DEFENDANT CLIFFORD L. ROBINSON:

Scott & Nolder Law Firm
By:  STEVEN S. NOLDER, ESQ.
35 East Livingston Avenue
Columbus, Ohio  43215


- - -

TRIAL ONE – VOL. 23 –  4502

1              WEDNESDAY MORNING SESSION

2              MAY 18, 2016

3                        –  –  –

4         (Thereupon, the following proceeding was held in open court

5    with all counsel and defendant present; jury not present.)

6              THE COURT:  Good morning.

7         Mr. DeVillers, you had something you needed to put on

8    the record, is that right, before we brought the jury in?

9              MR. DEVILLERS:  Yes, Your Honor.  We checked on the

10   firearm taken from Mr. Ledbetter's van in December of 2007.

11             THE COURT:  Yes.

12             MR. DEVILLERS:  There's indication there was DNA on

13   it.  That DNA standard still exists.  And we'll offer

14   Mr. Ledbetter a sample –– if he wants to give us a sample, we

15   will test that DNA against his sample.  But we need to know

16   pretty quickly.  That's all.  So I just want to put that on the

17   record, we're giving him that opportunity, but we probably need

18   to know by the end of today or tomorrow to get it tested in

19   time.

20             THE COURT:  Mr. Berndt?

21             MR. BERNDT:  Your Honor, this is the first I've heard

22   of it –– the government's offer.  I can also tell the Court,

23   though, that assuming that we provided a sample for the

24   comparison, what would happen is is that they would do their

25   testing, of course, if it came back not favorable to

TRIAL ONE - VOL. 23 -  4503

1   Mr. Ledbetter, I would want to have it tested also.  We're in

2   the midst of this trial.  This trial's going to be over in

3   about two weeks, and I don't see how I can properly go through

4   that process at this stage of the proceedings.  That's my gut

5   check on that.

6       THE COURT:  Okay.  That's fine.  I think that the

7   important thing is that as a matter of record, the offer was

8   made.  You can mull it over.  And if you think you have the

9   time to get both in, you may.  We can always put it on an

10  expedited tract.  It's entirely your call.  I think that is

11  your position.  Am I correct, Mr. DeVillers?

12      MR. DEVILLERS:  It is, Your Honor.  We understand

13  their position.

14      THE COURT:  Would close of business today --

15      MR. BERNDT:  By the end of today, Your Honor.

16      THE COURT:  All right.  Thank you.

17     Mr. Gatterdam, you had a matter.

18      MR. GATTERDAM:  Judge, I just wanted to, before we

19  start with witnesses, I have a stipulation that I'd like to

20  read to the jury.

21      THE COURT:  Linda, bring in the jury, please.

22     (Jury in at 9:02.)

23      THE COURT:  Good morning, ladies and gentlemen, and

24  welcome back.  We're poised to have a full day again today.

25      Once again, I really appreciate your patience that

                                          TRIAL ONE - VOL. 23 -  4504

1   you've displayed throughout this trial.  And I know that I

2   speak on behalf of all of the parties when I say that.

3        Mr. Gatterdam has a stipulation that has been agreed to

4   by the parties that he wishes to read at this time.

5   Mr. Gatterdam.

6        MR. GATTERDAM:  Thank you, Your Honor.

7        The government and Christopher Harris stipulate and

8   agree that the 1987 Chevrolet Monte Carlo driven by Christopher

9   Harris was purchased by his mother, Pamela Harris, on or before

10  June 1st, 2005.  The dates of ownership of this vehicle are set

11  forth in Harris's Exhibit D1, which is admitted into evidence.

12       That concludes the stipulation.

13       THE COURT:  Thank you.

14       MR. DEVILLERS:  So stipulated, Your Honor.

15       THE COURT:  Your next witness, Mr. Martinez.

16       MR. MARTINEZ:  Good morning, Your Honor.  The United

17  States calls Officer Timothy Maclellan.

18       THE COURT:  All right.  Officer Maclellan, please come

19  forward and be sworn.

20     (Witness sworn.)

21       THE COURT:  Officer, bend the microphone toward you

22  and speak clearly into it.

23       Mr. Martinez, you may proceed.

24       MR. MARTINEZ:  Thank you, Your Honor.

25

TRIAL ONE – VOL. 23 – 4505

```
 1                           – – –

 2                       TIMOTHY MACLELLAN

 3       Called as a witness on behalf of the Plaintiff, being first

 4   duly sworn, testified as follows:

 5                       DIRECT EXAMINATION

 6       BY MR. MARTINEZ:

 7       Q    Good morning, sir.

 8       A    Good morning.

 9       Q    Would you please state your name for the record and

10   spell your last name.

11       A    Officer Timothy Maclellan, spelled M-A-C-L-E-L-L-A-N.

12       Q    Where do you work?

13       A    City of Columbus Police Department.

14       Q    How long have you been employed with the Columbus Police

15   Department?

16       A    Thirteen years.

17       Q    What are your current duties?

18       A    I work patrol, work the street.

19       Q    Were you employed as a police officer before you came to

20   Columbus?

21       A    I was.

22       Q    Where did you work?

23       A    City of Grove City.

24       Q    I'd like to focus on the latter part of 2011.  What were

25   your duties back in 2011?
```

TRIAL ONE – VOL. 23 – 4506

1    A    I was a street officer, working the streets just like I

2   do now.

3    Q    Any particular area?

4    A    2011, I was on the west side of Columbus.

5    Q    I'd like to focus specifically on the evening of October

6   the 19th, 2011, just before 8 p.m.  Can you please tell the

7   ladies and gentlemen of the jury what were you doing at that

8   time?

9    A    I was working patrol car as usual, responded to dispatch

10   runs.

11    Q    Did you receive a call of a shooting that night?

12    A    I did.

13    Q    Do you recall the area of town the shooting was reported

14   from?

15    A    The Hilltop area, which is 70 and Broad Street, just

16   west of all that area.

17    Q    Did you respond to the call?

18    A    I did.

19    Q    Please tell the ladies and gentlemen of the jury what

20   you did when you got to the scene?

21    A    I responded to the scene of -- the call of a shooting.

22   I was the first officer on scene as other officers were

23   arriving simultaneously.  I observed a group of people standing

24   around the sidewalk leading up to the house.  There was a white

25   female laying on the ground on the sidewalk leading up to the

TRIAL ONE – VOL. 23 –   4507

1    house.  She appeared to have been shot in the head.

2        Q     You said that there was some people standing around?

3        A     Correct.

4        Q     Can you describe the crowd?

5        A     There was several women.  I do remember one young child

6    probably eight or nine years old.  She was very chaotic

7    screaming.  She is the one who stuck out.

8        Q     Did you come to identify who that little girl was?

9        A     I believe the daughter of the person that was shot.

10       Q     You mentioned the victim a moment ago.  Can you please

11   describe her condition?

12       A     She was laying on the ground, the path leading up to the

13   house.  She had a pizza box next to her, a cell phone.  And she

14   was laying on the sidewalk with blood coming out of the back of

15   her head, the side of her head.

16       Q     Did she speak?

17       A     She did not.

18       Q     Was she responsive at all?

19       A     Not at all.

20       Q     In your view, did she appear to be alive when you found

21   her?

22       A     No, she did not.

23       Q     At some point, did medical personnel arrive?

24       A     They did.

25       Q     You mentioned there was some property around the victim?

TRIAL ONE – VOL. 23 – 4508

1    A    There was, from what I recall.  It appeared she had just

2  gotten home, or was leaving her car and she had a pizza box on

3  the ground next to her and a cell phone right in the same

4  vicinity.

5    Q    What did you do after you found the victim there on the

6  sidewalk?

7    A    Once we started trying to clear people away from the

8  body, secure the scene, which means roping off the scene with

9  yellow crime scene tape, and trying to ask people if they saw

10  anything, knew anything, saw what happened and go from there.

11   Q    Did you learn any information that night about what

12  might have happened?

13   A    No.  As a first responder, you kind of secure the scene

14  and let –- call the detectives in.  And at that point, there

15  wasn't any solid information that I got, so not much more for

16  me to do at that point.

17        MR. MARTINEZ:  Your Honor, may I have just a moment,

18  please?

19        THE COURT:  Yes, you may.  While you're doing that,

20  Mr. Martinez, Officer, you said you were the first officer on

21  the scene that evening?

22        THE WITNESS:  Yes, sir.

23        THE COURT:  Had you been called to the scene, or how

24  did you get notice to come to the scene?

25        THE WITNESS:  They dispatched officers on a call of a

TRIAL ONE - VOL. 23 -  4509

1    shooting, and I just happened to be the closest one.  So I was

2    the first one there.

3         MR. MARTINEZ:  Your Honor, Mr. Berndt and I would like

4    to have a quick side-bar.

5         THE COURT:  Sure.

6                             - - -

7      (The following proceeding was held at side-bar.)

8         MR. MARTINEZ:  The reason Mr. Berndt and I asked for

9    this side-bar is I was going to hand Officer Maclellan all the

10   crime scene photos, as we've done with most of our witnesses.

11        THE COURT:  Right.

12        MR. MARTINEZ:  So he could identify them and admit

13   them into evidence.  I was then going to display just a few.

14        THE COURT:  A certain number, I see.

15        MR. MARTINEZ:  A couple of them won't be objectionable

16   just because of the house.  I was going to show the three that

17   might cause some concern.  The first is Number 26, which is you

18   can see the entire victim's body.

19        THE COURT:  Yes.

20        MR. MARTINEZ:  The second was Number 30, see her face

21   and the wound.

22        THE COURT:  Yeah, kind of a head shot.

23        MR. MARTINEZ:  And the third was Number 31 just so we

24   could see the property, the box and the phones and keys and

25   whatnot.  You see part of the hand and leg there, but you can't

TRIAL ONE - VOL. 23 - 4510

1 really see the face or anything. Those are the three I was

2 going to show that I thought Mr. Berndt might have some

3 concern.

4      MR. BERNDT: Your Honor, I don't have a concern with

5 the two photos, the one of the body and then the one that's a

6 little bit more focused on the head of the deceased Crystal

7 Fyffe. My understanding is that Mr. Martinez intends on

8 introducing as evidence all of the photos that --

9      MR. MARTINEZ: 31 and 2 --

10      MR. BERNDT: -- that also includes other shots of the

11 body which I don't believe -- and this one, which I don't

12 believe should be admitted because I think it would be

13 cumulative. They've got an autopsy. They have the other

14 photos.

15      MR. MARTINEZ: We don't have the autopsy photos in

16 evidence. I would also say this is what we've done with every

17 crime scene. We've admitted all the photos and we've only

18 shown a select few so they weren't cumulative.

19      THE COURT: Right. And I have no problem with your

20 proffering the entire set of crime scene photos or the three

21 that you intend to admit. But with respect to the photos of

22 the body, since it is somewhat gruesome, we will limit it to

23 the photos that you display to the jury. Because those other

24 photos of the victim don't show anything different than the

25 three that you're going to show. So make a note that I'm going

TRIAL ONE – VOL. 23 – 4511

1    to admit all of these photos except the ones of the bodies that

2    you do not display.

3              MR. MARTINEZ:  Okay.

4              THE COURT:  Okay.

5              MR. BERNDT:  Thank you.

6        (The following proceeding was held in open court.)

7              MR. MARTINEZ:  Your Honor, may I approach the witness?

8              THE COURT:  Yes, you may.

9      BY MR. MARTINEZ:

10     Q    Officer Maclellan, I've just handed you what's been

11   marked as Exhibit 84-2#-002 through 84-2#-034.  If I could ask

12   you to just take a quick look at those photographs, Officer

13   Maclellan.  Do you recognize those photos, sir?

14     A    I do.

15     Q    What are those photographs?

16     A    These are photos of the scene, the crime scene.

17     Q    And do those photos accurately depict the scene as it

18   was the night you responded to the call?

19     A    As I remember, yes.

20              MR. MARTINEZ:  At this time, the government would move

21   for the admission of Exhibits 84-2#-002 through 84-2#-034 with

22   the directive that the Court gave at side-bar.

23              THE COURT:  All right.  Those will be admitted.

24          Any objection, Mr. Berndt?

25              MR. BERNDT:  No, Your Honor.

TRIAL ONE – VOL. 23 –  4512

1          THE COURT:  Mr. Gatterdam?

2          MR. GATTERDAM:  No, Your Honor.

3          THE COURT:  Ms. Dixon?

4          MS. DIXON:  No, Your Honor.

5          THE COURT:  Mr. Meyers?

6          MR. MEYERS:  No, Your Honor.

7          THE COURT:  Mr. Nolder?

8          MR. NOLDER:  No, sir.

9          THE COURT:  You may publish the photos that you wish

10   to publish, Mr. Martinez.

11          MR. MARTINEZ:  Thank you, Your Honor.

12          Special Agent Lauber, if we may see Exhibit 84-2#-002.

13          Ms. Clark, I intend to publish all the photographs that

14   we show.  Thank you.

15   BY MR. MARTINEZ:

16   Q    Officer Maclellan, do you recognize what's in that

17   photograph?

18   A    I do.

19   Q    What is that?

20   A    I believe that is the house leading up to where the

21   victim was shot.

22          MR. MARTINEZ:  May I please see Exhibit 84-2#-026?

23   BY MR. MARTINEZ:

24   Q    Officer Maclellan, do you recognize what's in that

25   photograph?

TRIAL ONE - VOL. 23 -  4513

1    A    I do.

2    Q    What is that?

3    A    That is the victim, Ms. Fyffe, deceased, in the front

4    walkway on the house.

5    Q    Is that the condition Ms. Fyffe was in when you found

6    her?

7    A    I believe she was face down at first when I found her.

8    She's been moved since, when the medics do what they do.

9         MR. MARTINEZ:  May I please see Exhibit 84-2#-030?

10   BY MR. MARTINEZ:

11   Q    Officer Maclellan, do you recognize that?

12   A    I do.

13   Q    And what's being displayed in that photograph?

14   A    Just another photo of the victim.

15   Q    And you mentioned the wound and the blood.  Can you

16   please describe what you were referring to earlier?

17   A    I believe, from what I remember, that she had a gunshot

18   on the side or back of her head, and all the blood that came

19   out, obviously.

20        MR. MARTINEZ:  And then finally, may I please see

21   Exhibit 84-2#-031?

22   BY MR. MARTINEZ:

23   Q    Officer Maclellan, what are we looking at in this

24   photograph?

25   A    That was the pizza box and the cell phone that I

TRIAL ONE – VOL. 23 – 4514

1    referred to laying next to her.

2           MR. MARTINEZ:  May I have a moment, Your Honor?

3           THE COURT:  Yes, you may.

4           MR. MARTINEZ:  Your Honor, no further questions at

5    this time.

6         Thank you, Officer.

7           THE WITNESS:  Thank you.

8           THE COURT:  Cross-examination, Mr. Berndt?

9           MR. BERNDT:  Very briefly, Your Honor.

10                         - - -

11                    CROSS-EXAMINATION

12    BY MR. BERNDT:

13    Q    Officer Maclellan, good morning.

14    A    Good morning.

15    Q    How are you doing this morning?

16    A    Okay.

17    Q    Sir, this was obviously a very serious crime that was

18    committed that evening, correct?

19    A    Correct.

20    Q    You don't have any information to impart to this jury as

21    to who's responsible for this crime, do you?

22    A    I do not.

23    Q    What kind of neighborhood are we in here?

24    A    Residential neighborhood.  I'm not sure what --

25    Q    West side?

TRIAL ONE – VOL. 23 – 4515

1    A    It's the west side.

2    Q    Is it considered a high-crime neighborhood?

3    A    Parts -- parts of the west side are considered high

4    crime, yes.

5    Q    Have you worked the west side for a while -- or during

6    this time period, did you work the west side for a while?

7    A    I have worked west side for a while, and during this

8    time I had been there for a while.

9    Q    Other homicides occur on the west side?

10   A    Yes, they do.

11   Q    At or near this homicide scene from October of 2011?

12   A    I couldn't speculate as to where exactly they occur.

13   Q    I wasn't asking you to speculate.

14   A    There are homicides that occur, yes.

15        MR. BERNDT:  Thank you.  Nothing further, Your Honor.

16        THE COURT:  Thank you.  Mr. Gatterdam, any questions?

17        MR. GATTERDAM:  No, Your Honor.

18        THE COURT:  Ms. Dixon?

19        MS. DIXON:  No, sir.

20        THE COURT:  Mr. Meyers?

21        MR. MEYERS:  No, Your Honor.

22        THE COURT:  And Mr. Nolder?

23        MR. NOLDER:  No, Your Honor.

24        THE COURT:  Any redirect, Mr. Martinez?

25        MR. MARTINEZ:  No redirect.  Thank you.

TRIAL ONE – VOL. 23 –  4516

1          THE COURT:  Officer Maclellan, you may be excused.

2     Thank you.

3          MR. DEVILLERS:  Your Honor, may I have a moment?

4          THE COURT:  Yes, you may.

5          MR. DEVILLERS:  Your Honor, we have a stipulation.

6          THE COURT:  All right.

7          MR. DEVILLERS:  It's stipulated between the parties

8     that Government's Exhibit 84-15, which is a phone -- is a phone

9     found on the sidewalk near the victim on Wednesday,

10    October 19th, 2011, of the homicide of Crystal Fyffe at 614

11    Belvidere Avenue.  It's further stipulated that Government's

12    Exhibit 84-14 is a cell phone on the pizza box found by the

13    victim, Crystal Fyffe, on October 19, 2011, at 614 Belvidere

14    Avenue.

15         THE COURT:  Thank you.  So stipulated, Mr. Berndt?

16         MR. BERNDT:  Yes, Your Honor.

17         THE COURT:  Your next witness, Mr. Kelley.

18         MR. KELLEY:  Keith Leighton, Your Honor.

19        Your Honor, the stipulation did eliminate a witness.  If

20    I could just verify.  I know our witness is here.

21         THE COURT:  All right.

22         MR. KELLEY:  He is here, Your Honor, being retrieved

23    from the fourth floor.  I apologize for the delay.

24         THE DEPUTY CLERK:  Sir, come forward and be sworn,

25    please.

TRIAL ONE – VOL. 23 –  4517

1      (Witness sworn.)

2           THE COURT:  Please proceed, Mr. Kelley.

3           MR. KELLEY:  Thank you, Your Honor.

4                       - - -

5                   KEITH LEIGHTON

6    Called as a witness on behalf of the Plaintiff, being first

7    duly sworn, testified as follows:

8                   DIRECT EXAMINATION

9    BY MR. KELLEY:

10   Q     Please state your name and spell your last name for our

11   jury.

12   A     My name is Keith Leighton, L-E-I-G-H-T-O-N.

13   Q     Who do you work for?

14   A     I'm a special agent with the Drug Enforcement

15   Administration here in Columbus.

16   Q     How long have you been with the DEA?

17   A     Twenty-four-and-a-half years.

18   Q     Were you assigned to a task force at any point in the

19   last few years?

20   A     Yes, I was.

21   Q     What task force were you assigned to?

22   A     The Safe Streets Task Force with the FBI.

23   Q     Did that cause you to actually be located at the FBI?

24   A     Yes, I had an office there, a desk.

25   Q     What kind of work were you involved in with the FBI?

TRIAL ONE - VOL. 23 -  4518

1   A    I was assigned to work a gang by the name of the Short

2   North Posse.

3   Q    How long were you involved in that investigation?

4   A    It was approximately two years.

5   Q    At some point you left for greener pastures?

6   A    Yes.  I was called back to the DEA.

7   Q    Approximately when did you leave the investigation?

8   A    I was at the FBI from 2013 to 2016.  So I worked the

9   Short North Posse, I would say, from 2013 to 2015.  And then

10  the last year I did a heroin investigation separate from that.

11  Q    In the course of that investigation with the Short North

12  Posse, were you called upon to find some records and documents?

13  A    I was.

14  Q    First, I want to draw your attention to an incident in

15  April of 2008, the murder of Tyrell Davis.  Were there some

16  records that you were asked to obtain as it related to his

17  murder from May 25th, 2008?

18  A    Yes, there was.

19  Q    And likewise, were there documents from the murder of

20  Rodriccos Williams November of 2007?

21  A    Yes.

22  Q    Let's first go to the Rodriccos Williams murder.

23       MR. KELLEY:  If we could have Government's Exhibit

24  48-13.

25

TRIAL ONE - VOL. 23 -  4519

1    BY MR. KELLEY:

2    Q    Can you tell us what we're seeing at 48-13?

3    A    This is an e-mail that I sent to Dave DeVillers.

4    Q    Why did you send him this e-mail?

5    A    I had obtained some records from Budget, and it was a

6    little bit confusing.  I actually had to speak to people at

7    Budget.  So I actually put it down in writing just to get it

8    all sorted out.

9    Q    Were you surprised to see that as an exhibit?

10   A    Yes, I was.

11   Q    We'll blame Mr. DeVillers for that.

12        If we could go to page two of the exhibit?

13        MR. BERNDT:  Objection.  Side-bar.

14                              - - -

15     (The following proceeding was held at side-bar.)

16        THE COURT:  Go ahead, Mr. Berndt.

17        MR. BERNDT:  Your Honor, I would object to the use of

18   this document.  This document appears to be something that the

19   agent put together based upon his conversations with Budget

20   Rent A Car.  It actually specifically references things that

21   they told him.  So I think that the document simply

22   encapsulates hearsay, and I would object to the use of this

23   document.

24        MR. KELLEY:  The document is the cover page of the

25   exhibit, Your Honor, and I gave it to him in that form.

TRIAL ONE - VOL. 23 -  4520

1          THE COURT:  What is the exhibit again?

2          MR. KELLEY:  The rental car records.  This is the

3    cover page, and the way he has seen it includes that e-mail.  I

4    agree with Mr. Berndt.  I have no intention of getting that

5    e-mail before the jury.

6          MR. BERNDT:  But also we're talking about the

7    testimony about the explanation of the e-mail would also be the

8    witness repeating the hearsay that's in that cover letter.

9          THE COURT:  So my understanding, that hasn't happened

10   yet.  He hasn't asked that.  And based on Mr. Kelley's

11   representation, I understand he is not going to elicit

12   testimony from this witness that had been captured in this

13   e-mail that would necessarily contain hearsay.

14         What I don't know -- and probably the more compelling

15   question -- is whether this witness will offer something that

16   would otherwise be considered hearsay but for the fact that it

17   was a conversation being introduced to show the effect on the

18   listener, that is, show what they may have told this

19   investigator something that caused him to do something else but

20   puts it in another category of statements.

21         MR. KELLEY:  I'm about to do the foundation.  I didn't

22   mean to mislead by having that statement first.

23         MR. BERNDT:  Kevin, just as a reminder, I believe I

24   stipulated to the Budget records.  I'm not concerned if you go

25   through it with him, but they were stipulated to.

TRIAL ONE – VOL. 23 – 4521

1      (The following proceeding was held in open court.)

2          THE COURT:  Mr. Kelley, please proceed.

3          MR. KELLEY:  Thank you.

4   BY MR. KELLEY:

5   Q   We're looking at 48-13.  I think we wanted to go to page

6   two of that document.  Did you, in fact, obtain records from

7   Budget Rental Car?

8   A   Yes, I did.

9   Q   As it related to this particular incident, what dates

10  are we talking about?

11  A   I can't really see.  That's much better.  November 1st,

12  of '07 to November 8th of '07.

13  Q   Tell us first how you obtained these records, just so

14  our jury understands the process of you obtaining them.

15  A   Well, during the investigation, there was a couple

16  things that happened.  First of all, we were looking at some

17  bank records of Mr. Ledbetter, and we noticed around the time

18  of this -- of the Rodriccos Williams murder that there was a

19  charge on his bank records from Budget.  And also we had been

20  told by a cooperator that they had rented a car --

21          MR. GATTERDAM:  Objection.

22          THE COURT:  Overruled.

23  BY MR. KELLEY:

24  Q   You may finish your answer.

25  A   We had been told by a cooperator that they had used a

TRIAL ONE - VOL. 23 -  4522

1   rental car during this crime.

2   Q    What did you do, then, in response to learning that?

3   A    I sent a subpoena to Budget for records under the name

4   of Ledbetter for that time period.

5   Q    And then what did they provide you?

6   A    They came back -- again, this is why that previous

7   exhibit was sent to Mr. DeVillers.  They came back with a

8   couple different records, and it was a little confusing at

9   first.

10  Q    What we're going to do is take it page by page and look

11  at these documents.  This is page two of that Exhibit, 48-13.

12  And tell us the date that shows a vehicle rented on this page

13  two.  The date the vehicle was rented?

14  A    On November 1st.

15  Q    And due back in on what date?

16  A    November 8th.

17       MR. KELLEY:  And Your Honor, I think these records are

18  subject to a stipulation.  So if we may publish them from this

19  point going forward?

20       THE COURT:  Yes, you may.

21  BY MR. KELLEY:

22  Q    And just so our jury knows where you're looking, can you

23  indicate on the screen where the date is that it was rented and

24  when it was due back?

25  A    The top circle it says rented, and it has a date and

TRIAL ONE – VOL. 23 – 4523

1   then due in.

2   Q    And is there also an indication in the lower left as to

3   who was doing the rental?

4   A    Yes.

5   Q    What is the name?

6   A    Ledbetter, first name Robert.

7   Q    And does there appear to be a signature then at the

8   bottom of the page?

9   A    Yes.

10  Q    What does the signature appear to be?

11  A    His name, Robert Ledbetter.

12  Q    If we go to page three of the exhibit, if the agent can

13  again help us by blowing up the upper part of it.  Does this

14  give us a customer name in the upper left?

15  A    Yes.  Ledbetter, first name Robert.

16  Q    And then is there a phone number just to the right of

17  that?

18  A    Yes.

19  Q    What's the phone number?

20  A    (614)499-3467.

21  Q    Then there appears to be some comments below the name

22  Ledbetter in the document.  What does that comment say

23  regarding the customer?

24  A    Misunderstood the customer.

25  Q    And likewise on the left of that is yet another comment?

TRIAL ONE – VOL. 23 – 4524

1    A    Yes.  Customer wanted car exchanged and I closed.

2    Q    Was this consistent with your conversations with Budget

3   Rental as to what happened on this vehicle?

4    A    Yes.

5    Q    And if we go on the lower part of this document, does it

6   refer to what kind of car was rented?

7    A    Yes.  It was a silver Mitsubishi Galant.

8    Q    And two door or four door?

9    A    Four door.

10   Q    Now, if we go to our next page, which would be page

11  three of this document, and again if we start at the top, what

12  is this document telling us?  First starting -- again, it shows

13  a date again of November 1st to November 8th.  What is

14  different about this page from the previous pages?

15   A    It's a different vehicle.

16   Q    And what vehicle is now being rented?

17   A    On the left-hand side about four or five lines down, it

18  says a gray Pontiac it looks like, Grand Prix, four door.

19   Q    What dates are indicated for the date of the contract?

20   A    Same dates, 1st through the 8th of November 2007.

21   Q    And is there also then a name for the customer at the

22  lower left part of the document?

23   A    Yes.  Same name, Ledbetter, first name Robert.

24   Q    Now, if we go to the last page of the document, again,

25  starting up at the top, customer name for this vehicle?

TRIAL ONE - VOL. 23 -  4525

1    A    Ledbetter, first name Robert.

2    Q    And again, do we have a cell phone number for it as

3  well?

4    A    (614)499-3467.

5    Q    And the lower part of the document, does it indicate the

6  vehicle type?

7    A    Yes, gray Pontiac Grand Prix, four door.

8    Q    Does this appear to relate to the return of the vehicle?

9    A    Yes.

10         MR. KELLEY:  May I have a moment, Your Honor?

11         THE COURT:  Yes, you may.

12  BY MR. KELLEY:

13    Q    Agent, were you also asked to retrieve documents as it

14  related to the Tyrell Davis murder from April 25th, 2008?

15    A    Yes, I was.

16    Q    What is it you were looking for in that situation?

17    A    We had been told that another rental had been used for

18  that murder, that one being we were looking for a white Kia.

19  And we were even actually told that it had been rented from

20  Budget.

21    Q    What did you do, then, after learning that information?

22    A    We sent a subpoena like we always did, like in the last

23  case.  However, I don't remember the exact conversation, but we

24  were directed by Budget personnel to a warehouse where we

25  actually had to go through boxes of old records.  For whatever

TRIAL ONE – VOL. 23 –  4526

1   reason, they had been just housed in this warehouse, for lack

2   of a better word, and it was just, you know, hundreds of boxes.

3   And we just took a team out there one day and just went

4   through.

5   Q    What is it you were looking for specifically?

6   A    A white Kia -- we knew that, we were told that -- rented

7   from Budget.  And the only other thing we had to go by was a

8   name.  And that was we were looking for a last name of Wilson.

9   Q    And were you able, in fact, to find a set of documents

10  related, that matched up to that vehicle?

11  A    Yes, we were.

12  Q    If we could have Government's Exhibit 55-12.  There's a

13  series of pages to this document.  Do you remember reviewing

14  this document previously?

15  A    Yes.

16  Q    And is this document the rental records that you

17  obtained?

18  A    It's really blurry on my screen, but it appears to be.

19  Q    We'll make Agent Lauber try to fix that.

20  A    Yes.

21  Q    And so I think what we're looking at would be the front

22  page of this document; is that correct?

23  A    Correct.

24  Q    Is there a date of the scheduled rental on this, if we

25  look at the very top?

TRIAL ONE – VOL. 23 – 4527

1    A    April 18th of 2008.

2    Q    And then is there the name Wilson somewhere located in

3  this list?

4    A    Yes.  Third line from the bottom going up, Renee Wilson.

5    Q    There appears to be a time column as well that suggests

6  the time that it was actually picked up?

7    A    Correct, 15:44.

8    Q    If we now go to page two of this document, please.

9        MR. KELLEY:  If we could blow up the upper half of

10  this document.  A little farther, please.

11  BY MR. KELLEY:

12   Q    Can you tell us about page two of this document?

13   A    Just continuation of the rental period.  It was rented

14  on April 18th of 2008 and it was due in on the 21st of April

15  2008.

16   Q    And what type of vehicle are we talking about, per the

17  records?

18   A    It's on the left-hand side about halfway down, white

19  Kia.  I guess that's an Optimum, something like that, four

20  door.

21       MR. KELLEY:  These are also subject to stipulation.

22  So if we may publish this page for the jury.

23       THE COURT:  Yes, you may.

24  BY MR. KELLEY:

25   Q    If you would, you can actually touch the screen and

TRIAL ONE - VOL. 23 -   4528

1    circle it.  There is a date in and date out on this page, is

2    there not?

3     A    At the top -- whoops, I kind of messed it up.  Rented

4    and due in.

5     Q    Try again.  And then the type of vehicle is where?

6     A    (Witness complying.)

7     Q    Did you, in fact, learn from these records whether the

8    car was returned on the 21st of April?

9     A    I learned that it was not.  It was kept out longer.

10     Q    If we can then go to page four of the document.

11          MR. KELLEY:  If we could enlarge that for the agent's

12    eyes.

13    BY MR. KELLEY:

14     Q    What does this appear to be on page four?

15     A    The rental -- the return of the rental.

16     Q    What return date is indicated there at the top?

17     A    April 25, 2008.

18     Q    And is that the day of the Tyrell Davis murder?

19     A    Yes.

20     Q    What do we have in the time column as it relates to a

21    Renee Wilson?

22     A    13:19 returned that day.

23          MR. KELLEY:  May I have a moment, Your Honor?

24          THE COURT:  Yes, you may.

25          MR. KELLEY:  If you can take that down, Agent.  Thank

TRIAL ONE - VOL. 23 -  4529

1   you.

2    BY MR. KELLEY:

3    Q    In your previous life before the FBI, you were working

4   with the DEA, right?

5    A    Correct.

6    Q    In May of 2011, were you involved in a controlled

7   delivery of marijuana in the Columbus area?

8    A    Yes, I was.

9    Q    What was your basic role in that activity?

10   A    I was the case agent.

11   Q    Did that marijuana delivery involve Brandon Ledbetter?

12   A    Yes, it did.

13   Q    Do you recall when Brandon Ledbetter was arrested for

14   the load of marijuana coming in?

15   A    It was May 24th, 2011.

16   Q    Did you have cause, then, after that to have interaction

17   with a woman by the name of Crystal Fyffe?

18   A    Yes.

19   Q    Can you explain to the jury how that occurred?

20   A    After the arrest on the 24th, Mr. Ledbetter was

21   incarcerated that night.  The previous day -- we have a task

22   force officer -- or not anymore, but at the time there was a

23   task force officer by the name of Sanford Creighton.  He's

24   actually a Franklin County sheriff officer, deputy sheriff, and

25   he used to work at the jail.  So one of the things that he

TRIAL ONE – VOL. 23 – 4530

1    always did for us is whenever we arrested somebody, he would

2    pull all the jail calls.  Because even though they know they're

3    being recorded, very often people incarcerated will make a

4    mistake or slip or think the calls really aren't monitored when

5    they were.

6         So Task Force Officer Creighton had obtained the calls

7    for all three defendants, not just Mr. Ledbetter, as just a

8    matter of normal investigation.

9         And in one of the calls, Mr. Ledbetter was heard

10   telling -- I don't know if it was his girlfriend or an

11   ex-girlfriend, Crystal Fyffe, about removing some money from

12   the residence.

13   Q    Was there a quantity of money that he referenced that

14   you were looking for?

15   A    He mentioned $30,000 on the call.

16   Q    What did you all do in response?

17   A    We did some checks.  We tried to find where Ms. Fyffe

18   lived at the time because it was our belief that that was drug

19   proceeds and subject to seizure based on our previous

20   investigation with the marijuana.  We went out to a residence

21   we believed to be where Ms. Fyffe resided.  It actually was,

22   but we were told by neighbors that she had moved back with her

23   mom.

24   Q    So did you, in fact, go to that other location?

25   A    We did.  The first one was Beal Drive and then we went

TRIAL ONE – VOL. 23 –   4531

1   to Belvidere on the west side where her mom lived at the time.

2   Q    Did you ultimately locate Crystal Fyffe?

3   A    We did.

4   Q    What happened at the house?

5   A    We encountered her.  He never went inside.  We did this

6   all outside.  We explained who we were, what we were doing, why

7   we were there.  She was a little hesitant at first.  She seemed

8   very nervous.  But then she said, Okay, I know what you're here

9   for.  She actually went inside on her own and brought out –– it

10  looked like a little cooler or lunchpail.  I remember it was

11  red in color, and it contained a large amount of cash, and gave

12  it to us.

13          THE COURT:  Officer, excuse me.  Could you tell us,

14  Special Agent, the approximate date.

15          THE WITNESS:  That was the very next day after the

16  arrest.  That was May 25th, 2011.

17  BY MR. KELLEY:

18  Q    If your report indicates that you got information on

19  May 25th, that you met with Ms. Fyffe on May 26th ––

20  A    I'm sorry, yes.  The 24th –– I misspoke.  The arrest of

21  Robert Ledbetter was the 24th.  We received that information,

22  the calls, on the 25th.  And we went the next day on the 26th.

23  I'm sorry.  It was the day after.

24  BY MR. KELLEY:

25  Q    Did Ms. Fyffe indicate where this money came from?

TRIAL ONE - VOL. 23 - 4532

1    A    She told us that she was instructed by Mr. Ledbetter to

2    go to the other address that we were at first, the Beal Drive

3    address, and obtain it from -- I guess it was a duct, air duct,

4    air conditioning duct in the master bedroom of that house.

5    Q    Ultimately, did you come up with an amount of currency

6    that was seized?

7    A    We did.

8    Q    What was that total?

9    A    $30,570.

10   Q    Did Ms. Fyffe say anything else in relation to this

11   currency or Mr. Ledbetter?

12   A    Yes.  When she finally just -- when she gave it to us,

13   she made a statement to all of us standing there, saying, Take

14   it, I don't want it, I'm scared to death of him.

15   Q    What did you all do with the money?

16   A    We took the money and seized it and we treated it like

17   any other asset that we seize, whether it be a car or cash.  It

18   goes through the normal seizure and forfeiture process.

19             MR. KELLEY:  If I may have a moment, Your Honor?

20             THE COURT:  Yes, you may.

21             MR. KELLEY:  I have no further questions, Your Honor.

22   Thank you.

23             THE COURT:  Okay.  Mr. Berndt, cross?

24             MR. BERNDT:  I do, Your Honor.  Thank you.

25

TRIAL ONE - VOL. 23 - 4533

1                          - - -

2                    CROSS-EXAMINATION

3     BY MR. BERNDT:

4     Q    Special Agent Leighton, good morning.

5     A    Good morning, sir.

6     Q    How are you today?

7     A    I'm good.  You?

8     Q    I'm fine.  My name is Jeff Berndt.  I represent Robert

9     Ledbetter.  Can you hear me okay?

10    A    Yes, I can.

11    Q    Great.  I want to talk to you briefly about this issue

12    with the rental car.

13    A    Okay.

14    Q    The one from Budget, the silver Mitsubishi, correct?

15    A    Correct.

16    Q    That car was rented in the name of Robert Ledbetter,

17    correct?

18    A    Correct.

19    Q    And you say that you had some type of informant or

20    cooperator who gave you information that a rental car was used

21    by whoever murdered Rodriccos Williams, correct?

22    A    Correct.

23    Q    Did they tell you that that was a car rented by

24    Mr. Ledbetter, or did they tell you that that was a car rented

25    by somebody else?

TRIAL ONE - VOL. 23 - 4534

1    A    I don't remember the exact details, that there was a

2   rental car used in that crime.

3    Q    Well, do you remember running a check on other people

4   who allegedly rented a car for that incident?

5    A    I don't recall if we did or not.  There was a lot of

6   subpoenas going out.  I remember that we learned that there was

7   a rental car used.  And we saw during that time period that

8   there was a rental car expense on Mr. Ledbetter's bank records.

9    Q    Understood.  But my question still remains:  Did the

10  cooperator tell you that that car was rented by Mr. Ledbetter

11  or somebody else?

12   A    I don't recall exactly.

13   Q    Do you have records that might indicate that?

14   A    I personally don't.  I don't know if it's in the FBI

15  case file.  We were all given different tasks, and we just had

16  a big master file.  That was just one of my tasks to pursue.

17   Q    I understand.  And again, it was rented in the name of

18  Robert Ledbetter, correct?

19   A    Correct.

20   Q    And I didn't notice if there was even like a credit card

21  information on that Budget Rent A Car?

22   A    I think there was a credit card number.  I'd have to

23  look at it again.

24        MR. BERNDT:  Could we bring up 48-13, page 3, 4, or 5?

25  I think any of those will have it.

TRIAL ONE - VOL. 23 - 4535

1    BY MR. BERNDT:

2    Q    Can you see that okay, Special Agent?

3    A    I can. Isn't that one in the lower left where it says

4    swipe present and CX and a long number?

5    Q    I'm not an expert on these receipts, but it would appear

6    to me that that would indicate that it was charged on a credit

7    card. Would you agree?

8    A    Yes. Isn't that what you asked me?

9    Q    Yes.

10   A    Okay. Yes.

11   Q    Just so I understand this, this is a vehicle rented in

12   the name of Robert Ledbetter, correct?

13   A    Correct.

14   Q    Using a credit card of Robert Ledbetter, correct?

15   A    Correct.

16   Q    Much like you or I would do if we walked into an airport

17   to rent a car, right?

18   A    Correct.

19   Q    And it was for a silver car, correct?

20   A    A silver Mitsubishi.

21   Q    Okay. In terms of this incident that occurred in May of

22   2011 in regard to money and securing that money from Crystal

23   Fyffe -- I want to switch gears here for you. Okay?

24   A    Sure.

25   Q    Mr. Ledbetter was arrested as a result of the good work

TRIAL ONE – VOL. 23 –   4536

1   of the Drug Enforcement Administration with about a thousand

2   pounds of marijuana -- or I'm sorry, a thousand kilograms of

3   marijuana, correct?

4       A    Correct.

5       Q    About 2,200 pounds of marijuana?

6       A    Approximately, yes.

7       Q    Drugs probably worth in the neighborhood of $2 million?

8       A    Correct.

9       Q    Huge shipment of drugs, correct?

10      A    It was large.

11      Q    He was arrested in Grove City, I believe?

12      A    Yes, that's correct.  Well, actually that's where the

13  transaction went down.  He was actually followed back into

14  Columbus and then he was arrested.

15      Q    Correct.  He was in a vehicle that had a stall device

16  placed on it?

17      A    A kill switch, correct.

18      Q    And he was apprehended, correct?

19      A    Yes.

20      Q    He wasn't armed, was he?

21      A    No, he was not.

22      Q    And he didn't offer any resistance?

23      A    I would say he did.  He ran.

24      Q    How far did he run?

25      A    Not far.

TRIAL ONE – VOL. 23 –  4537

1    Q    Okay.

2    A    But he did attempt to flee.  That's resistance to me.

3    Q    And then when you caught him, did he offer you further

4   resistance?

5    A    No, not at that time.

6    Q    Okay.  So you say that there was a phone call that

7   Mr. Ledbetter made once he was arrested?

8    A    Correct.

9    Q    Did you keep a copy of that phone call?

10    A    I'm not sure.  That case is closed.  And once it's

11   closed, usually all the evidence -- you know, once there's no

12   appeals and the sentence has been handed down, usually

13   everything's destroyed.

14    Q    So you're saying that everything is destroyed in

15   relationship to this event that occurred with Mr. Ledbetter in

16   May of 2011?

17    A    Except the reports.  But normally even the marijuana

18   was, you know, eventually burned and destroyed.  And once all

19   the appeals are done and there's nothing left to be

20   adjudicated, normally all the evidence, drug and nondrug, is

21   destroyed.

22    Q    Okay.  And Mr. Ledbetter was charged in federal court

23   with a marijuana crime, correct?

24    A    Correct.

25    Q    Mr. Ledbetter pled guilty to that marijuana crime,

TRIAL ONE - VOL. 23 - 4538

1   correct?

2   A   Correct.

3   Q   Mr. Ledbetter was given a prison sentence as a result of

4   that crime, correct?

5   A   Correct.

6   Q   And that offense doesn't have anything to do with the

7   Short North Posse, does it?

8   A   No.  Not -- no.

9   Q   Now, this was $30,000 in round figures, correct?

10   A   Approximately.

11   Q   You didn't know Crystal Fyffe before this incident, did

12   you?

13   A   No, I did not.

14   Q   And she told you that she moved this money from an

15   address on Beal I think you said?

16   A   Beal Drive.  I don't remember the exact number, but it

17   was Beal Drive.

18   Q   To the place where she was living on Belvidere, correct?

19   A   Correct.

20   Q   And then you secured the money on May 26th or 25th of

21   2011, correct?

22   A   It was the 26th.

23   Q   What do you -- when you seize money like that, do you

24   notify people that the money's been seized?

25   A   Yes.

TRIAL ONE – VOL. 23 –  4539

1    Q     Do you notify them that if they have any right to the

2    money they should make a claim?

3    A     Yes.

4    Q     Did Mr. Ledbetter make a claim for that money?

5    A     I'm not sure because that's not my -- we have a certain

6    woman in my office.  She is the asset forfeiture specialist.

7    And her, combined with DEA headquarters in Washington D.C.,

8    they do all the notifications.  That's her job.  We make the

9    seizures.  We process them.  We take it to the bank.  They give

10   us a check if it's currency.  We hand it over to the U.S.

11   Marshals.  As an agent, I'm out of it.  I don't get involved

12   with who puts in claims, whether they're honored, denied.  It

13   goes on.

14   Q     Did you prepare for your testimony here today?

15   A     Yes, I did.

16   Q     Now, are you aware of Mr. Ledbetter making a claim or

17   anybody making a claim for that money?

18   A     I am not aware.  I am not aware in any seizure in any

19   case.  That's asset forfeiture people.  And just to take that a

20   step further, the reason behind that is that we never see the

21   money.  We're not -- it goes into a gigantic Department of

22   Justice fund which is spread out among many federal agencies.

23   So it's really not in my interest what happens with the money.

24   I do my job, and then it just goes on.

25   Q     I understand.  And you felt that this money was drug

TRIAL ONE – VOL. 23 – 4540

1    proceeds based upon the fact that Mr. Ledbetter had just been

2    arrested with a thousand kilograms of marijuana, correct?

3    A    Correct.

4          MR. BERNDT:  Thank you very much.

5          THE WITNESS:  Thank you.

6          MR. BERNDT:  Nothing further, Your Honor.

7          THE COURT:  Thank you, Mr. Berndt.

8          Mr. Gatterdam, any cross?

9          MR. GATTERDAM:  No questions.

10         THE COURT:  Ms. Dixon?

11         MS. DIXON:  No questions, Your Honor.

12         THE COURT:  Mr. Meyers?

13         MR. MEYERS:  No questions.

14         THE COURT:  Mr. Nolder?

15         MR. NOLDER:  No, Your Honor.

16         THE COURT:  Mr. Kelley, any redirect of Agent

17   Leighton?

18         MR. KELLEY:  One question, Your Honor.  Two questions.

19                              – – –

20                    REDIRECT EXAMINATION

21   BY MR. KELLEY:

22   Q    If we could go on Government's Exhibit 48-13.  I believe

23   you were asked about page three of this document?

24         MR. KELLEY:  If we could publish this for the jury,

25   Your Honor?

TRIAL ONE – VOL. 23 –  4541

1      THE COURT:  Yes, you may.

2   BY MR. KELLEY:

3   Q    Mr. Berndt asked you about page three, and I think it

4   was regarding credit card information.  Do you recall that

5   question?

6   A    Yes, I do.

7   Q    I want to be clear as far as the date on this agreement.

8   When was this silver Mitsubishi four door returned to the

9   rental car place?

10  A    On the 4th of November 2007.

11  Q    And when was Rodriccos Williams killed?

12  A    The day before, on the 3rd of November 2007.

13      MR. KELLEY:  No further questions, Your Honor.  Thank

14  you.

15      THE COURT:  Mr. Berndt, any recross?

16      MR. BERNDT:  Just one question, Your Honor.

17                       - - -

18                 RECROSS-EXAMINATION

19  BY MR. BERNDT:

20  Q    Special Agent, did you -- when you secured these records

21  from Budget, did you ask them what the condition of the car was

22  when it was returned?

23  A    I don't recall that I did.

24      MR. BERNDT:  Thank you.

25      Thank you, Your Honor.

TRIAL ONE - VOL. 23 - 4542

1    MR. KELLEY:  Nothing further, Your Honor.  Thank you.

2    THE COURT:  Agent Leighton, thank you very much, sir.

3  You may be excused.

4    THE WITNESS:  Thank you.

5    MR. DEVILLERS:  Your Honor, the government's next

6  witness is Steven Palmer.

7    THE COURT:  All right.

8    Mr. Palmer, please come forward and be sworn.

9    (Witness sworn.)

10    THE COURT:  Mr. Palmer, please bend the microphone

11  toward you and speak clearly into it.

12    THE WITNESS:  Okay.

13    THE COURT:  Thank you.

14  Mr. DeVillers, please proceed.

15    MR. DEVILLERS:  Thank you, Judge.

16    - - -

17    STEVEN PALMER

18  Called as a witness on behalf of the Plaintiff, being first

19  duly sworn, testified as follows:

20    DIRECT EXAMINATION

21  BY MR. DEVILLERS:

22  Q    Good morning, Mr. Palmer.

23  A    Good morning.

24  Q    Please state your full name and spell your last name.

25  A    Steven, middle initial E, last name Palmer, P-A-L-M-E-R.

TRIAL ONE - VOL. 23 - 4543

1    Q    What do you do for a living, Mr. Palmer?

2    A    I'm an attorney.

3    Q    Do you practice any particular type of law?

4    A    Primarily criminal defense law here in Columbus, Ohio.

5    Q    How long have you been a lawyer?

6    A    Twenty years, give or take a few months.

7    Q    Do you have a -- is there anyone you work with?

8    A    At different times I've worked with different people.

9    Right now, I have two associates in my office.  One is named

10   Jeffery Linn and the other Keri Collin.

11   Q    In 2011, how many different attorneys worked in your

12   office?

13   A    I would have to double check, but I think for relevant

14   purposes, Jeff Linn was with me and there might have been one

15   or two others.

16   Q    Do you have support staff?

17   A    I do.  At any given time -- I've always had an office

18   manager, and at any given time I've had a receptionist and

19   maybe a law clerk or two law clerks.

20   Q    Did you have occasion to meet a person by the name of

21   Crystal Fyffe?

22   A    I did.

23   Q    Can you tell about when that was?

24   A    That was in May of 2011.  She contacted my office

25   probably by telephone and was seeking representation.

TRIAL ONE - VOL. 23 - 4544

1    Q    Do you know what she wanted representation on?

2    A    There were -- there were two matters that she wanted to

3    talk about.  She was being contacted by authorities I believe

4    in Lancaster, Ohio, as well as some federal authorities

5    relative I think to a case that was going on in Fairfield

6    County, which is Lancaster.  She was being -- I think they were

7    telling her that she was going to be charged with tampering

8    with evidence, or some other crime, if she didn't cooperate.

9    Q    Eventually did you meet with some prosecutors in that

10   regard?

11   A    I did.  I met with a gentleman named Gregg Marx.  At

12   that point, he was the chief Fairfield County prosecutor.

13   Q    And the tampering with evidence allegations, were

14   they -- what did they pertain to?

15   A    The tampering with evidence allegations, according to

16   the authorities that I talked to, had to do with an allegation

17   that Ms. Fyffe may have assisted in disposing of clothing or

18   other items relative to a homicide or murder that occurred I

19   believe in Pickerington, but it would have been Fairfield

20   County.

21   Q    Do you remember when this homicide was to have taken

22   place?

23   A    I don't know specifically.  I think it was earlier in

24   2011, maybe before that.

25   Q    Do you know the name of the victim?

TRIAL ONE - VOL. 23 -   4545

1    A    The name of the victim was Rodriccos -- I can't recall

2    the last name.  Williams, maybe.

3    Q    Was there -- you indicated there was a federal issue as

4    well?

5    A    There was a federal issue.  Ms. Fyffe had been contacted

6    by federal authorities about some cash that she allegedly had

7    in her house.  And I believe it was the sum of $30,000.  And

8    they wanted her to turn that money over.  I don't know how they

9    found out she had $30,000.  I don't know the circumstances

10   behind it.  I can tell you what she told me about the money.

11   But how -- what the federal authorities knew or how they knew

12   it, I don't know.

13   Q    Why don't you tell us what she told you about the money.

14   A    She indicated that a gentleman named Ledbetter had given

15   her the money, 30,000 cash, to hold onto for him or for her to

16   use if she needed it maybe.  I can't recall exactly why.

17   Q    Did she tell you who this Mr. Ledbetter was?

18   A    It was her boyfriend or former boyfriend or some version

19   of that.

20   Q    When you first met with Ms. Fyffe, do you know where

21   Mr. Ledbetter was?

22   A    I don't.  I don't know where he was.  I think at some

23   point during my representation of Ms. Fyffe, he was apprehended

24   and put in jail, I think in Fairfield County jail.  But at the

25   time, for some reason, I think he was not yet in custody.

TRIAL ONE - VOL. 23 - 4546

1    Q    Do you remember the date you met with Ms. Fyffe?

2    A    If I'm correct, it was May 23, 2011.

3    Q    Do you remember where you met with her?

4    A    It would have been my conference room at my office here

5    in Columbus.

6    Q    Did you meet with her with anyone else besides yourself?

7    A    I did.  Jeff Linn, my associate, also participated in

8    the meeting.

9    Q    Did Mr. Linn participate in the representation of

10   Ms. Fyffe throughout the --

11   A    He did.

12   Q    What did Ms. Fyffe -- did Ms. Fyffe tell you anything

13   about Mr. Ledbetter?

14   A    She did.  She told us a lot about him, actually.  I

15   mean, she -- we spent some time talking to her about why she

16   was at the office, and she explained those two problems.  We

17   told her we would make contact with authorities and do what we

18   could about those issues.  She indicated that Ledbetter was her

19   boyfriend or former boyfriend.  She gave some of the history

20   about that, and she indicated all sorts of stuff about their

21   relationship.

22   Q    Did she indicate any concerns she had with

23   Mr. Ledbetter?

24   A    She did.  She was -- from the outset, when she came into

25   our office and talked to us, she was clear she was scared to

TRIAL ONE – VOL. 23 –   4547

1   death of the guy.

2   Q    Did she give -- you said she gave you some background on

3   her relationship with Mr. Ledbetter.  Did she give you any

4   background about her relationship with Mr. Ledbetter pertaining

5   to some of her concerns?

6   A    She did.  I think she told us a story where

7   Mr. Ledbetter had harmed her before.  I don't think it was

8   relative to why she was there, but it certainly gave background

9   as to why she was afraid.  She indicated that -- it might have

10  been as a result of her dating another guy or breaking up.

11  Whatever the reason was, she told us that Ledbetter had shot

12  her before.  She described how that happened.  Said she -- I

13  think she was on her knees, put up her hands and she was shot

14  through her hands.  I recall her telling us that she spit out

15  bullet fragments.  She was taken to the emergency room or the

16  hospital, not sure which one.  She told us -- I don't think she

17  came clean or told the hospital or doctors or any police

18  officers or anybody else who interviewed her exactly what

19  happened.  I think she made some story up about it.

20  Q    Do you know about when that happened?

21  A    I don't.  Maybe the year before.  For some reason, I

22  think it was the year before.

23  Q    Okay.  Let me -- I want to hand you something.  I want

24  to hand you what's been marked as Government's Exhibit 84-9.

25       MR. DEVILLERS:  Your Honor, may I approach?

1          THE COURT:  Yes.

2     BY MR. DEVILLERS:

3     Q     Tell us what that is, Mr. Palmer.

4     A     This is a copy, photocopy, of my office file on the

5     Fyffe matter.

6     Q     What is an office file?

7     A     Somebody comes into my office, we create a file.  We do

8     it both virtually on the computer and do it physically in the

9     form of a Manila file folder.  In that file would go in

10    documents relative to the representation, any notes that we

11    create, any memoranda we either dictate or type out ourselves,

12    and anything that we receive from anybody on the case.

13    Q     And is your handwriting -- are your handwritten notes in

14    that file?

15    A     Yes.

16    Q     I believe you said you had an -- the name escapes me,

17    your partner?

18    A     Jeffery Linn, L-I-N-N.

19    Q     Are some of Mr. Linn's notes in there as well?

20    A     Yes.

21    Q     When you take notes in the course of your business, do

22    you do it at or near the time you're talking to the witness?

23    A     Yes.  I mean, in the situation that I described when I

24    met with Ms. Fyffe, or another client, in my conference room

25    and Jeff was with me, we would have both been taking notes.  I

TRIAL ONE - VOL. 23 - 4549

1   have a practice of trying to have somebody else in the room

2   when I meet people, particularly if I -- if I want to pay

3   attention to the conversation, I have somebody else taking

4   notes because it's hard for me to do both.  I'm not a good

5   multi-tasker.

6     Q    You keep the file as a regular course of business?

7     A    I do.

8     Q    I want to show you what's been marked as Government's

9   Exhibit 84-18.

10         MR. DEVILLERS:  May I approach the witness, Your

11   Honor?

12         THE COURT:  Yes, you may.

13   BY MR. DEVILLERS:

14     Q    Tell me what that is, sir.

15     A    This is a printout of our computer records relevant to

16   the case.  We have in my office a software program called

17   Amicus Attorney.  It's -- I guess it's like proprietary

18   software for attorneys that helps us manage our law practice.

19         In that -- maybe it's best described as really beefed up

20   contact manager.  And we keep notes and track records of phone

21   calls and other things, scheduling and things like that that

22   occur in a case.  And this is a printout of what would be saved

23   in our computer system.

24     Q    Does that chronologically go through your contact with

25   Ms. Fyffe?

TRIAL ONE - VOL. 23 -  4550

1    A    It does.

2    Q    Would it include phone calls?

3    A    Yes.

4    Q    What other things would it include?

5    A    Well, phone calls is a big one.  We get a phone call

6    from a client, everybody in my office is instructed to open up

7    an icon, so to speak, on the computer system that says --

8    that's attached to a file.  We create a virtual file.  The

9    files have contacts assigned to them.  We click a little phone

10   call icon, or telephone icon, and up comes a box that indicates

11   who is calling.  We can fill in that information if it doesn't

12   populate automatically.  And we can type in as we speak, or

13   even later for that matter, the substance of the communication.

14        My office, for instance, gets a call from somebody and

15   I'm not there, they'll leave a message.  Whoever took the call

16   at my office, that icon will pop up.  They'll write down what

17   the message was and send it to me.  When I get it and return

18   the call hopefully quickly, I click the icon and I type in the

19   substance of the communication.  That all gets saved here.

20   It's all linked to the same file.  So if there's a court date

21   and we're taking notes relevant to a court date, it would be

22   there.  Anything that would happen in our office hopefully gets

23   attached to the Amicus file.

24   Q    I want to ask you -- getting back to the homicide -- do

25   you recall what else she told you about the homicide?

TRIAL ONE – VOL. 23 –   4551

1    A     Yes.  I mean, she told us –– she didn't tell us that she

2    was involved.  I guess what she told us is that she was being

3    contacted by authorities about the Rodriccos homicide and we,

4    of course, asked her what she knew about it.  She denied to us

5    she had any involvement in disposing of clothing or other items

6    relevant to that homicide.

7         She told us that she thought Ledbetter had done it, or

8    somebody for him had done it, or one of his crew had done it,

9    so to speak.  She told us about a time –– she told us about how

10   she put that together.  And if I –– if my memory serves me

11   correctly, she described a scenario where she received a phone

12   call from Mr. Ledbetter.  And he had asked her to look up an

13   address.  And this is before the homicide or maybe relative to

14   the time of it.  She looked up the address and didn't think

15   much of it because he portrayed himself in real estate –– or

16   maybe he was in real estate, I don't recall, but that was her

17   impression.  She supplied him that address by looking it up on

18   Google or telephone or computer or some other electronic means.

19        She later linked that together after she saw a story on

20   the news about a homicide at that address.  And I think in her

21   head she put two and two together and concluded that he was

22   involved in some way, shape or form.

23   Q    I want you to take a look at Government's Exhibit 84–9.

24   I don't believe yours has page numbers on it.  I'd ask the

25   agent to pull up 84–9 page 21.  Could you take a look at that

TRIAL ONE - VOL. 23 - 4552

1   for me, Mr. Palmer?

2       A    Yes.

3       Q    Can you see it on the screen?

4       A    I'm going to try to find it on my notes.  I can read it

5   better.  I think I do have page numbers.  I do.  Okay.

6       Q    Just for my benefit, is there a page number on your

7   document?

8       A    Yes.  It's 21 at the bottom.

9       Q    That works out well.  Okay.  Do you see anything in

10  regards to what you're testifying about in regards to a text

11  message -- first of all.  I'm sorry.  This page, these -- are

12  these handwritten notes?

13      A    They are.

14      Q    Are they yours?

15      A    No.  I believe this is Mr. Linn's handwriting, L-I-N-N.

16      Q    When you are working with Mr. Linn, are you in the

17  interviews with him?

18      A    Yes.  We were both in this interview.

19      Q    Okay.  And would this help refresh your recollection as

20  to what she told you during this interview?

21      A    Yes.

22      Q    Can you go towards -- in the middle of those notes is

23  there something indicating about text messages?

24      A    Yes.

25      Q    And what's it say?

TRIAL ONE – VOL. 23 – 4553

1   A     It says –– it's got a triangle there.  That stands for

2   defendant.  That's our shorthand for defendant.  It says,

3   "Defendant now remembers a text from Lead asking for directions

4   to location of later homicide."

5   Q     Okay.  And then when you say "defendant" in your notes,

6   who are you referring to?

7   A     In those notes –– in these notes it would have been

8   Crystal.  We do criminal defense work, so just about everybody

9   I talk to it's my habit to write D.  Sometime you may see a W

10  maybe attached to this case because, when I represent a

11  witness, I try to make myself write W.  But sometimes it says

12  defendant even though she may not have been charged with

13  anything yet.

14  Q     Had she ever talked to you about any of Brandon

15  Ledbetter's relatives, specifically a brother?

16  A     She did.

17  Q     What did she tell you about the brother?

18  A     She told me that his brother had been killed at some

19  point.  And she told me that Ledbetter had made statements or

20  had taken action against whoever he thought did it.  I believe

21  he said –– I believe she told us that he killed whoever killed

22  his brother.

23  Q     All right.  Did you –– you talked about a crew that she

24  was talking about.  What did she tell you about a crew?

25  A     She used the word crew.

TRIAL ONE - VOL. 23 -  4554

1          MR. GATTERDAM:  Objection.  Can we have a side-bar?

2          THE COURT:  Yes.

3                         - - -

4      (The following proceeding was held at side-bar.)

5          MR. GATTERDAM:  Your Honor, my objection might be a

6   little premature, but it's coming one way or the other.

7          THE COURT:  Okay.

8          MR. GATTERDAM:  I realize the Court had made a

9   previous ruling regarding the statements that come in against

10  Mr. Ledbetter and why.  However -- and we also filed a motion

11  in limine as to any statements that implicate Mr. Harris.  I

12  don't know if he's doing it now or if he's going to do it, but

13  I still object to any statements coming in about Christopher

14  Harris' name.  I thought the Court -- part of its ruling had

15  been forfeiture by wrongdoing.  It's very clear that Chris had

16  been in prison since 2008.  He could not be involved in the

17  Crystal Fyffe homicide.  I don't believe he could have anything

18  to do with it.  Any inference to him -- I think where this is

19  headed, Mr. Harris would be supposedly -- would be somebody he

20  could call on if he needed help or somebody she was afraid of

21  may kill or maybe -- Mr. Harris is in prison so he is incapable

22  of that.  I realize I can do that in cross.

23          THE COURT:  And in closing.

24          MR. GATTERDAM:  But I don't think it comes out.  I

25  don't think the hearsay -- I think it's hearsay of Christopher

TRIAL ONE - VOL. 23 -  4555

1    Harris is different than --

2            THE COURT:  Okay.  Go ahead.  I didn't mean to

3    interrupt you.

4            MR. GATTERDAM:  You were going to indicate -- part of

5    any conspiracy, he's not part of it.  He's not charged with

6    anything involving Crystal Fyffe nor could he be because he was

7    in prison.  So I don't think any statements about him come in.

8            MR. DEVILLERS:  Obviously, she is involved in the

9    homicide of Rodriccos Williams.  Ms. Fyffe is the person that

10   called and texted the directions to them.  Therefore, she is a

11   conspirator.  So I think the statement is in furtherance of the

12   conspiracy.  And there's going to be more evidence --

13           THE COURT:  You said she is an un-indicted

14   co-conspirator?

15           MR. DEVILLERS:  She is clearly.

16           MS. DIXON:  I would join in that objection but to also

17   add a foundational objection with respect to "crew" and what

18   time period he's talking about when his notes are referencing

19   his crew.  Because there -- in my mind, there is a crew who

20   will harm her in 2011, which clearly can't be my client who has

21   been locked up since 2008.  I want a foundation to be laid for

22   when you say crew, what are you talking about?  His crew with

23   respect to Rodriccos Williams, or a crew that will harm her in

24   2011?

25           THE COURT:  Mr. Durden.

TRIAL ONE - VOL. 23 - 4556

1    MR. DURDEN:  I too understand there were two mentions

2    of the word crew, being a crew that may have been there for

3    Rodriccos Williams as well as a later crew.  I didn't want to

4    prematurely object.

5    MR. MEYERS:  I join for Ussury on both fronts because

6    he, too, was incarcerated by the time Ms. Fyffe died.

7    MR. NOLDER:  I'll stay silent.

8    THE COURT:  I'm going to overrule your objection.  Of

9    course, I already ruled on it but you may have a continuing

10   objection.  The objection is preserved.  I'm going to sustain

11   yours, Ms. Dixon and Mr. Durden.  So put a time period on it as

12   part of your foundation, Mr. DeVillers.

13   MR. DEVILLERS:  Yes, Your Honor.

14     (The following proceeding was held in open court.)

15   THE COURT:  Mr. DeVillers, please continue.

16   MR. DEVILLERS:  Yes, Your Honor.

17   BY MR. DEVILLERS:

18   Q    We were talking -- the last thing, I was asking you

19   about a crew that Ms. Fyffe would have mentioned part of -- did

20   she talk about a particular crew that Mr. Ledbetter had?

21   A    She did.

22   Q    And what would this crew do?

23   A    She indicated that he had a group of people that would

24   help him do things.  And I think her -- I think she even told

25   us at one point that Mr. Ledbetter had told her to put a series

TRIAL ONE – VOL. 23 – 4557

1    of names and phone numbers into her telephone in case he was in

2    jail or something else happened, they could help her.  I think

3    these were the guys that were helping her -- or helping him

4    commit crimes, for lack of a better way to say it.

5              MR. GATTERDAM:  Objection.  Speculation, "I think."

6              THE COURT:  Overruled.

7    BY MR. DEVILLERS:

8    Q    I want to direct your attention to page 13 of that

9    exhibit.  If you look down on the bottom of that exhibit.

10   A    Yes.

11   Q    If you kind of just read through that last kind of three

12   or four lines to yourself.

13   A    Okay.

14   Q    Does that refresh your recollection to some of the names

15   given to you by Ms. Fyffe?

16   A    It does.

17   Q    What were the names given to you?

18             MS. DIXON:  Objection, Your Honor.  Foundation.

19             THE COURT:  Overruled.

20             THE WITNESS:  Some of the names were -- she used the

21   name Old Dog was one of the names, Young Buck.  She also

22   referred to him as Buckwheat.  And there was another gentleman

23   named Earl that she had mentioned to us that day.  And maybe --

24   I wrote down another name, the name Elijah.

25   Q    Do you know Mr. Ledbetter's brother's name, the one that

TRIAL ONE – VOL. 23 –  4558

1   was deceased?

2   A    I think that was Elijah.

3   Q    You said Earl?

4   A    Yes.

5   Q    Do you recall her saying anything about -- in particular

6   about a person by the name of Earl?

7   A    Earl, she told us, had been in jail for I think an

8   unrelated homicide and was involved in the Rodriccos homicide.

9   She was being told, and she advised us -- and frankly we

10  learned from other -- it was known that Earl was allegedly

11  accusing her of disposing of clothing.  And that was the

12  impetus of the investigation against her, and that would have

13  been the impetus of the tampering with evidence allegation.

14  Q    I want to direct your attention to page 26 of that

15  document.  If you go to the bottom of page 26, could you read

16  the bottom of 26 when it goes from Earl to the first part of

17  the next page as well to yourself?

18  A    Yes.

19  Q    Does that refresh your recollection as to what she told

20  you more specifically about Earl?

21  A    Yes.

22  Q    What did she tell you?

23  A    She told us that Earl was arrested in Columbus for

24  killing a gentleman named Paco and one other guy.  Earl cut a

25  deal for eight years and admitted to his involvement in the

TRIAL ONE – VOL. 23 – 4559

1  Rodriccos killing with several other individuals.

2  Q    Okay.  Did Ms. Fyffe indicate who Earl was talking

3  about?

4  A    With respect to?

5  Q    Who he was telling on?

6  A    Oh, Ledbetter.

7  Q    Did she indicate how many other people besides

8  Mr. Ledbetter?

9  A    She said three others.  That's what my notes would say.

10 She said Brandon and three others.

11 Q    Do you recall how many times about you met with

12 Ms. Fyffe?

13 A    I don't recall specifically.  I know once, at least

14 twice, maybe three or even four times in the office and once at

15 the Fairfield County Prosecutor's Office.

16 Q    During the time period you met with her, did her

17 attitude towards Brandon increase or decrease depending on the

18 day or --

19 A    She was always clear to us that she was terrified of the

20 guy.  And she didn't want us to do anything -- she didn't want

21 to tell on him.  She didn't want to cooperate.  She was afraid

22 that somebody, either Ledbetter directly or one of his people,

23 would cause her harm.  And she told us that if he didn't do it,

24 one of the crew guys would.  And she was scared.  I can't say

25 it any other way.

TRIAL ONE – VOL. 23 –  4560

1    Q    I want to direct your attention to page 26, again, of

2    that document.

3    A    Okay.

4    Q    And getting back to the Rodriccos Williams murder, did

5    she indicate whether Brandon talked to her about being

6    concerned about phone records or cell towers?

7         MR. DURDEN:  Your Honor, side-bar.

8                          - - -

9         (The following proceeding was held at side-bar.)

10        THE COURT:  Mrs. Evans, read back the question.

11        (Thereupon, the last question was read by the court

12   reporter.)

13        MR. DURDEN:  My issue is not an objection to the

14   question itself, but it appears that Mr. Palmer doesn't seem to

15   have independent recall in his recollection, a review of it.

16   But now he's reading from this document versus using it as

17   refreshing his recollection before he testifies.

18        THE COURT:  All right.  Do you have any response?

19        MR. DEVILLERS:  Your Honor, I'm actually having him

20   read it and seeing if it refreshes his recollection and then

21   talk about it.  I'm not having him read it to the jury.

22        THE COURT:  All right.  He first needs to establish

23   that his recollection is exhausted.

24        MR. DEVILLERS:  Understood.

25        THE COURT:  And then you may refresh.

TRIAL ONE - VOL. 23 - 4561

1      MR. DURDEN:  It happened twice, and I tried to let it

2  go, but it seems this testimony is going to go this path --

3      THE COURT:  I understand.  So going forward, let's use

4  the traditional, well-accepted approach.

5      MR. DEVILLERS:  Okay.

6      THE COURT:  All right.  Good enough.

7    (The following proceeding was held in open court.)

8  BY MR. DEVILLERS:

9  Q    Without referring to your notes, at least at this point,

10  do you have an independent recollection of her talking about

11  cell towers or phone records?

12  A    I mean, I've already looked at my notes.  I don't want

13  to be dishonest about this.  But I did actually know she had

14  talked to us about cell phones -- or cell phone towers before I

15  looked at my notes.

16  Q    Tell us about your independent recollection about those

17  cell towers.

18  A    She told us something about cell tower records linking

19  Ledbetter to the area of the Rodriccos killing.  And I don't

20  have any more independent recollection than that.

21  Q    When would this be?  What time period?

22  A    That she told us this?

23  Q    Yes.

24  A    This would have been in May.  This would have been

25  May 2011 when we were consulting with her about her case -- or

TRIAL ONE - VOL. 23 -  4562

1  her matter.

2  Q    Okay.  Eventually you indicated that Gregg Marx -- you

3  contacted Gregg Marx?

4  A    I did.

5  Q    Did you talk to him?

6  A    I did.

7  Q    Did you come to some sort of at least a general

8  understanding?

9  A    I did.

10  Q    What was that general understanding?

11  A    The plan, after I talked to Crystal was to contact both

12  the police officer who was contacting her and then Gregg Marx,

13  because the police officer contacting her wouldn't have any

14  authority to offer any sort of deal, but Gregg Marx would.  So

15  the idea was to contact Gregg and find out what he wanted.

16      And I eventually wanted to, and did, establish a proffer

17  agreement whereby Ms. Fyffe would provide information and, in

18  exchange for that, they would agree not to use her statements

19  against her if she were later charged with a crime unless

20  either they found out she was lying or they learned information

21  from an independent source.

22  Q    Did you talk to Ms. Fyffe about the possibility of

23  testifying against Mr. Ledbetter?

24  A    I did.

25  Q    And what did she tell you?

TRIAL ONE - VOL. 23 - 4563

1    A    She didn't want to do it.

2    Q    Why didn't she want to do it?

3    A    She was afraid that he would kill her, or one of the

4    people would kill her that he associated with.

5    Q    Was there a time period where she talked about leaving?

6    A    Yes.

7    Q    What did she tell you about that?

8    A    Our advice, when we met her, was if you're afraid of

9    these people or this gentleman or anybody else, you should

10   leave town.  We even talked to the authorities.  We talked to

11   the Pickerington police detective.  I can't remember his name.

12   And I talked to Gregg Marx about it.  And it was discussed that

13   she would leave Columbus to go to Youngstown, I think.  And

14   that way nobody would know where she was.  We would be able to

15   contact her.  We told her to maintain some sort of cell phone

16   communication with us.  The authorities would know where she is

17   but nobody else would.

18   Q    Did she indicate if Mr. Ledbetter said anything to her

19   about contacting authorities?

20   A    I don't recall if she said anything specifically about

21   that.

22   Q    I'd like to -- would anything refresh your recollection?

23   A    My notes I have certainly would.

24   Q    I want to look at Government's Exhibit's 84-18 which I

25   believe you already identified as your Amicus software?

TRIAL ONE - VOL. 23 -  4564

1    A    Yes.

2    Q    If you go to page two and just read that paragraph to

3    yourself.

4    A    Okay.

5    Q    Did Mr. Ledbetter -- did that refresh your recollection

6    as to her conversations with Mr. Ledbetter?

7    A    Yes.

8    Q    And what is it that he told her, if he would do -- what

9    did he tell her?

10    A    He told her, according to Crystal -- or Ms. Fyffe, he

11   told her she would be swimming with the fishes.  And that's in

12   quotes in our documents about -- or if she was playing him.

13    Q    Okay.  So, when you met with Mr. Marx -- did you

14   eventually meet with Mr. Marx with Ms. Fyffe?

15    A    We did.

16    Q    And did you talk to him?

17    A    She did.

18    Q    Do you remember where that meeting was?

19    A    That meeting occurred at the Fairfield County

20   Prosecutor's Office down in Lancaster.

21    Q    And what was discussed?

22    A    We showed up at the meeting.  I drove separately.  I met

23   her there.  I first met briefly with Mr. Marx, as well as his

24   detective.  And we -- it would be typical what I would do.  I

25   would say we're here for the proffer, what are the terms, make

TRIAL ONE – VOL. 23 – 4565

1    sure we're all on the same page about what is the agreement.

2           And then she came in the room, in a conference room

3    there at their prosecutor's office, and she provided

4    information similar to what she told us.

5    Q    Did she talk about the directions?

6    A    About directions?

7    Q    Texting the directions to Mr. Ledbetter?

8    A    She did.  She did.  She talked about that.  She talked

9    about how she was afraid of him, how she was afraid of

10   testifying.

11          MR. DURDEN:  Objection.  Nonresponsive.

12          THE COURT:  Overruled.  It's all in the context of the

13   proffer session.

14          THE WITNESS:  What else did she talk about?  She

15   discussed the generalities.  She denied that she had anything

16   to do with it.  I think she said she didn't recall having

17   anything to do with disposing of clothing or throwing anything

18   away.  She reiterated that she was afraid of Ledbetter.  She

19   provided a list of names, I think the same list that I had

20   gotten from her earlier in our meeting, and maybe even phone

21   numbers.  And the detective and Marx -- I don't know if Marx

22   was writing it down, but the detective was taking notes.  I was

23   taking notes.

24   BY MR. DEVILLERS:

25   Q    Did she give you some names of individuals that phone

TRIAL ONE – VOL. 23 – 4566

1    numbers were provided for?

2    A    Yes.

3    Q    And who provided those names and phone numbers?

4    A    She did.

5    Q    Who provided them to her?

6    A    Oh, Mr. Ledbetter did, yeah.

7    Q    And what was the purpose of providing the names and

8    phone numbers?

9    A    My understanding from Ms. Fyffe was that those names and

10   numbers were provided to her if Mr. Ledbetter were not around,

11   or if he were in jail, these are the individuals that could

12   protect her.  And she could contact them if she needed

13   anything.  So they were in her phone with names and phone

14   numbers.

15   Q    Do you remember some of those names?

16   A    One was Santa Clause.  I don't independently remember

17   any of the others as I'm sitting here.

18   Q    Did she provide a phone number for this Santa Clause as

19   well?

20   A    I believe she did.

21   Q    Did she tell you anything about -- anything else about

22   Santa Clause?

23   A    I think she did.  I don't recall what it was

24   independently now.

25   Q    Let's get back to the $30,000.  Do you recall what

TRIAL ONE – VOL. 23 –  4567

1   happened to that $30,000?

2    A    Yeah.  I think she felt a lot of pressure to do

3   something with that money.  And before I had worked something

4   out, I believe I had made contact with somebody from the DEA,

5   or tried to.  But before I knew it, they had actually entered

6   her house either with a warrant or otherwise, either a knock

7   and talk, or just went in with a warrant and took the money.

8    Q    Do you recall, was she -- did she indicate if anybody

9   from -- associated with Mr. Ledbetter tried to contact her

10  about that money?

11   A    She did.

12   Q    What did she say?

13   A    She said her attorney wanted her to bring the money to

14  him.

15   Q    Her attorney?

16   A    Or his attorney.  Forgive me.

17   Q    And who was his attorney?

18   A    Jeff Berndt.

19   Q    After the meeting with Mr. Marx, what happened?

20   A    After the meeting with Mr. Marx -- she was a mess during

21  this meeting.  She was -- just to give you some preference to

22  this.  She was nervous.  She was scared.  She was in tears

23  through some of it.  So I basically intervened.  And they

24  wanted her to say that she had disposed of clothing.  She never

25  gave them that information.

TRIAL ONE - VOL. 23 - 4568

1    So I basically said, Listen, guys, let's just postpone
2  this.  Give me a chance to meet with her again.  Give me a
3  chance to talk to her.  Let this settle down, and we'll
4  reconvene at a later date.
5    We then left the meeting and I had a conversation with
6  her outside the prosecutor's office in sort of the atrium or
7  entryway.
8    Q    What was the subject of that conversation?
9    A    I told her that if she -- I stressed she needed to tell
10  the truth on this.  If she did have anything to do with
11  disposing of clothing or other items, she had just been given
12  immunity, in fact.  It was more than a proffer agreement by the
13  end it of.  Earlier on in that meeting, even before they talked
14  to her, they offered her immunity.  They said anything she had
15  to do with any of this, she would not be prosecuted.  So it was
16  an immunity agreement.  That was the Holy Grail.  She wasn't
17  going to be prosecuted for anything.  So she had to be
18  truthful, and that's what I told her.  She said she was scared.
19  She didn't ever want to testify in a courtroom against
20  Mr. Ledbetter.  And she then produced a letter that she had
21  received from him.
22    Q    Did she show you that letter?
23    A    She did.  She didn't want to.  I coaxed it out of her.
24  I said, You got to show it to me, I'm your lawyer, that kind of
25  stuff.  She eventually showed it to me.

TRIAL ONE - VOL. 23 -  4569

1    Q    Did you read the letter?

2    A    I did.

3    Q    Do you remember what the letter said?

4    A    I don't remember precisely what it said, but it talked

5    about how if she were cooperating -- it was a threat she would

6    be killed, or words to that effect.  I don't know how it was

7    stated.

8    Q    What happened to that letter, do you know?

9    A    I tried to get her to give it to me.  She would not.

10   She took it.  She took it with her.  I don't know where it is

11   today.

12   Q    Did you and your partner try to convince her to do

13   something?

14   A    We tried to convince her to leave.  We wanted her to get

15   out of the city.  We tried to convince her to tell the truth.

16   We wanted to -- we just wanted her safe.  We had the case sort

17   of in hand at that point, or at least under control.  She

18   wasn't going to be prosecuted.  She just needed to get in a

19   protective situation of some sort.

20   Q    And the immunity offer, was that still good even after

21   she told them about the text messages and the directions?

22   A    Yes, at least it wasn't revoked.

23   Q    Okay.  Was there a time after that where -- are you

24   aware she had contact with Mr. Ledbetter?

25   A    Yes, she did.  We had told her -- we had told her to cut

TRIAL ONE - VOL. 23 -  4570

1   off all communication with him.  And apparently that didn't

2   happen and she had contact with him.

3      Q    Did she tell you what she told Mr. Ledbetter?

4      A    I don't believe she told me.  I think she talked to

5   Mr. Linn about that in my office.

6           Do you want me to tell you what --

7      Q    I do.

8      A    She told Mr. Linn that she had contacted Mr. Ledbetter,

9   that she had told him that she had actually proffered and

10  provided information and shared that with him.  She said that

11  his family was urging her to go see him again, and there was

12  some communication --

13     Q    Whose family was?

14     A    Mr. Ledbetter's.

15     Q    Was that conversation with Mr. Linn documented?

16     A    It was.

17     Q    I want to show you what's been marked as Government's

18  Exhibit 84-18.  And I'd like you to go to -- bear with me a

19  second -- five pages from the back.  I believe the date is

20  August 5th, 2011.

21     A    Okay.

22     Q    Is that the conversation you were talking about as

23  documented by your Amicus?

24     A    Yes.

25     Q    Do you remember the last time you talked to Ms. Fyffe?

TRIAL ONE – VOL. 23 – 4571

1    A    The last time I talked to her I think was outside the

2    prosecutor's office, me personally.

3    Q    Do you know what ended up happening to Ms. Fyffe?

4    A    She was shot.

5    Q    Do you remember how you found that out?

6    A    A Columbus police detective called me, or called my

7    office.  I remember I walked down the stairs from court that

8    day.  My office manager said something to me about it, and I

9    received a call -- or I returned a call to a Columbus police

10   officer and got some information on it.

11   Q    Did you talk to the Columbus police officer?

12   A    I did very briefly.  They wanted information about it.

13   I had privilege issues regarding communications with a client

14   so I couldn't provide much information.

15   Q    Eventually, what happened to those privilege issues?

16   A    There was a court order I think issued out of our

17   probate court, or somewhere it was waived and I was permitted

18   to divulge information.

19   Q    At that time, did you receive a subpoena from us?

20   A    I did.

21   Q    Was that subject to the documents you've testified

22   about?

23   A    It is, or was.

24        MR. DEVILLERS:  May I have a moment, Your Honor?

25        THE COURT:  Yes, you may, Mr. DeVillers.

TRIAL ONE - VOL. 23 - 4572

1    BY MR. DEVILLERS:

2    Q    When the police initially came to you, did you give them

3    information as to who -- what a possible suspect would be?

4    A    I think initially I told them that she had -- I was

5    vague.  I don't recall if I gave them an actual suspect.  I

6    referred them to the prosecutor's office in Fairfield County.

7    Q    Okay.  Did Ms. Fyffe ever, during your time period, did

8    she ever talk -- you said -- in the proffer with Gregg Marx,

9    did she deny collecting clothes for -- or bringing clothes to

10   Mr. Ledbetter after the Rodriccos Williams' murder?

11   A    She did both.  I think she denied it and then she said

12   she didn't recall, or maybe she didn't recall and then denied

13   it, but words to that effect.

14   Q    When you talked to her afterwards, did she say anything

15   more about that?

16   A    No.  She never said that she did that.

17        MR. DEVILLERS:  Nothing further, Your Honor.

18        THE COURT:  Thank you, Mr. DeVillers.  Ladies and

19   gentlemen, it's 10:40 now.

20        I take it, Mr. Durden, that you have some

21   cross-examination; is that right?

22        MR. DURDEN:  I do, Your Honor.

23        THE COURT:  We're going stand in recess until 10:55 at

24   which time we'll return with Mr. Palmer's cross-examination.

25        (Recess taken from 10:42 a.m. to 11:00 a.m.)

TRIAL ONE – VOL. 23 – 4573

1      THE COURT:  Mr. Durden, are you ready to proceed with

2  your cross?

3      MR. DURDEN:  I am, Your Honor.

4      THE COURT:  Please proceed.

5                        - - -

6                  CROSS-EXAMINATION

7  BY MR. DURDEN:

8   Q    Good morning, Mr. Palmer.

9   A    Good morning.

10  Q    My name is Aaron Durden.  I represent Robert Ledbetter,

11  and I have some questions.  You've met Mr. Berndt before?

12  A    I have.

13  Q    Let me start off by asking you a question.  You spoke

14  with a homicide detective, James Porter, on October 24th of

15  2011?

16  A    I can't recall that it was -- that was the correct name,

17  or the correct date exactly.  But, yes, I think you're

18  referring to the phone call or conversation, yes.

19  Q    And I'd like to have you read a homicide investigation

20  report.

21  A    Okay.

22      MR. DURDEN:  May I approach, Your Honor?

23      THE COURT:  Yes.

24      THE WITNESS:  Okay.

25      MR. DURDEN:  May I retrieve the document?

1    THE COURT:  Yes, you may.

2    BY MR. DURDEN:

3    Q    Now, Mr. Palmer --

4    A    Yes, sir.

5    Q    -- when questioned by James Porter, the homicide

6    detective, you stated that you did not have a smoking gun --

7    A    That's correct.

8    Q    -- in this investigation?

9         More specifically, you could only provide background

10   information, correct?

11   A    Correct.

12   Q    So my question is, you're not here to speak for

13   Ms. Crystal Fyffe.  You're simply to give information that you

14   may share that you've known during your representation, true?

15   A    Yes.

16   Q    So let's talk about that.

17        Now, I understand your first meeting with her occurred

18   on or about May the 23rd?

19   A    Correct.

20   Q    And you do exclusively criminal law?

21   A    I would say predominantly.  Exclusive -- every now and

22   then we do something else, but mostly criminal law.

23   Q    And she came to see you, as you indicated, for two

24   matters; one being a seizure of funds, 30,000-some odd dollars

25   from the DEA?

TRIAL ONE – VOL. 23 –  4575

1    A    Yes.

2    Q    And secondly, for the investigation against her

3    concerning a murder in Pickerington, correct?

4    A    Yes.

5    Q    Your retainer fee, I understand, was five thousand

6    dollars?

7    A    Yes.

8    Q    Did she pay in cash?

9    A    I don't recall.

10    Q    Do you recall whether she was employed?

11    A    I don't recall.

12        MR. DURDEN:  May I approach, Your Honor?

13        THE COURT:  Yes, you may.

14    BY MR. DURDEN:

15    Q    Can you identify that document, Mr. Palmer?

16    A    Yes.  This is an intake form that we use routinely in my

17    office.  It just is –– we give to the client when they come in,

18    and while they're out in the lobby, they fill it out with their

19    information.

20    Q    Look at page two, please.

21    A    Okay.

22    Q    Does page two indicate that she paid five thousand

23    dollars cash, correct?

24    A    It does.

25    Q    And it talks about a reference source, referral source,

TRIAL ONE – VOL. 23 –  4576

1  rather, and that being Ed Rife.  Is that Eddie Rife?

2   A    Yes.

3   Q    You represented him before as well, correct?

4   A    Yes.

5   Q    I'll get back to that a little later.

6        Go back to page one, if you can, and look at the bottom

7  left portion of that document.  And it appears that where it

8  asked whether or not she's employed, employer's name, she puts

9  NA?

10   A    Yes.

11   Q    Nonapplicable means not working or doesn't apply,

12  correct?

13   A    That's how I take it, yes.

14   Q    So she came in to pay you five thousand dollars cash.

15  Did she tell you where she got the money from?

16   A    If she did, I don't recall.

17   Q    And whereas, the funds had already -- well, the first

18  call I believe on the 23rd was a telephone call to your office,

19  correct?  Or did she come in that day?

20   A    The document is dated the 23rd.  That would tell me she

21  was in my office on that date.

22   Q    On the 23rd.

23        And do you know when the seizure of the funds occurred?

24   A    My recollection is it happened a few days after that,

25  maybe 26, 25.

TRIAL ONE - VOL. 23 - 4577

1  Q    So it seems -- I guess, whether it's going to anyone or

2  not, she had I believe a call from the DEA -- or I'm sorry.

3  Strike that.

4        She had been contacted concerning the Pickerington

5  event, correct?

6  A    Yes.

7  Q    And in the interim before she met you, her home was, you

8  know, seized and they took the funds, correct?

9  A    I don't think that was before I met with her.

10  Q    I do -- was there another meeting on the 26th?

11  A    I believe there was.  There was a meeting shortly after

12  this day.  If you're talking about the second --

13  Q    Yes.

14  A    The first on the 23rd I met with her, and then I met

15  with her on the 26th and that would have been after the money

16  was seized, correct.

17  Q    All right.  She said a lot of things concerning

18  Mr. Ledbetter?

19  A    Yes.

20  Q    And of main concern that you recall is that she was

21  quite fearful of him?

22  A    Yes.

23  Q    I'm looking at your exhibit pertaining to your Amicus

24  time sheet, and it talks about the meeting with the prosecutor.

25  But that didn't occur until some two months later, correct?

TRIAL ONE – VOL. 23 – 4578

1    A    The meeting with the prosecutor, if memory serves, was

2    July 11.

3    Q    There was an attempt -- if you can go back to your

4    Exhibit 84-18.  And there was an attempt to schedule meetings

5    throughout June?

6    A    Show me where you're --

7    Q    You don't have these pages numbered.

8    A    I got a numbered copy.  No, I don't.  Forgive me.

9         THE COURT:  Mr. Durden, if it would expedite matters,

10   if you can just approach and point to him particular pages.  Or

11   even better, if you could put the pages that you're referring

12   to on the ELMO, Ms. Clark can configure it so that you and

13   Mr. Palmer are looking at the same document.  That will

14   eliminate all of the --

15        MR. DURDEN:  These were handed to us yesterday.

16        THE COURT:  What I'm saying is Ms. Clark can configure

17   that so the only entities observing it are the parties and the

18   witness.

19        MR. DURDEN:  I understand.  I apologize.

20   BY MR. DURDEN:

21   Q    Go to the third page, sir.

22        In looking at the ELMO, page 3, it appears there was a

23   call from Ms. Fyffe?

24   A    Yes.

25   Q    June 2nd I believe she spoke with Jeffery Linn?

TRIAL ONE – VOL. 23 –  4579

1   A    This was a message taken by one of my staff to Jeffery

2   Linn.

3   Q    And it was concerning the homicide investigation,

4   correct?

5   A    Yes, it was concerning the case, yes.

6   Q    And again on June 2nd, the next page, another call from

7   Ms. Fyffe.  I apologize.  A call from Mr. Linn.

8   A    This would have been him returning the call that she

9   placed to the office.  So she -- she gave Jeff a message.  Jeff

10  returned the call.

11  Q    And on June 14th, again, a call from Ms. Fyffe.  And

12  again, it reads to Jeffery Linn.  Does it indicate whether or

13  not Mr. Linn spoke with her actually?

14  A    This is the message.  If you look, it says to Jeffery

15  Linn from Crystal Fyffe.  And down in -- it says status and

16  that says, please call.  That would have been a phone message.

17  Q    Taken by Keri Collin?

18  A    I can explain that.  Keri Collin now works for me.  She

19  didn't then.  Because of the way the permission in the accounts

20  work on the Amicus software, she would fill in whoever was

21  working at the time.  If it was a law clerk or somebody else --

22  it now says Keri Collin.  It would have been somebody else at

23  the time.

24  Q    And later that same day, same page, Ms. Fyffe called

25  again, correct?

TRIAL ONE - VOL. 23 - 4580

1    A    Yes.

2    Q    Now, it says to Jeffery Linn, the second, and the status

3    reads spoke.  Does that mean Mr. Linn did indeed speak with

4    her?

5    A    Yes.

6    Q    And he told her that Steven E. Palmer will let her know

7    the status.  Again, the question was originally, the Fairfield

8    County homicide detectives were wanting to speak with her at

9    that time?

10   A    Yes.

11   Q    Same day, one minute later, Ms. Fyffe called again

12   seeking an update?

13   A    This is probably Jeff sending me a message to call her.

14   It's only a minute later.  I would surmise from this, he hung

15   up, sent me a message to call her.

16   Q    We move on three pages to June 17th?

17   A    Yes.

18   Q    And it appears that Ms. Fyffe called and the message

19   there reads, Do we have a proffer date yet for Crystal?

20   A    Yes.

21   Q    I assume Ms. Fyffe was calling asking about the proffer

22   date?

23   A    Yes.

24   Q    Now, you talked about you negotiated a proffer with full

25   immunity.  I'll get to that a little later.  But that was full

TRIAL ONE - VOL. 23 - 4581

1   immunity before she even met with the detectives?

2   A    That didn't occur until the actual meeting day in

3   Fairfield County.  But, yes, that eventually happened.

4   Q    So let me ask, were you in contact with Fairfield County

5   throughout trying to negotiate the terms of the proffer during

6   this time?

7   A    I was in contact with Fairfield County.  I was in

8   contact with the Pickerington Police Department.  And I would

9   have had communication with a detective out there, and then I

10  would have followed up with Gregg Marx.  And we talked about

11  proffering her.  As far as negotiating the terms, I think it

12  was pretty standard.  I think we would have been assuming she

13  was proffering under typical terms, which she agrees to provide

14  information, they won't promise anything, except they won't use

15  the information against her unless she lies or they can prove

16  she's lying, or they learn information from another source.

17  Q    We turn to the next page, July 12th.  That appears to be

18  almost a month later, correct?

19  A    Yes.

20  Q    And that call is from the prosecutor Gregg Marx --

21  A    Yes.

22  Q    -- to you discussing doing a proffer?  Now, do you

23  recall, Mr. Palmer, whether or not you negotiated the terms on

24  that day or some time beforehand?

25  A    I don't recall specifically.  But it would make sense

TRIAL ONE – VOL. 23 –  4582

1   that we actually talked about a proffer letter and an agreement

2   for her.

3      Q    The following page, again, for informational purposes,

4   that you scheduled a meeting at two o'clock on a Thursday,

5   correct, the following page?

6      A    Yes.

7      Q    So I take it at this point, the seizure of the money had

8   been resolved, nothing more to do there, correct?

9      A    Correct.

10     Q    So your sole representation of Ms. Fyffe dealt with the

11  proffer?

12     A    Yes.

13     Q    So let's go into the meeting.  She denied any

14  involvement, true?

15     A    She denied any involvement in the Rodriccos killing.

16     Q    And we are talking about Rodriccos Williams' killing,

17  correct?

18     A    Yeah.  That's what you're asking me about, yes.

19     Q    Because the meeting seemed to go off into issues about

20  other people and other things.  But the purpose of this meeting

21  was to talk about Rodriccos Williams?

22     A    Which meeting are we talking about?

23     Q    The one held on July 14th, 2011.

24     A    With the prosecutors?

25     Q    Yes.

TRIAL ONE – VOL. 23 – 4583

1    A    That was the purpose, yes.

2    Q    And did they begin asking questions about other issues

3  as well?

4    A    My recollection, it was fairly limited to Mr. Ledbetter

5  and what she knew about Rodriccos and that homicide.

6    Q    Okay.  She denied disposing of any clothes, correct?

7    A    She did, or at least said she didn't recall doing it, or

8  both.

9    Q    And so the only thing she acknowledged was the Googling

10  of an address in Pickerington, correct?

11    A    Correct.

12    Q    So you talked about the word crew.

13    A    Yes.

14    Q    Yet the crew that she mentioned was different from the

15  crew that you talked about at a later time when you talked

16  about other people?

17    A    I don't know that to be true.

18    Q    Well, she wasn't present, correct, at this homicide

19  event?

20    A    That's right.  Well, as far as I know.

21    Q    And you don't know otherwise?

22    A    I don't know otherwise, no.

23    Q    She talked about a crew.  She did not give any names of

24  who may have been there because she wasn't there, so she says,

25  correct?

TRIAL ONE - VOL. 23 -   4584

1    A    I think she did give me some names.  I think in my notes

2    I did write down some names.  How she knew they were there, I

3    don't know.  I was just writing down what she was telling me.

4    Q    I'll get back to that in a moment because you gave --

5    I'll get back to that.

6         You met with her about four hours?

7    A    The proffer down in Fairfield County -- there is a

8    notation in my file that the whole thing took four hours,

9    including travel time.  It's about an hour down, hour back.  So

10   maybe a couple hours there.

11   Q    Do you recall taking -- being present at a hearing on

12   December 1st?

13   A    Yes.

14   Q    And during that time, Mr. Berndt asked a question

15   concerning what crew was there.  Do you recall being asked that

16   question?

17   A    Not specifically.

18   Q    Do you recall mentioning individuals but you didn't know

19   the names that were present at this event?

20   A    I don't recall it specifically.  But I know my notes

21   indicate that she gave names, but I didn't write down what the

22   names were.

23   Q    There were no names given, correct?

24   A    In Fairfield County?

25   Q    Yes.

1    A    No.  She gave names and phone numbers.

2    Q    Well, she gave names and phone numbers pertaining to a

3    crew that related to Elijah Ledbetter and who he may have hung

4    out with, correct?

5    A    Yeah.

6    Q    At the end of the meeting, correct?

7    A    Towards the end of the meeting, correct.

8    Q    But we're talking about the murder in Pickerington.  She

9    did not give names of a crew for that event, correct?

10   A    Did she name the people that -- I don't recall if she

11   actually did or not.  She gave names -- I'm sorry.  We're

12   talking about two different things.  She gave names, at the

13   end, of these folks Mr. Ledbetter told her to put in her phone.

14   And she gave those names and phone numbers.

15        As far as who was at the Rodriccos homicide, whether she

16   actually mentioned names specifically or not, I don't recall.

17   Q    Okay.  And back to the phones -- back to the names in

18   the phone, or the people that she claims Mr. Ledbetter put in

19   her phone, you were only able to mention one name, that being

20   Santa Clause, correct?

21   A    Yes.

22   Q    But isn't it true that she mentioned that name as a

23   person she may call if she needs protection?

24   A    That was the purpose that she had that name, yes.

25   Q    Thank you.  So the only information concerning the

TRIAL ONE - VOL. 23 - 4586

1    homicide is that for the Google search, correct, that she

2    acknowledged she did?

3     A    That was part of the information she gave, yes, about

4    the Google search.

5     Q    She did share with the investigators that Mr. Ledbetter

6    was into real estate, purchasing real estate, correct?

7     A    She did.  Well, she said that he was involved in real

8    estate and, therefore, she wasn't necessarily surprised at the

9    time she got the call to look up an address, she didn't think

10   much of it.

11    Q    Didn't think much of it.

12         Now, I think I asked you earlier -- and Ms. Fyffe was

13   referred to you by an individual named Ed Rife?

14    A    Yes.

15    Q    And was there a potential conflict in your office to

16   represent both Ms. Fyffe and Mr. Rife?

17    A    I don't believe so.

18    Q    Was that issue discussed in your office?

19    A    I would have had a conversation with her.  I don't

20   recall how she knew Mr. Rife.  But, if that came in like that,

21   I would make sure that we didn't have a conflict.  So it

22   wouldn't surprise me if I asked her if she knew Ed Rife, how

23   she knew Ed Rife, does she have a problem with us representing

24   him, or if there is a conflict of interest.

25    Q    Without asking what that conflict was, I'd like you to

TRIAL ONE – VOL. 23 – 4587

1   refer to your –– do you have your notes up there with you

2   still, handwritten notes, 84-9-21?

3   A    Yes.

4   Q    Well, not 21.  That's not the page, but...

5   A    What page are you on?

6        MR. DURDEN:  Give me a second, Your Honor.

7        THE COURT:  Yes.

8   BY MR. DURDEN:

9   Q    Page 24.

10  A    Okay.  I got page 24.

11  Q    And it reads there that client details spun off into

12  details about Eddie?

13  A    Okay.  Yeah.

14  Q    And you asked if client had a problem representing her,

15  correct?

16  A    If we had –– if she had a problem with us representing

17  her.

18  Q    Because that was a conflict of interest, correct,

19  potentially?

20  A    It doesn't say potential conflict of interest.  But that

21  would have been the gist of that.

22  Q    As lawyers, we know if we don't ask and we got a

23  problem, it may be a potential conflict?

24  A    Yes, that would have been the gist of it.

25  Q    Mr. Rife pled guilty to drug possession, correct?

TRIAL ONE - VOL. 23 - 4588

1    A    He did.

2         MR. DURDEN:  Request side-bar, Your Honor, if I may.

3         THE COURT:  All right.

4                        - - -

5    (The following proceeding was held at side-bar.)

6         THE COURT:  Go ahead, Mr. Durden.

7         MR. DURDEN:  I'm just trying to be cautious and not go

8    too far with the representation of Mr. Rife concerning his drug

9    dealing and his conviction.  But it does -- I want the Court to

10   guide me as to how far I can go because you did make a ruling

11   on that issue as to whether we can ask about the conviction

12   itself, but not the information about --

13        THE COURT:  -- the underlying.  What about the -- this

14   is going to sound like a facetious retort, and I don't mean it

15   that way.  But what about my ruling is unclear?  I don't mean

16   it that way, but that's the question.

17        MR. DURDEN:  Well, I guess I'll ask the government

18   whether or not it knows if there's any similarity between the

19   representation of Ms. Fyffe and Mr. Rife.

20        MR. DEVILLERS:  I don't.  I'm not sure why it would be

21   relevant.  I just don't know where you're going.

22        MR. DURDEN:  He's dealing.  She's dealing.

23        MR. DEVILLERS:  What's that --

24        MR. DURDEN:  He's a dealer and she's a dealer and that

25   issue is going on come up in a moment.  I'll bring up another

TRIAL ONE - VOL. 23 - 4589

1    name as well.

2         THE COURT:  I think that the rule was fairly clear

3    that you could establish a fact of conviction but not the

4    underlying details, because it's not particularly germane on

5    the issues in this case.  And that's it.

6         MR. DURDEN:  Okay.

7         THE COURT:  All right.

8         MR. DEVILLERS:  Are you saying that Mr. Palmer has a

9    conviction?

10        THE COURT:  No.  He's saying Rife has a conviction.

11   He's not talking about Palmer.

12      (The following proceeding was held in open court.)

13        THE COURT:  Mr. Durden, please continue.

14   BY MR. DURDEN:

15   Q    Mr. Palmer, on May 23rd, 2011, had your case concluded

16   with Mr. Rife for his drug possession and conviction?

17   A    I knew you were going to ask me that, and I don't

18   recall.  I don't remember when that case resolved.

19   Q    So back to the meeting itself, the -- did it last two

20   hours or four hours, because you billed for four hours?

21   A    I billed for four hours including travel time.

22   Q    How far was the journey back and forth?

23   A    45 minutes, maybe an hour.  So whatever the difference

24   would be.

25   Q    Was the meeting interrupted on more than one occasion?

TRIAL ONE – VOL. 23 –   4590

1    A    What do you mean interrupted?

2    Q    Based upon her crying and --

3    A    I think we took a couple of breaks for her where I

4  talked to her, make sure she's all right and stressed to her to

5  tell the truth, whatever it would be.  I think there were a few

6  breaks like that.

7    Q    And when the meeting ended, you walked outside with her?

8    A    Yes.

9    Q    And how long did that conversation go on?

10    A    Ten minutes maybe, 15 minutes.

11    Q    At that time, you indicate you saw a letter?

12    A    Yes.

13    Q    Which you interpret as a threatening letter to

14  Ms. Fyffe?

15    A    Yes.

16    Q    Did she throw it in the trash?

17    A    I didn't see her throw it in the trash.  I don't know, I

18  guess, is the right answer to that.

19    Q    Did she share the letter with the homicide investigators

20  at Fairfield?

21    A    No.

22    Q    Did you ask her why?

23    A    She was afraid.  I wanted to go in and say, let's go

24  back in, we can talk to them, they're all here, we can show

25  them this letter.  We probably even discussed them getting some

TRIAL ONE – VOL. 23 – 4591

1 help or protection for her, if she were that afraid. She

2 wouldn't let me do it.

3 Q    That was part of the conversation, getting protection

4 for her, during the meeting with the prosecutor?

5 A    I don't know that it was specifically discussed. But it

6 might have been. She was concerned about her safety. And

7 whether she brought up the witness protection program or

8 something like that, that was part of the conversations at some

9 point. Exactly when I don't recall. And I don't know that I

10 would have given much credence to it. We were dealing with

11 state court prosecutors. But she was afraid.

12 Q    I asked earlier whether or not the conversation went off

13 to other issues against other individuals. Do you recall

14 whether or not a Mike Fuller's name had been mentioned?

15 A    I don't specifically. Might have been.

16 Q    Do you recall whether or not Ms. Fyffe acknowledged that

17 she kept money at her mother's residence for Mike Fuller?

18 A    I do recall something like that, yes.

19 Q    Did that come out during the meeting?

20 A    I would have to check my notes. If it's in the notes,

21 it probably did.

22 Q    Did that also occur during your meeting in your office

23 on May 26th, 2011?

24 A    Again, if it's in my notes, I would say yes.

25 Q    You know Mike Fuller to be a drug dealer?

TRIAL ONE - VOL. 23 -  4592

1   A    I don't know Mike Fuller one way or another.

2   Q    Back to those numbers on the phones.  There were many

3   numbers given on the phones of individuals.  You only mentioned

4   one today.  But the series of numbers given were persons who

5   Ms. Fyffe said -- well, as told by you, that's what she told

6   you, rather, that she could call if she needed protection,

7   correct?

8   A    That was why -- her explanation for having them in the

9   phone.  She was providing those names because she was -- I

10  mean, they would tell her, look, Mr. Ledbetter is in jail, we

11  got him in custody, you're safe.  She said, You don't

12  understand.  His people will hurt me.  That kind of

13  conversation.  Here's the people who will do it.  He gave me

14  these phone numbers and names because I can call them because

15  of protection, but here is the people that work with him that

16  I'm afraid of.  It was that kind of conversation.

17  Q    So as it goes, the names given to her were the result of

18  persons to protect herself, correct?

19  A    That was the reason she told me Ledbetter gave her the

20  names.

21  Q    And you know in the end, at the end of that meeting with

22  Prosecutor Marx, they did not believe her, correct?

23  A    I don't think they did.  I think they thought that she

24  knew more about disposing of clothing, or something along those

25  lines, and that Earl Williams had said that she had disposed of

TRIAL ONE - VOL. 23 - 4593

1    clothing.  They wanted her to say she helped dispose of

2    clothing.  She never said that.

3       Q    Can we agree she gave no useful information?

4       A    I don't know that I can agree with that.  I don't know

5    what was useful to them or not.  It wasn't what they wanted to

6    hear.

7       Q    The meeting was in 2011.  Nothing came as a result of

8    it, correct, by way of an investigation for the Rodriccos

9    Williams killing, correct?

10      A    I don't know what they did with it.

11      Q    Then let's turn to the contact with Mr. Ledbetter.  Had

12   she told the prosecutor that she had been -- had been in

13   contact with Mr. Ledbetter?

14      A    I don't think she did.

15      Q    She withheld that information, correct?

16      A    If she didn't tell them, she withheld it.

17      Q    Did she tell you that she had been in contact with

18   Mr. Ledbetter prior to the meeting with the prosecutors?

19      A    Not that I recall.  She may have said that he was trying

20   to contact her.  I would have told her not to have any contact

21   with the guy.  If she had contact with him, it would have been

22   against my advice.

23      Q    Did she say Mr. Ledbetter had been trying to call her?

24      A    I don't recall.  Eventually, she did because we had

25   that -- we got messages afterwards.  But I don't recall her

TRIAL ONE - VOL. 23 -  4594

1   telling me that in real time before that meeting.

2     Q    Well, since you represent criminal defendants, do you

3   know where Mr. Ledbetter may have been housed during this time

4   in May of 2011?

5     A    In May of -- I don't know when he was placed in custody.

6   I don't know when he was arrested.  Later on, my understanding

7   is he was in jail.

8     Q    Franklin County?

9     A    I don't know if it was Franklin or Fairfield.  I think

10  the case came out of Fairfield County so I'm guessing Fairfield

11  County.

12    Q    Have you accepted collect calls from client from jails

13  yourself?

14    A    I have.

15    Q    Knowing those calls are being recorded?

16    A    Yes.

17    Q    The point being you have to accept the collect call,

18  correct?

19    A    Yeah.  I mean, if somebody calls me collect and I don't

20  want -- if I want to talk to them, I have to accept it.

21    Q    Did Ms. Fyffe share with you that she accepted the calls

22  of Mr. Ledbetter on more than one occasion?

23    A    At some point, I think we knew that.  But I don't know

24  that I knew in the middle of the case as I was representing her

25  that that had been going on.  I don't know, I guess, is the

TRIAL ONE - VOL. 23 -  4595

1  answer.

2  Q    You would agree that's inconsistent of someone who

3  claims to be afraid of another, to take their collect call?

4  A    I don't know that I would agree with that.

5  Q    Let's talk about visitation.

6  A    Okay.

7  Q    You visited clients in Franklin County jail yourself?

8  A    Yes.

9  Q    And you do know there's a log, correct?

10  A    Yes.

11  Q    A visitation log.  And you are aware that Ms. Fyffe

12  visited Mr. Ledbetter on at least one occasion, correct?

13  A    Yes.

14  Q    Maybe even two, attempted to use a fake ID to get in to

15  see him?

16  A    I don't know -- I don't know that personally.  I was

17  asked questions about that I think at the last hearing.

18  Q    Did Ms. Fyffe tell you she went to see Mr. Ledbetter in

19  jail?

20  A    She later told -- after that meeting, I think she told

21  us in a communication with Mr. Linn in my office that she had

22  visited him.

23  Q    And I'll ask the same question, sir.  Would you consider

24  someone who is afraid of another a reasonable step to go visit

25  them while they're in jail?

TRIAL ONE - VOL. 23 -  4596

1    A    Is it reasonable?

2    Q    Strike that.

3         Someone who claims to be afraid of another, would they

4    go see them in jail?

5    A    They might.  I mean, I don't know what her motivation

6    was.  If you're asking me was she still afraid, my impression

7    was she was afraid of the guy.  And whether she was going to

8    see him to tell him that it's all right, I'm not really

9    cooperating, I'm not telling them anything, whether she was

10   going to see him to give him something to protect herself, or

11   whether she was going to see him for some other reason, I don't

12   know.

13   Q    You don't know.  So you're speculating, right?

14   A    Yeah.

15   Q    But the records do indicate she seen him and she told

16   you that, correct?

17   A    She told me she had gone to see him after the proffer.

18   Q    Now -- and again, I'm going back to the

19   December 1st hearing.  Mr. -- Ms. Fyffe, rather, was offered

20   full immunity prior to the meeting, correct?

21   A    Correct.

22   Q    You negotiated a heck of a deal, didn't you, full

23   immunity no matter what she said?

24   A    That was pretty much the deal.

25   Q    Still she had nothing to say?

TRIAL ONE - VOL. 23 -   4597

1    A    Still she said -- she denied doing anything with the

2    clothing.

3    Q    And she even told you that she shared with Mr. Ledbetter

4    that she had nothing to say?

5    A    I don't know that she told me that.

6    Q    Well, 84-12-, I believe it's 18.  You were asked on

7    direct whether or not she --

8    A    You mean afterwards?

9    Q    Yes.

10   A    Yeah, we were told afterwards.  We had telephone

11   communication with Jeff Linn where she told Jeff she had gone

12   to see him.  His family was asking her to go see him again.

13   Q    And she told Mr. Ledbetter she had nothing to say?

14   A    Yes.

15   Q    So we can reasonably conclude she had nothing to fear,

16   correct?

17   A    I can't conclude that.

18   Q    You're aware that Ms. Fyffe also wrote letters to

19   Mr. Ledbetter, correct?

20   A    I don't think I ever saw any letters.

21   Q    Well, did she share with you that she had written him

22   letters as well?

23   A    She may have.  If it's in my notes --

24   Q    Well, I'm asking you.

25   A    I don't recall independently, but...

TRIAL ONE - VOL. 23 - 4598

1  Q   So again, we've talked about Ms. Fyffe accepting phone

2  calls, visiting Mr. Ledbetter in jail and writing him letters?

3  A   Yes.

4  Q   That does seem inconsistent with someone who is fearful

5  of their life.  Would you agree to that?

6  A   Again, I don't know that I can agree with that.  She

7  was -- every communication I had with her, she was scared of

8  the man.  And what she was telling him outside my communication

9  with her, I don't know.  But it seemed genuine to me, when she

10 was telling me that, that she was fearful.

11 Q   Okay.

12 A   And whatever conclusion you want to draw from the rest

13 of it, I guess it is what it is.

14 Q   Let me ask this way.  At the conclusion of the meeting

15 with the prosecutor in Fairfield County, they believed

16 Ms. Fyffe misrepresented statements, correct?

17 A   They thought that she was holding -- my impression of it

18 just looking at the dynamic of the room, is they thought she

19 was withholding information.  They were very -- they wanted her

20 to say she had helped dispose of clothing and other items.  She

21 never did.  My impression was they didn't believe that.

22 Q   So she said no, correct?

23 A   She said no.

24 Q   And they feel she did?

25 A   That was my impression of it, yeah.

TRIAL ONE - VOL. 23 - 4599

1    Q    That's a misrepresentation.  Would you agree?

2    A    I guess if they're right, yes, it would have been a

3   misrepresentation.  If they're wrong and she was telling the

4   truth -- I don't know if that statement was true or not.  I

5   don't know if she helped dispose of clothing, I guess, is what

6   I'm saying.  She always denied it.

7    Q    She told you she was fearful of Mr. Ledbetter, yet she

8   continued to write him, received his phone calls and go visit

9   with him?

10   A    Yep.

11   Q    That omission in and of itself is a form of

12   misrepresentation.  Can you agree?

13   A    The omission of what?

14   Q    Of telling you these are the things she's doing.

15   A    She didn't tell me that stuff.  And it's information I

16   would have wanted to know.  I would be telling all along, don't

17   have any communication with the guy, cut it off completely.

18   Q    Actually, you told her not to have communication with

19   him?

20   A    No question about it.

21   Q    On July 14, 2011?

22   A    I probably told her that in July.  I probably told her

23   that in May.  And I probably told her that in June.

24   Q    If I were to represent to you there have been one, two,

25   three, efforts of communications beyond that date, would you

TRIAL ONE - VOL. 23 - 4600

1   consider that an act that you'd advise a client not to do?

2   A    Yes.

3   Q    Especially of someone who is so fearful of her life?

4   A    In this case, it was directly contrary to my advice for

5   her to have contact with the guy.

6   Q    Let's turn to the shooting itself, October 19th, 2011.

7        Represent to you that Ms. Fyffe had two phones near her

8   at the time of her death, as well as seventeen hundred and I

9   believe forty-eight dollars in her pocket, correct?

10  A    I have no idea.

11  Q    Were you told that by others?

12  A    No.  That's the first I've heard of it.

13  Q    And you already acknowledged she had no source of income

14  by way of no employment, correct?

15  A    In her form, she said she wasn't employed.

16  Q    Was not?

17  A    Was not employed, correct.

18  Q    And $1,700 in her pocket and two cell phones.  You do

19  criminal defense work, correct?

20  A    Yes.

21  Q    Is that indicative of someone who is in the drug

22  business?

23  A    Could be.

24  Q    Now, again, this is October, five months after the

25  arrest of Mr. Ledbetter.  Can we agree that Mr. Ledbetter and

TRIAL ONE - VOL. 23 - 4601

1   Mr. Fyffe had no direct contact with each other via him being

2   outside of jail and her being -- living in the community still?

3   A    Did she -- did she have any communication with him --

4   Q    Direct contact, you know, person to person.

5   A    If she visited him in jail -- aside from her visits in

6   jail, I don't think -- I think he was in jail and she was out

7   of jail.

8   Q    So it's reasonable to conclude that any activities that

9   Ms. Fyffe may be engaged in during this time really had no

10  bearing on Mr. Ledbetter, correct?

11  A    I have no idea.

12  Q    I asked you earlier about the conflict of interest.  And

13  since we began talking, does it help you recall when Mr. Rife

14  pled guilty to this drug conviction?

15  A    I don't know -- I can't recall when he pled guilty.  For

16  some reason I think it might have been after that.  If I -- I

17  didn't have information from Ms. Fyffe that she was engaged in

18  drug trafficking with Mr. Rife.  If I would have had that

19  information, I wouldn't have represented her.  Whether she knew

20  something about Mr. Rife, whether she knew the guy or anything,

21  the notes seem to say that, but --

22  Q    Yet you asked about a conflict of interest, right?

23  A    Yeah.  I asked her if she had a problem with us

24  representing her.

25  Q    I guess we're not privy to know why, sir.

TRIAL ONE - VOL. 23 - 4602

1    MR. DURDEN:  But may I have a minute, Your Honor?

2    Side-bar, Your Honor.

3                    - - -

4    (The following proceeding was held at side-bar.)

5    THE COURT:  Yes, Mr. Durden.

6    MR. DURDEN:  Your Honor, it's my intent to put up on

7    the ELMO and even publish for the jury potential names of

8    individuals who we contend are not associated with the Short

9    North Posse and to make the point of names that were given to

10   Mr. Palmer via Ms. Fyffe.  The government -- well --

11   MR. DEVILLERS:  I have no problem.  We have no problem

12   admitting the entire document.  Some of it -- we would like the

13   entire document.  We have no problem with the entire document

14   coming into evidence.

15   MR. GATTERDAM:  It may have been my issue because I

16   think I said something to Mr. DeVillers.  I don't have a

17   problem with them putting up that list because, quite frankly,

18   I was going to do that.  But I don't believe that opens the

19   door to the entire document.  I was just going to do it for

20   purposes of asking him a question or two so either the jury

21   could see it or --

22   THE COURT:  Then you run into 106 issues.

23   MR. GATTERDAM:  I understand.  If I could simply show

24   it to him.  I don't think this entire document is admissible as

25   other evidence that's been testified to.  It's notes.

TRIAL ONE - VOL. 23 - 4603

1    THE COURT:  Here is my point.  You all are the best of

2  the best.  So, if you make a strategic decision to produce a

3  part of a document, you know that opens the door for 106

4  concerns.  It doesn't mean that 106 will compel the Court to

5  admit the entire document.  The purpose of 106 is to prevent

6  someone from putting in a portion of the document, if only that

7  portion would remain -- would be out of context and would lead

8  to a misimpression.  If you put in a portion and that portion

9  creates a misimpression because it's taken out of context and

10  you would need other portions of the document to put your

11  portion into context, then 106 interests would be implicated,

12  and I may admit all or another portion of a document.

13    I haven't studied this document.  So -- and it's been a

14  while since I think I've seen any of it.  I don't know what

15  Mr. Durden is going to put in.  I don't know whether

16  Mr. DeVillers will say, Judge, I need the rest of this in so

17  that one portion won't mislead the jury.

18    I just can't say.  It's almost, you know, a hypothetical

19  at this point because I don't know what they're going to do.

20    MR. GATTERDAM:  That's the reason that I sort of asked

21  for the side-bar because I don't either.  And if the entire

22  document is coming in, I do object.  If he's simply showing the

23  witness, hey, what's the list, then I don't object.

24    THE COURT:  Maybe over the -- I don't know what to

25  suggest.  It's a tactical decision that you have to make, and I

TRIAL ONE - VOL. 23 -  4604

1   can't give guidance because I don't have a ripe issue before

2   me.  So if there's nothing else -- is there anything else that

3   we need to take up?

4          MR. MEYERS:  Your Honor, could I ask we have 45 or 60

5   seconds right here with these defense lawyers instead of asking

6   for a full break?

7          MR. DEVILLERS:  You don't want me to stick around?

8          (Defense lawyers conferred at side-bar off the record

9   and out of hearing of the jury.)

10          THE COURT:  Are you ready to proceed, Mr. Durden?

11          MR. DURDEN:  Yes, Your Honor, I am.

12          THE COURT:  Please proceed.

13   BY MR. DURDEN:

14   Q    Two follow-ups.  You recall during the meeting in your

15   office on May 26th, 2011, that Ms. Fyffe indicated that Earl

16   Williams said that she disposed of clothes, correct?

17   A    I don't know if that happened on May 26th, but I do

18   remember her telling me that.  Early on, she told me -- at some

19   point, I learned that it was Earl Williams that was accusing

20   her -- had given information to the authorities that she had

21   helped dispose of clothing.

22   Q    And she denied that?

23   A    Yes.

24   Q    She denied it to you as well as during the meeting on

25   July 14th?

TRIAL ONE – VOL. 23 – 4605

1    A    Yes.

2    Q    I want you to go, then, to your Exhibit 84-9.  And thank

3  you for numbering the pages.  Page 23?

4    A    I don't know that I did.  But you're welcome.

5    Q    I want you to look at the bottom half of that

6  handwritten document.  And is this your writing?

7    A    This is Jeff Linn's writing.  Page 23 of 84-9?

8    Q    Yes, your office notes.

9    A    Yes.  That's Jeff Linn's writing.

10   Q    Do you see it reads, Lead gave several ampersand,

11  numbers, correct?

12   A    Yes.

13   Q    You mentioned the name Santa Clause, correct?

14   A    Yes.

15   Q    And a point, I guess, earlier was that these are the

16  numbers to call if she needed help, if she was in trouble,

17  correct?

18   A    Let me be clear.  I just want to be clear.  She told us

19  that Mr. Ledbetter gave her these names to put in her phone for

20  that purpose.  But she was giving us these numbers because she

21  was afraid that something could happen to her.

22   Q    All right.

23   A    And it was both.  So...

24   Q    And the names given did not include Christopher Harris,

25  correct?

TRIAL ONE – VOL. 23 –   4606

1    A    I think that's –- yeah.  I don't see his name.

2    Q    It did not include Rashad Liston, correct?

3    A    Correct.

4    Q    It did not include Deounte Ussury, correct?

5    A    Correct.

6    Q    Nor Clifford Robinson, correct?

7    A    Correct.

8    Q    You also mentioned a crew before, and that crew

9  pertained to Elijah Ledbetter?

10    A    I don't know.  I think that was his brother.  I don't

11  know if he was the crew she was talking about or –- I can't

12  recall.

13    Q    You don't recall any information concerning

14  Mr. Ledbetter being a part of a crew.  Isn't that correct?

15    A    Elijah Ledbetter?

16    Q    No.  Brandon Ledbetter.

17    A    She said he had a crew.  Whether he was part of it, I

18  don't know if that's semantics.  But, no, she didn't say –- I

19  don't know.

20         MR. DURDEN:  One last topic, and I apologize.

21         May I approach, Your Honor?

22         THE COURT:  Yes, you may.

23  BY MR. DURDEN:

24    Q    I'm showing you what's marked as Exhibit 84-19.  Can you

25  take a moment and read the typewritten portion in the middle,

TRIAL ONE - VOL. 23 - 4607

1  please?

2  A    Okay.

3  Q    So when you were asked about Ms. Fyffe being shot, you

4  referenced that Mr. Ledbetter had shot her, correct?

5  A    That's what she told us.

6  Q    Yet this appears to be a preliminary investigative

7  report on January 17th, 2009, for aggravated assault, correct?

8  A    Yes.

9  Q    Wherein she was questioned by Detective Delbert Chapman?

10  A    That's correct.

11  Q    And during that time, she stated that a group of M,

12  slash, B - black males - were involved in an argument and that

13  as she got closer to the group she was shot?

14  A    Yes.

15  Q    And that her boyfriend picked her up?

16  A    Yes.

17  Q    And took her to the hospital?

18  A    Correct.

19  Q    Do you know, in fact, that's what she told the police at

20  the hospital, correct?

21  A    I don't know.

22  Q    And she made application for Social Security

23  Administration giving this circumstance as a basis for an

24  injury as well, correct?

25  A    I don't know that.

TRIAL ONE - VOL. 23 - 4608

1      MR. DURDEN:  No further questions on direct -- on

2  cross-exam, Your Honor.  Thank you.

3      THE COURT:  Thank you, Mr. Durden.

4     Mr. Gatterdam.

5      MR. GATTERDAM:  May I proceed, Your Honor?

6      THE COURT:  Let me -- just a second.

7      MR. GATTERDAM:  Sure.

8      THE COURT:  Please proceed, Mr. Gatterdam.

9                     - - -

10                 CROSS-EXAMINATION

11  BY MR. GATTERDAM:

12  Q    Mr. Palmer, how are you doing?

13  A    I'm doing well.  Thank you.

14  Q    So just a couple of areas I want to get into with you.

15  So you start representing Ms. Fyffe in 2011 around May,

16  correct?

17  A    Yes.

18  Q    And it's at that point in time -- at some point in time

19  shortly thereafter that you learn that she was seeing or had

20  seen a person named Robert Brandon Ledbetter, correct?

21  A    Yeah.  He was discussed in our first meeting.

22  Q    So it's at that -- at some point in time in 2011,

23  shortly after your meeting that there's this list that we've

24  been talking about that's given out, or names to put in a

25  phone, correct?

TRIAL ONE – VOL. 23 –   4609

1    A    Yes.

2    Q    And you made a note of that in your notes that you've

3    talked about, correct?

4    A    The one I just looked at was Mr. Linn's notes, but our

5    office notes reflect that, yes.

6    Q    So your notes, Mr. Linn's notes, it's in the office

7    file, correct?

8    A    Correct.

9    Q    As you sit there right now, I bet you can't tell me the

10   names of those people on that list, correct?

11   A    I just remember Santa Claus.

12   Q    Can you remember all the names that were given to you?

13   A    No.

14   Q    Would it help to refresh your recollection to take a

15   look at that list?

16   A    Sure.

17   Q    Okay.  And you're going to go old school and take a look

18   at your notes, or I can have the document put up if you'd like?

19   A    Whatever you please.

20   Q    Why don't we do 84-9-023, please.

21   A    I've got it.  Old school.

22   Q    Old school, see, always prevails.  Do you see that list,

23   sir?

24   A    I do.

25   Q    I know you were asked some questions about that.  Could

TRIAL ONE - VOL. 23 - 4610

1   you -- you mentioned Santa Claus.  Could you read the other

2   names on that list?

3   A    Sure.  They're numbered.  One, Arod.  Two, Ba, B-A.

4   Three, Crazy.  There's a parentheses with quote Hen, end quote,

5   parentheses.  Four, Lil Darryl, L-I-L Darryl.  Five, Mizzle.

6   Six, Santa Claus.  Seven, SK.

7   Q    And I know you were asked this, but there's no --

8   there's no name of Christopher Harris on that list, correct?

9   A    Correct.

10  Q    And there's no name of O-Dog on that list either, is

11  there?

12  A    Not on that list.

13  Q    So were you aware at that point in time -- and when I

14  say that point in time, I'm talking 2011 during your

15  representation -- that Christopher Harris was in prison?

16  A    I have no knowledge of that one way or another.

17  Q    And obviously, you wouldn't have had any reason to,

18  correct?

19  A    Correct.

20  Q    I mean, unless you had done other research or whatever

21  and looked it up on the Web site for the DRC, right?

22  Otherwise, you would have no knowledge?

23  A    Correct.

24  Q    So then, if we could also take a look at 84-9-013.

25  That's going to be 013 in your notes.  And you're going to brag

TRIAL ONE – VOL. 23 –  4611

1   and get to it before --

2   A    I got it.

3   Q    I actually may need to see that.

4        MR. GATTERDAM:  Agent Lauber, do you mind highlighting

5   that very bottom part?

6   BY MR. GATTERDAM:

7   Q    Do you see the area we're talking about on the screen,

8   Mr. Palmer?

9   A    I do.

10  Q    Okay.  And so at that point in time, there's sort of in

11  the side of that the word Elijah, correct?

12  A    Yes.

13  Q    And your note, if I'm reading it correctly -- and your

14  penmanship is about as good as mine.  It says Brandon's

15  brother; is that correct?

16  A    That's brother, yes.

17  Q    And what's below that?  Is it "hung with these guys"?

18  A    Yes.

19  Q    Okay.  And then it gives two names.  And those names

20  are --

21  A    It's -- one is Old Dog.  The other is Young Buck dash

22  Buckwheat.

23  Q    Okay.  And you were specifically asked about this.  Do

24  you remember testifying in a previous proceeding --

25  A    Yes.

TRIAL ONE - VOL. 23 -  4612

1    Q    -- involving this matter?

2         And tell me if you believe this is correct what you said

3    on page 55.

4         Mr. Berndt asked you this question:  The reference to

5    Old Dog and Buckwheat was in reference to people that

6    Mr. Ledbetter's brother hung out with, correct?

7         Hung out with, comma, correct.

8         And your answer was, That's what the notes said, yes.

9         So that's what this note is in reference to, correct?

10   A    Yeah.

11        MR. GATTERDAM:  Nothing further.

12        THE COURT:  Thank you, Mr. Gatterdam.

13        Ms. Dixon, any questions?

14                        - - -

15                  CROSS-EXAMINATION

16   BY MS. DIXON:

17   Q    Good afternoon, Mr. Palmer.

18   A    Good afternoon.

19   Q    I believe you testified that you first met with Crystal

20   Fyffe sometime in May of 2011?

21   A    Yep.

22   Q    And she retained you for two matters, right?

23   A    Yes.

24   Q    One was some money that she had, right?

25   A    Yes, the 30,000.

TRIAL ONE - VOL. 23 -  4613

1   Q    And an investigation that she thought she could possibly

2   be a defendant?

3   A    Yes.

4   Q    And when you -- and you didn't know her prior to that,

5   did you?

6   A    No.

7   Q    So that was your first meeting with her ever?

8   A    Yes.

9   Q    Okay.  And she got information from you, right?  You

10  accepted her as a client?  Let me put it that way.

11  A    Yeah.

12  Q    And in your accepting her as a client, did you talk to

13  her about the issues of confidentiality?

14  A    Yes.

15  Q    And so -- and as a lawyer, you would let her know

16  whatever she told you was, in fact, confidential, correct?

17  A    Yes.

18  Q    And no matter what she told you, it was confidential,

19  right?

20  A    Yes.

21  Q    Of course.  And so with that being said, she never told

22  you that she disposed of any clothing, did she?

23  A    That is true.

24  Q    And so did you believe her?

25  A    I don't know that I believed her or not.  You know, she

TRIAL ONE - VOL. 23 - 4614

1   stuck to it.  I don't know that it was true.  I don't know that

2   it wasn't.  I don't know -- I don't remember forming a belief

3   about it at all.

4   Q    Is it fair or unfair to say that there could have been

5   trust issues between you and your client?

6   A    No, that's not true at all.

7   Q    You believe she trusted you?

8   A    Yes.

9   Q    And you trusted her?

10  A    She was my client.

11  Q    Okay.  So when --

12        THE COURT:  I'm sorry.

13        Mrs. Evans, could you read back Ms. Dixon's last

14  questions to Mr. Palmer?

15        THE COURT REPORTER:  "Question:  And you trusted her?

16        "Answer:  She was my client."

17        THE COURT:  Mr. Palmer, did you understand the

18  question?

19        THE WITNESS:  I did.  I would be happy to explain what

20  I meant by that answer.

21        THE COURT:  You may explain it.  But remaining true to

22  my gatekeeping function for this jury, I want to make sure that

23  the record is clear that the questions are responsively

24  answered.  That answer was unresponsive.

25        Could you first answer the question?  And if you feel

TRIAL ONE – VOL. 23 –  4615

1    the need to explain your answer, you may do so.

2          First answer it.

3          THE WITNESS:  I guess I was -- I trusted her as my

4    client.  I don't know that I would have trusted her outside

5    that realm.  That's what I meant by that.

6    BY MS. DIXON:

7    Q    And so you also mentioned several times what they wanted

8    to hear from her with respect to her tampering with evidence or

9    destroying clothing, correct?

10   A    Yes.

11   Q    And who is "they"?

12   A    I was referencing Gregg Marx and the detective from the

13   Pickerington Police Department.

14   Q    So it is a particular thing that the police wanted to

15   hear from her, right?

16   A    By "want," I mean, they wanted her -- I guess "want" is

17   the word I'm using, yes.  They wanted her to say she disposed

18   of clothing.  They wanted her to corroborate with what

19   Mr. Williams was saying, and she never did.

20   Q    So they had already made up in their mind that she had

21   destroyed clothing?

22   A    I don't know if they had concluded that or they were

23   trying to corroborate something.  I don't know.

24   Q    So it's either one of the two.  Either they believed it,

25   or they were trying to corroborate what someone else had said?

TRIAL ONE - VOL. 23 - 4616

1   A    I don't know what they were thinking exactly, whether it
2   was one of those two or some other option.
3   Q    And you don't -- all you know is that even with the
4   confidentiality that she has with you, she maintained -- never
5   did that, right?
6   A    Correct.
7   Q    And even with them offering her immunity, never said she
8   did that, right?
9   A    Correct.
10  Q    She maintained.  She was steadfast, "I did not do that,"
11  correct?
12  A    Correct.
13  Q    And any list that she provided to you would be based on
14  her getting a list, you said, from somebody else?
15  A    The list of names with telephone numbers we referenced
16  earlier was those -- that information, those names and phone
17  numbers, she advised, were given to her by Mr. Ledbetter.
18       MS. DIXON:  Nothing further.  Well, one second.
19       Nothing further.
20       THE COURT:  Thank you, Ms. Dixon.
21       MR. MEYERS:  Briefly.
22       THE COURT:  Mr. Meyers.
23
24
25

TRIAL ONE - VOL. 23 -  4617

1                              - - -

2                        CROSS-EXAMINATION

3     BY MR. MEYERS:

4     Q     Good afternoon.

5     A     Good afternoon.

6     Q     I can't pass up the chance to question a fellow lawyer.

7     A     It's thrilling.

8     Q     A couple of questions about the dynamic in the proffer

9     meeting with Prosecutor Marx and the lead detective?

10    A     Okay.

11    Q     The lead detective on the Rodriccos Williams homicide,

12    correct?

13          Whatever they were thinking, is it fair to say that

14    based on their questions to you and, more critically, to

15    Ms. Fyffe, they took the position that Earl Williams correctly

16    accused her of having a dirty hand in that homicide by way of

17    destroying clothes?

18    A     I felt that they believe that she had done that.

19    Q     And you understood that their belief of that information

20    derived from a guy named Earl Williams?

21    A     Correct.

22    Q     So either they were right or they were wrong, right?

23    You know, either Earl Williams is a truth teller or he's not a

24    truth teller.  But they wanted her -- did it give you the

25    feeling in that session -- I think you said they wanted her to

TRIAL ONE – VOL. 23 –   4618

1  say she disposed of the clothes and at the end of the meeting

2  it wasn't what they wanted to hear?

3   A   Yes.

4   Q   And they clearly telegraphed to your client what they

5  wanted to hear from her?

6   A   They asked her if she disposed of clothing.  She denied

7  it.  She said she didn't, and then at one point she said she

8  didn't recall.  They said they had that information, and she

9  still denied it.  That's the dynamic.

10   Q   They were putting a lot of pressure on her?

11   A   There was some pressure on her, yeah.

12   Q   And emotionality rooted in who knows what.  You

13  described her assertion of fear.  It got to the point where

14  you, as her guardian, her lawyer, you protected her.  You

15  called a stop to the meeting?

16   A   Yes.

17      MR. MEYERS:  Nothing further.  Thank you.

18      THE COURT:  Thank you, Mr. Meyers.

19     Mr. Nolder, anything else?

20      MR. NOLDER:  I will pass on the opportunity.

21      THE COURT:  Mr. DeVillers, any redirect?

22      MR. DEVILLERS:  Yes, Your Honor.

23

24

25

TRIAL ONE - VOL. 23 - 4619

1                           - - -

2                   REDIRECT EXAMINATION

3      BY MR. DEVILLERS:

4      Q    Mr. Palmer, I believe that Mr. Durden asked you

5 initially about a summary that you gave when you talked to the

6 police when you first learned about Ms. Fyffe's murder?

7      A    Yes.

8      Q    Do you recall the very first thing you told Detective

9 Porter when he informed you that Ms. Fyffe was dead?

10     A    I don't recall specifically.

11     Q    Would something refresh your recollection?

12     A    It would.

13     Q    May I approach with --

14          THE COURT:  Would you do me this one courtesy and ask

15 him what would refresh your recollection, Mr. Palmer?

16          THE WITNESS:  The report I reviewed earlier when I was

17 questioned.

18          THE COURT:  Would you provide him with the report,

19 please, Mr. DeVillers?

20          THE WITNESS:  Okay.

21     BY MR. DEVILLERS:

22     Q    Did that refresh your recollection?

23     A    It did.

24     Q    Do you recall the very first thing you said to

25 Mr. Porter when you learned that Ms. Fyffe was dead?

TRIAL ONE – VOL. 23 –  4620

1    A    Quote, she told me this was going to happen.

2    Q    I'm sorry?

3    A    She told me this was going to happen.

4    Q    That's what you told Detective Porter?

5    A    Yes.

6    Q    You were asked questions, I believe in a way, if

7    Ms. Fyffe was involved in the drug trade of some sort?

8    A    Yes.

9    Q    Do you recall being asked that?

10        Did Ms. Fyffe tell you about anything in regards to

11   working with Mr. Ledbetter in the drug trade?

12   A    She mentioned at one point that she had assisted him in

13   loading up a trunk of a car, and she felt that that was

14   probably narcotics or some other contraband.  And she never --

15   she never told me she was dealing drugs.  She never told me she

16   was dealing drugs with Mr. Rife.  She never told me she was

17   engaged in narcotics trafficking, and I never got that

18   impression.

19   Q    Are you aware of any medical condition that Ms. Fyffe

20   had?

21   A    Yes, but I can't recall what it is.  I think she had

22   epilepsy.

23   Q    All right.  I'll be perfectly clear about this.  You

24   indicated on cross-examination that the one list, the list of

25   the names with the phone numbers, was given to Ms. Fyffe by

TRIAL ONE – VOL. 23 – 4621

1    Mr. Ledbetter for the purposes of if she ever needed anything?

2    A    Yes.

3    Q    What was the purpose of Ms. Fyffe giving that to you and

4    the prosecutors from Licking County, or Fairfield County?

5    A    Fairfield County.

6         MR. DURDEN:  Objection.  Speculation.

7         MR. DEVILLERS:  I can rephrase.

8         THE COURT:  I don't know that the question as phrased

9    calls for speculation given that the witness has testified he

10   was her attorney, he counseled her.  And in the context of him

11   counseling her, he could very well have gathered this

12   information.  So given the context of that relationship, I

13   think that -- and the -- I think that Mr. DeVillers' question

14   is proper as phrased.

15        Your objection, Mr. Durden, is therefore overruled.

16        You may answer, Mr. Palmer.

17        THE WITNESS:  Thank you.  I forgot your question.

18        Mrs. Evans, you may read it back.

19   (Thereupon, the last question was read by the court

20   reporter.)

21        THE WITNESS:  These were the guys that she was afraid

22   of.  These were the guys that she said even though

23   Mr. Ledbetter is in jail, these are the guys that could hurt

24   her.  These are his people.

25

TRIAL ONE – VOL. 23 –  4622

1    BY MR. DEVILLERS:

2    Q    You were also asked on cross-examination about O-Dog

3    and/or Old Dog and Buck or Buckwheat.  Do you recall being

4    asked about that?

5    A    Yes.

6    Q    What did Ms. Fyffe say about Buckwheat and O-Dog?

7         MR. GATTERDAM:  Objection.  Asked and answered.

8         THE COURT:  Overruled.

9         THE WITNESS:  The notes I looked at said these were

10   the guys that hung around Elijah.  There may be other notes

11   before that to explain why I was into that area with her.  I

12   don't know.

13   BY MR. DEVILLERS:

14   Q    Did you talk to the FBI in 2013?

15   A    Yes.

16   Q    Do you recall talking to them about O-Dog and Buckwheat?

17   A    Not specifically.

18   Q    Would anything refresh your recollection as to that?

19   A    Any summaries or notes that the FBI might have generated

20   would probably refresh my recollection.

21        MR. DEVILLERS:  May I approach, Your Honor?

22        THE COURT:  Yes, you may.

23   BY MR. DEVILLERS:

24   Q    Direct your attention to this paragraph and this

25   paragraph.  Just read those to yourself.

TRIAL ONE – VOL. 23 –   4623

1    A    Okay.

2    Q    Do you recall what you told the FBI in regards to O-Dog,

3    Buckwheat and Elijah in that time period?

4    A    Yes.

5    Q    What did you tell them?

6    A    She said Ledbetter told her if anybody ever messed with

7    her to talk to O-Dog or Buckwheat, I guess, for help, or for

8    whatever purpose.

9    Q    Did he go on to say anything about Elijah?

10   A    Elijah had been killed.  And the person -- the person

11   who killed Elijah was known as FNU aka Aver.

12   Q    Anything else about Elijah?

13   A    Just that Fyffe advised that Elijah Ledbetter, Brandon

14   Ledbetter's brother, hung out with those guys.

15   Q    Okay.

16       MR. DEVILLERS:  May I approach, Your Honor?

17       THE COURT:  Yes.

18   BY MR. DEVILLERS:

19   Q    And you were asked if you would agree that -- exact

20   quote, can we say that she gave no useful information, that was

21   in regards to the proffer in July with the prosecutors.  Do you

22   remember being asked that question?

23   A    Yes.

24   Q    What did she indicate in regards to Googling?

25   A    She said that she recalled getting a text or a call from

TRIAL ONE – VOL. 23 –  4624

1   Ledbetter and asking her to Google an address and look it up

2   and give directions, and that later on that rung a bell with

3   her because she got news that a homicide had happened at that

4   same address.

5   Q    Did she tell that to the prosecutors back in July?

6   A    Yes.

7        MR. DEVILLERS:  No further questions, Your Honor.

8        THE COURT:  Thank you.

9        Mr. Durden, any additional –– any recross?

10       MR. DURDEN:  A few, Your Honor.

11                           - - -

12                    RECROSS-EXAMINATION

13   BY MR. DURDEN:

14   Q    Mr. Palmer, you were asked on redirect about the

15   conditions of Ms. Fyffe.  I'm going to refer you back to your

16   office notes.  84-9 page 18.  Take a moment and read the

17   paragraph there, please.  Let me know when you're ready.

18   A    Okay.

19   Q    Again, the question asked whether or not she was –– what

20   conditions did she have.  You mentioned epilepsy.  She was also

21   diagnosed with depression?

22   A    Yes.

23   Q    And other conditions, correct?

24   A    My memo said she is medicated for depression and other

25   conditions.

1    Q    Do you know if she was on a psychotropic medication as

2  well, Neurontin?

3    A    I didn't know what drugs she was taking.

4         MR. DURDEN:  May I approach the witness?

5         THE COURT:  Yes, you may.

6  BY MR. DURDEN:

7    Q    Can I see the document Mr. DeVillers gave you?

8    A    This one?

9    Q    Yes.

10        So despite, you said, She told me this was going to

11  happen, you acknowledge you have no direct information

12  concerning Crystal Fyffe's murder, correct?

13   A    Correct.

14   Q    And your statement was, when asked if you trust her, you

15  stated that, well, not on other realms; on your case only, but

16  not on outside realms?

17   A    I said I didn't know.  I didn't have an opportunity to

18  engage in a trust relationship with her beyond being her

19  attorney.  So I don't know really what that question meant.

20  But as a client, I trusted her.  I didn't deal with her in any

21  other way, shape or form.

22   Q    Would it have made a difference in your representation

23  whether you trusted her or not, then?

24   A    I don't know.  I mean --

25   Q    Your last contact with her was on or about August 4th,

TRIAL ONE - VOL. 23 - 4626

1   2011?

2   A    That sounds about right.

3        MR. DURDEN:  Thank you.  No further questions, Your

4   Honor.

5        THE COURT:  Thank you, Mr. Durden.

6        Mr. Gatterdam, any recross?

7        MR. GATTERDAM:  Yes, Your Honor.

8                          - - -

9                    RECROSS-EXAMINATION

10  BY MR. GATTERDAM:

11  Q    Mr. Palmer, did you say on redirect that this list of

12  names that we've been talking about that was given to Fairfield

13  County are -- were guys that Crystal was afraid of, guys that

14  could hurt her?  Did I write that down right?

15  A    Yes.

16       MR. GATTERDAM:  Agent Lauber, can we have

17  161-36.02-004?  If you could highlight the very -- 004.

18       Towards the bottom, the very last paragraph, Ledbetter

19  gave Fyffe the following, if you could highlight that.  Thank

20  you.

21  BY MR. GATTERDAM:

22  Q    When you were asked -- you talked before about doing an

23  interview with the -- with Mr. DeVillers and some agents,

24  correct?

25  A    Yes.

TRIAL ONE - VOL. 23 -  4627

1   Q    And I assume you saw they were taking notes of the

2   conversation, correct?

3   A    Yes.

4   Q    And then what did they indicate you said regarding that

5   list?

6   A    It says there, Ledbetter gave Fyffe the following phone

7   numbers of persons that Ledbetter ran with.

8   Q    Do you have any reason to doubt that they wrote down

9   what they believed you said on that date?

10  A    No.

11  Q    Now, you were asked on redirect whether or not -- these

12  names of people, if anyone ever messed with her.  Do you recall

13  that?  And you said the names O-Dog is one of the names,

14  correct?

15  A    Yes.

16  Q    And again, these were names that were given to you in

17  2011 when you were representing her, correct --

18  A    Yes.

19  Q    -- Ms. Fyffe?

20       So, if somebody was in prison in 2011 and had been there

21  for three years, they're not somebody that was capable of

22  messing with her, correct?

23  A    I guess not, not directly, no.

24  Q    And again, you were never given any information about

25  Christopher Harris being in prison, correct?

TRIAL ONE - VOL. 23 - 4628

1    A    Not that I recall.

2    Q    And you're not aware of whether there's a person who was

3    on the streets in 2011 who had a nickname O-Dog, correct?

4    A    That's correct.

5    Q    In fact, based on what Ms. Fyffe was telling you, that's

6    what you believed, that there was somebody out there that she

7    could call if somebody messed with her, and that person's name

8    was O-Dog?

9    A    That's what she said.

10    Q    And she never shared with you that person's real name,

11    correct?

12    A    I don't recall.  It's not in my notes.  Probably not.

13    Q    And you didn't get a phone number or anything like that.

14    That was not your concern, correct?

15    A    I didn't get a phone number.

16        MR. GATTERDAM:  Nothing further.

17        THE COURT:  All right.  Thank you.

18        Ms. Dixon, any recross?

19                        - - -

20                    RECROSS-EXAMINATION

21    BY MS. DIXON:

22    Q    Mr. Palmer, pretty much the same thing.  When Ms. Fyffe

23    gave you that name of -- that you testified about in the

24    notes -- when you expanded on it when you spoke with I think

25    the FBI in 2013, if anybody ever messed with her that she could

TRIAL ONE - VOL. 23 -  4629

1  call -- and I think Mr. Gatterdam just questioned you about

2  O-Dog.  So the other name you told them in 2013 was Young Buck

3  or Buckwheat, right --

4    A    Yes.

5    Q    -- if somebody ever messed with her?

6         Along the same lines, if Rashad Liston were incarcerated

7  in 2011, certainly that wouldn't be a person she could call on

8  to help her on the outside if somebody messed with her,

9  correct?

10   A    Is that Buckwheat?

11   Q    Pardon me?

12   A    What was the name?

13   Q    I said if Rashad Liston, which is my client, if he were

14  incarcerated in 2011, he would not be a person who could assist

15  her or help her if somebody messed with her, right?

16   A    Correct.

17   Q    Okay.  And your testimony, all of it, is pretty much

18  what Crystal Fyffe told you, right?

19   A    A lot of it, yes.

20   Q    I mean, in other words, you never did any independent

21  investigation to verify what she told you was correct?

22   A    Correct.

23        MS. DIXON:  Thank you.

24        THE COURT:  Mr. Meyers?

25        MR. MEYERS:  No questions.

TRIAL ONE – VOL. 23 –   4630

1          MR. NOLDER:  No questions.

2          THE COURT:  Any sur-redirect, Mr. DeVillers?

3          MR. DEVILLERS:  Yes, Your Honor.

4          THE COURT:  Of course.  I mean, of course come

5   forward.

6          MR. DEVILLERS:  I'm sure, Your Honor.

7                        – – –

8                FURTHER REDIRECT EXAMINATION

9   BY MR. DEVILLERS:

10  Q    You were asked about Government's Exhibit 161-36.02.  I

11  believe I want page four.  You were asked specifically about

12  this document on cross-examination.  Do you recall that?

13  A    Yes.

14  Q    And the first paragraph that you can see there, do you

15  recall what you told the -- can you read that?

16        Do you recall what you told the FBI in regards to what

17  Ms. Fyffe repeatedly told you?

18  A    She repeatedly told me that Ledbetter would have her

19  killed, and she gave me a list of names of who Ledbetter would

20  have on the outside to actually kill her.

21  Q    And were the names O-Dog or Young Buck or Buckwheat on

22  that list?

23  A    Yes.

24  Q    You were also asked in regards to whether someone who

25  was in prison in 2011 could either assist or do harm to

TRIAL ONE – VOL. 23 – 4631

1  Ms. Fyffe.  Do you remember being asked that?

2  A    Yes.

3  Q    Do you know a person by the name of Steven Austin?

4  A    No.

5       MR. DEVILLERS:  No further questions, Your Honor.

6       THE COURT:  Mr. Durden?

7       MR. DURDEN:  Yes.

8                    - - -

9            FURTHER RECROSS-EXAMINATION

10  BY MR. DURDEN:

11  Q    Mr. Palmer, the two names listed of O-Dog, Chris Harris,

12  Buckwheat, did she also share with you they were already in

13  prison and had been in prison for at least three years?

14  A    I don't recall.  I don't know.

15  Q    We can agree that being locked up, they're unable to

16  make direct contact with Ms. Fyffe, correct?

17  A    Correct.

18       MR. DURDEN:  Thank you.  No further questions.

19       THE COURT:  Mr. Gatterdam.

20                    - - -

21            FURTHER RECROSS-EXAMINATION

22  BY MR. GATTERDAM:

23  Q    You answered on recross that somebody who is in prison

24  you can't call to have them help if somebody messed with you.

25  Similarly, they're not going to -- if they're locked up for 17

TRIAL ONE - VOL. 23 - 4632

1  years, they're not going to be able to do harm to you, just as

2  they're not able to help you, correct?

3  A    Right.

4  Q    Okay.  And again, I'm going to -- I asked you about this

5  on cross before, but do you remember you testified at a

6  previous proceeding and you were asked the specific question

7  about these names, Old Dog -- and by the way, it was Old Dog

8  that you said, correct, previously, not O-Dog?

9  A    I don't know if I said O-Dog or Old Dog.

10  Q    You said something that Mr. DeVillers had you read that

11  had a different name, Old Dog.  But the record is what it is.

12  You were asked how did those names Old Dog and Buckwheat come

13  up.  Do you remember that?

14  A    Yes.

15  Q    And correct me if I'm wrong, you were asked the

16  question:  The reference to Old Dog and Buckwheat was in

17  reference to people that Mr. Ledbetter's brother hung out with,

18  correct?

19        MR. DEVILLERS:  Objection.  Asked and answered.

20        MR. GATTERDAM:  Responsive to his re-redirect.

21        THE COURT:  Yes.  I'm going to overrule it.  You may

22  answer, Mr. Palmer.

23  BY MR. GATTERDAM:

24  Q    Do you recall that?

25  A    I do.

TRIAL ONE - VOL. 23 - 4633

1    Q    And your answer said --

2         MR. DEVILLERS:  I'm just not sure what we're going off

3    of.  Is it a transcript of --

4         THE COURT:  You don't know what he's reading from?

5         MR. DEVILLERS:  Exactly.

6         MR. GATTERDAM:  Pages 55 and 56 of the hearing dated

7    December 1, 2015.

8         MR. DEVILLERS:  Thank you.

9         MR. GATTERDAM:  May I just ask the question again?

10        THE COURT:  It's your preference, but for ease of

11   convenience, the ELMO would show all counsel and the witness

12   what you're reading from.  And they could -- that might

13   eliminate some of the issues.

14   BY MR. GATTERDAM:

15   Q    Mr. Palmer, can you see on the ELMO the question that I

16   started to ask you?

17   A    Yes.

18   Q    Can you read what that question is?

19   A    The question is:  The reference to Old Dog and Buckwheat

20   was in reference to people that Mr. Ledbetter's brother hung

21   out with, correct?

22   Q    If I flip to page 56, can you tell me what your answer

23   was?

24   A    That's what the note says, yes.

25        MR. GATTERDAM:  Thank you.  Nothing further.

TRIAL ONE - VOL. 23 - 4634

1        THE COURT:  Ms. Dixon?

2        MS. DIXON:  Can I have 161-32.02, page 4 -- 36?

3                        - - -

4                FURTHER RECROSS-EXAMINATION

5    BY MS. DIXON:

6    Q    Mr. Palmer, you see that paragraph, right?

7    A    Yes.

8    Q    That's highlighted?  And you testified about that on

9    redirect, right?

10   A    Yes.

11   Q    And the names that -- and this is from your interview in

12   2013, right?

13   A    Yes.

14   Q    And the names that you gave of -- supposedly from

15   Ledbetter who would be on the outside, right?

16        If you look at the first sentence, does it not say,

17   "Fyffe gave Palmer a list of names who Ledbetter would have on

18   the outside to actually kill her," right?

19   A    That's what it says.

20   Q    Those names were O-Dog, in parentheses, Christopher

21   Harris aka O-Dog, or Young Buck aka Buckwheat, Rashad Liston

22   aka Young Buck aka Buckwheat, correct?

23   A    Yes.

24   Q    So those were names of people who were actually on the

25   outside, right, as far as she told you?

```
                                    TRIAL ONE - VOL. 23 -  4635
```

 1    A    I don't know.

 2    Q    That's what that says, right, that you told them?

 3    A    That's what it says I told them.

 4         MS. DIXON:  Okay.  Thank you.

 5         THE COURT:  Mr. Meyers?

 6         MR. MEYERS:  I'll gave it to Mr. Nolder.

 7         THE COURT:  Mr. Nolder?

 8         MR. NOLDER:  I will pass, Your Honor.

 9         THE COURT:  And Mr. DeVillers?

10         MR. DEVILLERS:  Nothing, Your Honor.

11         THE COURT:  Mr. Palmer, thank you very much, sir.  You

12    may be excused.

13         THE WITNESS:  Thank you.

14         THE COURT:  Ladies and gentlemen, it's just a skosh

15    past 12:30.  So we're going to stand in recess now for lunch

16    until 1:30.  Enjoy that rarest of commodities: sunshine.  And

17    enjoy your lunch.

18       (Jury out at 12:36.)

19         THE COURT:  Mr. DeVillers, anything further from the

20    government before we break?

21         MR. DEVILLERS:  No, Your Honor.

22         THE COURT:  Mr. Berndt?

23         MR. BERNDT:  No, Your Honor.  Thank you.

24         THE COURT:  Mr. Gatterdam?

25         MR. GATTERDAM:  No, Your Honor.

TRIAL ONE – VOL. 23 –  4636

1          THE COURT:  Ms. Dixon?

2          MS. DIXON:  No, sir.

3          THE COURT:  Mr. McVay?

4          MR. MCVAY:  No, Your Honor.

5          THE COURT:  Mr. Nolder, anything?

6          MR. NOLDER:  Nothing.

7          THE COURT:  Enjoy your lunch, everyone.

8       (Lunch recess taken from 12:34 p.m. to 1:30 p.m.)

9                         –  –  –

10                      WEDNESDAY AFTERNOON SESSION

11                      MAY 18, 2016

12                         –  –  –

13      (Thereupon, the following proceeding was held in chambers

14   with all counsel present:)

15          THE COURT:  Ms. Clark, would you bring the juror in,

16   please.

17          (Juror #10 was seated in the conference room.)

18          JUROR #10:  Yes, sir.

19          THE COURT:  Have a seat.  This is, as they say, a well

20   visit.

21          We're scheduling the next couple weeks, and I'm going to

22   address the entire jury on the scheduling matter, but we made a

23   promise to you that you would be out of here next Thursday, by

24   1:00, for your daughter –– or is it Thursday after next?

25          JUROR #10:  It's the Thursday after next, June 2nd.

TRIAL ONE - VOL. 23 - 4637

1        THE COURT:  June 2nd.

2        -- we would have you out by -- you need to be out by

3 1:00 to make your daughter's high school graduation.

4        JUROR #10:  I think it was noon.

5        THE COURT:  Okay, noon.

6        JUROR #10:  Unless you're going to drive me from here

7 to there.

8        THE COURT:  No.  There is an e-mail that I got from

9 Fran Green that said he had to be released no later than 1:00,

10 but noon is fine.

11        JUROR #10:  Right, noon.  Thank you.

12        THE COURT:  But my question to you --

13        JUROR #10:  Yes, sir.

14        THE COURT:  -- is whether it was a closed-end period,

15 sort of like noon to 2:00 or 3:00 and then you would be

16 available after that, or you had activities in connection with

17 the graduation schedule after that.  Whichever is fine, but I

18 just needed to know so that we could schedule around it.

19        JUROR #10:  Let's see.  Graduation is 2:00.

20        THE COURT:  Okay.

21        JUROR #10:  Dinner reservations are at 5:00.

22        THE COURT:  You've answered my question.  All right.

23        JUROR #10:  If you guys want to meet me at Tony's --

24        THE COURT:  You don't know these lawyers and their

25 ferocious appetites.

TRIAL ONE – VOL. 23 –  4638

1          What we will do, then, is, we will end that day at noon.

2          JUROR #10:  Thank you.

3          THE COURT:  And then resume either the Friday or

4    Monday.  But that's all we needed.  Thank you very much.

5          JUROR #10:  Thank you very much.

6     (Whereupon, Juror #10 exits the conference room.)

7          THE COURT:  Okay.  So we'll further refine our

8    schedule after the proceedings today, but we know now that, on

9    June 2nd, we'll be ending at noon.

10          MR. KELLEY:  If I could throw out, somewhere we have

11    to put in some time for all counsel to review the exhibits that

12    go to the jury.  Right now, we're starting with about 30

13    volumes.  Maybe that's a little high, but at least 25 volumes.

14    And they have to be culled, and we all then have to agree that

15    this is what goes to the jury.  And so that's going to be a bit

16    lengthy.

17          THE COURT:  And what I typically do is, I have -- I

18    get representatives from each side to sit down together and

19    just go through, with Mrs. -- First, you all go through your

20    list.  And then you make sure that your list is harmonized with

21    the official list that Ms. Clark has maintained throughout the

22    trial.  And then we'll get all of those together so we can be

23    running, Kevin, on parallel tracks.

24          MR. KELLEY:  My only concern, Your Honor -- I'm going

25    to make the defense counsel sit with us and look at those

TRIAL ONE - VOL. 23 - 4639

1   books.  I've had bad things get in there by accident.  I want

2   it to be an accident we all make.

3           THE COURT:  That's what I'm saying.  Representatives

4   from all parties, is what I really meant --

5           MR. KELLEY:  Yes, Your Honor.

6           THE COURT:  -- to sit down and go through it.  And so

7   once we get a list that is agreed to by all of the parties,

8   then, you know, a couple of representatives, one from the

9   government and one from the defense, can sit down with Ms.

10  Clark and make sure that the lists are together so that we

11  don't have to do that after the jury is charged and they're

12  waiting there for several hours to get the exhibits.  Okay.

13          The other thing I was going to raise with you, I haven't

14  called them back, but we have been contacted -- chambers has

15  been contacted by the press to ask what happened to the juror

16  who was excused.  The public has a right to know.  It's one of

17  those things I hate having that conversation because, you know,

18  it gets out in the press, and then it takes on a life of its

19  own.  So I'm going to avoid returning that call as long as I

20  can, but I'm open to any suggestions that anyone might have as

21  to how best to answer that question.

22          MR. DEVILLERS:  Avoiding is the best.

23          MR. MEYERS:  Duck and cover.

24          MR. MILLER:  Judge, Steve and I were downstairs at the

25  men's room and the *Dispatch* editor, writer, came by and asked

TRIAL ONE - VOL. 23 - 4640

1    us what happened.  I said we weren't there, we don't really

2    know what happened, he has been napping before, it might have

3    something to do with it, we have no idea.

4         Maybe we shouldn't have said that.

5         THE COURT:  That's just as good.

6         MR. NOLDER:  He said that -- he said the guy was

7    sleeping a lot.  The reporter said that.

8         THE COURT:  The problem is throwing the juror under

9    the bus.  And that's what I really --

10        MR. DURDEN:  Can we indicate, Your Honor, unknown

11   family commitments at this time?

12        MS. DIXON:  No.

13        THE COURT:  I don't want to do that because I'm not

14   sure that that's correct.

15        MR. DURDEN:  He didn't get enough sleep at home.

16   So --

17        MR. McVAY:  In light of the fact he's been ordered not

18   to discuss anything until the verdict is returned, shouldn't we

19   be held to the same standard?

20        THE COURT:  That's probably as good a response as

21   possible, except for the public right to know.

22       (Thereupon, the following proceeding was held in open court

23   with all defendants and counsel present.)

24       (Jury in.)

25        THE COURT:  Ladies and gentlemen, just so you know, we

TRIAL ONE - VOL. 23 -  4641

1    did bring Juror #10 back for the purpose of finalizing some

2    aspects of our schedule, which we've been working on over the

3    last couple of days.  It looks like the government's case in

4    chief may conclude late next week.  The defense case in chief

5    may conclude the week after.  On Monday of that week, we'll be

6    off, because that's Memorial Day.  But the following Tuesday

7    and Wednesday, we may see the conclusion of the defense case in

8    chief.  And, on that Thursday, the 2nd, we're only going to

9    work until noon.

10          So what we're doing is, we're working on a schedule so

11   that we can let you know when you can expect closing arguments

12   and to receive the case for your deliberation for your planning

13   purposes, but we no longer believe that the case will go into

14   the third week of June.  We believe, instead, that you may get

15   the case sometime during that first week of June.  It may spill

16   into the second week, with completion of closing arguments

17   and/or your deliberations, but we are meeting on that in the

18   evenings to finalize things.  And we meet in the evenings

19   because, after some of the witnesses have concluded, that gives

20   us an idea of how much more time we're going to take.

21          So, I wanted you to be aware of that.  But, you know,

22   you will certainly get the case within the first two weeks of

23   June.  All right.

24          Mr. Devillers, your next witness.

25           MR. DEVILLERS:  Your Honor, the government's next

TRIAL ONE – VOL. 23 – 4642

1    witness is Timothy Duerr.

2            COURTROOM DEPUTY CLERK:  Sir, come forward to be

3    sworn, please.

4      (Witness sworn.)

5            COURTROOM DEPUTY CLERK:  Please be seated, sir.

6            THE COURT:  Mr. Duerr, please bend the microphone

7    towards you and speak clearly into it.  Thank you.

8          Mr. Devillers, please proceed.

9            MR. DEVILLERS:  Thank you, Your Honor.

10                              - - -

11                         TIMOTHY DUERR

12     Called as a witness on behalf of the Plaintiff,

13      being first duly sworn, testified as follows:

14                              - - -

15                       DIRECT EXAMINATION

16    BY MR. DEVILLERS:

17    Q    Good afternoon.

18    A    Good afternoon.

19    Q    Please state your full name, and spell your last name.

20    A    Timothy Scott Duerr.  Last name is spelled D-U-E-R-R.

21    Q    What do you do for a living, sir?

22    A    I'm employed with the Miami Valley Regional Crime

23    Laboratory in Dayton, Ohio, as a laboratory supervisor and a

24    firearms and took mark identification person.

25    Q    Do you know a person by the name of Mark Hardy?

TRIAL ONE – VOL. 23 –  4643

1    A    Yes.  He's an examiner for the Columbus P.D. Lab.

2    Q    Do you have a similar occupation?

3    A    Yes.  In fact, we've been to training together.

4    Q    Well, tell us about your education and experience and

5    training to become -- to do what you do.

6    A    I have a bachelor of science degree from Bowling Green

7    State University, with a major in biology and a minor in

8    chemistry.  I have one year prior service with the Ohio Bureau

9    of Criminal Identification and Investigation at the Richfield

10   branch lab as a forensic chemist.

11        I came to this laboratory in the winter of 1988 as a

12   chemist.  In the fall of 1991, I began my training as a firearm

13   and tool mark examiner under the two firearm examiners at the

14   time.  Some of the training consisted of visiting different

15   laboratories, viewing ammunition, thousands of cartridge case

16   comparisons, along with becoming a member of AFTE, which I have

17   attended some of their seminar classes, and along with other

18   course work, such as gunshot residue distance determination.

19   Q    Is your crime laboratory a private or public laboratory?

20   A    We are actually a regional laboratory.  We receive our

21   funding from the local law enforcement agencies that we

22   service.  However, our benefits and everything come through

23   Montgomery County.

24   Q    Montgomery County, the government?

25   A    Yes.

TRIAL ONE - VOL. 23 -  4644

1    Q    Okay.  Do you often work with Franklin County crimes?

2    A    This was a different circumstance.  We agreed -- Our

3    laboratory contracted, or they contracted with us, to provide

4    services to assist with the backlog of cases they had at the

5    time.

6    Q    Can you tell us have you ever testified before in the

7    area of tool mark identification?

8    A    Yes, I have.

9    Q    And how many times do you think you've testified?

10   A    Well in excess of 150 times in Municipals, Common Pleas

11   and Federal Court in Dayton.

12   Q    I want to show you what's been marked as Government's

13   Exhibit 31-5.  Do you see that on the screen, sir?

14   A    Yes.

15   Q    What is this?

16   A    This is a laboratory report from our laboratory.

17   Q    Okay.  And are you a part of this report?

18   A    Yes.  This appears to be a copy of my report.

19   Q    Let's go to, actually, the last page, which would be

20   31-5-006.  Do you see that, sir?

21   A    Yes.

22   Q    And what is that?

23   A    That's my electronic signature for this report.

24   Q    Now, please go back to Government's Exhibit 31-5.  And I

25   want to take you back to -- I believe it was December, December

TRIAL ONE – VOL. 23 –  4645

1   of 2007.  Were you asked to do some things for the City of

2   Columbus Division of Police?

3    A    Yes.  It was a firearms comparison case.

4    Q    Do you remember how many firearms you were asked to

5   compare?

6    A    I would have to count the ones in the report.  We did

7   numerous cases for them.  There were several on this case, in

8   particular.

9    Q    All right.  I don't want to ask you about all of the

10  firearms and shell casings, but I do want to be direct your

11  attention to Submission 11.

12         MR. DEVILLERS:  And if you could highlight that.

13   BY MR. DEVILLERS:

14   Q    Do you see that, sir?

15   A    Yes.

16   Q    What is Submission 11?

17   A    It was a cardboard box containing one Smith & Wesson

18  Model SW40F .40-caliber semi-automatic pistol.

19   Q    I'm going to hand you what's been marked --

20         MR. DEVILLERS:  May I approach the witness, Your

21  Honor?

22         THE COURT:  Yes, you may.

23   BY MR. DEVILLERS:

24   Q    -- Government's Exhibit 31-26.  And if you could take a

25  look at that for me.

TRIAL ONE – VOL. 23 – 4646

1    A    (Witness complies.)

2    Q    What is that, sir?

3    A    This was the white box I received.  This has our

4  laboratory bar code that identifies this particular piece of

5  evidence for the chain of custody.  I can identify it by the

6  case number.  That's our property clerk's initials and date it

7  was received.  And my initials appear here on the box.

8    Q    What were you asked to do with that firearm?

9    A    One particular thing is to see if it was an operable

10 firearm and then compare it to .40-caliber cartridge casings

11 within this case.

12   Q    Did you do that?

13   A    Yes, I did.

14   Q    Was it an operable firearm?

15   A    Yes.  It fired projectiles under the force of an

16 explosion.

17   Q    All right.  I now want to direct your attention to page

18 5 of that document.  What are we looking at here, sir?

19   A    Another page of the report.

20   Q    Are these your opinions and conclusions?

21   A    Yes.

22   Q    All right.

23        MR. DEVILLERS:  Could you please highlight the

24 paragraph --

25   BY MR. DEVILLERS:

TRIAL ONE - VOL. 23 -  4647

1   Q    And I'm highlighting one of the paragraphs.  Let me ask

2   you this:  The exhibit, the entire exhibit I showed you,

3   Government Exhibit 31-5, is that a true and accurate depiction

4   of the crime lab -- the lab that you came up with?

5   A    I'm not sure of the question.

6   Q    Let me rephrase it.

7        Is this your lab report, Government's Exhibit 31-5?

8   A    Yes.

9        MR. DEVILLERS:  May I publish this to the jury, Your

10  Honor?

11       THE COURT:  Are there any objections?

12      Mr. Durden?

13       MR. DURDEN:  No objection.

14       THE COURT:  Mr. Durkin?

15       MR. DURKIN:  No, Your Honor.

16       THE COURT:  Ms. Dixon?

17       MS. DIXON:  No, Your Honor.

18       THE COURT:  Mr. McVay?

19       MR. McVAY:  No, Your Honor.

20       THE COURT:  Mr. Nolder?

21       MR. NOLDER:  No, Your Honor.

22       THE COURT:  Yes, you may.  It will be received, and

23  you may publish it.

24    BY MR. DEVILLERS:

25    Q    And, sir, looking at page 5 of that document, in

TRIAL ONE – VOL. 23 –  4648

1  particular, a paragraph which is the eighth paragraph down in

2  that document, could you -- It talks about Submission 11.  Is

3  that the firearm you have in front of you right now?

4     A    Yes.  It's this firearm.

5     Q    And, again, what were you asked to do?

6     A    Again, to test fire this weapon to see if it was

7  operable and to compare it against cartridge casings within

8  this case.

9     Q    And, once you did that, could you testify within -- in

10 your opinion, within a reasonable degree of ballistics

11 certainty, whether that firearm fired particular shell casings?

12    A    Yes.  It matched four of the cartridge cases submitted

13 to me.

14    Q    All right.  I'm going to hand you what's been marked as

15 Government's Exhibit 31-22 and 31-19.  Take a look at those for

16 me.

17    A    (Witness complies.)

18    Q    What did I hand you?

19    A    Two plastic bags.  They have my item numbers and my

20 initials here and my initials where I sealed it up with our

21 evidence tape.  This one contains three cartridge cases.  This

22 contains four cartridge cases and one unfired cartridge.

23    Q    The exhibit with the four cartridge cases, what exhibit

24 number do you have on that one?

25    A    The four cartridge cases, the government's exhibit

TRIAL ONE - VOL. 23 -  4649

1    number is 31-22.

2    Q    Okay.  And you indicated that -- Let's talk about that

3    31-22 for now.  You indicated that there is some shell casings

4    in there?

5    A    Yes.

6    Q    And you also talked about your, I think, your item

7    numbers.  Is that how you referred to that?

8    A    Yes.  It's my item number.  It's sub-items 13 D.  These

9    were both contained within a larger plastic bag.

10    Q    Okay.  The shell casings, is anything written on those

11    shell casings?

12    A    Yes.  This larger one, for instance, has "13 D5" and my

13    initials.

14    Q    Okay.  And you tested those shell casings with that

15    firearm?

16    A    This one shell cartridge case within here was compared

17    to the test-fired cartridge casings from State's Exhibit, or --

18    excuse me -- Government's Exhibit 31-26.

19    Q    Okay.  Your Item #13 D5, in your opinion, within a

20    reasonable degree of ballistic certainty, was that shell casing

21    fired by that firearm?

22    A    Yes, it was.

23    Q    All right.  Let's go to the next bag, please.  And

24    what's that exhibit number, sir?

25    A    Government's Exhibit #31-19.

TRIAL ONE – VOL. 23 – 4650

1   Q    And how many shell casings are in there?

2   A    There's three fired cartridge cases.

3   Q    And what are those item numbers to those shell casings?

4   A    C1, C2 and C3.

5   Q    And that's Item #13 C1, C2, and C3?

6   A    That's correct.  I'm sorry.

7   Q    That's all right.

8        Did you test those shell casings against that firearm?

9   A    Yes.

10  Q    And within a reasonable degree of ballistic certainty,

11  do you have an opinion as to whether that firearm fired those

12  shell casings?

13  A    Yes, I do.

14  Q    And your opinion is?

15  A    These three cartridge cases were fired in this firearm.

16       MR. DEVILLERS:  May I have a moment, Your Honor?

17       THE COURT:  Yes, you may.

18    (Whereupon, there was a brief interruption.)

19       MR. DEVILLERS:  No further questions, Your Honor.

20       THE COURT:  Mr. Durden, any cross?

21       MR. DURDEN:  No, Your Honor.

22       THE COURT:  Mr. Durkin, any cross?

23       MR. DURKIN:  No, Your Honor.

24       THE COURT:  Ms. Dixon, any cross?

25       MS. DIXON:  No, sir.

1          THE COURT:  Mr. McVay?

2          MR. McVAY:  Yes, Your Honor.

3                         - - -

4                   CROSS-EXAMINATION

5     BY MR. McVAY:

6     Q     Good afternoon, Mr. Duerr.

7     A     Good afternoon.

8     Q     Couldn't let you get away without -- couldn't let you

9     get away with thinking that maybe nobody cared.

10          I'm guessing I could probably stand up here and ask you

11    questions until 5:00 p.m. and we would recess and never

12    convince you to change your opinion with regard to those shell

13    casings, would I?

14    A     That's correct.

15    Q     I'm not even going to try, but I do have some questions.

16    I want to make sure that we're all on the same page, at least

17    from what it is we learned yesterday from Mr. Hardy.  And that

18    is, Mr. Hardy did educate us and this jury about the process

19    that you go through in making comparisons for purposes of

20    firearms examination and comparisons of shell casings and

21    projectiles and other things.  And he talked in terms of the

22    fact that this is a profession that requires something to help,

23    or assist, the naked eye.  Is that fair to say?

24    A     Yes.  A microscope is utilized.

25    Q     Okay.  It's not something that you can't pick up a shell

TRIAL ONE - VOL. 23 -  4652

1   casing or a couple of shell casings, hold them side by side,

2   and say these were fired from the same gun; is that fair to

3   say?

4       A    That's fair.

5       Q    So, you say you use a -- Is it a forensic comparison

6   microscope?  I believe that's what Mr. Hardy called it.

7       A    We call it a comparison -- firearms comparison

8   microscope.

9       Q    Okay.  And he described one that would, essentially,

10  give you the capability to look in through the microscope, as

11  we all did in junior high school, probably, although not as

12  powerful, or as, at least in my case, as old as I am, as what

13  you have today, but the capability to set two shell casings,

14  for example, or two bullet fragments, projectiles, underneath

15  that microscope and examine them at the same time.  Is that the

16  same process you use?

17      A    Yes.  There's two stages.  One is mounted on each stage,

18  and it brings it into view, into one sight.  And we're able to

19  use a hairline and move it and look at the cartridge casings

20  together.

21      Q    Okay.  You used a term that I'm not familiar with, a

22  hairline.

23      A    Hairline is what we call it that separates the two

24  images that we're looking at.

25      Q    Okay.  So, when you talk about hairline, essentially,

1   there is a hairline between the images so that you know where

2   the end of one is and where the start of the one next to it is?

3   A    Yes.

4   Q    Is that fair to say?

5   A    Yes.

6   Q    Okay. And Mr. Hardy discussed matters of class and

7   subclass and individual characteristics that can be noted on

8   projectiles or shell casings as placed upon them by the

9   instrument that's used, the firearm that's used. And that's

10   things that you're well familiar with, I'm sure.

11   A    Yes.

12   Q    Okay. He further discussed that the science, or the

13   scientific approach you use -- I believe he used the term that

14   it's a subjective scientific comparison that is made.

15   A    Yes. It's viewed by ourselves. It's based on my

16   training, expertise, and through our accreditation for

17   proficiency testing.

18   Q    Okay. But, ultimately, it comes down to a subjective

19   opinion in your mind as to whether there's a sufficient

20   comparison between the two items being compared; is that fair?

21   A    Yes, if there's sufficient individual characteristics to

22   conclude an identification.

23   Q    Okay. So it wouldn't be -- Again, as I believe we heard

24   yesterday, just the class characteristics or subclass

25   characteristics, you wouldn't make an identification based upon

TRIAL ONE - VOL. 23 -  4654

1  those alone, would you?

2  A    No.  That would just separate it into a particular

3  group.

4  Q    Okay.  And if you're looking at, say, as opposed to a

5  shell casing, which as a general rule comes to you whole,

6  correct, an entire shell casing most of the time, if not all of

7  the time?

8  A    Yes.

9  Q    And, in comparison, a projectile frequently will come to

10  you as a partial projectile; is that correct?

11  A    Yes.  It could come as fragments, yes.

12  Q    Okay.  Because as a bullet, projectile, as it has been

13  defined for us, passes through different substances, if it were

14  to pass through a body, strike a bone, or if it somehow were to

15  hit a piece of metal or something like that, it might fragment

16  that projectile into separate parts.  Fair to say?

17  A    Correct.

18  Q    So, when you're making a comparison, say, from those

19  that you've test fired -- and I'm talking about projectiles --

20  you testified it goes into a -- what's your collection system?

21  Is it a water-based collection system?

22  A    We have a water tank, yes.

23  Q    If you'll describe for the jury how that works.

24  A    It's a large steel tank that contains, I would say,

25  approximately 400 gallons of water, with a tube in the end that

TRIAL ONE - VOL. 23 - 4655

1    we shoot into.  And due to the density between air and water,

2    it will stop the projectile, and it enables us to collect a

3    bullet without damaging it.

4    Q    Okay.  And anyone who has taken a cannon ball off the

5    high dive understands that concept, I'm sure.

6    A    Yes.  It stops it.

7    Q    Okay.  So, but when you receive that projectile and

8    you're comparing that against one that's maybe recovered from a

9    crime scene or from the body of a victim from the performance

10   of an autopsy that maybe is a partial fragment or a partial

11   projectile, you'd be comparing a whole test case, test firing,

12   against a partial, correct?

13   A    Yes.

14   Q    And that complicates the issue in terms of making an

15   identification, in terms of finding a sufficient comparison; is

16   that fair to say?

17   A    Not necessarily, no.

18   Q    It wouldn't -- Is it fair to say that it would have a

19   tendency to reduce the number of points of comparison that you

20   could make?

21   A    It would have possibly less grooves to compare, but

22   there could -- it may only be one partial groove that has

23   sufficient individual characteristics to conclude that

24   identification.

25   Q    Okay.  And there are instances, it's fair to say, where

TRIAL ONE – VOL. 23 – 4656

1   you have a partial fragment which is just too much of

2   a -- well, maybe I should say too little of a partial fragment

3   in to order to make an identification?

4   A    Yes.  Many times there is insufficient characteristics

5   to even get a class characteristic -- a class to a

6   particular -- classify arms, let alone individual

7   characteristics to identify it to a particular firearm.

8   Q    Okay.  So, again, we're talking here about a subjective

9   scientific comparison, meaning you examine this based upon your

10  knowledge, training, and experience and form an opinion as to

11  whether you think there is a sufficient comparison to call it

12  whatever you call it to say that you think this was fired from

13  a particular gun?

14  A    Yes.

15  Q    Correct?  Okay.

16       Now, let me play skeptic, or devil's advocate, for a

17  minute.

18       I have good eyes.  I do wear contact lenses, but,

19  corrected, I have pretty good vision.  And I have the ability

20  to peer into a microscope just as you do or any of your

21  colleagues would have.  I have the ability to observe two

22  images and discern differences between those two images or

23  similarities between those two images.

24       And tell me what it is that you can see, or explain to

25  this jury what it is that you can see that I would not be able

TRIAL ONE - VOL. 23 - 4657

1   to, not having been trained and having knowledge and experience

2   in your field.

3   A    Your Honor, I do have a demonstration.  I could provide

4   the photographs I took between the comparison of these two

5   samples.

6   Q    That's fine.  Do you know what -- I don't know what the

7   exhibit numbers are.

8        MR. DEVILLERS:  I don't have them on me.

9        Do you have them?

10       THE COURT:  You brought some?

11       COURTROOM DEPUTY CLERK:  Yes.  They're a part of my

12  case notes, actually, sir.

13       THE COURT:  All right.

14       Would you care to see the case notes, Mr. McVay?

15       MR. McVAY:   Yes.  We can work from that, using the

16  Elmo.  If you can --

17       May I approach the witness?

18       THE COURT:  Yes, you may.

19  BY MR. McVAY:

20  Q    If you could maybe --

21  A    Can I assist him?

22       THE COURT:  Yes.

23  BY MR. McVAY:

24  Q    -- show me what it is that you want to display.

25  A    (Witness showing Mr. McVay a document.)

TRIAL ONE - VOL. 23 -  4658

1    Q    Oh, these are --

2    A    I'm sorry.  I'm waiting.

3    Q    What I wanted you to do is take these pages and put them

4    on the Elmo so we can display those --

5    A    Okay.

6    Q    -- so that you and I could be looking at it at the same

7    time.  Sorry.

8         Okay.  Is that adequate for you to look at, sir?

9    A    Yes, sir.

10   Q    And describe what it is that you want to show this jury,

11   or tell this jury.

12   A    Yes.

13   Q    And what is it that we are looking at there?

14   A    This is marked -- Okay.  This one (indicating), this one

15   (indicating).  Whoops!  I'm trying to --

16   Q    Okay.

17   A    It won't let me mark the other two.

18   Q    The top left, where I marked, the top right to that, and

19   the bottom left are C1 through C3 of my exhibit numbers.  That

20   is showing the comparison, one indication, where I would -- a

21   reference point.  This is from my notes.

22        As you can see, the line going down in the middle

23   between the two --

24        MR. DEVILLERS:  Your Honor, I believe -- Is it

25   published?

TRIAL ONE – VOL. 23 – 4659

1      THE COURT:  No, it's not published.

2    Side-bar for a moment.

3      THE WITNESS:  Oh, I'm sorry.

4      THE COURT:  No.  No.  No.  You did nothing wrong.

5      THE WITNESS:  Okay.

6                          – – –

7    (Thereupon, the following proceeding was held at side-bar.)

8      THE COURT:  You can do whatever you like with these

9  exhibits, Mr. McVay; but, since you have chosen to put yourself

10  in the position as a direct examiner, you have to establish a

11  foundation for the admission of these, as Mr. Devillers would

12  have had to if he chose to do that in his direct examination.

13      MR. McVAY:  Okay.

14      THE COURT:  If you choose to go down this road, you're

15  going to have to go down this road replete with all of the

16  baggage of cross-examining another party's expert in a manner

17  that's akin to a discovery deposition.  So you are going to

18  have to set the foundation for the admission of these exhibits.

19  But you have the advantage of at least having him on cross.  So

20  you can, you know, lead him as you go through the establishment

21  of the foundation.  But we can't skip that part.

22      MR. McVAY:  Yes, Your Honor.  Actually, I thought he

23  had indicated at some point these are pictures that he had.

24  But I will reaffirm that.

25      MR. DURKIN:  Your Honor, just on behalf of Mr. Harris,

TRIAL ONE - VOL. 23 -  4660

1   we're now seeing things we have never seen before.  And, so, on

2   behalf of Defendant Harris, we would object.  We're going to

3   object to moving these and -- publishing them and moving them

4   into evidence, if that happens.

5        MR. DEVILLERS:  Your Honor, may I?

6        THE COURT:  You may, Mr. Devillers.

7        MR. DEVILLERS:  We provided this witness.  We also

8   told all of the attorneys that I'm more than willing -- that

9   everything is for them to see from the bench notes,

10  photographs.  Anything they want to look at, they can do it.

11  And some people -- Mr. Durkin took advantage of that with

12  Mr. Hardy.  But we've made this available to them.  So this was

13  available to them to look at.

14       MR. DURKIN:  And I'm not complaining, at all, That I

15  was ambushed.

16       THE COURT:  I'm not going to rush the government.  You

17  decided to take the government's expert and then go through,

18  you know, his files and let him explain whatever.

19       That's Mr. McVay's choice.  It's a strategic decision

20  he's made.  And if you want to interpose your objection, you

21  may.  But it's not the government's fault.

22       MR. DURKIN:  And I'm not suggesting it is.

23       MS. DIXON:  I would simply object and ask Your Honor

24  to sever, just for the record.  It's --

25       THE COURT:  No.  No.  There is no substantive basis to

TRIAL ONE – VOL. 23 –  4661

1   sever this.

2          MS. DIXON:  It's just --

3          THE COURT:  I don't know that any of us, save perhaps

4   Mr. Devillers, knows what may lurk in his files.  But seeing

5   that Mr. McVay is soon to find out, do you have anything that

6   you wish to add to any of these objections?

7          MR. NOLDER:  No.  I'll stay out of it.

8          MR. DURDEN:  I'll object for the record, Your Honor.

9          THE COURT:  What are you objecting -- I mean, there is

10  nothing to object to.  My point is, unless you are objecting to

11  him laying the foundation for these exhibits -- Is that what

12  you all are objecting to?

13         MR. DURKIN:  We are.

14         MS. DIXON:  We are.

15         THE COURT:  Your objection is noted, but there is no

16  substantive or evidentiary basis for your objection.  The

17  objections are overruled.

18         MR. McVAY:  I'm going to ease everyone's concerns

19  here.  In light of the conversation we had here, I'm going to

20  move on to another area.

21         THE COURT:  That's totally up to you.

22    (The following proceedings were had in open court.)

23         THE COURT:  Please continue, Mr. McVay.

24         MR. McVAY:  Thank you, Your Honor.

25   BY MR. McVAY:

TRIAL ONE – VOL. 23 –   4662

1    Q    Mr. Duerr, in light of our conversations, I'm going to

2    move on to another area of my inquiry.  Thank you.

3         Again, just to kind of be a level-setter again, what

4    we're talking about here is, in your field, it's a subjective

5    scientific comparison that is made in which you draw a personal

6    opinion about whether there's a comparison sufficient to

7    satisfy you as to whether or not a firearm fired a

8    sufficient -- fired a particular shell casing or -- I'm

9    sorry -- projectile and ejected a particular shell casing,

10   correct?

11   A    Yes.  It's my expert opinion, yes.

12   Q    Okay.  And, in your work, this is not a matter of, when

13   you make your comparisons, you don't have any type of

14   machinery, because we are talking about microscopic things

15   here, to do any form of measurement, correct?

16   A    That's correct.  I did not do any measurements.

17   Q    And the reason you don't do measurements is because it

18   would be somewhat unreliable in the sense that we're talking

19   about a two-dimensional measurement of a three-dimensional

20   object?  Is that fair to say?

21   A    And it would still be me taking those measurements.

22   Q    Okay.  And, again, they're a two-dimensional view of a

23   three-dimensional object, looking through the microscope and

24   trying to measure something that is -- is appearing to you as a

25   two-dimensional object, correct?

TRIAL ONE – VOL. 23 – 4663

1   A    Yes.  However, by using the shading of the lights and

2   everything, it appears to be three-dimensional under a scope.

3   This is a two-dimensional picture, yes.

4   Q    Okay.  So, having said that, basically, I have two

5   questions for you.

6        When you do your comparison, is it fair to say that

7   there is nothing in the work that you do that tells you when a

8   projectile was fired or when a shell casing was ejected,

9   correct?

10  A    Oh, that's correct.  You mean "time" as in when it was

11  actually done at the crime scene, or whenever?

12  Q    You can't form or express an opinion as to on what date,

13  what time, a projectile was fired or a shell casing ejected?

14  A    That's correct.

15  Q    Okay.  And, again, similarly, you can't tell who fired

16  that firearm?  Even assuming that you're correct as to your

17  comparison and the opinions that you formed, that opinion does

18  not inform you as to who fired a firearm.  Fair to say?

19  A    That's correct.  I have personal knowledge -- I have no

20  personal knowledge of either.

21       MR. McVAY:  Okay.

22       May I have a moment, Your Honor?

23       THE COURT:  Yes, you may, Mr. McVay.

24   (Whereupon, there was a brief interruption.)

25       MR. McVAY:  No further questions.  Thank you,

TRIAL ONE - VOL. 23 -  4664

1    Mr. Duerr.

2            THE WITNESS:  Yes.

3            THE COURT:  Mr. Nolder, do you have anything?

4            MR. NOLDER:  No questions.

5            THE COURT:  Mr. Devillers, I am assuming that you have

6    nothing further, or do you?

7            MR. DEVILLERS:  I do, Your Honor.

8            THE COURT:  Oh.

9                            - - -

10                      REDIRECT EXAMINATION

11   BY MR. DEVILLERS:

12   Q    I would like to see what you showed Mr. --

13           THE COURT:  McVay.

14   BY MR. DEVILLERS:

15   Q    -- McVay.

16           MR. DEVILLERS:  Sorry, Kirk.

17   BY MR. DEVILLERS:

18   Q    Could I see that, briefly?

19   A    My notes?

20   Q    Your notes.  Your photographs.

21           MR. DEVILLERS:  May I approach the witness, Your

22   Honor?

23           THE COURT:  Yes, you may.

24           THE WITNESS:  May I separate these out?  These are my

25   only case notes.

TRIAL ONE – VOL. 23 – 4665

1          MR. DEVILLERS:  You may.  I'm going to put a sticker

2     on it, but I'll give it back to you.

3          THE WITNESS:  If you're going to give it back to me,

4     okay.

5          MR. DEVILLERS:  I promise.

6          THE WITNESS:  This is prior to electronic.  It's

7     paper.

8     BY MR. DEVILLERS:

9     Q     What was it that you wanted to show?  Is it this?

10    A     The two with the -- The two pages with the orange tabs.

11    Q     I'm going to put a sticker on it, and I'm going to mark

12    this as Government's Exhibit 31-31.  Is that okay?

13    A     Yes.

14    Q     All right.  And, for the record, what is it we're about

15    to look at?

16    A     These are the photographs showing the location and index

17    point where I made my identification for each of the cartridge

18    cases that I identified in this case.

19    Q     So, you've identified four cartridge cases thus far?

20    A     The ones that I've testified about, yes.

21    Q     And were all of those cartridge cases fired by the same

22    firearm, within a reasonable degree of ballistic certainty?

23    A     Yes.  Three on one page and one on the other page.

24    Q     I'm going to show you what's been marked as Government's

25    Exhibit 31-31.  All right.  And are these photographs of those

TRIAL ONE – VOL. 23 –  4666

1   four shell casings?

2     A    Only three –– Three of those four are the ones I've

3   testified about.

4     Q    Okay.  And what's the fourth one?

5     A    That is another cartridge case that I examined in this

6   particular case.

7     Q    Nothing to do with that particular firearm?

8     A    Correct.  It did not match that firearm.  In fact, it is

9   of a different caliber.

10    Q    Okay.  But these are pictures that you took?

11    A    Yes.

12    Q    Are they true and accurate depictions of what you saw

13  through the microscope?

14    A    Yes, they are.

15         MR. DEVILLERS:  May I publish this to the jury, Your

16  Honor?

17         THE COURT:  Any objection, Mr. Durden?

18         MR. DURDEN:  No, Your Honor.

19         THE COURT:  Mr. Durkin?

20         MR. DURKIN:  Yes, for the previously stated reasons,

21  Your Honor.

22         THE COURT:  Ms. Dixon?

23         MS. DIXON:  No, Your Honor.

24         THE COURT:  Mr. McVay?

25         MR. McVAY:  No, Your Honor.

TRIAL ONE – VOL. 23 – 4667

1          THE COURT:  Mr. Nolder?

2          MR. NOLDER:  No, sir.

3          THE COURT:  Your objection is noted, Mr. Durkin, but

4    overruled.  The door has been opened.

5          Please proceed.

6          MR. DEVILLERS:  Thank you, Your Honor.

7    BY MR. DEVILLERS:

8    Q    Okay, sir.  Can you tell us, just the shell casings,

9    where the shell casings subject to your testimony today are

10   located in this exhibit?

11   A    I'll explain, the top left photograph, that's

12   actually -- on the left is a test fire.  On the right is the

13   evidence.

14   Q    Okay.

15   A    The hairline going down the middle separates the two.

16   So the cartridge case -- The comparison on the top left, top

17   right, and bottom left are three of the four cartridge cases.

18   Q    Okay.

19   A    That would be C1, C2 and C3.

20   Q    Exactly.  Okay.  So, the image we see in the top left,

21   that is one of the casings; is that right?

22   A    It's actually two cartridge casings.  It's a test-fired

23   cartridge case and an evidence cartridge case.

24   Q    And which one is the test -- Which side is the test-fire

25   on?

TRIAL ONE – VOL. 23 –  4668

1    A    Left.

2    Q    Left.  And does that test fire come from the firearm you

3    have in front of you?

4    A    Yes.

5    Q    All right.  Explain to us -- I believe the question on

6    cross-examination was how you, as a examiner, can say that that

7    was fired, within a reasonable degree of ballistic certainty,

8    from the same firearm, the things you look at.  What are you

9    looking at here in this image?

10   A    First I'll explain, the test fire -- a cartridge case is

11   smooth, the primer, the silver part.  The first thing I would

12   do is, in the comparison of the two, examine if the class

13   characteristics are alike.  This one, for instance, has the

14   elliptical firing pin, egg-shaped, oval-type firing pin.

15        On this one, this is -- Like I said, this is just a

16   point of reference for me in my notes.

17        What I'm looking at there, along the hairline is the two

18   samples brought together.  The individual characteristics are

19   the deep -- You can see the valleys listed there and things

20   like that.  There was other areas on this primer that I

21   examined by moving the cartridge cases on that hairline.

22        And you can see differences, individual characteristics,

23   if you look at where I have the hairline on that.  For example,

24   on the bottom left, that's a different cartridge casing showing

25   a different -- same class characteristic, being elliptical, but

TRIAL ONE – VOL. 23 –   4669

1   the individual characteristics are different on that aperture

2   mark where that hairline is.

3       And as you can see in the other three, just with the

4   pictures along my reference items, you can see the similarity,

5   or the matching, between those three samples.

6       MR. DEVILLERS:  Okay.

7   I have no further questions, Your Honor.

8       THE COURT:  Mr. Durden?

9       MR. DURDEN:  No, Your Honor.

10      THE COURT:  Mr. Durkin?

11      MR. DURKIN:  No, Your Honor.

12      THE COURT:  Ms. Dixon?

13      MS. DIXON:  No, sir.

14      THE COURT:  Mr. McVay?

15      MR. McVAY:  No, Your Honor.  Thank you.

16      THE COURT:  Mr. Nolder?

17      MR. NOLDER:  No.

18      MR. DEVILLERS:  May I return the --

19      THE COURT:  Mr. Duerr, thank you very much, sir.  You

20  may be excused, and you may return those items to him.

21      THE WITNESS:  Thank you, Your Honor.

22      MR. DURKIN:  Your Honor, would we be able to get a

23  color copy of that exhibit?

24      THE COURT:  I was just getting ready to say that,

25  since it was admitted into evidence, we do need a copy of that

TRIAL ONE – VOL. 23 –  4670

1    exhibit.  We'll get that for you.

2          MR. DEVILLERS:  Thank you, Your Honor.

3          THE COURT:  Mr. Duerr, you may be excused.

4       Your answer is "yes."

5          THE WITNESS:  Thank you.

6          THE COURT:  Mr. Kelley, your next witness?

7          MR. KELLEY:  Thank you, Your Honor.  We call Eileen

8    Fyffe.

9      (Witness sworn.)

10         THE COURT:  Ms. Fyffe, please come forward and be

11   sworn, ma'am.

12         COURTROOM DEPUTY CLERK:  Please raise your right hand.

13       (Witness sworn.)

14         COURTROOM DEPUTY CLERK:  Please be seated.

15         THE COURT:  Ms. Fyffe, please bend the microphone

16   toward you and speak clearly into it.  All right?

17         THE WITNESS:  Okay.

18         THE COURT:  Thank you very much, ma'am.

19       Please proceed, Mr. Kelley.

20         MR. KELLEY:  Thank you, Your Honor.

21

22

23

24

25

TRIAL ONE – VOL. 23 –  4671

1                         –  –  –

2                     EILEEN FYFFE

3    Called as a witness on behalf of the Plaintiff,

4    being first duly sworn, testified as follows:

5                         –  –  –

6                   DIRECT EXAMINATION

7    BY MR. KELLEY:

8    Q    Would you please state your name and spell you first and

9    last name for our jury?

10   A    Eileen Fyffe, F-Y-F-F-E.

11   Q    Ms. Fyffe, where do you currently live, what area of

12   town?

13   A    West side.

14   Q    How long have you lived on the west side?

15   A    All my life.

16   Q    And do you have children?

17   A    Yes.

18   Q    How many children have you had?

19   A    Two.

20   Q    What are their names?

21   A    Anthony Wright and Crystal Fyffe.

22   Q    When was Crystal born, ma'am?

23   A    August --

24        THE COURT:  Take your time, ma'am.  Take your time.

25        Betty, would you give Ms. Fyffe some water?

TRIAL ONE - VOL. 23 -  4672

1            THE WITNESS:  Just a second.

2            THE COURT:  Ms. Fyffe, take your time.

3            THE WITNESS:  August 3rd, 1981.

4    BY MR. KELLEY:

5    Q    And, Ms. Fyffe, I know it's difficult, but I'm going to

6    ask you to kind of bear with me, and we're going to talk a

7    little bit about Crystal.  Okay?

8    A    Uh-huh.

9    Q    Where did Crystal go to school initially?

10   A    Elementary, Avondale.  High school, West, for a little

11   bit.  And she dropped out.

12   Q    Do you know what grade she dropped out in?

13   A    About tenth.

14           THE COURT:  What high school did you say she went to?

15           THE WITNESS:  West High.

16           THE COURT:  West.  Okay.

17   BY MR. KELLEY:

18   Q    Did she work at all during this time?

19   A    She was working some part-time jobs.

20   Q    What kind of work did she do part-time?

21   A    She worked at -- She was going to printing -- working at

22   a printing place downtown somewhere here.

23   Q    And can you estimate for us, roughly, the years that

24   that would have been going on?

25   A    Probably about 2006, 2007, maybe.

TRIAL ONE – VOL. 23 –  4673

1    Q    At some point did she have a child?

2    A    Yes.

3    Q    When was the child born?

4    A    March 21, 2000.

5    Q    And what's the child's name?

6    A    Marcysia Daniels.

7    Q    And if you'll help our court reporter out, can you spell

8    Marcysia's name for us?

9    A    M-A-R-C-Y-S-I-A.

10   Q    Do you all have a nickname for her?

11   A    Cysia.

12   Q    In the years after she had Cysia, were you involved in

13   helping raise Cysia?

14   A    Yes, From the beginning.

15   Q    And not that the jury needs an explanation, but just

16   explain to the jury how was the relationship between you,

17   Crystal, and Cysia.

18   A    Crystal lived with me, and we -- we -- mother daughter.

19   We would have our fun times.  We'd argue some because she was a

20   grown woman.  So, you know, I thought you have to have a

21   part-time job and help pay the bills and take responsibility

22   and was -- you know, she was a mother, but she was a good

23   person.

24   Q    How old was she when she had Cysia?

25   A    How old was she?  Cysia was born -- nineteen, nineteen,

TRIAL ONE – VOL. 23 –  4674

1    twenty.

2        Q    Was she in a relationship during the time she had Cysia

3    or shortly thereafter?

4        A    She was with Marcysia's dad.

5        Q    Okay.  And, over time, did that change?

6        A    Yes.

7        Q    Did she get into another relationship?

8        A    Yes.

9        Q    Who was that relationship with?

10       A    She was -- Robert Ledbetter.

11       Q    Do you remember when that relationship started?

12       A    It was while she was working at the printing shop.

13       Q    Okay.  Did you meet Robert Ledbetter when she first

14   started in that relationship?

15       A    No.

16       Q    How did you hear about him?

17       A    Really, just kind of, like, when she started having

18   Marcysia's birthday party, I met him.

19       Q    Do you remember which birthday that was?

20       A    It would have been -- I don't know -- maybe her sixth

21   birthday or something.  I'm not really sure.

22       Q    Would that put us about 2006?

23       A    Yeah.

24       Q    Does that sound about right to you?  If you're not sure,

25   that's okay.

TRIAL ONE - VOL. 23 -  4675

1   A    Yeah.  I'm just trying -- yeah, because it was just all,

2   you know, birthday parties through the years.

3   Q    That was the first time, though, you met Mr. Ledbetter?

4   A    Yeah, but we never really -- we never talked.

5   Q    At that party?

6   A    No.  Probably, if anything, maybe "hi," but no talking.

7   Q    Okay.  Was this relationship going on for awhile as far

8   as you knew?

9   A    Clear up until, you know, he got arrested.  They did

10  split up a few times where she -- you know, split up a few

11  times.  She tried to leave.

12  Q    Let's start with, where was she living when she first

13  started dating him?

14  A    With me.

15  Q    In the same house you live in today?

16  A    No.

17  Q    When did you move into the house that you live in today?

18  A    I think 2007.

19  Q    Okay.  But she lived with you before that?

20  A    Yes.

21  Q    And during times if the relationship was rocky, would

22  she share that with you?

23  A    No.

24  Q    Explain that so our jury understands.

25  A    Crystal didn't tell me about anything that was going on

TRIAL ONE - VOL. 23 -  4676

1  like that.  I was working, and she was home with Marcysia.  And

2  then when I would come home, she would leave.  And I would -- I

3  have to be at work at like -- I get up at 4:00, or whatever, in

4  the morning.  And I'd be calling and calling her phone, and she

5  wouldn't answer.  And I'd get agitated and mad because she

6  wouldn't call.  But then it would just be late, you know, late,

7  late at night, she would come in.  But then she would go in her

8  room with Marcysia.  And then I'd get up and go to work and

9  come back home.  And it was sort of like, sometimes, an ongoing

10 process.

11   Q    Was that a source of some problems between you and

12 Crystal at times?

13   A    Yeah.

14   Q    Were you caring for Cysia when she would be gone?

15   A    Yes.

16   Q    And those are times you said she -- In regards to the

17 phone, could you reach her on the phone regularly?

18   A    No.  Most of the time, no.  And I'd always ask her why,

19 why -- why ain't you answering your phone?

20        She'd say, Oh, my phone is dead.

21        She would always have some kind of excuse.

22        I said, What if something was to happen to Marcysia?

23 How am I going to get ahold of you, you know, if she was to be

24 in the hospital or something?

25        But then, you know, that was the end of that.

TRIAL ONE – VOL. 23 – 4677

1   Q     Did there come a time, in fact, that Crystal did go to

2   the hospital?

3   A     Yes.

4   Q     Tell our jury about that.  How did you first hear about

5   it?

6   A     I kept calling and calling and calling her phone

7   because, my mom, was -- my mom was dying.  This was in 2009.

8   My mom was on her death bed.  And my sister called me, and she

9   told me that I needed to get over there, you know, to spend a

10  few moments with her.

11        So I called because I had Marcysia.  So, I kept calling,

12  and I kept calling.  And she wasn't answering.  And so,

13  finally, her friend answered the phone.  And I said, Leah, I

14  said, where's Crystal?

15        And she said, I think she is in the hospital.

16        I said, What do you mean she's in the hospital?

17        She said, Well, she's been shot.

18        And I said, Do what?

19        And she said -- she said, She didn't want me to call

20  you.  She said, She is in surgery.

21        And I said, Where are you at?

22        And she said, I'm at OSU.

23        And I said, Okay.  I said, I'm coming.  I'm on my way.

24        So I called my sister, and her and my brother-in-law

25  took me up to the hospital at OSU.

TRIAL ONE - VOL. 23 - 4678

1    Q    Did you get to see Crystal when you got there?

2    A    When I first got there, I had to sit down and when they

3    was bringing her out of surgery.  And the doctor came out and

4    explained to us what they did to her hand.  And then we got to

5    go up there.  They was bringing her out of recovery.  So we

6    went upstairs to her room.

7    Q    Can you explain for the jury what was the injury that

8    she suffered?

9    A    She got shot in her right hand, in her -- by her finger,

10   pinky.

11   Q    And what kind of damage did it cause?

12   A    They wanted to remove her finger.  But she told them,

13   when she went in, she didn't want her finger cut off.  She

14   didn't want -- she wanted to keep her finger.  So they put some

15   metal rods, whatever, in her hand to keep her finger together.

16   But he said it would never be right.  And he also even told

17   her, eventually, she may have to have it cut off because of the

18   damage that it did.

19   Q    Was there a time at the hospital that you were then able

20   to talk to Crystal about what had happened?

21   A    When I got -- When we got to go upstairs, they brought

22   her in the room.  And she was still coming out of the, you

23   know, the drugs.  And her friend, Leah, was there.  And her

24   phone rung, and I picked it up.  And she still wasn't talking.

25   She was still coming out of it.  And her phone rung.  And I

TRIAL ONE - VOL. 23 - 4679

1    picked it up.  And she heard me say -- because I said -- it

2    was -- I think -- I don't know -- Don somebody asked where is

3    Crystal.  I said, She's in the hospital.

4         And all of a sudden she kind of like opened her eyes.

5    And she's like -- She got real angry.  She's like, Oh, my gosh!

6    She said, Hang up!  Hang up!  She said -- She said, You just

7    don't know what you just did.

8         And I'm like, What are you talking about, Crys?

9         So, I hung up the phone.  And she's like, Just leave.

10   Just leave.

11        And I'm like, What -- what -- what did I do?

12        She said, Just leave.  Just leave.  You don't

13   understand.

14        I'm like, Crys, I said, I come all the way up here to

15   the hospital.  My mom is dying.  And, you know, and I come up

16   here, and you're telling me to leave.  I don't understand.

17   What did I do?

18        And I could see I was making her upset.  So, I looked at

19   my sister, Nancy.  And then I said, Okay.  I said, I'll leave.

20   Q    You mentioned a Leah was there.  Do you know this Leah?

21   A    Yes.

22   Q    Who is she?

23   A    She was Crystal's friend.

24   Q    Okay.  And before you left, or before this incident with

25   the phone call, did Crystal explain to you how she had gotten

TRIAL ONE - VOL. 23 - 4680

1    shot?

2     A    All I heard was that they were -- I don't -- It didn't

3    come from Crystal.  I don't -- that they -- it was supposed to

4    --

5              MR. GATTERDAM:  Objection.

6              THE COURT:  Sustained.

7              Rephrase your question, Mr. Kelley.

8     BY MR. KELLEY:

9     Q    Let's focus, first, on the time in the hospital.

10         Did you talk to Crystal about what had happened while

11   you were in the hospital with her?

12    A    No.

13    Q    Okay.  Did there come a time where you talked to Crystal

14   about what had happened?

15    A    Yes.

16    Q    And did she explain to you, then, what had happened?

17    A    I -- I had two different stories, the first story and

18   the last story.  So --

19    Q    Tell us the first story.  What was the first story?

20    A    The first story -- the first thing that she told me,

21   this is what she said:  That she and Brandon had stopped at a

22   place up on -- oh, I don't know -- I'm going to say Weber Road,

23   whatever -- at a restaurant.  Brandon got out to go get some

24   food, wings, chick- -- I don't know -- went out to get

25   something.  And she said that she was in the car, and two

TRIAL ONE - VOL. 23 -  4681

1    people were arguing.  And she said she got scared and got out,

2    and she heard shots, and she put her hands up like this

3    (indicating) for the cross-fire, and she got shot in the

4    finger.

5         And I said, Crys, did any -- I didn't hear anything on

6    the news.  I didn't hear her talk to any kind of -- no cops.

7    So I just couldn't understand, you know.  If you got shot in

8    the hand through a cross-fire, why didn't I hear anything on

9    the news?

10        And that's -- she wouldn't change.  That's what -- the

11   story she told me until --

12   Q    Until it changed?

13        THE COURT:  Ma'am, in relation to when she was shot,

14   do you remember approximately when she told you this first

15   story?

16        THE WITNESS:  It was -- It was when she -- She told me

17   this, like, the day, maybe, after she had got shot --

18        THE COURT:  Okay.

19        THE WITNESS:  -- because, of course, I asked what

20   happened.

21        THE COURT:  Yeah.

22        THE WITNESS:  And it was just, that night, she didn't

23   tell me.

24        THE COURT:  Okay.  Thank you.

25        Please continue, Mr. Kelley.

TRIAL ONE - VOL. 23 -  4682

1          MR. KELLEY:  Thank you, Your Honor.

2     BY MR. KELLEY:

3     Q    Did you talk to Brandon at all in that day that she was

4     shot or close in time to that?

5     A    On the way to the hospital.

6     Q    Tell us about that.

7     A    He said that he was out looking for the person who shot

8     Crystal.  And I told him -- I said, Don't do that.  You need to

9     go back to the hospital and be with her.

10    Q    Did you learn how Crystal got to the hospital?

11    A    At that time, no.  Later on, yes.

12    Q    Did you ever see Brandon at the hospital?

13    A    No.

14    Q    In the weeks that followed, was Crystal still in a

15    relationship with Brandon?

16    A    Yes.

17    Q    Can you describe for the jury, in the weeks that

18    followed, how would you describe their relationship?

19    A    I -- My mom had just passed.  So, when Crystal got out

20    of the hospital, I had cleaned up a room for her so she could

21    be comfortable for her hand and everything.  And I went to go

22    over, because my mom passed at my sister's house, and we were

23    all there before -- before they took my mom out.  And I was

24    surprised to see Brandon in my house, because I've never seen

25    Brandon in my house.  He's never been in my house, but he was

TRIAL ONE - VOL. 23 -  4683

1    laying beside her in the bedroom, and Leah was on the other

2    side of her.  And I guess they ended up getting a place

3    together.  He took her to Hawaii.

4      Q    Was that soon after that time when she'd been shot?

5      A    She was shot in 2009, in January.  I don't know the

6    exact time and date or anything like that.  I had too much

7    other stuff, you know.

8      Q    But you remember it was around the time your mom was

9    passing, right?

10     A    Uh-huh.

11     Q    And did she go to Hawaii shortly thereafter?

12     A    If it was the same year, it would have been, like,

13   around her birthday, because me -- me and Marcysia, we painted

14   her one bedroom for her.  We kind of set it up like a hotel

15   room.  So it was around -- it would be probably at the end of

16   July, around.

17     Q    But you indicated she wasn't living there?

18     A    She was -- She was still living with me.

19     Q    Was she also living somewhere else, or spending a lot of

20   time elsewhere?

21     A    With Brandon.

22     Q    Do you know where they were living when they were

23   together?

24     A    I -- I never went to the first house that Crystal said

25   they had.  I've never been to their house other than until

TRIAL ONE - VOL. 23 -  4684

1    after Crystal got -— until after Brandon got arrested and

2    Crystal moved.  And it was up in Reynoldsburg.

3         The other one, I think -- I can't even tell you.

4    Crystal didn't tell -- Crystal didn't tell me too much of that

5    stuff until after.

6    Q    You mentioned a couple times that there was a second

7    story.  We're talking about after.  I want you to explain to

8    the jury when did things change and Crystal started explaining

9    more things to you?

10   A    Not until after Brandon was in jail.

11   Q    Do you remember when that was?

12   A    She started telling me the first time they'd arrested

13   him when she called me, and she said, Mom, did you see the

14   news?

15        And I said, No.  Why?

16        And she said, Because they're looking for Brandon.

17        I'm like, Well, what are they looking for him for?

18        She said, For murder.

19        And I'm like, Do what?

20        And it threw me back.  And then, then after, she started

21   telling me stuff.

22   Q    Let's take it small bits at a time.  Do you remember

23   where that murder was?  Does a town stand out for you?

24   A    Pickerington.

25   Q    Pickerington.  Did Crystal say she knew anything about

1  this murder?

2   A    She said the Pickerington detective wanted to question

3  her about somebody had said that she had had a bag of clothes

4  and got rid of the clothes of a murder that happened in

5  Pickerington.

6   Q    And did she say if she had done something like that?

7   A    I asked her.  I said, Crystal, did you take something

8  like that and do -- .

9         She is like -- She said that she did take something and

10  she threw it away but she didn't look at it to see what was in

11  it.

12   Q    Did she seem to know that's what they wanted to talk to

13  her about?

14   A    She said that somebody had told her that that's what

15  they were --

16         MR. GATTERDAM:  Objection.

17         THE COURT:  Sustained.

18         Rephrase your question, Mr. Kelley.

19         MR. KELLEY:  Sure.

20   BY MR. KELLEY:

21   Q    This thing about the bag of clothes and whether she did

22  something with it or not, did you and Crystal talk about that

23  much?

24   A    Not much.

25   Q    Did it seem like that was something important to

TRIAL ONE - VOL. 23 -  4686

1    Crystal?

2     A    Yes.  Yes, because she was afraid that they -- the

3    detective told her that she could be charged with getting rid

4    of evidence and --

5     Q    Did she say if she did anything to help Brandon as it

6    related to this murder?

7     A    She just said that she had threw a bag away, but she

8    didn't know what was in it.  She -- That's all she told me

9    about that.

10    Q    Did she ever say anything about helping Brandon find a

11   location or an address?

12    A    She -- She was always looking up stuff.  She didn't say

13   to -- not that I remember her saying anything.

14    Q    Okay.  Then, after she starts telling you things like

15   that, does she tell you what really happened the time she was

16   shot?

17    A    Yes.

18    Q    Can you tell our jury about that, please?

19        THE COURT:  Mr. Kelley, would you also, in setting

20   your foundation, give me a time frame?

21        MR. KELLEY:  I'm sorry.

22    BY MR. KELLEY:

23    Q    You said Brandon was being looked for in relation to

24   this Pickerington murder.  Do you have a time that you can

25   estimate for us that would have been?

TRIAL ONE - VOL. 23 - 4687

1  A   When he got picked up?

2  Q   Yeah.

3  A   It was in February.  They pulled him over for a traffic

4  stop, or something, and found drugs on him.  So, then he was

5  arrested and --

6  Q   Do you know what year that was?

7  A   2011.

8  Q   Okay.  And is that around the time frame, then, that she

9  started telling you more and more of these things?

10 A   As it got closer to -- about after she started going to

11 talk to her attorney and then she started to tell me a little

12 bit more and more of what was going on.

13 Q   And did she tell you about that original shooting

14 incident and what happened?

15 A   For the Pickerington, or her --

16 Q   No, in regards to her being shot in the hand.

17 A   Yes.

18 Q   What did she tell you had happened?

19 A   She said that Brandon had shot her in the hand because

20 she was trying to leave.  And she said that he had her tied

21 like this (indicating), with her hands up like this, and held a

22 gun to her head and threatened her and threatened our life.

23 And the gun went off and shot her in the hand, and he dropped

24 her off at the hospital and told her the story to tell the

25 police and --

TRIAL ONE – VOL. 23 –  4688

1    Q    Did she say why this happened?

2    A    Because she said that she wanted to leave.

3    Q    Wanted to leave Brandon?

4    A    (Nodding affirmatively.)

5    Q    Did she say if Brandon made any threats to people other

6    than her?

7    A    To myself, my sister, my son, that if she was to leave,

8    that he would do something to us.

9    Q    After telling you that, do you know if Crystal still had

10   some contact with Brandon?

11   A    I don't know.

12   Q    Were there times?

13   A    She -- I think she went down -- I think she talked to

14   him -- Yes, she talked to him a few times on the phone.

15   Q    Did she explain why she didn't tell you the truth, the

16   first time, about what had happened?

17   A    Because she was scared, she didn't -- and he told her

18   not to say nothin'.

19   Q    Are you aware of Brandon spending money on Crystal?

20   A    Yes.

21   Q    Can you tell our jury about some of the things that you

22   know he bought?

23   A    Cars and some jewelry from -- What is it? -- the Kay

24   Kay, whatever, Jewels?  I don't know what that store is called

25   Kay Jewelry.

TRIAL ONE - VOL. 23 -  4689

1    Q    Okay.  Can you tell us some of the cars?  Do you know

2  about some of those cars, the specifics?

3    A    She had -- She had a black car, one time, with tinted

4  windows.  And she ended up getting rid of it.  And she had a

5  Trailblazer that, supposedly, had got wrecked.  And then she

6  had a Tahoe.  And then there was the blue car that was in her

7  name.

8    Q    Tell us about that blue car.  Can you describe it for

9  us?

10   A    It was an older car, real pretty.  And it was a Chevy

11 Impala.

12   Q    And whose car was it?

13   A    She said it was in her name, but it wasn't hers.  It was

14 Brandon's.

15   Q    During this time, was Crystal, herself, working?

16   A    No.  There -- She didn't have a job, like that, where

17 she could afford all that stuff.

18   Q    Where did you think her money was coming from?

19   A    Just -- I knew she was getting her money from Brandon.

20   Q    And during this time frame -- Strike that, Your Honor.

21        You mentioned Brandon getting arrested.  Before he was

22 arrested, though, did anything ever happen with that blue car?

23   A    She said that -- I don't even know how it came up, but

24 she said that somebody had stolen the car from Melissa's house

25 and she had to call insurance on it.

TRIAL ONE - VOL. 23 -   4690

1        And I said, What do you have a car like that down at
2   Melissa's house for?
3        Didn't make any sense.  And she said somebody stole it,
4   and it got wrecked, and so she was filing insurance charges on
5   it, or phoning insurance on it.
6   Q    Do you know if she got an insurance settlement on it?
7   A    I saw a paper, you know, after she had passed, for
8   $20,000 for it.
9   Q    Do you believe that car was stolen?
10  A    No.
11  Q    Who was Melissa?
12  A    Melissa was her friend.
13  Q    Did Brandon know Melissa?
14  A    Yes.
15  Q    Did Crystal tell you anything else about Brandon and any
16  murders?
17  A    She said that, when Brandon's brother got, got shot,
18  that they found him and killed the person who did -- shot his
19  brother.
20  Q    Did she say who they were?  And you have to show our
21  court reporter.  Can you say "yes" or "no"?
22  A    No.
23  Q    Okay.  Was it your understanding, though, that Brandon
24  was one of those "they"?
25  A    Yeah.

TRIAL ONE – VOL. 23 –  4691

1    Q    Did she share anything else that Brandon said to her

2  about snitches?

3    A    That they don't mess with his money and they don't steal

4  from him and they don't snitch on him.

5    Q    And Crystal shared that with you?  You have to answer

6  for me, ma'am.

7    A    I'm sorry.  Yes.

8    Q    Did there come a time that Crystal moved out of wherever

9  she had been living with Brandon?

10   A    Yes.

11   Q    And can you tell us the circumstances around that?

12   A    The 2011?

13   Q    Uh-huh.

14   A    She moved out because she was scared for her life.  She

15  came home.

16   Q    And what had happened to Brandon around that time?

17   A    He was still -- He was in jail.

18   Q    And did something come up regarding some money of

19  Brandon's?

20   A    She had -- I don't even know how -- She had $30,000 that

21  was Brandon's money that she was supposed to take up to his

22  attorney and take, I guess, she said something like 10,000 out

23  for her attorney, but the DEA came to the house and got the

24  money.

25   Q    Do you know what house they came to to get that money?

TRIAL ONE - VOL. 23 -  4692

1   A    My house on Belvedere.

2   Q    Do you know how the money got there?

3   A    She brought it in, but I don't know where she

4   got -- where she went to get it or whatever.

5   Q    After Crystal gives the DEA this money, how would you

6   describe her demeanor?  How was she acting?

7   A    After she gave him the money -- gave the money, she was

8   really, really scared.  That's when we went up to her house to

9   move her stuff out of the house, because she said that he was

10  going to kill her because of them taking the money.

11  Q    Who is the "he" you're talking about?

12  A    He was going to kill her.

13  Q    Who is "he"?

14  A    She was afraid of a man named "Santa."

15  Q    How did this name "Santa" come up?

16  A    She said that Brandon would use him.

17  Q    Did she say why Brandon would use this guy named

18  "Santa"?

19  A    If you needed something done.

20  Q    And she took that to mean what?

21  A    Death.  Her being killed.

22  Q    Did she ever tell you about a letter she got from

23  Brandon regarding Santa?

24  A    I saw -- I found the letter.  She -- I think the letter

25  was sent to Melissa, and she got it from Melissa's.  And it was

TRIAL ONE – VOL. 23 –  4693

1    from Brandon.  And he had on it that Santa would be coming

2    early this year.

3      Q    Do you remember the time of year that letter was?

4      A    It was in the summertime, I believe.

5      Q    Did Crystal tell you anything more about this Santa

6    person?

7      A    I don't --

8      Q    Was she scared?

9      A    She was very scared.

10     Q    What kind of things was she doing because she was

11   scared?

12     A    I had ADT put on my house.  I did try to take her down

13   to my cousin's house to get her out of Columbus, but she

14   heard -- she heard Crystal on the phone, talking, because

15   Brandon kept trying to call her phone.  And she called a

16   detective in Pickerington because she was so scared.  And my

17   cousin wouldn't let her stay there because they were afraid

18   something was going to -- they were afraid something was going

19   to happen to them if she was there.

20     Q    Do you remember there being talk about Crystal going to

21   visit Brandon?

22          Let's take a moment.

23            THE COURT:  Yeah.

24       (Whereupon, there was a brief interruption.)

25            THE COURT:  Ms. Fyffe, do you need some water or

TRIAL ONE - VOL. 23 - 4694

1    anything?  Do you want to take a -- Are you ready to proceed?

2              THE WITNESS:  (Nodding affirmatively.)

3              THE COURT:  Please continue.

4              MR. KELLEY:  Thank you, Your Honor.

5      BY MR. KELLEY:

6      Q    Ms. Fyffe, do you remember some talk from Crystal about

7    Brandon wanting her to come visit him in jail?

8      A    I don't remember.

9      Q    Do you know if Crystal ever went to visit him in jail?

10     A    I don't remember.

11     Q    That's okay.  I'm now going to take you to October of

12   2011.  Do you remember the night before Crystal died?

13   Something happened involving Crystal.  Can you tell our jury

14   about that?

15     A    I think she had got a phone call -- I believe she got a

16   phone call that Brandon's uncle, or somebody, was missing.  And

17   she was -- His aunt wanted her to go up and help find him.  But

18   when she got there, she saw him on the porch, or whatever.  So

19   she left because she -- well, she thought she was being set up

20   to be killed.

21     Q    And to be fair, during this time, Brandon, himself, was

22   in jail, right?

23     A    Yes.

24     Q    All right.  I'm going to take you to the next day, which

25   is October 19th, 2011.  Tell us what's going on that evening.

TRIAL ONE – VOL. 23 – 4695

1    A    Crystal -- Crystal and Marcysia came home.  And I was in

2    the front room.  And they went into the dining room, and

3    Crystal put a pizza in the oven for Marcysia.  And I was

4    texting my boyfriend, at the time, on the phone.

5         And Crystal had said -- That's when those animals came

6    up loose in that one town, and they shot all of the animals.

7    And we were talking about that for a minute.  And she said,

8    That's messed up, they had to kill all them animals.

9         And I said, Yeah, it is.

10        And she says, You want to go half on a pizza?

11        And I said, Well, why do you want to go have a pizza

12   for, Crys?  You just stuck one in the oven.

13        She said, I don't want that one.

14        And her favorite place to eat was Josie's Pizza.  And I

15   told her -- I said, I don't want Josie's, Crys.

16        She said, Okay.  So we'll do this thing.

17        She said, Okay, Grandma's.

18        I said, I don't want Grandma's.

19        She said, Okay.  Donatos.

20        I said, Okay.

21        So, I got up to give her my money.  And, as I was

22   getting up, I realized I had on her flip-flop sandals.  And she

23   don't like nobody to wear her shoes.  And then I thought, oh,

24   shoot, she is going to say something to me.

25        And she looked down at my feet, and she said, Those are

1    really comfortable, aren't they?

2          And I said, Yeah.

3          I wasn't expecting that from her.

4          So, I gave her the money.  And I sat back down.  And

5    then she was just sitting in there in the dining room with her

6    coat on.  She just had this -- She is just sitting there like

7    this.  And then she got up, and she walked over to Marcysia.

8    And she stood over Marcysia -- She stood over Marcysia, and she

9    had her arms on her, her hands on her shoulder.  And Marcysia

10   is like, I'm going with you, Mom.

11         And Crystal is like, No, you're not going.

12         Marcysia is like, Why?

13         She said, You've got to stay here and watch the pizza.

14         Marcysia said, Well, Grandma can watch the pizza.

15         She said, No.  You stay here.

16         And she told her that she loved her.  And then, when she

17   walked to the front room and she went to go out the door, she

18   put her hand on the doorknob.  And she was standing there, just

19   looking at me with this glaze, like she wanted to say

20   something.  And I looked at her like -- like I'm saying, like,

21   Yeah, Crys, I love you, too.  But I didn't say it.  It's just

22   that look.  And it seemed like it lasted forever, but she

23   walked out the door.  She never came back in.

24         And she went to go get the pizza.  And I don't know how

25   much time, whatever time it took to go get a pizza.  But Cysia

TRIAL ONE - VOL. 23 -  4697

1    was sitting in the dining room, and I was in the front room.

2    And it was around seven -- seven-forty-eight, because I was

3    texting Danny, and he was telling me about a fire out there,

4    because I thought about going to his house.  And I was just

5    going to wait until Crys came home.  But we heard a -- we heard

6    this shot.  And Cysia is like, Grandma!

7         And I jumped up.  And I said, Don't look out the window.

8         And I turned the light off, and she opened the blind,

9    and she screamed, Mom!

10         And she went running out the door.  And Crystal was

11   laying on the ground.  And I'm touching her, her body.  And I

12   rolled her over.  And her eyes were open, and I saw the shot,

13   gunshot, right here.  And Cysia took off running, screaming,

14   Why did you do this to my mom?  Why did you do this to my mom?

15         And I'd picked up the phone to call 911 from her phone,

16   but it was -- it was locked.  So I ran in, and I got my phone

17   and came back out.  And I called 911, and I told them to send

18   help.  And I heard them ask if there was -- if I could feel a

19   pulse.  But there was a man standing -- I don't know where he

20   came from.  And I just couldn't check to see if she had a

21   pulse, and I gave the phone to him.

22         She was gone.  Her eyes were open, and she was gone.

23          MR. KELLEY:  May we take a moment, Your Honor?

24          THE COURT:  Yes.

25      (Whereupon, there was a brief interruption.)

TRIAL ONE – VOL. 23 – 4698

1        MR. KELLEY:  If I may have a moment, Your Honor?

2        THE COURT:  Yes, you may, Mr. Kelley.

3     (Whereupon, there was a brief interruption.)

4   BY MR. KELLEY:

5   Q    Ms. Fyffe, I know it's difficult.  I just want to ask

6   you a few more questions.  Okay?

7        THE COURT:  Ms. Fyffe, do you need more time?  If you

8   need some more time, we can take a break here.

9        THE WITNESS:  No.

10        THE COURT:  All right.  Please continue, Mr. Kelley.

11        MR. KELLEY:  Thank you, Your Honor.

12   BY MR. KELLEY:

13   Q    Ms. Fyffe, who did you think was responsible for what

14   happened to Crystal?

15   A    Brandon.

16        MR. BERNDT:  Objection.

17        THE COURT:  Basis?

18        THE WITNESS:  I knew he --

19        THE COURT:  Just a minute.

20     Go ahead.

21        MR. BERNDT:  Your Honor, I believe it would be outside

22   of her knowledge, and I don't believe her opinion as to her

23   daughter's cause of death --

24        THE COURT:  Side-bar.

25

TRIAL ONE – VOL. 23 –  4699

1                                   – – –

2        (Thereupon, the following proceeding was held at side-bar.)

3              THE COURT:  Go ahead.

4              MR. BERNDT:  Sorry.  Your Honor.

5              THE COURT:  Go ahead.

6              MR. BERNDT:  She was asked who she thinks murdered her

7     daughter.  And I don't believe that her opinion as to who

8     murdered her daughter is relevant.  And I think that who is

9     proved to be the person that murdered her daughter is relevant,

10    and that's for the jury to decide.

11             THE COURT:  Why should she be in a position, or why is

12    she is in a position, to give that kind of opinion evidence,

13    Mr. Kelley?

14             MR. KELLEY:  I would suggest because she was aware of

15    threats against her daughter's life and that she can basically

16    narrow down who she believes the suspect was.  I was specific

17    and said only who she believes, not who did it, but who she

18    believes did it.

19             THE COURT:  All right.  I'm going to sustain the

20    objection.

21        (The following proceedings were had in open court.)

22             THE COURT:  Please continue.

23             MR. KELLEY:  Thank you, Your Honor.

24      BY MR. KELLEY:

25      Q    Ms. Fyffe, after all this was over and in the years that

TRIAL ONE – VOL. 23 – 4700

1  followed, did you gather up some of Crystal's items and give

2  them to law enforcement?

3  A    Yes.

4  Q    Do you remember what some of those items were?

5  A    Letters.

6  Q    Did your family also gather up photographs and bills and

7  thing like that?

8  A    Yes.

9  Q    Who did they give them to?

10 A    The law enforcement.

11     MR. KELLEY:  I have no further questions, Your Honor.

12 Thank you.

13     THE COURT:  Cross-examination, Mr. Berndt?

14     MR. BERNDT:  Thank you, Your Honor.

15                         – – –

16                   CROSS-EXAMINATION

17 BY MR. BERNDT:

18 Q    Ms. Fyffe, I want to start by apologizing to you that

19 I'm in a position to have to ask you some questions.  Okay?

20 A    Yes.

21 Q    I want you to feel free to take any breaks that you want

22 to take.  And I want you to understand that I have a deep sense

23 of loss about your loss.

24     Ma'am, your daughter met Mr. Ledbetter at

25 Mr. Ledbetter's place of employment; is that correct?

TRIAL ONE - VOL. 23 -   4701

1    A    Yes.

2    Q    Okay.  And she actually worked with Robert, correct?

3    A    Yes.

4    Q    Your daughter, prior to meeting Mr. Ledbetter, was

5  involved with a gentleman by the name of Donald Tisdale.  Is

6  that correct?

7    A    I've never met him, but I know she was seeing someone

8  else before Brandon.

9    Q    Does the name mean anything to you?

10   A    Not Tisdale.  I just know a Don.

11   Q    Do you know what line of work Don was in?

12   A    No.

13   Q    Did she ever tell you whether he had a job?

14   A    No.

15   Q    You stated in your direct examination that you met

16  Robert at Cysia's sixth birthday --

17   A    Yes.

18   Q    -- at the party?  Where was the party held?

19   A    A hotel, I believe.

20   Q    Did Mr. Ledbetter pay for the party?

21   A    Yes.

22   Q    And did Mr. Ledbetter support Crystal, financially,

23  during the course of their relationship?

24   A    Yes.

25   Q    And did he take care of Cysia?

TRIAL ONE – VOL. 23 –   4702

1    A    Yes.

2    Q    Did he appear to be somebody who cared for Cysia?

3    A    Yeah.

4    Q    Cared for Crystal?

5    A    It seemed to be like that.

6    Q    And that went on for a number of years, correct?

7    A    Yes.

8    Q    Mr. Ledbetter also helped you out financially, too; did

9    he not?

10   A    No.

11   Q    No?

12   A    No, sir.

13   Q    Okay.  You spoke of this incident that occurred in 2009

14   where your daughter was shot in the hand.  Do you remember

15   speaking about that?

16   A    Yes.

17   Q    And I think that you said that you were surprised that

18   there weren't news reports on it.  Do you remember saying that?

19   A    Yes.

20   Q    And you were surprised that there was no police

21   involvement, correct?

22   A    Yes.

23   Q    Okay.  Are you aware that Crystal spoke to the police?

24   A    I was aware afterwards.

25   Q    Are you aware that she spoke to the police about this

1    incident the day that it happened?

2    A    I was told that she talked to the police.

3    Q    Were you told that that was on the day that it occurred?

4    A    I do not remember, because I lost my mother.

5    Q    I understand.  And were you aware that she told the

6    police what you were initially told by her?

7    A    Yes.

8    Q    Okay.  When you went to the hospital to see your

9    daughter, there was a phone call, correct?

10   A    Yes.

11   Q    The phone call that you took on Crystal's phone,

12   correct?

13   A    Yes.

14   Q    And I believe that you told the police that that was

15   from an individual named Del.  Does that ring a bell?

16   A    I -- Del?  Don?  I don't really remember the --

17   Q    Do you remember --

18   A    The situation --

19   Q    I'm sorry.

20   A    The situation that day was --

21   Q    Chaotic, I'm sure.  But do you remember telling the

22   police that Del is an individual who Crystal traveled to New

23   York with?

24   A    What -- what -- what time are you talking about?  After

25   my daughter was shot?

TRIAL ONE – VOL. 23 – 4704

1    Q    Well, this is a statement that I have that you made on

2    October 1st, 2015, about what occurred in the hospital room

3    when your daughter was shot on January 17th of 2009.

4    A    My daughter was shot October 19th.

5    Q    I meant in the hand.

6    A    My daughter went to New York with a guy.

7    Q    Do you remember when you took that call that Crystal was

8    upset?

9    A    Yes.

10   Q    She actually asked you to leave the hospital room?

11   A    Yes.

12   Q    She told you that you didn't know what you did?

13   A    Yes.

14   Q    And you told the police that that was a phone call from

15   somebody named Del?

16   A    I didn't talk to the police during that time about the

17   gunshot.

18   Q    I meant in October of 2015 when you spoke to the police.

19   A    I don't remember even talking to the police, is what I'm

20   trying to -- because there was -- I don't remember talking to

21   the police in October 15th -- on October 15th of 2011, because

22   I don't remember having a reason to talk to them.  My daughter

23   wasn't shot until October 19th.  That's the only time when I

24   talked to the police.  So, I don't remember this conversation.

25   I guess that's what I'm trying to say.

TRIAL ONE – VOL. 23 –   4705

1      Q     I think I can clear it up.

2      A     Thank you.

3      Q     I refer to the police as prosecutors, as well as

4   uniformed police officers.  So that's my fault.  But I have a

5   statement here in front of me that says that, on October 1st of

6   2015 --

7      A     Oh, okay.  You said '15.

8      Q     Right.  And that would be a statement that you made to

9   people at the FBI office at 425 Nationwide Boulevard,

10  Mr. Bajus, Special Agent Erick Lauber, Detective Mitch Seekman,

11  Assistant United States Attorneys DeVillers, Martinez, and

12  Kelley.  Do you remember that statement?

13     A     I talked to them.  And if I said that on the statement,

14  then that's what I said.

15     Q     I just want to make sure that I understand what you

16  said.

17           That there was a phone call that came in on Crystal's

18  phone when you were at the hospital when she was shot in the

19  hand in 2009 --

20     A     Yes.

21     Q     -- do you remember that?

22     A     Yes.

23     Q     Do you remember telling these gentlemen that you

24  answered the phone and told Del that Crystal had been shot and

25  was in the hospital?

TRIAL ONE - VOL. 23 -  4706

1   A    I told them about the phone call.  I don't remember if I

2   said "Del" or not.  But, yes, I did tell them about the phone

3   call.  And she got upset because I told him that she was in the

4   hospital.  That's what I said.

5   Q    Do you remember stating that Del is an individual who

6   Crystal traveled to New York with but that you did not believe

7   that he was an associate of Mr. Ledbetter?  Do you remember

8   telling them that?

9   A    She went to New York.  She was trying to leave Brandon,

10  is what she told me.  She came back.  And then that's when he

11  held her and shot her.

12  Q    And did you remember telling the prosecutors that

13  Crystal asked you if you knew what you just did?

14  A    Yes.

15  Q    Okay.  And then she asked you to leave?

16  A    Yes.

17  Q    Okay.  Do you know who this person is that she traveled

18  with to New York?

19  A    I never met Crystal's friends like that.

20  Q    Do you know what she was doing in New York?

21  A    No, I don't.

22  Q    Okay.  Do you know if she has any friends or family in

23  New York?

24  A    No, she doesn't.

25  Q    Okay.  You said that, after Crystal was shot in the

TRIAL ONE - VOL. 23 -  4707

1   hand, that you came home, and you saw Mr. Ledbetter at your

2   house, and that surprised you?

3   A    Yes.

4   Q    Okay.  So that is the house at 614 Belvedere?

5   A    Yes.

6   Q    So, shortly after January of 2009, Mr. Ledbetter knew

7   where you lived, correct?

8   A    Yes, he knew.

9   Q    Did he come to the house on other occasions?

10   A    That's the first time Brandon has ever been in my house

11   with me being in my house.  He has never been in my house.  If

12   he was ever in my house, it was when I wasn't there.  But while

13   I was there, he was never in my house except for that one time.

14   Q    Okay.  And then he took Crystal to Hawaii, correct?

15   A    Yes.

16   Q    Very close to her birthday, correct?

17   A    Yes.

18   Q    And her birthday is August 3rd, correct?

19   A    Yes.

20   Q    So that would be seven months after the shooting

21   incident occurred, correct?

22   A    Yes.

23   Q    Okay.  You said that things changed in regard to Crystal

24   after Robert Ledbetter was arrested in May of 2011.  Do you

25   remember testifying to that?

TRIAL ONE - VOL. 23 - 4708

1    A    February?  He got arrested in February of 2011?

2    Q    I believe it was May, but we'll use --

3    A    Okay.  Okay.

4    Q    Okay?

5    A    Yeah.

6    Q    Okay.  Thank you.

7    A    February was the first time she told me he was running

8    from the police for the Pickerington.

9    Q    Right, that he was a fugitive at that point, correct?

10   A    Right.  Right.

11   Q    And did she tell you -- Do you remember telling the

12   prosecutors that you thought that she had seen Mr. Ledbetter

13   after he became a fugitive?

14   A    I told her, I sure hope you're not doing nothin' for him

15   because he is and she would get in trouble if she was.

16        Then she told me she wasn't.  If she did -- I'm sure she

17   did because she had to come up with the $30,000 she got from

18   someone.

19   Q    So you do believe that she saw Mr. Ledbetter after

20   February of 2011 but before he was arrested?

21   A    Yes.

22   Q    I believe that my memory of your direct testimony was

23   that she started telling you things after she had hired a

24   lawyer?

25   A    Yes.

TRIAL ONE – VOL. 23 –   4709

1    Q    You spoke about the blue car.

2    A    Yes.

3    Q    Okay.  And you said that you didn't believe it was

4    stolen; is that right?

5    A    I said I didn't believe it was.

6    Q    Now, my understanding of your testimony was that the

7    vehicle was at somebody else's residence.

8    A    Yes.

9    Q    And that you were informed at some point that there was

10   an insurance claim made?

11   A    I found a paper that showed she had got insurance for

12   the vehicle.

13   Q    And that the vehicle had been stolen and wrecked?

14   A    Yes.

15   Q    Now, Crystal started telling you things after

16   Mr. Ledbetter was arrested in May of 2011 and after she

17   retained Mr. Palmer's services, but she didn't tell you

18   anything about this vehicle not being stolen, did she?

19   A    I can't remember if she said anything, before or after

20   that, about the vehicle as far as the date.

21   Q    Now, there was some money that was at your house,

22   correct?

23   A    Yes.

24   Q    Okay.  And I believe that the money was seized on May

25   26th of 2011, correct?

TRIAL ONE – VOL. 23 –   4710

1    A    Yes.

2    Q    Did you see that money come into your house?

3    A    I didn't see the money come into my house, but I did see

4    the money in my house.

5    Q    Okay.  And were you told by Crystal that that money came

6    from Brandon?

7    A    I was told that the money was for Brandon to go up to

8    pay his attorney and 10,000 for her attorney.

9    Q    So that's a "yes" that you were told that the money came

10   from Brandon?

11   A    Yes.

12   Q    Okay.

13   A    It was Brandon's money.  It couldn't have came directly

14   from Brandon, because he was in jail, but it was Brandon's

15   money.

16   Q    Okay.  And Crystal told you that?

17   A    Yes.

18   Q    You mentioned somebody named "Santa," right --

19   A    Yes.

20   Q    -- that Crystal was afraid of, correct?

21   A    Yes.

22   Q    And you mentioned that Santa was the person that

23   Mr. Ledbetter would go to to get things done, correct?

24   A    Yes.

25   Q    So, from what you understand about that, Mr. Ledbetter

1  has been involved in a series of crimes with Santa?

2  A    I would -- From what she said, that -- she must have

3  believed it, or she wouldn't have been so scared, which made me

4  scared.

5  Q    I understand.  But the impression that you got from

6  Crystal about the relationship between Robert Ledbetter and

7  this person we're referring to as Santa was that they engaged

8  in a series of ongoing criminal acts?

9  A    Yes.

10 Q    Okay.  So, if Mr. Ledbetter committed a robbery, based

11 upon what your daughter told you, you would believe that

12 probably would involve Santa?

13 A    No.  I didn't say that.

14 Q    I'm not -- I'm not saying you did say that.

15 A    No.

16 Q    You wouldn't believe that?

17 A    Will you ask me the question?

18 Q    Well, I'm just asking you whether or not you believe

19 that Mr. Ledbetter -- based upon what you heard from your

20 daughter, that Mr. Ledbetter and Santa committed crimes

21 together?

22 A    Yes.

23 Q    Okay.  Did she impart to you what types of crimes they

24 committed together?

25 A    She said that he would use him to take care of business.

TRIAL ONE – VOL. 23 –  4712

1   Q    Okay.  That was the extent of it?

2   A    From what I recall.

3   Q    Okay.  There was some items that were turned over to law

4   enforcement after Crystal's death, correct?

5   A    Yes.

6   Q    Okay.  Some letters?

7   A    Yes.

8   Q    Okay.  Some letters that were received by Crystal?

9   A    Yes.

10  Q    From Mr. Ledbetter?

11  A    Yes.

12  Q    As well as letters that Crystal wrote to Mr. Ledbetter,

13  correct?

14  A    Yes.

15       MR. BERNDT:  Your Honor, if I could just have one

16  moment?

17       THE COURT:  Yes, you may, Mr. Berndt.

18       MR. BERNDT:  Thank you.

19    (Whereupon, there was a brief interruption.)

20  BY MR. BERNDT:

21  Q    You testified that there was a person named Leah

22  Hilliard who was in the hospital room with Crystal when she was

23  shot in January of 2009.

24  A    Yes.

25  Q    Have you talked to Leah Crystal, or, I mean, Leah

TRIAL ONE – VOL. 23 – 4713

1   Hilliard, about what happened in regard to Crystal in January

2   of 2009?

3   A   Yes.

4   Q   Okay.  Was she with Crystal when the incident occurred?

5   A   No.

6   Q   Do you know if law enforcement ever talked to Leah

7   Hilliard?

8   A   I don't know.

9   Q   We're almost done, ma'am.  I apologize.

10      You mentioned that, the day before Crystal passed, that

11  she was asked to come, or to go, somewhere.  Where was she

12  asked to go?

13  A   Brandon's aunt's house.  Aunt Paulette, I believe it

14  was.

15  Q   And you said that Crystal believed that she was being

16  lured out?

17  A   Yes.

18  Q   Mr. Ledbetter knew where you lived in 2009; did he not?

19  A   Yes.

20      MR. BERNDT:  Thank you, ma'am.  Again, thank you.

21      THE COURT:  Mr. Gatterdam?

22      MR. GATTERDAM:  No questions.

23      THE COURT:  Ms. Dixon?

24      MS. DIXON:  No questions.

25      THE COURT:  Mr. Meyers?

TRIAL ONE – VOL. 23 –  4714

1          MR. MEYERS:  No questions, Your Honor.

2          THE COURT:  Mr. Nolder?

3          MR. NOLDER:  No questions.

4          THE COURT:  Any redirect, Mr. Kelley?

5          MR. KELLEY:  Yes, Your Honor.

6          THE COURT:  All right.

7                         – – –

8                  REDIRECT EXAMINATION

9     BY MR. KELLEY:

10    Q     Ms. Fyffe, did Crystal ever explain to you why she got

11    so upset at the hospital over that phone call?

12    A     Yes.

13    Q     What did she tell you?

14    A     Because Brandon had shot her, and she was scared, and

15    that that was -- I, by telling him, was going to cause more

16    trouble.

17    Q     Was anyone else at the hospital that you saw besides

18    Leah?

19    A     Yes.

20    Q     Who else was at the hospital?

21    A     When I left, a black girl, with a little boy, was

22    walking in.  And Crystal told me, later on, that that was

23    Brandon's sister, and she was there to make sure that, if the

24    cops came, that she would not talk to the cops about what had

25    happened.

TRIAL ONE - VOL. 23 -  4715

1          MR. KELLEY:  I have no further questions, Your Honor.

2          THE COURT:  Mr. Berndt, any recross?

3          MR. BERNDT:  Very briefly, Your Honor.

4                              - - -

5                       RECROSS-EXAMINATION

6    BY MR. BERNDT:

7    Q    Ms. Fyffe, I just want to make sure that I understand.

8    Crystal didn't start telling you the truth about things until,

9    basically, May of 2011, her truth, correct?

10   A    Did you say "her truth"?

11   Q    Yes.

12   A    The truth is what she told me, yes.

13   Q    Okay.  In May of 2011?

14   A    I don't -- I didn't say May of 2011, but --

15   Q    Okay.  Go ahead.

16   A    She told me the fact after -- not in 2009.  She told me

17   after Brandon was in jail.  That's when she told me.

18   Q    I understand.  And the phone call which occurred in the

19   hospital room was in 2009?

20   A    Yes.

21   Q    Did Crystal tell you what kind of trouble occurred,

22   because of that phone call, between 2009 and 2011, because I

23   believe your statement was your disclosure to this person on

24   the phone was going to cause more trouble?  Was there any more

25   trouble?

TRIAL ONE - VOL. 23 -  4716

1    A    To -- I believe Crystal's thing was that, if Brandon

2   knew that she had went to New York with this guy, it was going

3   to cause trouble.

4    Q    Okay.

5    A    And that's why she said, You just don't know what you

6   did.

7         She just got shot in the hand, and she was scared.  I

8   don't -- I don't know what else -- I mean --

9    Q    That's fine.  I just have a couple more questions for

10  you.

11        The night that Crystal was shot in the hand, you said

12  that Mr. Ledbetter didn't stay at the hospital, correct?

13   A    No.  He dropped her off and left.

14   Q    And he told you that he was out looking for the shooter,

15  correct?

16   A    That's what he told me.

17   Q    Okay.  And a relative of his was at the hospital,

18  correct?

19   A    When I was leaving, his sister was walking in, because

20  she had told me to leave.  I was not in that hospital room,

21  probably for ten minutes, and she had told me to leave.

22   Q    That was, Crystal told you to leave?

23   A    Because I upset her because I answered the phone.

24   Q    Brandon's relative did not ask you to leave, correct?

25   A    No.  As I was walking out, she was walking in.

TRIAL ONE – VOL. 23 – 4717

1   Q   Okay.  Okay.  With a child?

2   A   With a child.

3   Q   Okay.  A relative --

4   A   His sister.

5   Q   A relative visiting somebody that he cared for, correct?

6   A   If that's what you want to call it, then --

7   Q   Had you ever met his sister before?

8   A   No.

9       MR. BERNDT:  Okay.  Thank you.

10      MR. KELLEY:  No further questions, Your Honor.  Thank

11  you.

12      THE COURT:  Ms. Fyffe, thank you very much, ma'am.

13  You may be excused.

14      MR. DEVILLERS:  May we approach, Your Honor?

15      THE COURT:  Yes.

16              – – –

17   (Thereupon, the Court and Counsel conferred out of the

18  hearing of the court reporter.)

19   (The following proceedings were had in open court.)

20      THE COURT:  Ladies and gentlemen, that will conclude

21  our proceedings for today.  There was an additional witness who

22  became ill who was scheduled to testify today and complete our

23  day of taking evidence but, because of the illness, was not

24  able to come.  So, we will resume, tomorrow morning, at 9:00

25  a.m.  And, hopefully, by the end of this week, I'll be able to

TRIAL ONE - VOL. 23 - 4718

1  confer more about the schedule. But what I told you earlier

2  about your likely getting the case the first week of June

3  remains the case. But I just want to be able to tell you more

4  precisely what our schedule will be going forward.

5      Ladies and gentlemen, thank you, again, for your

6  patience and attentiveness. Enjoy your evening drive, safely,

7  going home. I look forward to seeing everyone first thing

8  tomorrow morning.

9      (Jury out at 3:27 p.m.)

10      THE COURT: Mr. Devillers, so, in light of today's

11  testimony, will the witness who did not appear today, will he

12  or she come in tomorrow?

13      MR. DEVILLERS: Probably. We don't know yet. He's in

14  Kansas City, Your Honor. So we're trying to get him back. I

15  am guessing it will be next week, but we'll see.

16      THE COURT: All right. Are we still, then, looking at

17  your completing your case on or about the 26th?

18      MR. DEVILLERS: I would say before that.

19      THE COURT: Okay.

20      MR. DEVILLERS: I'm confident, relatively confident,

21  that we will be done before the 26th. That means I believe we

22  can be finished on Wednesday, the 25th.

23      THE COURT: Okay. And if that's the case, then

24  defense would go on the 26th and the 1st. The 31st, that's

25  right.

TRIAL ONE - VOL. 23 -  4719

1    Do you think, from the defense perspective, that we will

2  take -- if you begin your case in chief on the 26th, that

3  you'll be done with your presentation of evidence by close of

4  business on the 31st, or sometime earlier, maybe by noon on the

5  31st?  Any thoughts, Mr. Berndt?

6         MR. BERNDT:  Your Honor, I can only speak for myself.

7         THE COURT:  Right.

8         MR. BERNDT:  I do believe I'll be calling a few

9  witnesses.  I don't believe they'll be lengthy, maybe a half

10  day.

11         THE COURT:  Since you'll be going first, then, and

12  your witnesses will start on the 26th, do you have enough

13  witnesses to fill the 26th, or just partially?

14         MR. BERNDT:  I would -- I would say that, probably not

15  the whole day.

16         THE COURT:  Okay.  All right.

17      Would you go beyond lunchtime, do you think?

18         MR. BERNDT:  It's possible.  I think that, if it was,

19  it wouldn't be much.

20         THE COURT:  All right.  Gotcha.

21      Mr. Gatterdam?

22         MR. GATTERDAM:  Your Honor, I think the problem is

23  that, while we may not have witnesses beyond -- We have two

24  experts, and I believe they started to make arrangements to be

25  here on -- I believe it would be Tuesday.  And one of them, I

TRIAL ONE – VOL. 23 – 4720

1  think, is renting a car.  The other, I think, would be flying.

2  So that's the only issue with switching that up.  So we'd have

3  to have further discussions with them.  And that's now about a

4  week out.

5       THE COURT:  Okay.  Ms. Dixon?

6       MS. DIXON:  We don't.

7       THE COURT:  I'm coming back to you, Mr. Gatterdam.

8       MR. GATTERDAM:  Understood.

9       THE COURT:  Let's say that Mr. Berndt puts on his

10 witnesses and they take half of the day on Thursday.  Your

11 experts aren't here yet.  So I could go on to Mr. Liston's

12 witnesses, if any.

13      MS. DIXON:  Your Honor, we pretty much presented our

14 defense through cross-examination.

15      THE COURT:  Okay.

16      MS. DIXON:  So we won't have any.

17      THE COURT:  That's fine.

18   Mr. Meyers or Mr. McVay?

19      MR. McVAY:  Your Honor, at this point, we're not

20 anticipating calling witnesses.

21      THE COURT:  All right.

22   Mr. Nolder.

23      MR. NOLDER:  I don't, either, Your Honor.

24      THE COURT:  Okay.

25      So, here is what I would like for you to do, since the

TRIAL ONE - VOL. 23 - 4721

1  experts are being -- we're paying for the experts, the Court

2  is, as Mr. Harris is indigent.  Maybe we should see if we can

3  get them -- One is driving?

4          MR. DURKIN:  Your Honor, he's -- we have

5  moved -- Originally, we had believed that June 6th was when the

6  defense would be made.  And, fortunately, now it's earlier than

7  that.  So our witness has said that, given the short period of

8  time, he said:  I'll reserve -- I'm going to rent a car on

9  Sunday.

10          THE COURT:  Where is he coming from?

11          MR. DURKIN:  He's coming from Virginia.  And I don't

12  remember the name of the town, but it's near Richmond, Your

13  Honor.  The other witness who is from California, I am still

14  trying to work out the logistics of that.  He has other

15  commitments, other cases, he is supposed to testify for.  But

16  he said he would -- he understood that we had to move it from

17  the 6th to the Tuesday after Memorial Day.  He said, I will

18  make it work.

19          THE COURT:  All right.  Here is what I -- Here is what

20  I ask you to do:  The one who is driving, obviously, has some

21  flexibility.  Why not have him here for Thursday?  Then you

22  could put your other expert on on Tuesday morning.  And then

23  we'll be done with the defense case, probably, by Tuesday,

24  noon.  And we could start closing arguments Tuesday, noon.  And

25  that will give us ample time to get closing arguments completed

TRIAL ONE - VOL. 23 - 4722

1   by Thursday, noon, which has now become my goal, because that's

2   when we have to allow Juror #10 to leave for his daughter's

3   graduation.  And then we can come back Friday morning, the 3rd.

4   And I can charge the jury, and they can begin.  So that would

5   be the schedule that I would prefer.

6        MR. DURKIN:  Your Honor, obviously, I would like to

7   consult with the experts as to what other court commitments

8   they have and report back to you on that matter.  I understand

9   the Court's -- what the Court wants.  And I will certainly

10  convey that to them.  And it's great that we're getting done

11  faster than we anticipated, but it's been a moving target.  And

12  we're trying to work with it.

13       THE COURT:  No.  I understand.  And I understand that

14  experts can be in demand.  But, as I said, the California

15  expert appears to understand that he's going on on Tuesday.  So

16  we're not -- I'm not asking you to change anything that was not

17  already in place.

18       The Virginia expert, you know, the Court is going to pay

19  for his travel anyway.  So whether he's flying or driving,

20  since the Court is paying for it anyway, I would just as soon

21  as fly him in, get him in here for Thursday, have him testify

22  on Thursday and be done with it, as opposed to wasting half a

23  day on Thursday, and then that throws us off otherwise.

24       So, what I'm going to direct you to do is to direct the

25  Thursday expert, the driving expert, to get here, by car or

TRIAL ONE - VOL. 23 - 4723

1   flight, for testimony beginning either late morning or early

2   afternoon Thursday.  So, he should prepare to be here Wednesday

3   night, because, you know, I don't want -- you know, at this

4   point I would prefer not to have -- since we're talking about

5   just two witnesses, there is no need to waste, waste, waste a

6   day with respect to that.

7        So, let's make that happen, Mr. Durkin.  You can report

8   back to the Court sometime before close of business tomorrow as

9   to any issues with the Virginia expert.  And I'd be happy to

10  talk to him and explain to him the necessity of him being here

11  on Thursday, why we need him here on Thursday.  I would be more

12  than happy to do it.  Do it all the time.

13       MR. DURKIN:  Thank you, Your Honor.

14       THE COURT:  Now, is there anything else that we need

15  to cover on the schedule?  I think we're pretty good.  And once

16  this final piece of the puzzle, Mr. Durkin, is put in place, I

17  can even advise the jury as to what our schedule will be.  And

18  then you all will know what your schedule will be so that you

19  can prepare, accordingly, for closing arguments.

20       But based on what you told me, if we start closing

21  arguments Tuesday afternoon, we should be done, at the latest,

22  by noon on Thursday, because we have all day Wednesday to go.

23  And then I'm going to have the jury come in on Friday to begin

24  deliberations.

25       Mr. Devillers, anything?

TRIAL ONE – VOL. 23 –  4724

1          MR. DEVILLERS:  Your Honor, we have the Exhibit 31-31,

2    the ballistic report.

3          THE COURT:  Would you give that to Ms. Clark?

4        Ms. Clark, I'll have you -- You can just distribute it.

5          MR. DEVILLERS:  I'll give it to Ms. Clark.

6          THE COURT:  Okay.  Thank you.

7        Thank you, Mr. Devillers.

8          MR. DEVILLERS:  You're welcome, Your Honor.

9          THE COURT:  Is there anything else from the

10   government?

11         MR. DEVILLERS:  There is not, Your Honor.

12         THE COURT:  Mr. Durden?

13         MR. DURDEN:  No, Your Honor.  Thanks.

14         THE COURT:  Mr. Gatterdam?

15         MR. GATTERDAM:  No, Your Honor.

16         THE COURT:  Ms. Dixon?

17         MS. DIXON:  No, sir.

18         THE COURT:  Mr. McVay?

19         MR. McVAY:  No, sir.

20         THE COURT:  Mr. Nolder?

21         MR. NOLDER:  No, sir.

22         THE COURT:  Have a good evening, everyone.  I'll see

23   everyone tomorrow.

24        (Proceedings were concluded at 3:30 p.m.)

25                              - - -

```
                                       TRIAL ONE - VOL. 23 -  4725

 1                             - - -

 2                        WITNESS INDEX

 3                             - - -

 4     WITNESSES              DIRECT   CROSS   REDIRECT   RECROSS

 5     PLAINTIFF'S:

 6     Timothy Maclellan       4505    4514
       Keith Leighton          4517    4533     4540       4541
 7     Steven Palmer           4542    4573     4619       4624
          By Mr. Gatterdam             4608                4626
 8        By Ms. Dixon                 4612                4628
          By Mr. Meyers                4617
 9     (Further)                                4630       4631
       (Further By Mr. Gatterdam)                          4631
10     (Further By Ms. Dixon)                              4634
       Timothy Duerr           4642    4651     4664
11     Eileen Fyffe            4670    4700     4714       4715

12                             - - -

13                      INDEX OF EXHIBITS

14                             - - -

15     PLAINTIFF'S:                                      RECEIVED

16     31-5                                                4647
       84-2#-002 THROUGH 84-2#-034                         4511
17

18

19

20

21

22

23

24

25
```

TRIAL ONE – VOL. 23 –  4726

1                          C E R T I F I C A T E

2

3          We, Shawna J. Evans, Denise N. Errett, do hereby

4    certify that the foregoing is a true and correct transcript of

5    the proceedings before the Honorable Algenon L. Marbley, Judge,

6    in the United States District Court, Southern District of Ohio,

7    Eastern Division, on the date indicated, reported by us in

8    shorthand and transcribed by us or under our supervision.

9

10

11                              s/Shawna J. Evans
                                Shawna J. Evans, RMR
12                              Official Federal Court Reporter

13

14                              s/Denise N. Errett
                                Denise N. Errett, RPR FCRR
15                              Official Federal Court Reporter

16

17

18                              May 18, 2016

19

20

21

22

23

24

25